AO 440 (Rev. 8/01) Summons in a Civil Action

2008-002253

# UNITED STATES DISTRICT COURT

_____Eastern_____ District of ___New York___

CY GREENE,                                 Plaintiff,

v.

THE CITY OF NEW YORK; NEW YORK CITY TRANSIT
AUTHORITY; DETECTIVES OR FORMER DETECTIVES
MICHAEL NORRITO (Shield No. 3736) and JOSEPH
TUMBARELLO (Shield No. 883), in their individual
and official capacities; FORMER ASSISTANT
DISTRICT ATTORNEY ROBERT SULLIVAN, in his
individual and official capacities; CHARLES
J. HYNES, DISTRICT ATTORNEY, KINGS COUNTY, in
his official capacity; and JOHN DOES, 1, 2, 3,
etc. and JANE DOES 1, 2, 3, etc. (whose identi-
ties are unknown but who are or formerly were
Police Officers and/or supervisory personnel
of the New York City Police Department and/or
Transit Authority Police Department), all
being sued in their individual and official
capacities,                                Defendants.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

CV 08          243

TO: (Name and address of Defendant)

The City of New York
Law Department of the City of New York
Office of Corporation Counsel
100 Church Street
New York, New York 10007

DEARIE, CH. J

POLLAK M

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue — Suite 1600
New York, New York 10016-1503

an answer to the complaint which is served on you with this summons, within ____20____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

ROBERT C. HEINEMANN                    ___January 16, 2008___
                                                    DATE

(BY) DEPUTY CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x

CY GREENE,

                           Plaintiff,

           -against-

THE CITY OF NEW YORK; NEW YORK CITY TRANSIT
AUTHORITY; DETECTIVES OR FORMER DETECTIVES
MICHAEL NORRITO (Shield No. 3736) and JOSEPH
TUMBARELLO (Shield No. 883), in their
individual and official capacities; FORMER
ASSISTANT DISTRICT ATTORNEY ROBERT SULLIVAN,
in his individual and official capacities;
CHARLES J. HYNES, DISTRICT ATTORNEY, KINGS
COUNTY, in his official capacity; and JOHN
DOES 1, 2, 3, etc. and JANE DOES 1, 2, 3,
etc. (whose identities are unknown but who
are or formerly were Police Officers and/or
supervisory personnel of the New York City
Police Department and/or Transit Authority
Police Department), all being sued in their
individual and official capacities,

                        Defendants.

------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 16 2008 ★

BROOKLYN OFFICE
Civil Action
No.

**VERIFIED**
**COMPLAINT**
**AND JURY DEMAND**

CV 08 243

DEARIE, CH.

         Plaintiff Cy Greene, by his attorneys Beldock Levine &
Hoffman LLP, alleges as follows for his complaint:

                 **PRELIMINARY STATEMENT**

         1.   This is a civil action to redress the deprivation,
under color of state law, of plaintiff's rights, privileges, and
immunities under the United States and New York State
Constitutions, including, without limitation, deprivation of his

- 1 -

state and federal rights to a fair trial, due process of law, equal protection, and freedom from unreasonable and unlawful seizures.

2.   This civil rights action is grounded upon defendants' wrongful and improper acts, primarily including, without limitation: false arrest, false imprisonment, malicious prosecution and related deceit and dishonesty; suppression and concealment of exculpatory evidence and related cover-up; conspiracy to cover-up, suppress and conceal exculpatory evidence; racially motivated conduct and related conspiracy; negligent and intentional infliction of emotional distress; negligent hiring, training, instruction, discipline and retention of police officers, detectives, other New York City employees and agents, and Kings County assistant district attorneys in regard to their constitutional and statutory obligations and responsibilities in conducting criminal investigations, making arrests, and pursuing prosecutions; and deliberate indifference to the need to establish and implement policies and procedures to protect persons from being wrongfully and unconstitutionally accused of and prosecuted for crimes.

## JURISDICTION

3.   This action is brought pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, 1988, the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article 1, §§ 1, 6, 11 and 12 of the Constitution of the State of New York, and the

statutory and common law of the State of New York.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the aforementioned statutory and constitutional provisions.  Plaintiff further invokes the supplemental jurisdiction of the Court to hear and decide claims arising under state law.

<u>**PARTIES AND RELATED PERSONS**</u>

4.    Plaintiff Cy Greene is a black male citizen of the United States of America.  At all relevant times, he was and is currently domiciled in the County of Kings, City and State of New York.

5.    Defendant City of New York ("City") is and was, at all times mentioned, a municipal corporation organized according to the laws of the State of New York.

6.    The New York City Police Department ("NYPD") is an agency of defendant City charged with the mission to "enhance the quality of life in [New York City] by working in accordance with constitutional rights to enforce the laws...".[1]

7.    Defendant New York City Transit Authority ("Transit Authority") is and was, at all times mentioned, a public benefit corporation organized according to the laws of the State of New York.

---

[1]    <u>Briefing Paper of the Governmental Affairs Division</u>, New York City Council, Committee on Civil Rights and Committee on Public Safety, January 24, 2007.

- 3 -

8.    Prior to March 31, 1995, the Transit Authority maintained its own police force, known as the New York City Transit Authority Police Department ("TAPD").

9.    Defendant Detective Michael Norrito (Shield No. 3736) was, at all relevant times, a City police officer assigned to the NYPD.  He is being sued in his individual and official capacities.  Whether he is currently a City police officer is unknown to plaintiff.

10.    Defendant Detective Joseph Tumbarello (Shield No. 883) was, at all relevant times, a police officer assigned to the TAPD who became a City police officer after the 1995 merger of the two police departments (the NYPD and the TAPD).  He is being sued in his individual and official capacities.  Whether he is currently a City police officer is unknown to plaintiff.

11.    Defendant Charles J. Hynes is, and he and his predecessors in office were, at all times relevant to the circumstances underlying the complaint, employed by the City as the Kings County District Attorney.  He is being sued in his official capacity and as the successor to such previous District Attorneys.

12.    Defendant Robert Sullivan was, at all times relevant to the circumstances underlying the complaint, employed by the City as an assistant district attorney ("ADA") in Kings County.  He is no longer an ADA.  He is being sued in his individual and official capacities.

- 4 -

13. The term "related persons" refers to individuals who participated in the wrongful conduct against plaintiff alleged in this complaint but who are not named as defendants because of immunity doctrines. Related persons includes Gerald Green and "Kathy" Plazner, who were each, at all times relevant to the circumstances underlying the complaint, employed by the City as an assistant district attorney ("ADA") in Kings County. Mr. Green, who is no longer an ADA, and Ms. Plazner, who, upon information and belief, is deceased, were respectively the pre-trial/trial prosecutor and the grand jury prosecutor.

14. Defendants John Does 1, 2, 3, etc., and Jane Does 1, 2, 3, etc., were, at all relevant times, police officers and/or supervisory personnel of the NYPD and/or TAPD. Their identities are as yet unknown to plaintiff, although they may include, depending upon facts developed during discovery proceedings, officers who were named Detective L. Rango (Shield No.: unknown), Detective V. K. Herlihy (Shield No.: unknown), Detective Eugene Collins (Shield No.: unknown), Detective Wecker (Shield No. 297), Detectives or Sergeants Hernandez, Stewart, Higgins and Shea (Shield Nos.: unknown), Lieutenant Gardella (Shield No.: unknown) and Lieutenant Arnenson (Shield No. 148). They are being sued in their individual and official capacities. Whether they are currently employed by the City as police officers or supervisory personnel is unknown to plaintiff.

15. At all times relevant to the circumstances underlying this complaint, upon information and belief, all police officer defendants were assigned to the 67th Precinct, located in the County of Kings, City and State of New York, including former TAPD Detective Tumbarello who was assigned to the investigation in this case in conjunction with 67th Precinct police officers.

16. At all times relevant to the circumstances underlying this complaint, and in all their actions described herein, all the individual defendants were acting under color of state law as agents, servants and employees of the defendants City and/or Transit Authority and under their direction and control.

17. Pursuant to the March 31, 1995 "Memorandum Of Understanding Among The Metropolitan Transportation Authority, The New York City Transit Authority And The City of New York On Merger Of The New York City Transit Authority Police Department And The New York City Police Department," the City agreed to "save harmless, indemnify and defend" the Transit Authority and its employees for damages and compensation arising from various prior and future events and related claims. The City's agreed liability included, without limitation, "any act taken or omitted to have been taken by a sworn member of the TAPD in the performance of his or her duties as a police officer or for which NYCTA may otherwise be held liable, in any such case with respect for an occurrence which took place prior to the merger date." Therefore, the City is

responsible to save harmless, indemnify and defend the Transit Authority and its police personnel with respect to the claims for damages and compensation being sought by plaintiff in this litigation due to the involvement of defendant Detective Tumbarello and/or any other pre-merger Transit Authority police personnel in the circumstances underlying this complaint; and is liable for the pre- and post-merger actions taken or omitted to have been taken by defendant Detective Tumbarello and/or other Transit Authority police personnel who were involved.

## ADMINISTRATIVE PROCEEDINGS

18.   On August 2, 2007, within ninety (90) days after the claims herein sued upon arose, plaintiff caused his sworn notice of claim, in proper form, to be duly served upon defendant City.

19.   Although more than thirty (30) days have elapsed since service of such notice of claim, the Comptroller and defendant City have neglected and/or refused to adjust or pay said claims.

20.   This action has been commenced within one year and ninety days after the causes of action set forth herein accrued and within the three-year statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. §§ 1983 and 1985(3).

## HISTORY AND PRELIMINARY STATEMENT

21.    The  following  factual  allegations,  except  for plaintiff's allegations about himself and his conduct, are made upon information and belief based on official police, prosecution and court documents, records and transcripts of testimony, and on post-conviction investigations by and/or under the supervision of Cy Greene's defense counsel in relation to the proceedings that led to dismissal of the charges.

22.    The unlawful charges brought against plaintiff and his unjust prosecution and conviction arose from the June 14, 1983 murder and robbery of John Choi.

23.    On June 24, 1983, plaintiff was indicted (Kings County Indictment No. 3521/83), along with co-defendant Larry Williams,  for  murder  in  the  second  degree  in  two  counts - intentional murder and felony murder - and for robbery in the first degree, in connection with the murder and robbery of John Choi on June 14, 1983.  Plaintiff was alleged to have stabbed Choi and caused his death.

24.    A pre-trial suppression hearing was held before Justice Joseph Lombardo in December 1984, at which defendant Detectives Norrito and Tumbarello testified.

25.    On May 8, 1985, following a jury trial held before Justice Michael L. Pesce in Supreme Court, Kings County, and after over two days of jury deliberations, plaintiff was acquitted of

- 8 -

intentional murder but convicted of felony murder and robbery in the second degree.

26. Plaintiff's co-defendant, Larry Williams, was convicted only of first degree robbery.

27. Plaintiff and Williams were represented by separate defense counsel.

28. At the 1985 trial, plaintiff presented defenses of mistaken identity, wrongful identification, and innocence. His contentions included the lack of credibility of the prosecution witnesses.

29. Various police and civilian witnesses testified, including, without limitation, plaintiff and an alibi witness on his behalf.

30. At the 1985 trial, the sole eyewitness who testified for the prosecution, Jae Hark Kim, identified plaintiff as the stabber.

31. Kim testified he was a friend of John Choi and was with him when Choi was attacked and robbed.

32. It was established at trial that Kim initially told the police the stabber was 6 feet tall and later reportedly said 5 feet 9 inches.

33. On June 14, 1983, Cy Greene was no taller than 5 feet 2 inches tall.

34.   That height difference of 10 to 7 inches between witness Kim's description of the stabber and Cy Greene's much shorter height was a crucial issue in the case.

35.   The height difference was a crucial discrepancy before plaintiff was arrested and continued to be so throughout all subsequent proceedings.

36.   The defendants and related persons knew from the time they contemplated taking plaintiff into custody that the height difference would have to be disregarded in determining whether there was probable cause to arrest plaintiff and would have to be undermined as an issue in order to charge and prosecute him.

37.   The defendants and related persons did both, and conspired to do so, by suppression and non-disclosure of exculpatory evidence favorable to plaintiff, by improper manipulation of evidence, by related deceits and falsifications regarding the perpetrator's and plaintiff's heights, and by manipulating and/or concealing of other significant factual evidence that developed from the arrest through grand jury and pre-trial proceedings and at trial.

38.   The individual defendants and related persons, upon information and belief, jointly engaged and assisted each other in carrying out the various actions described herein and further lent their presence and support to each other in furthering the aforementioned conspiracy by the acts described below.

39.  In regard to the height issue, the defendants and related persons accomplished their wrongful objectives through police and prosecutorial misconduct which resulted in plaintiff being wrongfully charged, prosecuted, convicted and incarcerated, including, but not limited to, acts and omissions described in this complaint.

40.  Without limiting the foregoing, defendants and related persons were able to wrongfully cause plaintiff to be indicted and prosecuted by concealing and not revealing the height differential issues in the presentation to the grand jurors; and were able to wrongfully obtain a conviction at trial by deceitfully contending to the petit jury that the height descriptions of the stabber given to the police in feet and inches were not meaningful because Kim was of Korean background and only understood measurements in meters and centimeters.

41.  The latter contention and plaintiff's conviction at trial would not have been possible, and, in any event, probably would not have been successful, but for the wrongful acts and omissions of defendants and related persons.

42.  Plaintiff's conviction resulted in his being sentenced on May 31, 1985 to concurrent terms of 15 years to life and 2 to 6 years.

- 11 -

43.    Plaintiff served his sentences at various New York State Correctional Facilities and in the City jail at Rikers Island until he was released in 2006.

44.    On January 4, 2006, after a proceeding commenced in December 2003 under New York State Criminal Procedure Law § 440.10, including evidentiary hearings during which witnesses' testimony and numerous documents were introduced, plaintiff's unlawful convictions were vacated in a Decision and Order by Justice Pesce, the same judge who had presided at the 1985 criminal trial.

45.    Plaintiff was then granted a new trial.

46.    Plaintiff was released from custody in January 2006, after having served over 22 and a half years in prison.

47.    The People appealed, seeking to reverse Justice Pesce's Decision and Order.

48.    On February 13, 2007, the Appellate Division affirmed the trial court's vacation of plaintiff's unlawful convictions. People v. Greene, 37 A.D.3d 615, 828 N.Y.S.2d 816 (2d Dep't 2007).

49.    The People's application for leave to appeal was denied by the Court of Appeals. 8 N.Y.2d 985 (2007).

50.    On June 11, 2007, on motion of the Kings County District Attorney's office, all charges against plaintiff were dismissed.

## FACTUAL ALLEGATIONS

51.   On the afternoon of June 14, 1983, John Choi and Jae Hark Kim, had come from Manhattan to the vicinity of the intersections of Nostrand and Church Avenues in Brooklyn, New York to look at a store for business reasons.

52.   Shortly after approximately 4:00 - 4:15 p.m., Kim and Choi entered the subway station at Nostrand and Church Avenues to return to Manhattan.

53.   They entered through a stairwell on Nostrand Avenue at the northwest corner of Nostrand and Church Avenues.

54.   On the other side of Nostrand Avenue there was another set of subway stairs to the platform for Manhattan bound trains, with an entrance on Church Avenue at the northeast corner of Nostrand and Church Avenues.

55.   As Kim and Choi were walking downstairs into the subway station, three or four young black men chased Choi down those stairs, across the subway platform, and up onto the first of two sets of stairs leading up to Church Avenue.

56.   Choi fell on that first set of stairs, where two or three of those young men attacked him while another of those young men physically confronted Kim on the subway platform, to block him from coming to Choi's aid.

- 13 -

57.   After Choi fell on the stairs, his assailants turned him over and took money from his pockets; and one of them stabbed him in the chest with a knife.

58.   All the crime perpetrators then fled from the station.

59.   Kim then carried Choi up to the street and took him to a nearby store at 1450 Nostrand Avenue, where they waited until police arrived.

60.   At the time of those events, Abdul Rahman was a vendor standing on the subway station platform at that Nostrand and Church Avenue station.

61.   Rahman had a stock of pantyhose to sell to people as they entered and exited the subway.

62.   Rahman witnessed the events described above and the interactions between and among Kim, Choi and their assailants, including seeing those assailants pass in front of him as they chased Choi on to the stairs where he fell and seeing them as they ran back across the platform station to flee by way of the stairs at the northwest corner of Nostrand and Church Avenues.

63.   After those events Rahman saw a knife on the stairs where Choi had been stabbed and picked it up, using a cellophane wrapper from a pair of the pantyhose that he had for sale.

64.   The first two police officers to respond to the subway crime scene were 67th Precinct Officers John Castricone

- 14 -

(Shield No. 7615) and Margaret Pilato (Shield No. 26061). Upon information and belief, Officer Pilato is deceased.

65. Officer Castricone entered the station where he saw and spoke to Rahman, who handed the cellophane wrapper with the knife to him.

66. Officer Castricone left the station and, along with Officer Pilato, found Kim and Choi at the store to which Kim had carried Choi. They assisted in arranging for Choi to be taken by ambulance to Kings County Hospital.

67. At approximately 7:00 p.m. on June 15, 1983, Choi was pronounced dead by Associate Medical Examiner Manuel Navarro.

68. Dr. Navarro performed an autopsy and determined that Choi died of a stab wound to his chest.

69. At least one other 67th Precinct police officer, Patrolman Williams (Shield No. 3496), a male whose first name is unknown, came to the crime scene, reportedly arriving after or around the time Choi was taken away by ambulance.

70. At the Nostrand Avenue store to which Kim had carried Choi and later at the 67th Precinct, Kim gave police officers descriptions of the men who had been on the station platform, including the man who stabbed Choi.

71. According to Officer Castricone's official report, known as a DD5, Kim described the person who did the stabbing as a

- 15 -

male black, 16 to 18 years in age, medium weight, unknown eye and hair color, short hair, no facial hair, and 6 feet tall.

72.   According to Officer Castricone's report, Kim described a second male black (the one who confronted him on the platform) as 16 to 18 years of age, thin, no facial hair, with unknown eye and hair color, unknown hair length, and 5 feet 8 inches tall.

73.   Castricone's report states that Kim was unable to identify the additional two perpetrators except that they were male blacks and 13 to 14 years old.

74.   According to the official DD5 report of an interview at the 67th Precinct, a report made, upon information and belief, by Detective Norrito, Kim described the man who did the stabbing as a male black, 5 feet 9 inches tall, 18 to 20 years of age, medium build, short hair, chocolate color shirt and dark pants.

75.   According to the official complaint report, known as a UF61, made by Officer Williams, Kim described the stabber as a male black, 18 to 20 years old, 5 foot 8 to 5 foot 9 inches tall, weighing 130 lbs., medium build, chocolate color shirt, dark pants, dark sneakers and short hair.

76.   That Officer's report stated that Kim described the second perpetrator as a male black, 18 to 20 years of age, wearing sneakers, with no further details as to height, weight, or otherwise; and, as to the other male blacks who were on the subway

- 16 -

station, stated that there were three to four of them, 18 to 20 years of age, wearing sneakers.

77. All three reports - by Castricone, Norrito and Williams - were dated June 14, 1983.

78. According to a Detective Division Unusual Occurrence Report dated June 14, 1983, naming Detective Norrito as the assigned 67th Precinct detective along with Detective Tumbarello, witness Kim described the "perpetrators" as three male blacks, 18 to 20 years of age, 5 foot 8 inches to 5 foot 10 inches tall, thin, brown shirt, shorts, sneakers.

79. According to another Detective Division Unusual Occurrence Report dated June 14, 1983, naming Detective Norrito as the assigned detective, the stabber was described as a male black, age 18, 5 feet 9 inches tall, weight 160 pounds, wearing "Dark Brown [Shirt][2] - long pants - knife."

80. The same report described a second assailant as a male black, age 18, weighing 140 pounds, 5 feet 8 inches tall and "wearing Red & White short sleeve shirt."

81. Given the paucity of descriptive information provided by Kim regarding the person who stabbed Choi, Kim's information about that man's height was a key issue of fact from the beginning of the police and prosecution investigation and

_____

[2]    Misspelled "Short" in police report.

- 17 -

became the crucial evidentiary factor in the charges against and the prosecution of plaintiff.

82.   On June 14, 1983, Choi was 5 feet 6 inches tall, and Kim was 5 feet 4 inches tall.

83.   On June 14, 1983, plaintiff was shorter than both Choi and Kim as plaintiff was no taller than 5 feet 2 inches tall.

84.   Since plaintiff was a short person, any identification of him as a 6 foot or approximately 5 foot 9 inches tall person would not have been credible.

85.   On June 14, 1983, plaintiff was 19 years old, having been born March 29, 1964; weighed approximately 120 pounds; had short cut black hair; no facial hair and medium brown skin.

86.   The detectives assigned to lead the investigation into the robbery and murder of Choi were defendants Norrito and Tumbarello.

87.   Defendant Robert Sullivan was the ADA initially assigned to the case and participated in the investigation.

88.   ADA Sullivan came to the 67th Precinct on the evening of June 14, 1983, where various police officers, including Detectives Norrito and Tumbarello, had brought witnesses to be interviewed.

89.   ADA Sullivan questioned and obtained information about the investigation from the police defendants, including, but not limited to, defendants Norrito and Tumbarello; and interviewed

- 18 -

and/or participated in interviews of various witnesses, some of which were tape recorded.

90. Kim spoke English, although his native language was Korean.

91. Kim had been in the United States for about four years at the time he was interviewed on June 14, 1983.

92. Kim was interviewed and answered questions in English.

## Suppression of "Tall Guy" Description

93. At the 67th Precinct, Kim was interviewed by Detectives Norrito and Tumbarello and later by ADA Sullivan.

94. In an audio recorded interview conducted by ADA Sullivan in the presence of Detectives Tumbarello and Norrito, Kim gave a narrative of the events during which he described the stabber, the man with the knife, as a "tall guy."

95. In that audio recorded interview, Kim did not give a height description other than stating the stabber was a "tall guy," but did give a distance description in feet: "two feet."

96. One of the principal ways that the defendants and the related persons wrongfully and maliciously deprived plaintiff Greene of his rights before, at and after the 1985 trial came about when they provided plaintiff's trial counsel with a falsely and deceitfully contrived transcript of the audio recorded precinct interview of Kim.

- 19 -

97.  In that regard, before the 1985 trial, defendants and the related persons provided plaintiff's then defense counsel with a typewritten transcript of Kim's precinct interview containing various handwritten corrections, but omitted from that presumably corrected transcript the key height description of the stabber that Kim had given: that the man with the knife was a "tall guy."

98.  This deceit was compounded throughout the case by the defendants' and the related persons' failure to disclose Kim's precinct description of the stabber as a "tall guy."

99.  By this deceit the defendants and related persons misled the defense and the jury and were able to maintain the false contention at trial that the descriptions of the stabber as 6 feet or 5 feet 9 inches tall that had been given by Kim could be disregarded because, as a Korean, he only measured in meters and centimeters; and that Kim's identification of plaintiff should be credited even though at 5 feet 2 inches plaintiff was a short, not tall, person.

100. That deceitful contention and the related credibility of Kim's identification of plaintiff at trial would have been seriously undermined had the "tall guy" description not been omitted from the transcript of Kim's precinct statement and had it not been kept undisclosed throughout the prosecution until discovered by subsequent defense counsel in 2004.

101. When the defendants and related persons failed to include in the transcript of Kim's precinct statement the key descriptive information about the killer with the knife - that he was a "tall guy" - and further failed to disclose that descriptive information throughout the prosecution, highly material exculpatory evidence was suppressed and withheld that, at the very least, would probably have favorably changed the jury verdict.

102. That exculpatory evidence undermined the prosecution's case against Cy Greene and strongly supported his defense that this was a case of mistaken identity and wrongful identification and that he was actually innocent.

103. The defendants' and related persons' wrongful conduct thereby deprived plaintiff of his state and federal rights to a fair trial, due process of law, equal protection, and freedom from unreasonable and unlawful seizures.

104. That significant misconduct was, as it turned out, one of a series of wrongful acts and omissions which pervaded and perverted the process of justice in regard to the charges against plaintiff and the resulting prosecution, wrongful conviction and wrongful incarceration. Those additional wrongful acts and omissions are described below.

105. Singularly and cumulatively, along with the suppression of the "tall guy" description, those wrongful acts establish both the lack of probable cause from the inception of the

charges against Cy Greene and throughout the process of his prosecution, as well as the defendants' liability for the injuries to plaintiff caused by their violations of his rights.

## Other Witness Information Negating Probable Cause to Arrest Plaintiff

106. At approximately 4:35 p.m. on June 14, 1983, at the scene of the crime and later at the 67th Precinct, Abdul Rahman, the vendor who had witnessed the events of the crime at the subway station, was variously interviewed by police officers, including defendants Norrito and Tumbarello.

107. According to an official police report, believed to have been authored by Detective Norrito, when Rahman was interviewed on June 14, 1983 at the 67th Precinct, he described three of the perpetrators that he had seen as 5 feet 8 inch male blacks, weighing 120 pounds: one being 15 to 19 years old and wearing a red shirt and tan shorts, a second being 15 to 20 years old and wearing a brown shirt and dark pants, and the third being 17 years old and wearing a white shirt with stripes.

108. According to various police reports, several neighborhood witnesses - James Robinson, Lavaughn Ryan, Fred Thomas and Eric Head – gave accounts of seeing men running from the subway station immediately after the incident, with heights varying from 5 feet 5 inches to 6 feet.

109. Another witness, Reynold Guerrier, a cab driver, described three men, seen by other witnesses running from the

- 22 -

subway station, who entered his taxicab several blocks away from the scene of the crime.

110. Police reports concerning those witnesses included the information described in the following paragraphs.

111. On June 14, 1983, at approximately 5:30 p.m., James Robinson was interviewed at the 67th Precinct.

112. Robinson reportedly told the police that he was in the area of Nostrand and Church Avenues at the approximate time of the incident when a man told him to stop another man who was running on Nostrand Avenue.

113. Robinson chased the man – whom he described as a black male, approximately six feet in height, with a medium build, a small afro, and wearing a brown shirt and pants – west on Church Avenue, then left on Lloyd Street, then right on Erasmus Street, and then right on Veronica Place.

114. At Veronica Place and Erasmus Street, Robinson saw the man run to and enter a taxicab that was stopped at an open fire hydrant.

115. Robinson saw that two other men were already sitting in the cab when that man entered it.

116. On June 14, 1983, at approximately 7:45 p.m., Lavaughn Ryan was interviewed on Church Avenue by a police officer from the 67th Precinct.

117. Ryan told the officer that at the approximate time of the incident he had seen three men running on Church Avenue and that they had turned from Church Avenue onto Lloyd Street.

118. Ryan described one of the men as being approximately 5 five feet 9 nine inches in height.

119. On June 15, 1983, at approximately 1:00 p.m., Fred Thomas was interviewed by a police officer from the 67th Precinct.

120. Thomas told the police officer that he was in the area of Nostrand and Church the day before at approximately 4:20 p.m. selling pantyhose.

121. Thomas stated that at that time, date and location, he heard Abdul Rahman, a person known to him, yelling from the subway station.

122. Thomas immediately went towards the station where he saw three male black men, 18-20 years old, running from the subway station, west on Church Avenue.

123. Thomas gave descriptive information about the three men, including their being 5 feet 5 inches, 5 feet 6 inches and 5 feet 7 inches in height.

124. On June 14, 1983, at approximately 6:35 p.m., Reynold Guerrier was interviewed by defendants Detectives Norrito and Tumbarello at the 67th Precinct.

125. Prior to his interview at the Precinct, Guerrier had been interviewed on June 14, 1983 at his home by Detective V. K.

Herlihy; and the official DD5 report about Guerrier's information was signed with Detective Herlihy's name.

126. Upon information and belief, defendant ADA Sullivan was aware, on June 14, 1983 or soon thereafter, of the information provided by Guerrier in police interviews.

127. Guerrier told the police during his precinct interview that he was the driver of a taxicab, license plate number 61L619, that had been commandeered by three men earlier that day at approximately 4:45 p.m.

128. Guerrier was off-duty, stopped near Veronica Place at an open fire hydrant, when three men got into the back of his taxi.

129. Guerrier informed them that he was not working.

130. The men pushed four dollars through the plexiglass divider and told Guerrier that they wanted to go to Flatbush Avenue.

131. They also told Guerrier "We got a problem."

132. Guerrier drove them to Flatbush Avenue and Clarendon Road where they exited, walking towards Courtelyou Road.

133. Guerrier described the three men as black males, approximately 18-19-20 years in age, two of thin build, all wearing sneakers.

134. Guerrier described one of the two thin built men as wearing a brown shirt and shorts; and another of the three men, 130

- 25 -

pounds in weight, as wearing a red shirt, shorts, and a blue or black cap.

135. All of this information was essentially contained in the official DD5 police report of Guerrier's home interview by Detective Herlihy, which also added that when the men entered the cab they were out of breath.

136. Certain significant information given by Guerrier was, however, left out of the DD5.

137. That exculpatory information was intentionally not provided to defense counsel at or before the 1985 trial.

138. That exculpatory information was discovered by subsequent defense counsel when he obtained a copy of Detective Tumbarello's notebook during the proceeding that led to the 2007 dismissal of the underlying charges.

## Suppression of Evidence That Three Fleeing Suspects Spoke Spanish And Were 5 Feet 8 to 10 Inches Tall

139. That significant exculpatory information was that Guerrier told the police, including Detectives Norrito and Tumbarello, that the three men who commandeered his taxicab were speaking Spanish to each other and were between 5 feet 8 to 10 inches tall — the one wearing a brown shirt at 5 feet 10 inches, and the one wearing a red shirt at 5 feet 8 inches.

140. Upon information and belief, that significant exculpatory information was learned by defendant former ADA Sullivan during and/or soon after Guerrier's precinct interview and

- 26 -

prior to the commencement of any prosecution arising from the stabbing and robbery of Choi.

141. Upon information and belief, that significant exculpatory information was learned by related person ADA Plazner prior to commencement of the grand jury proceedings.

142. The 5 foot, 2 inch, Cy Greene did not speak Spanish.

143. The defendants and related persons - including at least Detectives Norrito and Tumbarello and, upon information and belief, former ADA Sullivan on June 14, 1983, former ADA Plazner before the grand jury proceedings, and former ADA Green at least before the 1984 suppression hearing - were aware that Guerrier provided that information and were aware of its exculpatory significance as to charges against and prosecution of plaintiff.

144. Upon information and belief, at least the police defendants, including Detectives Norrito and Tumbarello, were aware in June 1983 that a dark-skinned, Spanish-speaking group of young men of Panamanian nationality, were involved in robberies and assaults in the Nostrand and Church Avenues neighborhood and, based on Guerrier's information, were or should have been considered suspects.

145. Despite their knowledge of what Guerrier had said, the police defendants intentionally failed to include the Spanish-speaking and height information in the DD5 official report, which

was the only information regarding Guerrier provided to plaintiff's trial counsel in connection with the 1984 hearing and 1985 trial.

146. Despite this knowledge, both the police and District Attorney defendants and the related persons intentionally failed to disclose that information to the defense throughout the investigation and prosecution of the criminal case, although those defendants and persons were or should have been aware of the significant manner in which that exculpatory information could have been used by the defense, including, without limitation, in challenging the existence of probable cause and in cross examining and impeaching the 1984 hearing and 1985 trial testimony of Detectives Tumbarello and Norrito, particularly when defense counsel was challenging their credibility, the lack of integrity to their investigation and lack of sufficiency of evidence to charge, prosecute and convict plaintiff.

### Suppression of Evidence That Suspect Lenny Best Was Identified As Fleeing the Scene

147. On the evening and night of June 14, 1983, Eric Head was interviewed by defendants, including Detectives Norrito and Tumbarello, at the 67th and 87th precincts.

148. Head had been at work that day at a store located at 2846 Church Avenue, on the other side of the street from the subway station entrances and exits on the north side of Church Avenue.

149. Head told the detectives that at approximately 4:35 p.m. that day he saw two men leave the subway station and flee west on Church Avenue.

150. Just a few seconds later, Head saw a third person leave the subway station and flee in the same direction on Church Avenue.

151. Head recognized all three of these persons from the area – he knew them to hang out and pick pockets at Nostrand and Church.

152. During his police interview Head was shown photographs.

153. According to the June 14, 1983 handwritten entries in Detective Tumbarello's notebook, maintained for this case only, Head identified the photographs of the three people he had seen at the subway crime scene: Joseph Ross, Ronald Blanding and Lenny Best.

154. Lenny Best was the older brother of Mark Best, who, under circumstances referred to below, was coerced into falsely identifying Cy Greene as the person who had stabbed Choi in the subway robbery.

155. Both Best brothers were known by the police, including, without limitation, Detectives Norrito and Tumbarello, and by persons in the neighborhood of the Nostrand Avenue and Church Avenue station, including two persons interviewed by the

- 29 -

police after the June 1983 Choi stabbing and robbery, to have previously been involved in criminal conduct, including robbery, picking pockets and weapons possession.

156. On June 15, 1983, based, at least in part, on Eric Head's June 14, 1983 precinct interview identification, Lenny Best was taken into custody by Detectives Norrito and/or Tumbarello to be questioned about the robbery and murder of Choi.

157. While the police officer defendants were taking Lenny Best to the 67th Precinct on June 15, 1983, Lenny Best escaped and was not subsequently apprehended or questioned by the defendants regarding the robbery and murder of Choi.

158. Lenny Best was a prime suspect for the robbery and murder of Choi and when he escaped it was a source of serious concern to the police defendants and a basis for official discipline for misconduct, which risk and attempted avoidance of risk seriously affected the police investigation and undermined its integrity and credibility.

159. The defendants, particularly including Detectives Norrito and Tumbarello, and the related persons considered Mark Best, as well as Lenny Best, to be prime suspects for the robbery and murder of Choi.

160. It was an official requirement, as well as the custom and practice of the NYPD, to create Unusual Occurrence reports for case related events, including irregular events.

~ 30 ~

161. Such a report was required when a suspect escaped from police custody.

162. No such report was created to record Lenny Best's escape.

163. In their attempt to overcome the problem of having allowed Lenny Best to escape and to avoid the consequences of not making the required Unusual Occurrence report, and in trying to wrongfully close their investigation with an arrest of an alleged perpetrator without regard to proper investigatory or probable cause standards, the defendants, particularly including Detective Norrito and Tumbarello, and related persons wrongfully acted in a number of ways, in addition to those described above, that eventually led to the false charges made against plaintiff.

**Falsification of Police Report To Conceal That**
**Lenny Best Was Identified As Fleeing the Scene**

164. Notwithstanding the contemporaneous entry in Detective Tumbarello's notebook, the official DD5 report about information taken by the police from Eric Head – as provided to defense counsel by defendants prior to trial in 1985 - falsely stated that the third person Head identified was one Eric Tidwell, not Lenny Best.

165. The official report stated that Head identified the photographs of three people: Joseph Ross, Ronald Blanding and Eric Tidwell.

166. Upon information and belief, at least the police defendants, particularly Detectives Norrito and Tumbarello, intentionally substituted Eric Tidwell for Lenny Best in the official DD5 report knowing that Tidwell was in jail on June 14, 1983.

167. That false statement, substituting Tidwell for Best, was intended to and did cover up the fact that Lenny Best was a prime suspect in the crime and a person who the police defendants on June 15, 1983 had allowed to escape from a patrol car while they were bringing him to the 67th Precinct to be questioned.

168. The defendants and related persons - at least including Detectives Norrito and Tumbarello and, upon information and belief, former ADA Sullivan and related persons ADA Green and ADA Plazner - were aware of this falsification in the official report and of the suppression of the significant information that Lenny Best had been seen at and identified as having been seen fleeing from the scene of the crime.

169. The defendants and related perons - at least including Detectives Norrito and Tumbarello and, upon information and belief, former ADA Sullivan and related persons ADA Green and ADA Plazner - were further aware that disclosure to the defense at and before the 1984 hearing and 1985 trial of the false official report, which omitted reference to Lenny Best and substituted Eric

- 32 -

Tidwell, would have the misleading effect of discrediting Eric Head as a source of accurate information.

170. That deception was intended to and did successfully mislead the defense (as well as judges assigned at the pre-trial hearing, at trial and in post-trial proceedings) by discrediting Head as an eyewitness and undermining his credibility in identifying persons he named as having been seen running from the subway station crime scene while not identifying either Cy Greene or co-defendant Larry Williams as having been at the scene.

171. That deception was ultimately compounded by the defendants and related person ADA Green through Detective Norrito's testimony at the 1984 pre-trial hearing that police investigation had established that Eric Tidwell could not have been seen and identified by Eric Head because Tidwell was incarcerated on June 14, 1983.

172. That deception was further expanded by Detective Norrito at the pre-trial hearing when he testified that Eric Head was known to be unreliable because he had been involved in robbery and theft of automobiles.

## Police Coercion Leading to False Identification By Mark Best

173. On June 15, 1983, purportedly based on Eric Head's identification, Joseph Ross was brought to the 67th Precinct at approximately 5:00 p.m. to be interviewed by the defendants, including Detectives Norrito and Tumbarello.

174. Ross purportedly told the police, according to the DD5 official report, that he was in the area of Nostrand and Church Avenues at approximately 4:00 p.m. on June 14th with his friend, Mark Best.

175. According to the DD5, Ross also purportedly told the police that at approximately 4:10 p.m. he left Mark Best at Nostrand and Church; that he knew nothing about the incident; and that the police should question Mark Best.

176. On June 16, 1983, at approximately 11:20 a.m., Mark Best was interviewed at the 67th Precinct by ADA Sullivan and Detectives Norrito and Tumbarello.

177. Upon information and belief, Mark Best was a person psychologically and physically vulnerable to police pressure and was in fear that he and/or his brother would be charged with the murder of Choi and that he would be charged with other crimes.

178. Upon information and belief, Mark Best was subjected to improper police pressure and coercion and induced by promises and provision of benefits into giving a false statement about the June 14th incident.

179. According to the official DD5 prepared in connection with the interview, Mark Best told defendants Sullivan, Norrito and Tumbarello that at approximately 4:20 p.m. on June 14th he was at the Nostrand and Church Avenue subway station standing on the top of the staircase.

- 34 -

180. In his alleged account of the attack, robbery, and murder of Choi by three persons, as recorded in the DD5, Mark Best said that he saw Cy Greene, who he knew, take out a knife and stab Choi in the back and then flee from the station with the two other men.

181. The DD5 states that Mark Best looked at photographs of Cy Greene and gave the police Cy Greene's address.

182. The police and prosecution defendants wrongfully used a coerced and non-credible statement of Mark Best to accomplish their goal of closing the case expeditiously for improper, illegal and unconstitutional reasons.

### Wrongfully Obtained Photo and Line-Up Identifications

183. On June 21, 1983, at approximately 5:00 p.m., plaintiff was arrested by Detective Norrito in his home at 1431 Nostrand Avenue.

184. Larry Williams, who was visiting plaintiff, was also arrested.

185. Both men were taken to the 67th Precinct and interviewed there.

186. During his interview, plaintiff told the police and prosecutor that he did not participate in the robbery or murder of Choi.

187. Cy Greene told the police and the prosecutor that he was in another Brooklyn neighborhood with his sister-in-law on the day of and at the time of the incident.

188. The police and prosecution brought both Kim and Mark Best to the precinct on June 21, 1983, purportedly to view plaintiff and Larry Williams in separate line-ups.

189. While plaintiff and Williams were at the 67th Precinct awaiting the line-ups, they were held in a holding cell.

190. While plaintiff was in the holding cell, prior to the line-up, the police improperly, illegally and in violation of constitutional requirements, brought Kim into the room where the holding cell was located so that he could look at plaintiff and Williams.

191. Upon information and belief, the police and prosecution did this so that Kim would know who to pick out of the line-ups, which were to be conducted later.

192. On June 21, 1983, plaintiff was placed in a line-up purportedly for potential identification of the perpetrator of the stabbing.

193. This line-up was conducted by Detective Tumbarello and ADA Sullivan.

194. Detective Tumbarello, perhaps with the assistance of Detective Norrito, had chosen the persons, besides plaintiff, that would be placed in the line-up.

- 36 -

195. During the line-up, all the participants were seated.

196. Upon information and belief, all of the other persons in the line-up were not of a similar height to plaintiff, but since all were sitting down, any reasonable judgment about height differences was negated and distorted.

197. Under the circumstances described in this complaint, the photo and lineup identifications of plaintiff by eyewitness Jae Hark Kim and by Mark Best were wrongfully obtained, were not credible, and were not a proper basis for probable cause to arrest and charge plaintiff for any criminal conduct.

### An Undisclosed Material Witness Able to Identify Persons Who Fled From the Crime Scene

198. There was at least one material witness whose identity was suppressed by defendants and related persons who would have been a source of information for identifying the persons who fled from the subway station.

199. That person's existence was not made known to and was wrongfully and intentionally kept from plaintiff and his counsel at and before the 1985 trial.

200. That person was not referred to in any official police report, but references to her existence appeared in some police notes first discovered by plaintiff's subsequent counsel during the proceeding begun in 2004.

- 37 -

201. She was described in the notes as a woman selling "flowers/art" who said she could make identifications.

202. That person, upon information and belief, was brought to the 67th Precinct along with Abdul Rahman to view photographs for identification purposes.

203. Although that person's name has never been disclosed by the defendants, further information about her and what she knew and told the police may be developed during discovery proceedings in this case.

## DNA Evidence of Actual Innocence

204. In addition to all the foregoing facts and circumstances (and such other supporting facts and circumstances as may be developed during discovery proceedings in this case) and plaintiff's related contentions, there is DNA evidence of the plaintiff's actual innocence.

205. During the course of the proceedings before Justice Pesce that led to the dismissal of all charges against plaintiff in 2007, plaintiff Cy Greene applied for a DNA examination of the knife used in the stabbing, alleging that any DNA on the knife would not match his.

206. At the direction of Justice Pesce, a DNA test was conducted to discover whether there was any recoverable DNA evidence on the knife which was used to stab Choi.

207. The examination of the knife was conducted by police laboratory technicians in the presence of an expert retained by counsel for plaintiff.

208. The result of that test was that there was DNA recovered on the knife handle which did not match the DNA of Cy Greene.

209. Plaintiff contends that this is compelling evidence of his actual innocence of the crime.

### Racial Discrimination and Class Animus

210. Upon information and belief, the defendants' and related persons' wrongful actions and omissions regarding the plaintiff were motivated and tainted by racial and class discrimination because of an improper attitude towards black persons, including the prejudicially selective disregard of their rights because of their race and class as if they were generally and individually more likely to be involved in criminal conduct than non-black persons.

### Summary Statement of Legal Contentions

211. Under the circumstances described in this complaint, the police and prosecution defendants and related persons accumulated substantial exculpatory evidence negating any basis for charging and prosecuting plaintiff with the crimes at issue yet chose to disregard that evidence and, instead, to falsely and maliciously arrest, imprison and prosecute Cy Greene.

212. In wrongfully causing plaintiff to be arrested, charged, prosecuted, convicted and incarcerated for crimes that he did not commit, the conduct of the individual defendant police officers, prosecutors and related persons included intentional, grossly negligent, deliberately indifferent, and/or negligent acts, which resulted in violations of plaintiff's constitutional, statutory, and/or common law rights.

## LIABILITY OF INDIVIDUAL DEFENDANTS

213. At all relevant times and at the time of all of their actions described in this complaint, the individual defendants were acting under color of state law as agents, servants and employees of the City of New York and/or the Transit Authority and under the City's and/or the Transit Authority's supervision, direction and control.

214. The individual defendants, in committing the conspiracies, acts and omissions to act described above, were, in addition to all other allegations related above, deliberately indifferent to and in reckless disregard of all the plaintiff's rights, and said acts and omissions to act caused actual injury to plaintiff.

215. The individual defendants, in committing the aforesaid acts, were concurrently acting as joint tortfeasors.

216. At all times described above, the individual defendants were engaged in a joint venture, assisting each other in

performing the various actions described and lending their support and the authority of their office to each other.

217. As a direct and proximate result of the conspiracies, acts, and omissions to act described above, the individual defendants subjected plaintiff to an unconstitutional arrest and imprisonment; malicious prosecution; deprivation of federal and state constitutional, statutory and common law rights; emotional distress and mental anguish; physical injury and pain and suffering; interference with intimate relationships; embarrassment; humiliation; indignity; degradation; loss of employment opportunities and related income; and shame for being unlawfully arrested, charged, convicted, imprisoned, and maliciously prosecuted for the robbery and murder of John Choi.

## LIABILITY OF DEFENDANTS CITY AND TRANSIT AUTHORITY

218. Upon information and belief, all of the acts by the individual defendants and the related persons were carried out with full direct and/or constructive knowledge, consent, and cooperation and under the supervisory authority of defendant City and/or defendant Transit Authority.

219. Upon information and belief, the City and Transit Authority defendants by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' and the related persons' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those

- 41 -

acts to continue; and/or engendered and fostered a climate to allow or encourage those acts to continue.

220. Moreover, upon information and belief, the actions of the individual defendants and related persons resulted from and were taken pursuant to de facto policies and/or well-settled and widespread customs and practices of defendants City and/or Transit Authority, which were implemented by their police officers and the City's Assistant District Attorneys, to intentionally and/or negligently circumvent the investigative process, to intentionally deceive and mislead defense attorneys and to knowingly obtain unjust convictions by covering-up, suppressing, concealing, altering, destroying, and/or failing to report on the existence of potentially exculpatory evidence.

221. Upon information and belief, the existence of such de facto policies and/or well-settled and widespread customs and practices were known to supervisory and policy-making officers and officials of the New York City Police Department, the Transit Authority police force, the District Attorney's Office, and the City for a substantial period of time prior to and after June 14, 1983.

222. Upon information and belief, despite knowledge of such illegal de facto policies, customs and practices, the supervisory and policy-making officers and officials of the Police Department, the Transit Authority police force, the District

- 42 -

Attorney's Office, and the City did not and have not taken adequate steps to terminate those policies and practices; did not and have not disciplined individuals who engage in such practices; did not and have not properly trained police officers and assistant district attorneys with regard to the constitutional and statutory limits on the exercise of their authority; but have instead sanctioned, ratified, allowed and/or acquiesced in those unlawful policies, customs and practices through their deliberate indifference to or negligent disregard of the effect of those policies, customs and practices upon the constitutional rights of persons in the City of New York.

223. Among the unlawful policies, customs and practices sanctioned, ratified, allowed and/or acquiesced in by defendants City and Transit Authority was a repeated and knowing failure to properly and adequately supervise, train and discipline police officers and other police personnel, including defendant officers, with respect to, among other matters, dealing with exculpatory evidence and conducting thorough and competent investigations, by repeatedly and knowingly failing to promulgate and enforce rules and regulations of the New York Police Department and the Transit Authority police force in a manner consistent with due process, and in compliance with the requirements of the constitutions and laws of the State of New York and the United States.

- 43 -

224. Upon information and belief, these unlawful policies, customs and practices reflect the deliberate indifference of defendants City and Transit Authority to the constitutional rights of citizens of New York City as said defendants knew or should have known that the acts alleged herein would deprive such citizens, including plaintiff, of rights without due process of law, in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6, 11 and 12 of the New York State Constitution, as well as to federal and state common law and state statutes, including, without limitation, such rights as plaintiff's rights, privileges and immunities to be free from false arrest; false imprisonment; malicious prosecution; cover-up, suppression and concealment of exculpatory evidence and conspiracy to cover up and suppress and conceal exculpatory evidence; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence in hiring, supervising, training, disciplining or retaining police officers and detectives and other City and Transit Authority employees and agents, including assistant district attorneys, who were unfit for and lacking in competence for proper law enforcement purposes; and negligence in the training, instruction and disciplining of police officers and detectives and other City and former Transit Authority employees and agents, including assistant district attorneys.

- 44 -

225. With respect to plaintiff's state law claims, defendants City and Transit Authority are also directly liable and responsible for the acts of defendants under the doctrine of *respondeat superior*.

## LIABILITY OF SUPERVISORY PERSONNEL OF DEFENDANTS CITY AND TRANSIT AUTHORITY

226. Upon information and belief, supervisory officers and personnel sanctioned, ratified, allowed and/or acquiesced in the individual defendants' affirmative acts and participated in the aforementioned unlawful policies, customs and practices.

227. Without limiting the foregoing, the individual defendants' wrongful conduct includes an institutional history, upon information and belief, in numerous cases known to their supervisory personnel in which, prior to and/or after arrest and prosecution, police officers and other law enforcement personnel were aware of exculpatory evidence that was not known to or disclosed to the accused and their counsel.

228. Despite such knowledge of the wrongful conduct of police officers and other law enforcement personnel under their supervision, supervisory personnel, upon information and belief, (a) frequently failed to take corrective action to remedy the adverse affect on persons charged with crimes of the failure to disclose exculpatory evidence to the accused and their counsel; (b) frequently compounded such wrongful failures to disclose by allowing false and fraudulent statements and representations on the

- 45 -

part of persons under their supervision to remain uncorrected; (c) frequently failed to discipline, train and instruct police officers and district attorneys to remedy such wrongful failures in order to fulfill their constitutional obligations and proper roles in the justice system; and (d) frequently tolerated rather than monitored and investigated such wrongful failures by police officers and assistant district attorneys.

229. Further, in regard to the administrative and managerial functions of district attorneys and especially pertaining to obligations for disclosure to defense counsel in accordance with the standards of <u>Brady v. Maryland</u>, defendant City and supervisory personnel at the Office of the Kings County District Attorney evinced and followed a pattern of ignoring law enforcement improprieties and misconduct and a pattern of failure to train and supervise regarding disclosure obligations imposed by <u>Brady</u> and other legal obligations.

### FIRST CAUSE OF ACTION
#### (Constitutional Violations - 42 U.S.C. § 1983)

230. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

231. Defendants, under color of state law, subjected plaintiff to the foregoing conspiracies, acts and omissions to act without due process of law thereby depriving plaintiff of his

- 46 -

rights, privileges and immunities secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges and immunities:

(a)  Plaintiff was deprived of his Fourth Amendment right to be free from malicious prosecution.

(b)  Plaintiff was deprived of his Fourth Amendment right to be free from unreasonable searches and seizures of his person.

(c)  Plaintiff was deprived of his Fourteenth Amendment right to liberty without due process of law.

(d)  Plaintiff was deprived of his Fourteenth Amendment right to the equal protection of the laws.

(e)  Plaintiff was deprived of his Fourteenth Amendment right to equal privileges and immunities of the laws.

## SECOND CAUSE OF ACTION
### (Constitutional Violations - 42 U.S.C. § 1985(3))

232. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

233. The defendants, acting under color of law and in violation of 42 U.S.C. § 1985(3), conspired to injure and damage plaintiff because of defendant's race and because of class-based animus against plaintiff.

- 47 -

234. In furtherance of that conspiracy, the defendants subjected plaintiff to unlawful acts thereby depriving plaintiff of his rights to the equal protection of the laws and equal privileges and immunities under the laws in contradiction of the Fourteenth Amendment to the United States Constitution.

235. The individual defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for plaintiff's rights and are therefore also liable for punitive damages.

## THIRD CAUSE OF ACTION
### (Constitutional Violations - 42 U.S.C. § 1986)

236. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

237. The individual defendants, having knowledge of the conspiracy and of the wrongs about to be done to injure plaintiff and having the power to prevent or aid in preventing those wrongs, neglected and failed to do so in violation of 42 U.S.C. § 1986.

238. By reason of their lack of reasonable diligence in preventing the wrongs to be done to injure plaintiff, defendants are liable for all damages resulting from those wrongful acts.

## FOURTH CAUSE OF ACTION
### (Violations of the New York State Constitution)

239. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

240. Defendants subjected plaintiff to the foregoing acts and omissions to act without due process of law, thereby depriving plaintiff of rights, privileges and immunities secured by Article 1, §§ 1, 6, 11, and 12 of the New York State Constitution, including, without limitation, the following deprivations of his rights, privileges and immunities:

(a) Plaintiff was deprived of the rights and privileges secured to him as a citizen of the State of New York, in violation of Article 1, § 1 of the Constitution of the State of New York;

(b) Plaintiff was deprived of his rights to liberty without due process of law, in violation of Article 1, § 6 of the Constitution of the State of New York;

(c) Plaintiff was deprived of his right to equal protection of the laws, in violation of Article 1, § 11 of the Constitution of the State of New York;

(d) Plaintiff was deprived of his right to be free from unreasonable searches and seizures of his person, in violation of Article 1, § 12 of the Constitution of the State of New York.

- 49 -

## FIFTH CAUSE OF ACTION
### (Malicious Prosecution)

241. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

242. Defendants instituted and continued a criminal proceeding against plaintiff with malice and without probable cause.

243. As a result, plaintiff suffered deprivation of liberty, physical injury with pain and suffering, emotional distress and mental anguish, interference with intimate relationships, and other psychological injuries, including, without limitation, embarrassment, humiliation, indignity, degradation, shame, loss of employment opportunities and related income, and legal fees, costs and expenses.

244. The acts and conduct of the defendants constitute malicious prosecution under the laws of the State of New York.

245. The individual defendants committed the aforesaid acts intentionally, willfully and with malicious disregard for plaintiff's rights and are therefore also liable for punitive damages.

## SIXTH CAUSE OF ACTION
### (Negligence of Individual Defendants)

246. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

247. Defendants, by their aforesaid acts, negligently failed to use due care in the performance of their duties.

248. All of defendants' acts were performed without any negligence on the part of plaintiff and were the proximate cause of plaintiff's injuries.

### SEVENTH CAUSE OF ACTION
#### (Negligence of Defendant City and Transit Authority)

249. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 229.

250. Defendants City of New York and Transit Authority, by their aforesaid acts, negligently failed to use due care in the performance of their duties.

251. Said defendants' acts were performed without any negligence on the part of plaintiff and were the proximate cause of plaintiff's injuries.

WHEREFORE, Plaintiff Cy Greene demands the following relief against defendants, jointly and severally:

(a) Compensatory damages in an amount to be determined at trial;

(b) Punitive damages from the individual defendants in the amount of $22,500,000.00; and

(c) Such other and further relief as this Court may deem just and proper, including reasonable attorney fees and costs and

- 51 -

such attorney fees and costs as may be provided pursuant to 42 U.S.C. § 1988.

* * * * * * *

A jury trial is demanded.

Dated:     New York, New York
           January 14, 2008


                    BELDOCK LEVINE & HOFFMAN LLP


           By:     _____
                    Myron Beldock
                    Attorneys for Plaintiff
                    99 Park Avenue, Suite 1600
                    New York, New York 10016
                    (212) 490-0400

- 52 -

## VERIFICATION

STATE OF NEW YORK    )
                     :    ss.:
COUNTY OF NEW YORK   )

    CY GREENE, being duly sworn, deposes and says:

    Deponent is the plaintiff in the within action.  Deponent has read the foregoing Verified Complaint and Jury Demand and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

                                                            Cy Greene

Sworn to before me this
14th day of January, 2008.

_____
Notary Public

BYRON BELDOCK
Notary Public, State of New York
No. 5249455
Qualified in New York County
Commission Expires Aug. 31, 20__

- 53 -