UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CY GREENE,                                                    1:08-cv-00243-AMD-CLP

                   Plaintiff,

     - against -

THE CITY OF NEW YORK, *et al.*,

                  Defendants.

## PLAINTIFF'S LOCAL CIVIL RULE 56.1
## <u>COUNTER-STATEMENT OF MATERIAL FACTS</u>

LAW OFFICE OF JOHN F. SCHUTTY, P.C.
271 Main Street, Second Floor
Eastchester, New York 10709
Tel:  (914) 202-0076

Counsel to Plaintiff Cy Greene

<u>**TABLE OF CONTENTS**</u>

**Page**

**PRELIMINARY STATEMENT** ...................................................................1

I.     **Plaintiff's Response to Defendants' Rule 56.1 Statement** ...................3

II.    **Plaintiff's Rule 56.1 Counter-Statement** ........................................**31**

      A.     **Background on Cy Greene & This Litigation** .......................**31**

      B.     **The Murder of John Choi** ...................................................**38**

      C.     **The Principal Eyewitnesses Provide Some Common Descriptions** .....**42**

      D.     **The Knife-Wielding Black Male Wearing a Chocolate Brown Shirt** ................................................................**42**

      E.     **Detectives Norrito & Tumbarello Assume Control of the Investigation** ....................................................................**44**

      F.     **Some Eyewitnesses Are Interviewed at the 67th Precinct that Night** ......................................................................**45**

          1.     Jae Kim Interview ...........................................................45

          2.     Abdul Rahman Interview ................................................50

          3.     Eric Head Interview .......................................................51

          4.     Mark Best Is First Interviewed on the Day of the Murder............52

          5.     Ronald Blanding Is Taken Into Custody at 1 a.m. on June 14.......52

      G.     **Day 2 of the Investigation** ...................................................**54**

          1.     Joseph Ross Is Interviewed on June 15, 1983................................54

          2.     Attempted Interview of Lenny Best & His Escape on June 15 .....55

      H.     **Detective Norrito Fabricates & Secretes Evidence** ...............**59**

          1.     Norrito Fabrication No. 1: Norrito Claims that Lenny Best Is Not One of the Local Pickpockets Eric Head Identified as Fleeing the Murder Scene ..................................................................59

2. Norrito Fabrication No. 2: Norrito Claims that Guerrier's "Fleeing" Panamanian Passengers Were "Not Part of the Group Involved in This Incident (Crime)"........................................68

I. **Day Three of the Investigation – Norrito & Mark Best Form an Undisclosed, Unholy Alliance**.................................................**76**

1. Mark Best & Detective Norrito.........................................76

2. Mark Best Was a Known Pickpocket Who Worked with Teams & Knives ..................................................................77

3. Mark Best Provides His Account of the Choi Murder.................78

4. Tumbarello Has Admitted Mark Best's Account Was Very Suspect ................................................................83

5. Norrito Fabrication No. 3: Norrito Falsely Testifies that He Had Mark Best Undergo a Polygraph Examination.................83

6. Mark Best Is Promised a Deal If He Implicates Cy Greene ..........85

7. Mark Best Ultimately Confesses that He Was Part of the Pickpocketing Team & that Cy Greene Played No Role in the Mugging/Murder of Choi................................................89

J. **Cy Greene Is Arrested Based Solely on Mark Best's False Statements to Norrito and Norrito's Fabrication & Secretion of Valuable Eyewitness Evidence** ...............................................**95**

1. The Greene/Williams Lineups Were Woefully Tainted ...............96

2. Tumbarello Wanted Other Eyewitnesses to See Lineups............101

3. Other Exculpatory Evidence Was Not Produced Pre-Trial .........101

K. **Norrito / Tumbarello – Neither Wants to Accept Responsibility Today for Greene's Arrest** .................................................**105**

L. **Tumbarello Admits There Was Likely No Probable Cause for Greene's Arrest** ..............................................................**106**

M. **Hynes Admits That There Were Brady/Rosario Violations** .............**107**

N. **A Grand Jury Indicts Greene & Williams** ...........................**107**

O. **The Trial: April 30 to May 9, 1984**....................................**108**

P. **Greene's Subsequent Appeals & Post-Conviction Proceedings** ........**109**

**Q.**    **This Civil Rights Action & the Claims Asserted Herein** ..................**110**

**R.**    **The Specific Claims Asserted Against the City, KCDA and the Individual Defendants Norrito, Tumbarello & ADA Sullivan** ..........**111**

**S.**    **Expert Witness Opinion on the Liability of the KCDA** ....................**120**

    1.    Municipal Liability Facts ............................................................121

**T.**    **Battle of the Experts: Yaroshefsky Versus Caplow**...........................**125**

    1.    Yaroshefsky KCDA Training Criticisms:...................................126

        a.    Caplow contends it is difficult to standardize an internal disciplinary policy ...............................................126

        b.    Caplow contends there are "no enforceable ethical provisions" ....................................................................127

        c.    Kaplow conflates "new" with "newly-discovered"..........130

    2.    Fundamental disagreement as to the applicable law of *Brady v. Maryland*: .......................................................................131

        a.    Caplow constantly equates Brady with exculpatory evidence, and underemphasizes to the point of ignoring entirely, the fact that favorable evidence to the defense is also *Brady* material .........................................131

        b.    Professor Yaroshefsky sees absolutely no place for a "materiality" determination at the pre-trial or trial phase of a criminal case ...................................................132

## PLAINTIFF'S LOCAL CIVIL RULE 56.1
## COUNTER-STATEMENT OF MATERIAL FACTS

Plaintiff Cy Greene, by and through his attorneys, the Law Office of John F. Schutty, P.C., submits this Local Civil Rule 56.1 Counter-Statement of Material Facts in opposition to the Motion for Summary Judgment (dated April 5, 2016) filed by the Defendants seeking a dismissal of all of Plaintiff's claims arising out his wrongful arrest and unjust incarceration of over twenty-three years.

## PRELIMINARY STATEMENT

Clarence Darrow was right when he said: "A courtroom is not a place where truth and innocence inevitably triumph; it is only an arena where contending lawyers fight not for justice but to win."  This is so true, especially here, where the opinions of Defendants' own expert echo those of Darrow: "For some ADAs power interferes with justice.  There are simply too many examples of impropriety, misconduct and even illegality to ignore... as Professor Abbe Smith forcefully asks, given the many internal and external influences at work, quote, can you be a good person and a good prosecutor[?]."  *See infra* ¶ 414.

The Defendants contend that there were no constitutional violations committed against Plaintiff Cy Greene by police and prosecutors, *as a matter of law*.   The Defendants contend that no evidence was fabricated and no evidence was secreted by police and prosecutors, and they avoid the issue of Cy Greene's true guilt or innocence and the admissions of their own expert on prosecutor training and misconduct.   The issues of fact raised by the Defendants' motion are: (1) have John Choi's true assailants made admissible confessions to Choi's murder and established Cy Greene's innocence, (2) was evidence fabricated and secreted by police investigators to justify the arrest of Cy Greene and to establish/maintain his conviction, (3) were prosecutors aware of patent

discrepancies in the evidence produced by the investigating detectives that were not disclosed to defense counsel, (4) were there resulting, abundant *Brady/Rosario* violations committed by police and prosecutors in connection with Cy Greene's arrest and conviction, and (5) were the latter failures the direct result of a deliberate indifference to proper training, supervision and discipline of Brooklyn police and prosecutors?

How is an innocent man convicted of a murder and then be unable to prove his innocence during twenty-three years of imprisonment?  Answer: police and prosecutor misconduct.  Lies, evidence fabrication/secretion, secret deals and a highly-tainted lineup, lead to a corrupt arrest and an unlawful conviction.  Here is what will be shown below:

1. Cy Greene is innocent of the robbery and murder of John Choi.  Three of the actual (now deceased) five assailants have confessed to participating in the crime and two of them have acknowledged (in admissible form) that Cy Greene played absolutely no role in the Choi robbery/murder.

2. A detective (Michael Norrito) fabricated and secreted evidence to protect his informant(s) and initiate and preserve the arrest and conviction of Cy Greene (with the acquiescence of another detective -- Joseph Tumbarello).

3. At least one prosecutor (ADA Douglas Kallen) has acknowledged that there were serious discrepancies in the evidence provided by detectives against Cy Greene, but defense counsel was not provided with this information.

4. Police and prosecutors fabricated and secreted abundant evidence from Cy Greene and his criminal attorney (and secreted a deal made with one informant) in violation of established *Brady/Rosario*[1] constitutional rules.

5. Police and prosecutors were routinely violating their *Brady/Rosario* duties as a result of deficient training, supervision and discipline.

---

[1]    We use the terms "*Brady/Rosario* materials," "*Brady* obligations" and "*Brady* violations" throughout this Rule 56.1 Statement to refer to the federal constitutional duties required of prosecutors explained in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, including, *e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995).  Except where otherwise noted, we include in this reference New York disclosure duties established in *People v. Rosario*, 9 N.Y.2d 286 (1961), and its progeny, and since codified in the Criminal Procedure Law.

## I.     Plaintiff's Response to Defendants' Rule 56.1 Statement[2]

1.     *Not disputed.*[3]

2.     *Not disputed.*

3.     *Not disputed, but Plaintiff's home address is wholly irrelevant as to his guilt or innocence or any issue on this motion.*

4.     *Not disputed,* but the Defendants rely on certain unsworn (hearsay) statements of a witness who has not testified as to most of these "facts" as alleged here.

5.     *Disputed,* but only as to the Defendants' unsupported claim that Norrito was a "seasoned" homicide detective.

6.     *Disputed,* but only as to (a) the Defendants' unsupported claim that the Brooklyn South Task Force "supported" the investigation undertaken by Detectives Norrito and Tumbarello, since no evidence has been supplied that this Task Force was involved after day one of the investigation, and (b) the "67th Precinct was one of the busiest units in Brooklyn," since that claim, even if true, does not provide an excuse for a violation of an accused's constitutional rights.

---

[2]     Plaintiff's objects to those portions of the Rule 56.1 Statement submitted by the Defendants that contain paragraphs consisting of multiple sentences, where many of the sentences are not followed by citations to specific support in the record.  Moreover, many of the "statements of fact" are, in fact, are "arguments" that are proper only in a legal memorandum.  Local Rule 56.1(d) requires that "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

[3]     Defendants the City of New York ("City"), the New York City Transit Authority ("NYCTA"), former New York City Police Department ("NYPD") Detective Michael Norrito ("Norrito"), former NYCTA Detective Joseph Tumbarello ("Tumbarello"), the Kings County District Attorney ("KCDA") and former Assistant District Attorney ("ADA") Robert Sullivan ("Sullivan"), will all be collectively referred to hereinafter as "the Defendants."

7.    *Not disputed,* but supplemented by Plaintiff's claim that Detectives Norrito and Tumbarello (and prosecutors) withheld notebooks and audiotapes, improperly redacted valuable witness information, fabricated evidence, secreted admitted "deals" made with informants, and withheld other evidence from Plaintiff and his attorneys all in violation of established constitutional principles. *See also* following paragraph.

8.    *Disputed.* These claims by the Defendants are incorrect and are purposely overly-general so as to suggest that "most" of the *Brady/Rosario* material was turned over to Plaintiff. While it is true that *some* DD-5s and *some* highly inaccurate transcripts were turned over to Plaintiff, none of the audio recordings of interviews of eyewitnesses were turned over, some of the transcripts of these interviews were not turned over, none of the detective's notebooks (with detailed handwritten notations) were turned over, evidence collected from a "confidential informant" who escaped with Choi's assailants was not turned over, the details of an admitted "deal" between an investigating detective and an alleged informant/eyewitness was not turned over, and most of the DD-5s were redacted to blot out eyewitness names, addresses and phone numbers. The undeniable, main dispute in this case concerns "what information and evidence was turned over to Plaintiff, and what was not, prior to his criminal trial." On this motion for summary judgment, the Defendants have the burden of proof and they have wholly failed to carry that burden on this key issue.[4] As one example of how the Defendants attempt to

---

[4]    *See, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 86 (2d Cir. 2001) (discussing New York Supreme Court Justice Ruth Moskowitz's decision to grant the defendant's 440 motion in principal part (*Brady*) because the prosecutor from the KCDA's office "did not keep a log of documents that had been disclosed . . . [and] the court's independent review of pre-trial appearances did not show any in-court disclosure of the documents").

disguise their misconduct, defense counsel disingenuously suggests to the Court that the mere "presence" of a detective's notebook (on the lap of a testifying detective during a Wade Hearing) satisfies *Brady/Rosario*. *See* Defendants' citation to Defts' Ex. 22 [Dec. 14, 1984 Wade Tr.]. This suggestion is absurd. The notebooks of Detectives Norrito and Tumbarello were never turned over to Plaintiff or his criminal attorney prior to, or during, trial. *See* Transcript of Deposition of Lewis Cohen ("Cohen Dep.") 219:10-13; 223:17-19; 224:11-13; 231:11 to 232:4; 258:8-17 (**Ex. 1**). In fact, the ADA at that Wade Hearing objected to and successfully prevented Plaintiff's attorney from even getting a cursory look at one of the notebooks. Transcript of Dec. 14, 1984 Wade Hearing ("Wade Tr.") at 76:14 to 78:10 (**Ex. 2** hereto[5]). And the most important DD-5s were improperly redacted so that witnesses could not be located and independently interviewed. *See* Police Reports provided to criminal defense attorney, Lewis Cohen (CG426-524), (**Ex. 3** hereto). *See* Cohen Dep. 189:25 to 190:10 (Cohen believes that he received redacted DD-5s) (**Ex. 1** ).

9. *Disputed.* While Mr. Kim was apparently one of the first witnesses interviewed, he was *first interviewed at the scene of the crime*. NYPD Police Officer Castriccone arrived at the scene and took the first statement from Kim. Kim advised Castriccone that Choi was surrounded by four male blacks, and that "Perp No. 1" stabbed Choi. Perp No. 1 was described at that time as: "Sex: M; Race: B; Age: 16 to 18; **Height: 6'0"**. UF-61, Complaint Report dated June 14, 1983 (Defts' Ex. 1). Kim was interviewed by a second officer at the crime scene, Police Officer Williams (Badge#3496); at that time Kim described the assailant wearing a "chocolate shirt" who

---

[5]   All references to Plaintiff's exhibits herein ("**Ex.**") are to the exhibits attached to the Declaration of John F. Schutty, Esq. dated October 31, 2016, submitted in opposition to the Defendants' motion for summary judgment.

stabbed Choi as "Sex: M; blk; Age: 18-20; Height **508-509**; weight: 130." Complaint Report dated June 14, 1983 (CG445) (**Ex. 3** hereto) (redacted DD-5s and police records given to Greene's criminal attorney, Lewis Cohen). Later that day, Kim was interviewed by Detectives. Norrito and Tumbarello and then described the person who stabbed Choi as a black male, 5'9" tall, wearing a "dark brown shirt." Defts' Ex. 5. Still later, Kim was interviewed by ADA Sullivan in the presence of Norrito and Tumbarello and stated that the stabber was the "tall guy." Defts' Ex. 18 (Audio Recording of Kim Interview).

10.    *Disputed,* since what is claimed in this paragraph was conveyed by Kim in his third or fourth interview, not his "initial" interview.

11.    *Disputed,* because Kim always provided initial measurements in feet and inches (height and distance) without prompting by police and prosecutors.    *See, e.g.,* Audio Recording of Kim Interview (Defts' Ex. 18). Kim only claimed a lack of familiarity with the imperial system of measurement at trial – likely as a result of prompting/coaching by the police and prosecution team, in light of Plaintiff's height and Kim's early description of Choi's murderer.

12.    *Not disputed,* but none of these facts are relevant to what is at issue on Defendants' motion – *viz.,* (a) have Choi's true assailants made admissible confessions to Choi's murder and established Cy Greene's innocence, (b) was evidence fabricated and secreted by police investigators to justify the arrest the arrest of Cy Greene and establish/maintain his conviction, (c) were prosecutors aware of patent discrepancies in the evidence produced by the investigating detectives that were not disclosed to defense counsel, (d) were there abundant *Brady/Rosario* violations committed by police and

prosecutors, and (e) were the latter failures the direct result of a breakdown in training, supervision and discipline of police and prosecutors.

13.     *Not disputed.*

14.     *Not disputed,* but supplemented by Plaintiff's claim that the prosecutors had an undeniable obligation to turn over the audiotape of the Kim interview (and all other audiotapes of witness interviews), among other things, to Plaintiff and his attorneys.

15.     *Not disputed.*

16.     *Disputed.*   It is abundantly clear from the audiotape of Kim's interview (Defts' Ex. 18) and Kim's several NYPD interviews on the day of the murder that Kim had described the brown-shirted, black male who stabbed Choi as "tall" (between 5'9" and 6' tall), but prosecutors and police did all that they could to conceal that fact from Plaintiff and his attorney.

17.     *Disputed.* Mr. Rahman has testified under oath that he did *not* tell Detectives Norrito and Tumbarello that all three assailants were 5'8" tall; he has testified that the assailants were between 5'8" tall and 5'10" and that none of them 'was as short as his wife' who is 5'5" tall.  Transcript of Criminal Trial Hearing on Mar. 25, 2005 in *People v. Greene*, S.Ct. Kings Co., Indict. No. 3521/83, at 56:1 to 57:8 (CG1642-43) (**Ex. 4** hereto).

18.     *Not disputed,* but these facts are irrelevant to the Defendants' liability, except for the fact that the audiotape of the Rahman interview was improperly withheld from Plaintiff and his attorneys.

19.     *Not disputed,* but supplemented by the fact Mr. James Robinson "ran after" the brown-shirted black male until the latter entered a cab; that brown-shirted man

was described by Robinson as "6' tall."   Robinson's statement is especially important because it shows that Norrito both: (a) withheld valuable evidence and (b) lied at trial about the occupants in that taxi.  *See infra* ¶¶ 254 - 265.  Without a doubt, the connected "chain" of eyewitness accounts – Kim to Rahman to Head to Ryan to Robinson to the taxi driver, Reynold Guerrier, unequivocally establishes that the tall, chocolate-brown-shirted man in the taxi was the same man seen fleeing the murder scene, then the subway station, then into Guerrier's cab, "out of breath."  *See infra* ¶¶ 254-258.  Detective Michael Norrito, however, testified falsely at Cy Greene's criminal trial that that the black males seen fleeing into the cab were *not* part of the "group involved in this incident (crime) . . . because **we were later informed by a confidential informant who got into that cab**."  Transcript of Criminal Trial in *People v. Cy Green*, N.Y. Sup. Ct., Kings Cty., April 30 through May 9, 1984 (Indict. No. 3521/83) ("Trial Tr.") at 243:3-17 (CG 962) (**Ex. 5**).  Remarkably, this highly relevant information was never conveyed to Greene or his criminal attorney.  Those men, with the brown-shirted man, in the cab were chased by Robinson, so they absolutely were an integral "part of the group involved in this incident"; Norrito has never revealed who that "confidential informant" was who provided that misinformation or, much more importantly "who got into that cab" (the identities of the brown-shirted man and his companions).  *See infra* ¶ 258.  What is undeniably true from these facts is that Detective Norrito withheld the identity of one or more of the actual assailants to protect a New York City Police Department ("NYPD") informant (and Mark Best) at the expense of Cy Greene.

      20.    *Not disputed.*

21.     *Not disputed,* but supplemented by the fact that Mr. Reynold Guerrier ("Guerrier") advised Detectives Norrito and Tumbarello that the passenger wearing the "brown shirt" was "MB 18-20 5'10" thin bn shirt."  Tumbarello Notebook (Defts' Ex. 15).  Guerrier also advised the detectives that his three passengers "were speaking Spanish."  *Id*.  Unfortunately, Tumbarello's Notebook was not turned over to Plaintiff or his attorney prior to trial.

22.     *Not disputed,* but supplemented by the fact that prosecutors turned over only a redacted DD-5 Report of the Guerrier interview, which blotted out Mr. Guerrier's name and address and effectively prevented Plaintiff and his criminal attorney from interviewing him.  *See* **Ex. 3** (redacted DD-5s provided to Attorney Cohen) (CG428).

23.     *Not disputed.*

24.     *Not disputed,* but the fact that Detective Herlihy failed to obtain the information (that the assailants spoke Spanish) is irrelevant, since Norrito and Tumbarello had this valuable information and they failed to disclose it to Plaintiff and his criminal attorney.

25.     *Not disputed,* but supplemented by the fact that prosecutors turned over only a redacted DD-5 Report of the Ryan interview, which blotted out Mr. Ryan's name and address and effectively prevented Plaintiff and his criminal attorney from interviewing him.  *See* **Ex. 3** (redacted DD-5s provided to Attorney Cohen) (CG429).

26.     *Not disputed,* but supplemented by the fact that prosecutors turned over only a redacted DD-5 Report of the Thomas interview, which blotted out Mr. Thomas's name and address and effectively prevented Plaintiff and his criminal attorney from interviewing him.  *See* **Ex. 3** (redacted DD-5s provided to Attorney Cohen) (CG429).

27.     *Disputed,* because while Rahman may not have seen the knife enter Choi's body, he did witness most of the assault.  *See* Defts' Ex. 14 [Norrito Notebook], Defts' Ex. 25 [DD-5 Report of Rahman Interview], Defts' Ex. 26 [June 14, 1983 Statement of Rahman], and **Ex.** 6 hereto [Audio Recording of Rahman Interview].

28.     *Not disputed,* but supplemented by the fact that prosecutors turned over only a redacted DD-5 Report of the Head interview, which blotted out a good deal of information and thereby prevented Plaintiff and his criminal attorney from having the same ability to interview Head that prosecutors and police enjoyed.  *See* **Ex. 3** (redacted DD-5s provided to Attorney Cohen) (CG426-524)*.*

29.     *Not disputed,* but supplemented by the fact that Head specifically told Detectives Norrito and Tumbarello that he recognized the black males that he had seen fleeing the murder scene because he had previously seen them doing pickpocketing around the subway station; he stated explicitly that he could identify them.  *See* Audio Recording of Eric Head Interview (**Ex. 7** hereto) and Defts' Ex. 33 [Head Interview Transcript].  The fact that Norrito substituted the name of "Eric Tidwell" for "Lenny Best" is highly significant because of a "deal" that Norrito made with Lenny Best's brother, Mark Best, and his concealment of a "confidential informant" who took part in the Choi murder with Mark Best.  *See infra* ¶¶ 239-240.

30.     *Disputed,* since the Defendants assert arguments, not facts, within this paragraph.  Detective Tumbarello's Notebook (Defts' Ex. 15 at 8) clearly recorded three names (Joseph Ross, Ronald Blanding and Lenny Best) as the persons identified by Head; the related Norrito DD-5 recorded three names, but Norrito had the motive and the opportunity to change his DD-5 to delete Lenny Best's name and add the name of a

known-jailed individual, Eric Tidwell, both to hide Lenny Best's identification (and his escape from police custody) and to discredit Eric Head as "unreliable." *See infra* ¶ 240. We call the Court's attention to one of the last notations in Norrito's Notebook (10:30 p.m.) after the audiotaped interview of Head at 9:50 p.m.: "Leonard Best, Marcus [Mark Best], Joseph Ross." Defts' Ex. 14 at CG4026. Clearly, Lenny Best's name was recorded by Norrito shortly after the Head interview was completed. Another witness, Colbert Narcisse, was the witness who actually advised Norrito about Eric Tidwell, at least according to his Norrito's own Notebook notations. Defts' Ex. 14 at CG4031.

31.    *Disputed.* This paragraph contains patent argument, not fact. Norrito did, in fact, record Lenny Best's name in his Notebook on June 14, 1983 (at 10:30 p.m.), immediately after the Head audiotaped interview was completed that night (it was begun at 9:50 p.m.). *See* Defts' Ex. 14 at CG4026.

32.    *Not disputed,* but supplemented with the fact that Head admitted that he didn't know the names of the individuals who he saw running away from the subway station moments after the murder; but Head also stated that he had seen these individuals previously and could identify them. Defts' Ex. 33 at CG 368. Again, prosecutors failed to turn over the audiotape of the Head interview or the detectives' Notebook pages that are related to the Head interview to Plaintiff or his criminal attorney.

33.    *Not disputed.*

34.    *Not disputed.*

35.    *Disputed.* First, the record does not support the Defendants' claim that Norrito met with Mark Best "at 11:20 a.m. and again at 1:30 p.m." Norrito's Notebook shows only that Norrito *made notations at those times*. Defts' Ex. 14 at CG4035-36.

Second, we call the Court's attention to the first notation made by Tumbarello on June 15, 1983 (the day after Head identified Lenny Best, and the same day Lenny Best escaped from police custody): "Lenny Best."  Defts' Ex. 15 at CG2385-88.  The first notation made by Norrito on June 16, 1983 (the morning after Lenny Best escaped) is Mark Best's name along with the following: "Says his brother Lenny told him about the [Choi] killing."  Defts' Ex. 14 at CG4035.  Lenny Best was undeniably a prime suspect and was recorded as such in Norrito's own (withheld) Notebook.  Lenny Best was taken into custody by NYPD officers on June 15, 1983 and escaped; remarkably, this fact was secreted from Plaintiff and his criminal attorney.  Transcript of Leonardo Best Deposition (L. Best Dep.) 32:3 to 33:5 (**Ex. 8** hereto); *see also* Transcript of Deposition of Joseph Tumbarello ("Tumbarello Dep.") 132:2 to 133:6, 133:5-7 and 133:15-22 (**Ex. 9** hereto) (Tumbarello recalls arriving at the 67th Precinct on June 15, 1983 and everyone was talking about how Lenny Best was taken into NYPD custody but escaped).   Norrito furthered this outrageous misconduct by fabricating evidence (Head's alleged identification Eric Tisdale in the place of Lenny Best) to protect and secrete Lenny Best, and hide the absolute bias of Mark Best and latter's desire to shift the investigation away from him and his brother and pin the crime on someone else.  *See infra ¶¶* 237-239.  Finally, since Mark Best later fully admitted that he participated in the crime, Plaintiff can show that Mark Best's early, unsworn accounts of the Choi murder, allegedly provided to Norrito and Tumbarello, are false.  Plaintiff objects to the introduction of any and all such (pre-criminal trial) statements made by Mark Best as inadmissible hearsay.

36.    *Disputed.  See* paragraph 35 above, the contents of which are repeated here.   And, since everything Detectives Norrito and Tumbarello claim occurred with

Mark Best is suspect in light of what Norrito fabricated and hid from Plaintiff regarding Mark Best, Lenny Best, and the "confidential informant" who was in the company of those who committed the murder (all with Tumbarello's wrongful acquiescence).   *See infra ¶¶* 237-239.

    37.    *Disputed.   See* paragraphs 35 and 36 above, the contents of which are repeated here.

    38.    *Not disputed.*

    39.    *Disputed.   See* paragraphs 35 and 36 above, the contents of which are repeated here.

    40.    *Disputed.   See* paragraphs 35 and 36 above, the contents of which are repeated here.  Moreover, Mark Best's early account of the crime (even if it was found admissible) is itself unbelievable, unless he was a criminal participant since he allegedly was in all places, with alleged perfect vantage points, and observed everything that occurred – from Choi and Kim's purchase of a soda in a store (he was there), to their walk down the subway stairs (he was there), to Cy Greene allegedly urinating on the subway stairs (he was there), to the chase and  assault that took place on a landing below the subway stairs (he was there) and then the murder across the landing on another staircase (he was there).  Even Norrito now admits that Mark Best likely participated in the crime.  Transcript of Deposition Michael Norrito ("Norrito Dep.") 108:24 to 109:14 (Norrito discusses why he recalls showing Kim photos of Lenny Best, Mark Best and Blanding: "[t]hey were always there [at the subway station][;] [t]hey were pickpockets ... purse snatchers"); 242:8-10 ("I always treated him as a suspect. I never quite believed that he was innocent[.]") (**Ex. 10**).   Mark Best was a participant in the crime and he

-13-

provided a false statement against Cy Greene to protect himself, which was promoted improperly by the investigating detectives.  *See infra ¶¶* 280-293.

41.     *Not disputed.*

42.     *Disputed.  See* paragraphs 35, 36, 37, 39 and 40, the contents of which are incorporated here.

43.     *Disputed.*  Abdul Rahman also witnessed the assault.  *See* paragraph 27 above.

44.     *Disputed.*   No eyewitness ever described the facial features of any assailant who attacked Choi or Kim, at least according to all the police records produced to date, including all the DD-5s and Notebook notations of Norrito and Tumbarello.

45.     *Disputed.  See* paragraphs 35, 36, 37, 39 and 40, the contents of which are incorporated here.  Detective Norrito engaged in a planned strategy to set up and arrest Cy Greene, which is evident from Norrito's fabrication of evidence and withholding of evidence (all with Tumbarello's acquiescence).  Norrito's alleged, permissible reliance on "evidence" provided by Mark Best cannot be justified, and the tainted lineups conducted by Detectives Norrito and Tumbarello were inexcusable.   *See infra ¶¶* 323-326.

46.     *Not disputed,* but supplemented by the fact that Detective Tumbarello has testified that he was the arresting officer only at Norrito's insistence.  Tumbarello Dep. 232:19 to 233:3; 243:16-25; 300:25 to 301:16 (Ex. 9).

47.     *Disputed.*  A thorough review of the DD-5s, the Kim interview tape and transcript, and the criminal trial transcript, shows that Kim never mentioned in his early accounts that he landed any blow to any assailant.  Norrito's testimony on this subject is highly suspect and uncorroborated because he admitted at the Wade Hearing that he

-14-

never recorded in any writing that Kim had struck one of the assailants and Norrito's uncorroborated, hearsay account of what Kim allegedly told him is and was an inadmissible statement.   Wade Tr. 30:17 to 31:5 (CG595-96) (**Ex. 2**).   The Kim Statement (Defts' Ex. 2) referred to by the Defendants in support of their claim that Kim struck one of the assailants in the face is wholly unsupportive – Kim never stated that he struck anyone in the face in that recorded statement.  He stated only that "I *tried* to fight one of them."  Defts' Ex. 2 at CG135 (emphasis added).

48.     *Not disputed,* but supplemented by the fact that: (a) the jail cell in question was highly visible in the middle of that second floor of the 67th Precinct; (b) Cy Greene and Larry Williams were the only people in that jail cell; (c) Detectives Norrito and Tumbarello have admitted that for several hours they did not supervise Kim while he was present on that second floor of the 67th Precinct that evening; (d) Plaintiff and Larry Williams offered corroborating sworn testimony that an "Oriental" man kept walking past their jail cell at that time staring at them in an angry way (two detectives allegedly were assigned to keep Kim away from Greene/Williams and Mark Best, but those detectives have never been identified or deposed); (e) defense counsel was prohibited from asking Kim about whether he was allowed to view Plaintiff and Larry Williams in a jail cell prior to the lineup and Kim has never offered sworn testimony on that question, (f) Kim testified at the criminal trial that Tumbarello told him, improperly, on the way to the lineup, that "we will line up the people who were at the crime scene, so pick one, pick them out."  Trial Tr. 366:20-21 (CG1089) (Ex. 5), and (g) the Defendants have yet to rebut the sworn testimony of Plaintiff and Larry Williams about the pre-lineup viewing of them by an "Oriental man," Kim, prior to the lineups. *See infra* ¶¶ 329-331.

49.  *Disputed.* Norrito's and Tumbarello's testimony is untrustworthy in light of their other fabrications and withholdings, and their testimony on this subject has never been corroborated by either Mark Best or Kim.

50.  *Disputed.  See* paragraph 49 above and the fact that both Norrito and Tumbarello testified that they were not with Kim in the 67th Precinct in the hours before the lineups were commenced.  *See infra ¶¶* 319-324.

51.  *Disputed.* "Nearly impossible" is not impossible or improbable, in light of the other conduct by Detectives Norrito and Tumbarello that has come to light in this case.  Hence, at best, an undeniable issue of fact exists as to whether the lineups were tainted – the sworn testimony of Greene and Williams has never been rebutted by Kim or the two detectives who allegedly were assigned to keep Kim away from viewing Greene and Williams in the nearby jail cell.  *See infra ¶¶* 315-337.

52.  *Not disputed,* but supplemented by the fact that the lineups were conducted many hours after Kim was present on the second floor of the 67th Precinct – allowing Kim several hours to view Cy Greene and Larry Williams in a jail cell together on the same floor as Mr. Kim.  Kim arrived at the 67th Precinct at 6:30 p.m. and the lineups were not commenced until 9:05 p.m.[6]  The jail cell was in the middle of the second floor of the 67th Precinct, visible from many angles on that floor.  *See* **Ex. 2** hereto: Wade Tr. 20:25 to 21:2-3 (CG585-86) (Norrito: "The cell is in the middle of the

---

[6]    Norrito and Tumbarello have each admitted that they were not with Kim on the second floor of the 67th Precinct in the hours before the lineups when Kim would have had the opportunity to examine Greene in a jail cell or converse with Mark Best.  *See* **Ex. 2** hereto: Wade Tr. 104:22-23 (CG669) (Tumbarello took Kim to the 67th Precinct at 6:30 p.m.); 108:2-14 (CG673) (Tumbarello left Kim alone in the catch unit with two other detectives); 54:2-4 (CG619) (Norrito admits he never saw Kim arrive at the 67th Precinct), and 55:2-3 (CG620) (Norrito first interacted with Kim at 8 p.m. that evening).

P.D.U.); 49:23-25, 50:7-8 (CG614-15) (Norrito admits that anyone entering the detective's room can look from the center of that room and can see the jail cell). *See infra ¶¶* 316-330.

53.     *Disputed.*  No admissible evidence has been submitted by the Defendants that Kim "identified Mr. Greene as the murderer immediately upon seeing him in the lineup."

54.     *Disputed,* since everything Norrito and Tumbarello claim occurred with Mark Best is suspect in light of what Norrito fabricated and hid from Plaintiff regarding Mark Best, Lenny Best, and a "confidential informant," who was in the company of those who committed the murder (all with Tumbarello's wrongful acquiescence). *See infra ¶¶* 232-244.

55.     *Disputed,* since both Norrito and Tumbarello testified at a Wade Hearing against Plaintiff and Norrito testified against Plaintiff at the criminal trial; Norrito fabricated evidence and lied at the criminal trial about his interview with Eric Head, the involvement of Mark Best in the crime, and the importance of the identity of the occupants in Mr. Guerrier's cab, including the brown-shirted stabber (information available through Norrito's unidentified "confidential informant").  In short, both Norrito and Tumbarello were intimately involved in the prosecution of Cy Greene.

56.     *Disputed,* because ADA Sullivan was involved in the investigation of Choi's murder and he made certain critical decisions and created items of evidence that were not given to Plaintiff in violation of *Brady/Rosario.*  ADA Sullivan was fully aware that Kim referred to the brown-shirted man who stabbed Choi as the "tall guy," and that

Kim otherwise referred to him as 6' tall to another police officer; despite this knowledge, ADA Sullivan failed to pass it along to Plaintiff's defense counsel

57.    *Not disputed*.

58.    *Not disputed,* but Plaintiff objects to the Defendants' suggestion that the 5'4" tall Kim does not understand the English phrase "taller than me."  Defts' Ex. 41 (Q: When you say tall what [sic- was] he [the man with the knife] tall or was he taller than you?  A. Taller than me.")

59.    *Not disputed*.

60.    *Not disputed.*

61.    *Not disputed,* but supplemented with the fact that defense counsel requested the opportunity to cross-examine the only two witnesses who allegedly identified Greene and Williams as two of the assailants involved in the Choi murder. Prosecutors improperly opposed producing Kim and Mark Best at the Wade Hearing and the presiding judge (Justice Joseph Lombardo) wrongfully refused to compel their attendance so that a proper examination of the alleged identifications could take place. Wade Tr. 82:19-33 to 83:9-15 (CG647-48) (**Ex. 2**).   Norrito and Tumbarello were allowed, throughout the Wade Hearing and criminal trial, to testify improperly about the hearsay statements of Kim and Mark Best.  *See, e.g.,* Trial Tr. 652:24 to 653:8 (CG1376-77) (**Ex. 5**).

62.    *Disputed*.  Yes, Greene and Williams both testified at length about the "Chinese" or "Oriental" man who repeatedly walked past their cell and stared at them prior to their lineups.  Wade Tr. 126:23-25 to 128:2-6 (CG691-93); 131:5-20 (CG696); 132:19-24  (CG697);  136:8-10  (CG701);  137:10-12  (CG702);  151:2-25  153:2-20

(CG716-18) (**Ex. 2**).  The Defendants wrongfully suggest that Greene should have known who this man was at the Wade Hearing because they state "Mr. Greene did not identify this man as Mr. Kim [of course not – Greene had never seen him before in his life] and denied ever seeing him again after this incident [that is not true – but Greene would not see him (Kim) again until Greene's criminal trial almost six months later]."  Greene described this "Oriental" man with great detail during his Wade Hearing ("five-five, five-six [tall], [weighing] about one-thirty, one-twenty [pounds]," *id.,* 137:10-12 (CG702), and Greene was told by a janitor working in the 67th Precinct that day that the "Oriental" man staring at him was a witness who was there "to identify the men who had killed his friend."  Defts' Ex. 62 (Cy Greene Dep.) 244:4-11; *see also* Wade Tr. 148:18-20 (CG713) (**Ex. 2**).  Finally, Greene's attorney properly claimed that the lineups should have been conducted with Greene and the fillers standing because having them seated hid the height of the lineup participants -- Greene was about 5'1" tall (Wade Tr. at 135:4-7 (CG700) (**Ex. 2**) – [I'm] about 5'1" tall") and one of the fillers in his lineup was 6'3" tall (Patrick Palmer), *id.*, 5:7-10 (**Ex. 2** ).

63.    *Disputed*.  Justice Lombardo simply did not have all the facts before him; he didn't know that Norrito and Tumbarello had fabricated evidence and secreted other evidence; he didn't know that Norrito had "cut a deal" with Mark Best for pinning the crime on Cy Greene; he determined that Kim did not observe Greene or Williams in a jail cell prior to the lineups without hearing from Kim or the two detectives then assigned to supervise him at the Precinct, and he improperly rejected the detailed and corroborating testimony of Greene and Williams that the latter two observed an "Oriental" man, freely moving around the second floor of the 67th Precinct, frequently and suspiciously staring

at them in their jail cell in the hour or two preceding their lineups.  In a rush to judgment, Justice Lombardo gave no credit to the testimony of Greene and Williams even though it was not rebutted (*e.g.*, Norrito and Tumbarello have admitted that they were not personally with Kim during his several hour wait at the Precinct, pre-lineups) and, instead, gave great faith to the testimony of Norrito and Tumbarello, without knowing how deceitfully Norrito had steered the murder investigation away from the Bests (and others) and Norrito's still undisclosed "confidential informant," who escaped in a taxi with the brown-shirted murderer.  *See infra* ¶¶ 343-349.

64.    *Disputed*.  *See* paragraph 63 above.

65.    *Disputed*.   Plaintiff is unable to determine precisely what point the Defendants are trying to make here.  Evidence was fabricated and secreted pre-arrest and post-conviction and that will be shown by Plaintiff throughout these motion opposition papers.

66.    *Disputed*.  ADA Sullivan was involved in the investigation up to the time of Greene's arrest and was wrongfully acquiescent, if not complicit, in the withholding of valuable evidence from Greene and his criminal attorney.   *E.g.,* Defts' Ex. 18 [Audio Recording of Kim Interview], **Ex.** 6 [Audio Recording of Rahman Interview], **Ex.** 11 [Audio Recording of Mark Best Interview], and **Ex. 7** hereto [Audio Recording of Head Interview].  Plaintiff also believes that ADA Sullivan played a role in redacting very vital information on many of the police records produced to Greene through his criminal attorney, Lewis Cohen.  *See, e.g.*, **Ex. 3** (redacted police records provided to Attorney Cohen).

-20-

67.     *Plaintiff can neither deny nor dispute the Defendants' claim that "ADAs Kallen and Greene received all of the Detectives' and police officers' notes prior to the trial."* Plaintiff can merely repeat that he did not receive the audio recordings of interviews, the Norrito and Tumbarello Notebooks, the 67th Precinct's "Homicide Work Sheet," all of the DD-5s without redaction, or the valuable "confidential informant" information Norrito had about the assailants seen in the cab that left the murder scene with the brown-shirted stabber prior to the criminal trial.

68.     *Not disputed,* but supplemented by the fact that ADA Kallen failed to bring several important, noted discrepancies to the attention of the court and counsel before withdrawing from the case, apparently due to a lack of training or supervision on *Brady/Rosario* case law and the duty of prosecutors.

69.     *Disputed.* The fact that ADA Kallen and Gerald Greene "cannot remember anything unusual about Mr. Greene's case" does not excuse their behavior, which violated clearly established constitutional standards.

70.     *Not disputed.*

71.     *Disputed.* The Defendants here make legal argument that is totally inappropriate in a Rule 56.1 Statement. The gross and palpable "height difference" between the brown-shirted murderer (5'9" to 6') and Cy Greene (5'1") and the sole eyewitness' admission that the brown-shirted stabber was "tall" and "taller than me" (Kim was 5'4" tall) show that but for the fabrication and secretion of evidence, a tainted lineup identification, and the continual assertion by police at criminal hearings and trial that a second, never-produced eyewitness (Mark Best) also identified Greene as the murderer, Cy Greene would never have been arrested or convicted for this crime.

72.     *Disputed. The Defendants here make legal argument that is totally inappropriate in a Rule 56.1 Statement.* As any trial attorney will do, the cited testimony of Attorney Cohen simply shows that he will attempt to defend his work for Cy Greene. His ineffectiveness, however, if any, does not alter the fact that serious police and prosecutor misconduct caused Greene's arrest and conviction.

73.     *Disputed.*   Again, Attorney Cohen's performance at the criminal trial, ineffective or not, does not alter the fact that serious police and prosecutor misconduct caused Greene's arrest and conviction.   Attorney Cohen was never given the audio recording, though he requested all *Brady/Rosario* material pretrial.  *See* Attorney Cohen's Pretrial Requests for *Brady/Rosario* Material ("Notice of Motion" & "Attorney Affirmation" dated July 25, 1983 (NYC40-46), and "Supplemental Affirmation" dated October 18, 1983 (NYC48), **Ex. 12** hereto) and the KCDA's Responses ("Voluntary Disclosure – Particulars, Notices & Demands" dated June 23, 1983 (CY138-142), and "Response to Motions/Bill of Particulars" (undated) (NYC54-56), **Ex. 13** hereto).

74.     *Disputed.*  The Defendants use improper hyperbole when they suggest that "numerous DD-5s [were] handed over to the opposing counsel at the time of trial," as if the decision of prosecutors to turn over some redacted DD-5s excuse the serious police and prosecutor misconduct that caused Greene's arrest and conviction

75.     *Disputed.*  The opinions and beliefs of Lewis Cohen, Esq. are irrelevant and inadmissible in this action.

76.     *Disputed.*   With the fabricated evidence produced and other evidence withheld, police and prosecutors had an incredibly unfair advantage at Greene's criminal trial.  What Attorney Cohen chose to do or not to do (or what he believes), based on the

-22-

misinformation that he was provided, is irrelevant.  What is relevant here is only whether there was police and/or prosecutor misconduct; Plaintiff can and will show that with abundant evidence that  Eric Head did not identify Eric Tidwell as one of the assailants that he observed fleeing the crime scene, as the Defendants still claim – that claim is a fabrication by Detective Norrito, a fact that is borne out not only by Detective Tumbarello's Notebook, but by Norrito's own Notebook entries following the Head interview, and by the fact that Lenny Best was arrested the very next day (and then escaped from police custody).  Plaintiff will also show that a myriad of other evidence involving Mark Best, Lenny Best, and the identity of a "confidential informant" who participated in the murder, was wrongfully withheld from Attorney Cohen.

77.     *Disputed.* On this motion, Plaintiff does not bear the burden of proof on whether police and prosecutors delivered *all* of the exculpatory evidence in their possession to Greene and his criminal attorney prior to trial; the Defendants bear that burden[7] and the Defendants have submitted no sworn testimony by any prosecutor stating precisely what was produced to Greene or his criminal attorney.  Attorney Cohen has testified that he does not recall receiving any audiotapes of interviews relating to the Choi murder from prosecutors and he certainly never received, among other things, the highly relevant Notebooks of Norrito and Tumbarello, or the notes of ADA Kallen that undeniably show that prosecutors knew that both Norrito and Mark Best had provided evidence that conflicted with Kim's statements (where and how Choi was stabbed), who Eric Head had identified, or the escape of Lenny Best from police custody, or the identity

---

[7]   *See, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 86 (2d Cir. 2001) (discussing New York Supreme Court Justice Ruth Moskowitz's decision to grant the defendant's 440 motion in principal part because the prosecutor from the KCDA's office "did not keep a log of

of the "confidential informant" who participated in the Choi murder.  *See infra* ¶¶ 260-262.

78.     *Disputed.*  The Defendants have grossly exaggerated the number of days of live testimony at the criminal trial, where the only admissible testimony offered against Cy Greene, linking him to Choi's murder, was through Jae Kim, who allegedly identified Greene after a very tainted identification.

79.     *Disputed.*  Legal arguments made previously by Greene's attorneys are wholly irrelevant to the issues of police and prosecutorial misconduct here, because these issues are only now capable of being fully addressed following discovery in this civil rights action.

80.     *Not disputed.*

81.     *Not disputed,* except supplemented by the fact that many other witnesses have testified that they were threatened physically and emotionally (with criminal charges) if these witnesses did not provide the precise information sought by Detectives Norrito and Tumbarello in their relentless quest to arrest and convict Cy Greene.  *see infra* ¶¶ 275-277.  The fact remains that Mark Best confessed to participating in the crime prior to his death and his confession perfectly matches the confessions of at least two other participants in the Choi robbery and murder.  *See infra* ¶ 310, 312 and 315.

82.     *Not disputed.*

83.     *Not disputed.*

84.     *Not disputed,* but supplemented by the fact that Mark Best's pre-death confession that he participated in the Choi robbery and murder is wholly credible in light

---

documents that had been disclosed. . . [and] the court's independent review of pre-trial appearances did not show any in-court disclosure of the documents").  *See infra* ¶¶ 384.

of the corroborating confessions of at least two other participants in the crime. *See infra* ¶ 310, 312 and 315.

85.    *Disputed.*  No evidence is submitted in support of the allegations made in this paragraph, other than Justice Pesce's description of what the People (prosecutors) reported to him.  That "account by Justice Pesce" is pure hearsay and is not admissible here.

86.    *Disputed.* Justice Pesce's ruling in this regard has absolutely no relevance to the issue of police and prosecutorial misconduct at issue here.  This action was filed specifically to determine what police and prosecutor misconduct caused Greene's wrongful conviction.   Justice Pesce had far different evidence before him.  *See* paragraphs 81 and 84 above.

87.    *Not disputed.*

88.    *Disputed.*  Legal and factual arguments made previously by Greene or his attorneys are wholly irrelevant to the issue of police and prosecutorial misconduct here, because this issue is only now capable of being shown through discovery in this civil rights action.

89.     *Disputed.*  Legal and factual arguments made previously by Greene's attorneys are wholly irrelevant to the issue of police and prosecutorial misconduct here, because this issue is only now capable of being fully addressed through discovery obtained in this civil rights action.

90.    *Disputed.*  Legal and factual arguments made previously by Greene's attorneys are wholly irrelevant to the issue of police and prosecutorial misconduct here,

because this issue is only now capable of being fully addressed through discovery obtained in this civil rights action.

91.     *Disputed.*   Justice Pesce's rulings in this regard have absolutely no relevance to the issue of police and prosecutorial misconduct at issue here and now. Justice Pesce had far different and less misconduct evidence before him.

92.     *Disputed.*   Justice Pesce's rulings in this regard have absolutely no relevance to the issue of police and prosecutorial misconduct at issue here and now. Justice Pesce had far different and less police and prosecutor misconduct evidence before him.   Plaintiff now has had the opportunity to obtain further documents, and the opportunity to depose police investigators, prosecutors and expert witnesses.   Plaintiff also submits that Justice Pesce misinterpreted police and prosecutor obligations under *Brady/Rosario,* as he wrongfully determined that defense counsel had the obligation to request evidence in the possession of prosecutors when no such obligation "to request" exists under *Brady/Rosario*.  And, in fact, defense counsel requested it.  *See* paragraph 73 above.

93.     *Disputed.  See* paragraph 92 above.

94.     *Disputed.  See* paragraph 92 above.

95.     *Not disputed.*

96.     *Disputed.* This is "argument" for a legal brief and is not a proper Rule 56.1 Statement "fact."   The question of whether "any material was improperly withheld from Mr. Greene" is the ultimate fact and legal issue in this case and, unfortunately for the

Court, the Defendants have not shown what they provided and did not provide to Greene and his criminal attorneys.[8]

97.    *Disputed.*    The Complaint cites to evidence *known at the time the Complaint was filed and not what is known today.*  Justice Pesce's prior ruling has no relevance in this § 1983 litigation, where additional and new evidence has been developed.

98.    *Not disputed.*

99.    *Not disputed.*

100.    *Disputed.*  This information has absolutely no relevance on this motion and is objected to by Plaintiff.

101.    *The first sentence is disputed and the second is not.  Plaintiff moves to strike the specious and inadmissible claims in the first sentence.*  Lenny Best's "beliefs and opinions" are wholly irrelevant and should not be considered in any way by the Court.  As to the second sentence, what Lenny Best observed about police treatment towards Cy Greene is relevant and admissible.

---

[8]   The Defendants' own expert on prosecutor training and prosecutor misconduct, Stacy Caplow, has testified that ADAs should have disclosed "exculpatory" material (like detectives' notebooks and any evidence showing a discrepancy in height between Cy Greene and the eyewitness descriptions of the stabber).  *See* Transcript of Deposition of Stacy Caplow (Rule 30(b)(6) witness on KCDA training) ("Caplow Training Dep.") 57:13-15 ("                                                                                             "); 59:23 to 60:2-9 ("                                                                                                                                                                                                                                                                                                                                                                                                                                             ") (**Ex. 14**).

102.   *Portions are disputed and portions are not.*   Lenny Best was being brought in to be questioned about the Choi murder.   Tumbarello Dep. 132:14 to 133:22 (Tumbarello heard "rumors" at the precinct about Lenny Best escaping the police car when he was being brought in) (**Ex. 9**).   Lenny Best's "belief and opinions" are otherwise inadmissible.   Lenny Best did escape from police custody and this escape was not recorded in any police report in violation of NYPD regulations.   *See infra* ¶¶ 225–229.   Lenny Best's escape also was apparently not reported to Greene's criminal attorney.   *Id.*

103.   *Plaintiff objects to the "legal argument" in this paragraph.*   Plaintiff has produced a list of thirty-six cases tried by the KCDA's office which were reversed because of *Brady/Rosario* issues during the period from 1975 to 1997.   The timing of when these reversals occurred, in relation to when Plaintiff's conviction was reversed, is wholly irrelevant.

104.   *Not disputed.*

105.   *Not disputed.*

106.   *Disputed* and supplemented by the fact that Greene described this "Oriental" man with great detail during his Wade Hearing and Greene was told by a janitor working in the 67th Precinct that day that the "Oriental" man staring at him was a witness who was there "to identify the men who had killed his friend."   Defts' Ex. 62 (Cy Greene Dep.) 244:4-11; *see also* Wade Tr. 126:23-25 to 128:2-6 (CG691-93); 131:5-20 (CG696); 132:19-24 (CG697); 136:8-10 (CG701); 137:10-12 (CG702); 151:2-25 153:2-20 (CG716-18) (**Ex. 2**).   The Defendants have never produced the two detectives who were assigned to watch Kim at the 67th Precinct and ensure that he had no contact with Greene, Williams and Mark Best.   Norrito and Tumbarello have each admitted that they

were not with Kim on the second floor of the 67th Precinct in the hours before the lineups when Kim would have had the opportunity to examine Greene in a jail cell or converse with Mark Best.   Wade Tr. 104:22-23 (CG669) (Tumbarello took Kim to the 67th Precinct at 6:30 p.m.); 108:2-14 (CG673) (Tumbarello left Kim alone in the catch unit with two other detectives); 54:2-4 (CG619) (Norrito admits he never saw Kim arrive at the 67th Precinct); and 55:2-3 (CG620) (Norrito first interacted with Kim at 8 p.m. that evening), **Ex. 2**.

107.   *Not disputed,* but supplemented by the fact that this document shows a clear *Brady/Rosario* violation by its own terms.

108.   *Not disputed,* but supplemented by the fact that regardless of who made the handwritten notations on the DD-5, these notations show a wrongful and improper desire to withhold evidence at any cost to preserve a conviction.

109.   *Not disputed,* but supplemented by the fact that regardless of who made the handwritten notations on the DD-5, these notations show a wrongful and improper desire to withhold evidence at any cost to preserve a conviction.

110.   *Disputed.*  Mark Best was always considered a suspect by Norrito and Tumbarello, so Ms. Szulc's claims in this regard do not ring true.  *See supra* ¶ 40; Norrito Dep. 242:8-10 (**Ex. 10**).

111.   *Disputed.*  There is no evidence to support the Defendants' legal argument here that "ADAs in the KCDA office received intensive training and supervision in conducting prosecution, including Brady responsibilities . . . ."  In fact, the evidence and the opinions of Defendants' expert witness and Plaintiff's expert witness on

*Brady/Rosario* and the history of the KCDA support a very contrary position.  *See infra* ¶¶ 391-393.

112.    *Not disputed.*

113.    *Disputed*, since both experts in this action who have examined the training, supervision and discipline at the KCDA office have found it woefully inadequate and deliberately indifferent to the constitutional rights of the accused.  *See infra* ¶¶ 394-403.

114.    *Disputed.  See* paragraph 113 above.

115.    *Disputed.*  ADA Greene's "beliefs and opinions" are irrelevant, since the actions of the prosecutors in the KCDA clearly show a deliberate indifference to the constitutional rights of the accused.

116.    *Disputed.  See* paragraph 113 above.

117.    *Disputed.  See* paragraph 113 above.

118.    *Disputed, See* paragraph 113 above.

119.    *Disputed.  See* paragraph 113 above.

120.    *Disputed.  See* paragraph 113 above.

121.    *Disputed.  See* paragraph 113 above.

122.    *Disputed.  See* paragraph 113 above.

123.    *Disputed.  See* paragraph 113 above.

124.    *Disputed.  See* paragraph 113 above.

125.    *Disputed.  See* paragraph 113 above.

## II.   Plaintiff's Rule 56.1 Counter-Statement

### A.   Background on Cy Greene & This Litigation

126.   Cy Greene ("Greene" or "Plaintiff") spent twenty-three years in prison for a murder that he did not commit -- the murder of John Choi ("Choi"), who was stabbed in the heart during a robbery within a Brooklyn subway station on June 14, 1983.  *See* Defts' Ex. 60 [440 Motion Hr'g Tr., *People v. Greene*, N.Y. Sup. Ct., Kings Cty., June 11, 2008 (Indictment No. 3521/83)], at 2:10–14.).

127.   Choi was robbed and murdered by five individuals: Rudolpho Brown (stabber), Tony Bowers, "Fulo," Mark Best and William Patterson.  *See infra* ¶¶ 315-322. All five are now deceased.  *Id.*   Since three of these individuals confessed to their respective roles in the crime (prior to their deaths) to several witnesses who have testified in this civil rights case, we now know that Cy Greene played absolutely no role in the crime and we now know the identities of Choi's actual assailants.  *Id.*

128.   Mr. Greene's conviction was based solely on the weakest of evidence -- the uncorroborated testimony of a single eyewitness -- the victim's companion, Jae Hark Kim ("Kim"), who identified Greene after being improperly allowed to view him in a jail cell prior to Greene's lineup.  *See infra* ¶¶ 330-338.

129.   Significantly, Kim was not able to describe the actual murderer with any particularity after a brief and traumatic struggle (less than 2 or 3 minutes -- Trial Tr. 318:3-4 (CG1037),  **Ex. 5**) that he and Choi had with their four assailants – Kim was able to describe only the color of the muggers' skin (black), their sex (male), their approximate age (18 to 20), their height (stabber: "tall guy": 5'9" to 6'), and certain

clothing (the knife-wielding murderer wore a chocolate brown shirt).[9]  *See infra* ¶¶ 181-182.

130.    All of the other witnesses who observed the chocolate brown-shirted man running from the murder scene described him as "tall" – between 5'8" and 6" tall.  Cy Greene is noticeably diminutive -- 5'1" tall.[10]

131.    No eyewitness described the facial features of any of the assailants.

132.    No other trial witness supported Kim's identification of Cy Greene.

133.    No physical evidence has ever linked Cy Greene to Choi's murder.  *See infra* ¶¶ 145 -205.

134.    No fingerprints were found on the recovered murdered weapon, a knife.  Norrito Dep. 245:5-9 (**Ex. 10**)

135.    A DNA analysis performed on the knife, in fact, has shown that another male's DNA was on the knife.  *See* Reports of Office of Chief Medical Examiner (NYC) regarding DNA Testing on Choi Murder Weapon [Knife] and Cy Greene Oral Swab dated August 17 and 18, 2005 (CG2950, *et seq.*) (**Ex. 59**).

---

[9]    Kim told the first officer on the scene that the brown-shirted stabber was 6' tall; he later told the detectives in the precinct that the stabber was 5'9" tall.  In a taped precinct interview, Kim told the detectives and defendant ADA Robert Sullivan, who was participating in the investigation, that the stabber was a "tall guy."  The latter reference was conveniently, but obviously, left out of a transcript of that interview provided to criminal defense counsel.  *See infra* ¶ 181.

[10]    Cy Greene was 5'1" tall.  Wade Tr. 135:4-7 (CG700) (**Ex. 2**) ("[I'm] about 5'1" tall").  At the Wade Hearing, Norrito testified that "police records" indicated that Greene was 5'6" or 5'7" tall, without ever producing those records.  Wade Tr. 66:17-25 (CG631) (**Ex. 2**).  In an apparent attempt to justify Greene's arrest, Norrito described Greene's height as 5'5" when booking him.  *See* Online Booking Report (**Ex. 15**); Tumbarello Dep. 420:16-25, 421:2-6 (**Ex. 9**).  Norrito constantly exaggerated and misrepresented Greene's height. *See, e.g.*, Norrito Dep. 216:15-17 ("He just gave a bigger appearance, though.  As he does now.") (**Ex. 10**).

136.    A fingerprint lifted from a partition in the taxi used by the murderers to leave the scene was not left by Greene.  Norrito Dep. 154:17 to 155:19, 243:18 to 244:16 (Ex. 9); Tumbarello Dep. 239:13 to 241:25 (**Ex. 10**).

137.    Thus, Greene's conviction was undeniably the result of: (a) an uncorroborated, tainted identification by a single, traumatized witness, and (b) evidence that was falsified and/or secreted by police and prosecutors.  *See infra* ¶¶ 343-349.

138.    Kim's tainted identification of Greene was protected by certain evidence that was fabricated and other evidence that was withheld from Greene and his attorney to ensure that Greene would be unable to properly investigate other "protected" suspects (Mark Best and Lenny Best) and a still unidentified, NYPD "confidential informant." *See infra* ¶¶ 318-320.

139.    It is widely known that uncorroborated eyewitness identifications made by victims of violent crimes can be highly inaccurate, especially those of a different race than that of the accused.[11]

140.    Thus, in a case such as this, even a small amount of police or prosecutorial misconduct can be extraordinarily prejudicial to a criminal defendant's defense.  Here, the amount of evidence fabrication and secretion was enormous.  *See, e.g.,* ¶¶ 232-253, 254-265 and 293-300.

---

[11]   "[T]estimony about an emotionally loaded incident should be treated with greater caution than testimony about a less emotional event. . . . The term weapon focus has been used to refer to the situation in which a crime victim is faced with an assailant brandishing a weapon.  The weapon appears to capture a good deal of the victim's attention, resulting in, among other things, a reduced ability to recall other details from the environment, to recall details about the assailant, and to recognize the assailant at a later time."  Elizabeth F. Loftus, *Eyewitness Testimony* 32, 35 (Harv. Univ. Press 1996) (**Ex. 17** hereto).  "It seems to be a fact – it has been observed so many times – that people are better at recognizing faces of their own race than a different race."  *Id*. at 136-37.

141.    In the minutes and hours after the murder, Kim himself admitted that he could only "possibly" identify his attackers because he could not describe virtually any of their physical characteristics (other than their age, skin color and height).  *See* 67th Precinct Homicide Work Sheet (CG 2387) (**Ex. 16** hereto).

142.    However, other eyewitnesses, who had obtained objective and unobstructed views of the assailants and claimed that they could identify the men seen fleeing the subway station (*id.*), were wrongfully deemed "unreliable" by Detective Norrito, because the descriptions of those fleeing men, especially the height of the brown-shirted stabber, wholly contradicted Greene's diminutive stature and the tainted identification by Kim.  *See infra* ¶ 172.

143.    No other eyewitness was asked to corroborate Kim's tainted identification through a lineup, despite the arresting detective's (Tumbarello's) recent admission that he wanted other eyewitnesses to identify Greene because that was "proper [police] practice."[12]    Tumbarello Dep. 410:16 to 411:12 (**Ex. 9**).    The arresting officer (Tumbarello) now wholly admits that there likely was not probable cause for Greene's arrest.  Tumbarello Dep. 409:21 to 410:15 (**Ex. 9**).

---

[12]    *See also* Transcript of Deposition of Rule 30(b)(6) Witness, Robert Stewart ("Stewart Dep.") 58:4-8 and 60:10-12 (**Ex. 18**) (after being evasive on who might be brought in to view a lineup, Stewart finally concedes: "The people that would view a lineup would be your eyewitness to the actual crime, and of those, the eyewitnesses that say or tell you that they can identify the perpetrator. . . .If they [eyewitnesses] can identify, then those would be the people that will view a lineup."); Caplow Training Dep. 30:3-25 ("████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████") (**Ex. 14**).

144.    At least one prosecutor recognized discrepancies in the KCDA file (police reports, detectives' notebooks, etc.) but he failed to report what he learned to Greene's attorneys (*see infra* ¶¶ 245-253), and the prosecutors who worked the file thereafter failed to produce this fact and a wealth of other material in violation of *Brady* and *Rosario*.

145.    Testifying in his "official capacity" as the former Kings County District Attorney, Charles Hynes has admitted in this case that there appeared to be at least one *Brady* violation and that there was no exception under *Rosario* that would justify keeping the exculpatory evidence in question from defense counsel.  Transcript of Deposition of Charles Hynes ("Hynes Dep.") 64:23 to 65:15 (**Ex. 19**).[13]

146.    Cy Greene always maintained his innocence and he presented an alibi defense at his criminal trial, but after almost three days of deliberation, he was convicted of felony murder and second degree robbery.  Trial Tr. 780:7-16 (CG 1504) (**Ex. 5**). Greene's co-defendant, Larry Williams, who also made statements of innocence and presented an alibi defense, was convicted of first degree robbery, but acquitted of murder. *Id*.

147.    Plaintiff's allegations concerning the Defendants' Section 1983 violations are set forth in detailed form in Plaintiff's responses to Interrogatory No. 2 in the attached documents: (a) Plaintiff's Response to Defendants' Second Set of Interrogatories dated July 17, 2013 (**Ex. 20**), (b) Plaintiff's First Supplemental Response to Defendants' Second Set of Interrogatories dated October 10, 2013 (**Ex. 21**), and (c) Plaintiff's Second

---

[13]    *See, e.g.,* Hynes Dep. 64:3 to 65:2 (**Ex. 19**); Transcript of Douglas Kallen Deposition ("Kallen Dep.") 197:7 to 198:5 (**Ex. 23**); Transcript of Deposition of Phyllis Mintz ("Mintz Dep.") 180:13-16 (**Ex. 24**) ("I know that as part of a Rosario package, you have to turn over the detective's notebook. So I'm astounded if it wasn't turned over, astounded.").

Supplemental Response to Defendants' Second Set of Interrogatories dated June 19, 2014 (**Ex. 22**).

148.    For over fifteen years, Mr. Greene unsuccessfully sought relief from his wrongful conviction.  After his direct appeal was denied, he filed numerous post-conviction and FOIL applications, making various claims of innocence and police/prosecutorial misconduct and seeking exculpatory evidence.

149.    As will be demonstrated below, the Kings County District Attorney's ("KCDA's") Office consistently opposed Greene's applications and repeatedly failed to locate and/or provide previously undisclosed exculpatory materials that existed in its files.  *See infra* ¶ 376.

150.    Even when Justice Pesce specifically and explicitly ordered the KCDA in 1993 to reinvestigate (informant and assailant) Mark Best's role in the case, the KCDA did not disclose, among many other things, the fact that prosecutors believed (years ago) that Mark was a participant in the crime and, more importantly, that he had been offered a plea deal on other charges in exchange for his cooperation in prosecuting Greene for Choi's murder.  *See infra* ¶ 384, and **Ex. 38** at 4 (quoted at ¶ 415, note 67, below).

151.    Mr. Greene finally received some of these critical exculpatory materials during a Freedom of Information Law ("FOIL") application that his new attorney, Myron Beldock, filed in December 2003, which enabled Greene to file his final and ultimately successful C.P.L. § 440 petition.  *See infra* ¶¶ 378-383.

152.    It was through that FOIL application that Greene and his new counsel first received the audio recording of Mr. Kim's precinct interview and discovered that Mr. Kim had identified the stabber as a "tall guy," police reports documenting Mark and

Lenny Best information, detectives' notebooks, and many other materials that show there was an absolutely corrupt police investigation and prosecution. *See infra* ¶ 380. In 2006, Mr. Greene's conviction was finally set aside by Justice Pesce who found that ineffectiveness of criminal trial defense counsel -- in failing to conduct investigations to obtain exculpatory evidence -- was a contributing cause in Greene's conviction.[14]  *See* Defts' Ex. 20 (2006 Decision by J. Pesce). Justice Pesce simply did not have the police and prosecutor misconduct evidence before him that has been uncovered and developed in this case, and, therefore, defense counsel should not have been made the scapegoat for the unlawful conviction. *See, e.g.*, Caplow Training Dep. 66:2-24 ("███████████ ██████████████████████████████████████████████████ ████████") **(Ex. 14)**.

153.    Justice Pesce's decision vacating Greene's conviction was affirmed on appeal by the Appellate Division. *People v. Greene*, 37 A.D.3d 615 (2d Dep't 2007). On June 11, 2007, all charges against Greene were dismissed on the District Attorney's motion. Defts' Ex. 60 [440 Motion Hr'g Tr., *People v. Greene*, N.Y. Sup. Ct., Kings Cty., June 11, 2008 (Indictment No. 3521/83)], at 2:10–14.

154.    During discovery in the civil case, more previously-undisclosed exculpatory material was uncovered, including an ADA's notes that revealed, among other things, an awareness of Detective Michael Norrito's false testimony about Mark

---

[14]    Justice Pesce's 2006 decision found a failure on the part of defense counsel to investigate and obtain information from available witnesses who had given police descriptive information about suspects and who could have given favorable testimony on Greene's behalf, including the one witness who was within the subway station platform and numerous witnesses who saw persons fleeing that station. *See* Defts' Ex. 20 (2006 Pesce decision). Justice Pesce simply did not have all the evidence before him that is now brought before this Court.

Best, Lenny Best, and false testimony regarding an alleged "confidential informant" who is now known to have participated in the murder.  *See infra* ¶¶ 245-248 and 317-318.

155.    As will be seen below, Detective Norrito interviewed at least two of the individuals who participated in the robbery and murder, but Norrito wrongfully hid the information/evidence that he collected from them in order to ensure and protect the arrest and conviction of Cy Greene.  *See infra* ¶¶ 258-265.

156.    Detective Norrito was indicted, along with multiple ("mob") co-defendants, on racketeering and conspiracy charges unrelated to the instant case in April 2001.  *See* Docket Sheet for *U.S.A. v. Aparo, et al.*, E.D.N.Y. Criminal Case No. 1:01-cr-00416-ILG-26 (**Ex. 25**).  Norrito pled guilty to "Racketeering" [18:1962(c), 1963 and 3351 *et seq.*] and was sentenced 33 months' imprisonment.  *Id*.

157.    While Detective Norrito is a demonstrated "bad guy," his nefarious work against Cy Greene was protected by the reckless indifference of his partner in the investigation (Detective Tumbarello) and prosecutors (including ADAs Sullivan, Kallen and Gerald Greene) who knew or should have known from discrepancies in Norrito's DD-5 reports and notebook notations that Norrito was fabricating and secreting evidence.  *See infra* ¶¶ 245-248, 361-364, and footnote 26.

**B.    The Murder of John Choi**

158.    On June 14, 1983, at approximately 4:45 p.m., John Choi was murdered on the stairs of a subway station at Church and Nostrand Avenues in Brooklyn, New York.  *See* Defts' Ex. 1 [June 14, 1983 Complaint Report].

159.    John Choi's companion that day, Jae Hark Kim, witnessed the mugging/assault/murder; Kim has admitted the whole incident took "2 or 3 minutes or less, it was a very short period."  Trial Tr. 318:3-4 (CG1037) (**Ex. 5**).

-38-

160.    Choi was assaulted by at least four young black males.  Defts' Ex. 1 [June 14, 1983 Complaint Report].

161.    The police investigation was apparently begun with great intentions – multiple eyewitnesses were interviewed at the scene, right after the murder, by various officers canvassing the area near the subway station (Detectives Norrito and Tumbarello immediately proceeded to the hospital from the crime scene to determine the status of the victim).  *See* 67th Precinct Homicide Work Sheet (CG 2387) (**Ex. 16** hereto).

162.    The first officers on the scene took a statement from Kim as to the individuals who had assaulted him and murdered Choi.[15]

163.    In his first statement, Kim described the stabber follows as: "Sex: M; Race: B; Age: 16 to 18; **Height: 6'0"**; Weight: Med; Eye Color Unk; Hair Color: Unk; Hair Style: Short; Facial Hair: None . . ."  Defts' Ex. 1.  Other than height ("tall" and "taller than me") and skin color, the one distinguishing feature of the stabber described by Kim were his "chocolate" (dark brown) colored shirt and dark pants.  Defts' Ex. 2 (Kim Interview Transcript) at 3 ("one of black guys, tall guy, he puts on the brown chocolate jacket . . .the one with the chocolate jacket, he got the knife"); Ex. 18 (Audiotape of Kim Interview); Defts' Ex. 14 (Norrito Memo Book) (Interview of Jae Kim: "The guy with the brown shirt stabed [sic] him."); Defts' Ex. 5 (DD-5 of Kim

---

[15]    Officer Castriccone arrived at scene and took the **first statement** from Kim.  Kim advised that Choi was surrounded by four male blacks, and **Perp No. 1 stabbed Choi**.  Perp No. 1 is described as: "Sex: M; Race: B; Age: 16 to 18; **Height: 6'0"**; Weight: Med; Eye Color Unk; Hair Color: Unk; Hair Style: Short; Facial Hair: None . . ."  Perp No. 2 is described as: "Sex: M; Race: B; Age: 16 to 18; Height: 5'7"; Weight: Thin; Eye Color Unk; Hair Color: Unk; Hair Style: Unk; Facial Hair: None . . ."  Reportee [Kim] was unable to I.D. additional two perps with exception of MBs 13 to 14 years of age."  Defts' Ex. 1 [UF-61, Complaint Report].

Interview) ("Witness describes male with knife as . . . [wearing] chocolate colored shirt").

164.    Statements also were taken from a peddler working in the train station who witnessed much of the crime (Abdul Rahman)[16]; a local store employee (Eric Head)[17] who observed several male blacks fleeing the subway station who were "familiar" to him as "local pickpockets" he had seen previously and could identify; another local store employee (James Robinson)[18] who also saw and followed several male blacks fleeing from the train station and saw them enter a taxi, and a taxi driver (Reynold Guerrier),[19] who transported three fleeing men (one with a dark brown shirt) away from the crime scene.   In short, the stabber, who was observed by several eyewitnesses fleeing from the scene, was uniformly described as a "tall" black man (5'8" to 6' tall), 18 to 20 years old, wearing a chocolate brown shirt and dark pants.[20]

165.    Most thwarting to defense counsel was the fact that prosecutors only provided defense counsel with redacted police reports – *i.e.*, prosecutors blocked out the names and addresses of the witnesses interviewed by police, making an independent investigation and interview of the witnesses virtually impossible.   *Compare* Defts' Ex. 16, 25, 27 and 28 *with* Police Reports provided by criminal defense attorney, Lewis Cohen (CG426-524) (**Ex. 3**); *see also* Cohen Dep. 191:3-19 (redaction of "co-defendant" description of Mark Best), 198:13-24 (redaction of Eric Head's work address) (**Ex. 1**).

---

[16]   Defts' Ex. 25.

[17]   Defts' Ex. 16.

[18]   Defts' Ex. 27.

[19]   Defts' Ex. 28.

[20]   Kim, Rahman, Head and Guerrier all described the man in the "brown shirt" as "tall" – 5'8" to 6" tall in the first few hours after the murder.

166.    In the hours after Choi died, Norrito and Tumbarello interviewed the first uniformed officers on the scene to collect their information (Defts' Ex. 11) and then began interviewing primary eyewitnesses (Kim, Head, Rahman and Guerrier) with defendant Assistant District Attorney Robert Sullivan ("ADA Sullivan") at the 67th Precinct (Defts' Exs. 2, 26 and 33); portions of the Kim, Head and Rahman interviews were recorded, however, neither the audiotapes nor the notebook records of Norrito and Tumbarello were produced to Greene or his criminal attorney.  Cohen Dep. at 189:25 to 109:10 (he believes that he received redacted DD-5s) (**Ex. 1**).

167.    Transcripts were made of the latter three interviews by ADA Sullivan's office, and the Kim transcript was provided to Greene's criminal attorney, but the Kim transcript was deceptively inaccurate – Kim distinctly and explicitly referred to the stabber as the "tall guy," but this vitally important phrase was omitted from the transcript of that interview provided to defense counsel.  *See* Defts' Ex. 18 (Audio Recording of Kim Interview) and Defts' Ex. 2 (Transcript of Kim Interview provided to Attorney Cohen) and *compare them with* **Ex. 26** (Corrected Transcript of Kim Interview – Corrections in Red Ink by Plaintiff's Attorney); *see also* Defts' Ex. 18 (Audio Recording of Kim Interview at 5:07 and 6:09 for "tall guy" statements).

168.    Finally, it is significant that the 67th Precinct's "Homicide Work Sheet" contains the following notations as to the ability of certain witnesses to identify Choi's assailants: Kim ("Possibly Can I.D."), Rahman (?) – selling flowers and art ("Can I.D.")[21], and Head ("Can I.D.").  *See* 67th Precinct Homicide Worksheet (CG2387) (**Ex.**

---

[21]   This Worksheet, not produced to defense counsel until long after  the criminal trial, indicates that a Detective Rango was supposed to "Interview Female Eyewitness Selling Flowers."  Unfortunately no report on the latter interview was ever produced to defense counsel – and she was never identified.

**16**).   This latter document, indicating that Kim was the least reliable witness for identification purposes, was never produced to defense counsel.

### C.   The Principal Eyewitnesses Provide Some Common Descriptions

169.   The actual assault was witnessed by only two unbiased eyewitnesses who have given criminal trial or deposition testimony – Choi's companion that day, Jae Kim, and a street peddler, Abdul Rahman.  Defts' Ex. 2 (Kim Interview Transcript), Defts' Ex. 5 (DD-5 re Kim Interview) and Defts' Ex. 25 (DD-5 re: Rahman Interview).   Several other eyewitnesses, however, observed the black male with the distinctive chocolate brown shirt, described by both Kim and Rahman, running from the subway station with two other black males.  *See infra* ¶ 172.

170.   The one distinguishing feature of the perpetrator who stabbed Choi with a knife was his chocolate brown shirt.  *See, e.g.*, Defts' Ex. 2 (Kim Interview Transcript) at 3 ("one of black guys, tall guy, he puts on the brown chocolate jacket . . .the one with the chocolate jacket, he got the knife"); Defts' Ex. 18 (Audiotape of Kim Interview); Defts' Ex. 14 (Norrito Notebook) (Interview of Jae Kim: "The guy with the brown shirt stabed [sic] him."); Defts' Ex. 5 (DD-5 of Kim Interview) ("Witness describes male with knife as . . . [wearing] chocolate colored shirt").

171.   Because of his distinctive brown shirt, it was and is possible to describe this individual further (beyond skin color and approximate age) through the many other eyewitnesses who saw a black male wearing a chocolate brown shirt fleeing the train station with two other black males shortly after the assault.

### D.   The Knife-Wielding Black Male Wearing a Chocolate Brown Shirt

172.   Based on the interviews of eyewitnesses (memorialized in audiotapes, police reports (a/k/a "DD-5s") that contain no redactions, and memo book notations of

investigating NYPD officers, we can piece together a fairly accurate (uniform) description of the height of knife-wielding black male who was wearing a chocolate brown shirt and who was seen fleeing the crime scene through the eyewitnesses:

1. *Jae Kim*:   First description at scene: **6'** tall (Defts' Ex. 1 and **Ex. 3** [DD-5s given to Cohen] at CG439); Second description shortly after crime: **5'9"** tall (Defts' Ex. 5); Audiotaped Interview that evening: "tall guy" (Defts' Ex. 18 and **Ex. 26** - corrected transcript); Grand Jury Testimony: "taller than me" – Kim was 5'4" tall (Defts' Ex. 41).

2. *Abdul Rahman*:  First Description: "Male black **5'8** 120 lbs 15 to 20 yrs old wearing brown shirt dark pants" (Defts' Ex. 25); 2005 Description: **5'8' to 5'10"** (Transcript of Mar. 25, 2005 Criminal Court Hearing at 55-57 (CG 1641-43) (**Ex. 4** hereto)).

3. *James Robinson*: "I was in the area of Church Ave and Nostrand Ave when a man told me to stop a male that was running . . . I ran after him and . . . [he] entered a taxi . . . As the taxi passed I saw other people in the taxi . . . The only person I saw running was a male Black **6'** Med build small afro wearing a brown shirt . . . ."  (Defts' Ex. 27 [DD-5 re: Robinson Interview]).

4. *Reynold Guerrier (Cab Driver)*: "I was driving my cab . . . Three males described as . . . #2 M/B/20/ thin build wearing brown shirt . . . entered the cab out of breath."   Interview Notes: "3 males got into the back of his [Guerrier's] cab . . . They told him that they had a problem . . . He gave a description of 3 MB – 19-20 – 5-8 to 5'10". 1 of them had on a brown shirt . .

. Description - 1 – MB 18-20 **5'10"** thin – bn shirt." (Defts' Ex. 15 [Tumbarello Notebook at p. 7 – not turned over by prosecutors]).

**E.      Detectives Norrito & Tumbarello Assume Control of the Investigation**

173.    While Norrito and Tumbarello would soon take over the Choi homicide investigation, multiple NYPD officers participated in the interviewing of witnesses and this is reflected in the assigned 67th Precinct's "Homicide Work Sheet" (Collins, Hecker, Norrito, Tumbarello, Herlihy, Rango, Higgins, Hernandez and Stewart). *See* 67Th Precinct Homicide Work Sheet (CG2387) (**Ex. 16**), and certain redacted DD-5s and other police papers provided to Attorney Cohen (**Ex. 3**).

174.    Of the day-one eyewitnesses interviewed by the police and ADA Sullivan, only two eyewitnesses (Rahman and Head) volunteered that they "Can I.D." the assailants, while a third eyewitness (Kim) allegedly volunteered that he "Could Possibly I.D." *Id*. Norrito testified at trial to the contrary -- as to Rahman and Head -- and he separately discredited the latter two eyewitness accounts. Norrito testified as to his 'opinion' that Rahman was not a "reliable" witness because he was "negative towards police" and "uncooperative." Trial Tr. 247:22 to 249:16 (CG966-98) (**Ex. 5**). Norrito testified Head was not a "reliable" witness: (a) because he was known as a burglar of stolen cars, and (b) because Head had identified someone fleeing the scene who was actually in jail (Eric Tisdale). Trial Tr. 236:6-25 (CG955); 246:21 to 247:22 (CG965-66); 191:11-12 (CG908) ("Mr. Head's testimony became nothing."); Norrito also summarily and inexplicably dismissed the accounts of other eyewitnesses because they "didn't see the incident [murder]," Trial Tr. 249:19 to 251:24 (CG968-70) and 252:24 to 254:9 (CG971-73), but he "believed" Mark Best's account wholeheartedly, *id.*, 251:13-18 (CG970).

-44-

175.    Mention must be made here too of one of the most important eyewitnesses in the murder investigation – Mr. Reynold Guerrier – the cab driver who drove away from the scene of the murder with the chocolate brown-shirted stabber and two of his companions.  While the significance of Guerrier's information was again dismissed by Norrito at Cy Greene's criminal trial, Guerrier's eyewitness account and Norrito's related misinformation and secretion of the identities of those within Guerrier's cab are among the most highly significant matters in this case.  *See infra* ¶¶ 254-265.

**F.    Some Eyewitnesses Are Interviewed at the 67th Precinct that Night**

177.    By the end of the day (June 14, 1983), the three principal eyewitnesses (Kim, Rahman and Head) were brought to the 67th Precinct for interviews conducted by Norrito, Tombarello and ADA Sullivan.  *See, e.g.*, Audio Recordings of Interviews of Jae Kim (Defts' Ex. 18), Abdul Rahman (**Ex. 6**) and Eric Head (**Ex. 7**).

178.    Significantly, none of these audio recordings were provided to Greene or his criminal attorney.  Cohen Dep. 330:3 to 331:17 (**Ex. 1**).

179.    Instead, a deceptively contrived transcript of the Kim interview (or, at best, a highly inaccurate version), which had handwritten additions and corrections indicative of careful comparisons between the audio recording and the written transcript, was provided to defense counsel.  *See* Transcripts of Interviews of Jae Kim (Defts' Ex. 2 and **Ex. 26**), Abdul Rahman (Defts' Ex. 26) and Eric Head (Defts' Ex. 33).

**1.    Jae Kim Interview**

180.    One of the most significant acts of police and prosecutor misconduct concerns the handling of the Kim interview, audio recording, and transcript due to the valuable information Kim provided to ADA Sullivan, Norrito and Tumabarello that evening.  *See supra* ¶¶ 178-179.

181.   As seen above, Kim, Choi's then-companion, was the only eyewitness who testified at trial to identify Cy Greene at trial as the stabber.  According to the police reports and testimony cited above, Kim told the first officer on the scene that the brown-shirted stabber was 6' tall and he told the detectives in the precinct that the stabber was 5'9" tall.   In his taped precinct interview, Kim told ADA Sullivan, Norrito and Tumbarello, once again, that the brown-shirted stabber was the "tall guy."  Defts' Ex. 18 (Audio Recording of Kim Interview at 5:07 and 6:09).

182.   As seen above, the prosecution's entire case against Greene hinged on the description of the stabber by Mr. Kim, the sole testifying eyewitness.   And, as seen above, according to the trial evidence, Mr. Kim initially told police the stabber was 6' tall and then 5'9".  Mr. Greene, 5'1"- 5'2" tall at best, was not only short, but he was shorter than the 5'4" Kim and the 5'6" Choi.  Trial Tr. 333:4 and 265:24 (CG1053 and 984) (**Ex. 5**).

183.   This significant height difference was a crucial issue which the prosecutor successfully, but improperly, deflected at trial by contending that, as a Korean raised on the metric system, Kim's feet and inches measurements could not be credited.  Trial Tr. 707:14-21 (CG 1431) (ADA Greene: "this Korean gentleman who was in the country for four years and spoke a halting English had no conception of feet and inches") (**Ex. 5**).

184.   Unknown to Lewis Cohen, Mr. Greene's then-criminal counsel, in Kim's audio-recorded precinct interview Kim described the stabber as a "tall guy"—a crucial description that would have significantly undermined the prosecution claim that the feet and inch height description was not reliable.  *Compare* Defts' Ex. 18 (Audio Recording of Kim Interview) with Defts' Ex. 2 (Kim Interview Transcript provided to Cohen) *with*

**Ex. 26** (Copy of the Kim Transcript provided to Cohen with ADA Kallen's corrections in black ink and Plaintiff's counsel's corrections – made during the 440 proceeding – in red ink).

185.    Again, the audio recording of Kim's June 14, 1983 precinct statement was *not* provided to defense counsel.  Cohen Dep. 330:3 to 331:17 (**Ex. 1**).

186.    Instead, the deceptively contrived transcript of the interview, which had various handwritten additions and corrections indicative of careful comparisons, but omitting the "tall guy" descriptive words for the stabber, was created by the defendants and provided to defense counsel.  *Compare* Defts' Ex. 18 (Audio Recording of Kim Interview) *with* Defts' Ex. 2 (Kim Interview Transcript provided to Cohen) with **Ex. 26** (copy of the Kim Transcript provided to Cohen with ADA Kallen's corrections in black ink and then Plaintiff's counsel's corrections – made during the 440 proceeding – in red ink).

187.    As first disclosed in the civil deposition of former ADA Douglas Kallen in this action, who handled the bulk of pretrial proceedings including the *Wade/Dunaway/Huntley* hearings in the criminal action,  those handwritten annotations in the transcript (Defts' Ex. 2) were all in Kallen's handwriting.  Kallen Dep. 74:19-75:9 (**Ex. 23**).

188.    Detectives Norrito and Tumbarello and ADA Sullivan—the three individual defendants in this civil case—were present at Kim's precinct interview.  *See* Defts' Ex. 2 at 1 (Audio Recording), 18 (Transcript) and **Ex. 26** (Corrected Transcript).  ADA Sullivan, Norrito and Tombarello therefore knew that Kim had described the person who did the stabbing as a "tall guy."

189.    Tumbarello himself specifically testified that he knew from Mr. Kim's precinct description that the stabber was a "tall guy"; and that he knew that Cy Greene was a short guy.  Tumbarello Dep. 86:7-11, 86:20 to 87:3, 203:8 to 204:14 (**Ex. 9**).

190.    Norrito and Tombarello also unquestionably knew that Greene was short and not tall from their observations, beginning when he was arrested and interviewed by ADA Ruskin in their presence on June 21, 1983.  Indeed, Tumbarello testified that, after Greene was arrested, he mentioned the height difference to Norrito because it made Tumbarello question whether Greene was the right person.  *Id.* 204:6, 206:2 (**Ex. 9**).

191.    With Mr. Kim's critical description of the stabber as a "tall guy" withheld, Mr. Greene's defense counsel was left only with Mr. Kim's feet and inches description to question his identification testimony.   The trial prosecutor, ADA Gerald Greene, managed to deflect the striking difference in heights by eliciting trial testimony from Mr. Kim that he measured in meters and centimeters and was not familiar with feet and inches:

> Q.    When you measure the height of somebody, how do you do that, Mr. Kim?
> A.    I still express by meters.  I am one meter and 61 centimeters, that's 161 centimeters.
> Q.    So your unit of measurement is meters and centimeters, is that correct, Mr. Kim?
> A.    Yes.
> Q.    It is not feet and inches, is that right?
> A.    I learned it after I came to the United States and I am still not familiar with it.

Trial Tr. at 316:5-14 (CG1035) (**Ex. 5**).

192.    In his summation, ADA Greene then made a great point of the issue of Kim's unfamiliarity with feet and inches:

I submit to you what we have here is the ability to recognize and when we are talking about recognition, think about the man who said yeah, he might have said feet, he might have said another height. He didn't even know from feet and inches. That, if you recall, was never mentioned when both of my learned adversaries were predicting what I'd say over here.

None of them said he is going to say to you this is a Korean, he works in centimeters and if you are, during the course of the trial even then, this man was unable to say height of the two people. There were references in here from the minutes he was unable to even judge the height of Green seeing him in court. . . .

Well there's the whole case on the fact this Korean gentleman who was in the country for four years and spoke a halting English had no conception of feet and inches.

Trial Tr. 706:11-25 and 707:18-21 (CG1430-31).

193.    ADA Greene's tactics and arguments would have been baseless had the audio recording of Mr. Kim's precinct interview been disclosed, as required under *Brady* and *Rosario*, *see, e.g.*, Hynes Dep. 64:3-22, 65:6-15 (**Ex. 19**) — or at the very least, had the words "tall guy" been included rather than omitted from the transcript of the interview.   Had the proper disclosures been made,[22] the defense would have had a powerful argument that it was totally unreasonable for the prosecutor to try to convince the jury that Mr. Kim had accurately identified Mr. Greene as the "tall guy" stabber, especially since Mr. Greene was in fact several inches shorter than Mr. Kim.

194.    At his deposition, Mr. Hynes acknowledged that Kim's "tall guy" statement should have been disclosed under *Brady* and that its omission from the transcript "certainly looks like a *Brady* violation to me."  Hynes Dep. 64:21 to 65:2 (**Ex.**

---

[22]   Caplow Training Dep. 59:8-15 ("[Plaintiff's attorney] Q.  If you as an Assistant knew that that witness [Kim] had made a statement at a precinct interview describing the stabber, supposedly Mr. Greene, as a tall guy, would you have considered that *Brady* material that should have been turned over to the defense? A. Maybe -- I mean, yes[.] (**Ex. 14**).

-49-

**19**).  He further conceded that the audio recording of Kim's interview should have been disclosed under *Rosario*, and that there was no exception to the obligation under *Rosario* to disclose that audio recording.  *Id.* 64:23 to 65:15 (**Ex. 19**).

195.    The failure to disclose the "tall guy" description to the defense throughout and after the original investigation and prosecution was a monumental *Brady* violation and substantial instance of police and prosecutorial misconduct.  The detectives and prosecutors thereby misled the defense, judge, and jury and were able to maintain the false contention at trial that Mr. Kim's feet and inches descriptions of the stabber could be disregarded because he only understood measurements in meters and centimeters; and that Kim's identification of Mr. Greene should be credited even though Greene was short and nowhere near the feet and inches height descriptions Mr. Kim had given.

## 2.    Abdul Rahman Interview

196.    While the audio recording and transcript of interview of Abdul Rahman is less significant than those relating to Kim and Eric Head, both the transcript and audio recordings of his interview should have been turned over to defense counsel, but they were not.

197.    Detectives Norrito and Tumbarello and ADA Sullivan—the three individual defendants in this civil case—were also present at Rahman's precinct interview.  *See* Defts' Ex. 26 (Transcript of Rahman interview) and **Ex. 6** (Audio Recording of Rahman Interview).

198.    While the interview of Rahman was critical for Cy Greene, police and prosecutors ultimately denied the significance of Rahman's interview and disclosures. Norrito testified Rahman was not a "reliable" witness because he was "negative towards police" and "uncooperative."  Trial Tr. 247:22 to 249:16 (CG966-68) (**Ex. 5**).

199.    Other than Kim, Rahman was the only eyewitness to observe the physical attack on Choi on the subway stairs.  Defts' Ex. 26 (Transcript of Rahman interview) and **Ex. 6** (Audio recording of Rahman interview).

200.    Rahman described three perpetrators, including one perpetrator wearing a "brown shirt and dark pants": "Male black 5'8" 120 lbs 15 to 20 years old."  Defts' Ex. 25 (DD-5 re: Rahman Interview).

201.    Rahman, while seemingly a viable witness for a lineup of a suspect, was not able to identify any of the perpetrators after viewing mug shot photos and, peculiarly, he was never called to view Cy Greene or Larry Williams in a lineup or at trial because Norrito, again, deemed him an "unreliable" witness. Trial Tr. 247:22 to 249:16 (CG966-68) (**Ex. 5**).

202.    Aside from the prosecution's failure to produce the Rahman interview evidence to defense counsel, Rahman has claimed that police investigators wrongly transcribed what he said that he observed about the height of the assailants after he witnessed the chase and assault perpetrated upon Choi – Rahman has testified under oath that he did *not* tell Detectives Norrito and Tumbarello that all three assailants he observed were 5'8" tall; he has testified that the assailants were *between* 5'8" tall and 5'10" and that none of them 'was as short as his wife' who is 5'5" tall.  *Compare* **Ex. 3** (DD-5s given to Attorney Cohen) (CG435) *with* Transcript of Criminal Trial Hearing on Mar. 25, 2005, 56:1 to 57:5 (CG1642-43) (**Ex. 4** hereto).

### 3.    Eric Head Interview

203.    Eric Head's interview, and subsequent identification of three individuals he saw fleeing the subway station, are among the most controversial and important examples of police and prosecutor misconduct in this case.

204.    Like Kim and Rahman, Detectives Norrito and Tumbarello and ADA Sullivan—the three individual defendants in this civil case—were present at Head's precinct interview.   *See* Defts' Ex. 33 (Transcript of Head Interview of June 14, 1983) (CG366-69) at 1 and **Ex. 7** (Audio recording of Head interview).   Neither the audio recording, nor the transcript of the very important Head interview, was given to defense counsel.  Cohen Dep. 87:14-24 (**Ex. 1**).

205.    Eric Head was a most significant witness because he observed three black males fleeing from the subway station shortly after Choi was stabbed and he recognized them as local pickpockets who were regularly working that subway station.  Tumbarello remembers Head looking at photos in a photo book and identifying photos of persons he saw at the subway station leaving the subway station and running from it.  Tumbarello Dep. 242:2 to 243:5, 473:2 to 475:25 (**Ex.9**).

### 4.    Mark Best Is First Interviewed on the Day of the Murder

206.    Detective Norrito has testified that he first interviewed Mark Best about the Choi murder on the day of the murder – "The day of the murder I rounded up several people known to frequent that area [murder scene].  Mark Best was one of them.  That particular time I received no information from Mark Best.   The following day I interviewed an individual [Joseph Ross – identified by Eric Head during the evening of June 14] who emphatically told me that Mark Best was at that location . . . just about the time the homicide was there."  Wade Tr. 61:19-62:3 (CG626-27) (**Ex. 2**).   Mark Best would be interviewed again two days later.

### 5.    Ronald Blanding Is Taken Into Custody at 1 a.m. on June 14

207.    Ronald Blanding was taken into custody at this mother's apartment at 1 a.m. on June 15, 1983 by Detective Norrito.  Transcript of Ronald Blanding ("Blanding

Dep.") 24:24 to 25:25 (**Ex. 27**); Trial Tr. 535:6-21 (CG1258) (**Ex. 5**).  This is confirmed by a notation in Norrito's Notebook: "0225 Interviewed Ronald Blanding."  Defts' Ex. 14 at CG4029.

208.    As a reminder, Blanding was identified by Eric Head as one of the "black males" that Head believed was fleeing the subway station after the murder (and Lenny Best and Joseph Ross were taken into custody the very next day), so Norrito must have found credibility in Head's identifications that first night.  *Compare* Defts' Ex. 16 *with* redacted version given to Attorney Cohen, **Ex.** 3 (DD-5s re: Head Interview) (CG475).

209.    Blanding has testified several times about what occurred between himself and Norrito that late night/early morning.   What is most unusual about Blanding's testimony is that Norrito began pressing Blanding, during that late night interview to identify either Lenny Best *or Cy Greene* as the stabber – *before any eyewitness had advised the police that Cy Greene had anything to do with the Choi murder*.  Why did Cy Greene's name come up during the Blanding interview, but for Norrito attempting to pin the crime on him?

210.    Blanding has testified that Norrito picked him up and questioned him for two or three hours shortly after the Choi murder.  Transcript of April 24, 1992 Hearing before Justice Michael Pesce at 1 to 9 (CG3352-3360) (**Ex. 28**); *see also* Blanding Dep. 24:24 to 25:25 (**Ex. 27**).  Over the course of those three or four hours, Norrito threatened Blanding that that he was going to be charged with the Choi murder unless Blanding identified the actual person who did it.  Trial Tr. 536:15-16, 539:3-5 (CG1259, 1262) (**Ex. 5**); April 24, 1992 Tr. 4 (CG3355) (**Ex. 28**); *see also* Blanding Dep. 32:15-20 (**Ex.**

**27**).   Norrito showed Blanding photographs of Leonard Best and Reginald Greene.  *Id.*
29:3 to 30:3; Trial Tr. 537:12-23 (CG 1260) (**Ex. 5**).

211.   Norrito wanted Blanding to pick out Cy Greene and to make a videotape
of Blanding's identification.  April 24, 1992 Tr. 5:3-13 (CG 3356).  Blanding refused to
identify Greene.  *Id.*, 6:3-7 (CG3357).

212.   Blanding also testified that Norrito threatened him outside the trial court
advising him that the police would shift the blame to Blanding if he testified on behalf of
Cy Greene.  *Id.*, 7:13-18 (CG3358).

**G.    Day 2 of the Investigation**

**1.    Joseph Ross Is Interviewed on June 15, 1983**

213.   The next person interviewed by Norrito after the Head interview was
Joseph Ross, an individual identified by Head as a black male seen fleeing the murder
scene.  *See and compare* Defts' Ex. 34 *with* redacted version provided to Attorney Cohen
[DD-5s re: Interview of Joseph Ross] (CG483), **Ex. 3**.

214.   Norrito has testified that he likely chose to interview Ross because Head
had identified Ross as one of the individuals who was observed fleeing the murder scene.
Norrito Dep. 195:20 to 196:9 (**Ex. 10**).

215.   According to Norrito's DD-5 (Defts' Ex. 34), at 1700 hours on June 15,
1983, Joseph Ross advised Norrito that he was near the scene of the crime some thirty
minutes before the murder occurred, but he left before it occurred.  *Id.*  Ross apparently
concluded his interview by advising that "he didn't see anything [sic] but his friend Mark
[Best] Did [sic] and we should question him as to what happened."  *Id.*

216.   When questioned during his May 18, 2010 deposition about the last
quoted sentence in the DD-5, about Mark Best's knowledge about the murder, Ross

-54-

testified that while it was a true that he [Ross] didn't see anything, the latter portion of the statement – "*but his friend Mark did and we should question him as to what happened*" – Ross said those statements were <u>not true</u>.  Transcript of Deposition of Joseph Ross ("Ross Dep.") 247:13 to 248:2 and 287:16 to 288:5 (**Ex. 29**).

217.    Ross has testified that his interview with Norrito was less than cordial:

> they [the detectives in the interrogation room] was pressuring me to admit -- to admit to something and they physically was pressuring me to do something, say something that I didn't know nothing about.  Q. What do you mean by physically pressuring you?  A. You know, like touching me pushing me and stuff like that.  Grabbing on me and stuff like that.  Hitting on me and stuff like that.  Q. Is it your testimony today that they hit you?  A. Yeah.

*Id.,* 232:17 to 233:7 (**Ex. 29**).

218.    Ross did admit that he was in the area near the scene of the murder at or around the time of the murder, and that his friend, Mark Best, was in that area just before the murder occurred.  *Id*., 290:20 to 291:8.

## 2.    Attempted Interview of Lenny Best & His Escape on June 15

219.    Another very substantial *Brady/Rosario* violation concerns the cover-up of all police activity concerning Lenny Best and his possible involvement with the Choi murder.

220.    First, the Defendants wholly failed to disclose that on the day of the murder, Eric Head, who worked at a store across the street from the crime scene, identified Lenny Best as having fled from the subway station just after the crime was committed.  *See infra* ¶¶ 237-238.

221.    Exacerbating that failure to disclose, Detective Norrito falsified a "DD-5" follow-up police report, which was provided to defense counsel, to conceal and withhold that Head had identified Lenny Best.  *See infra* ¶¶ 239-240.

222.   In light of the fact that Lenny Best was taken into NYPD custody, immediately following the late night (started at 9:50 p.m.) interview of Eric Head and the notation made at 10:23 p.m. in Norrito's Notebook that Lenny Best was of interest to Norrito, circumstantially we can show that Norrito was advised that Head identified "Lenny Best" and not "Eric Tisdale" as the third person he saw fleeing the murder scene. Norrito's interest in Lenny Best coincided with his interest in Joseph Ross on June 15, the very next day after Head had identified them.

223.   Norrito admitted during his deposition that he knew the Best brothers, Mark and Lenny Best, were local pickpockets that previously had worked in and around the murder scene and that "Lenny was a little more dangerous than his brother [Mark]," adding that Lenny had been arrested for "possession of a gun, assault."  Norrito Dep. 190:20 to 191:8 (**Ex. 10**).

224.   Finally, and perhaps most outrageously, in a related suppression of evidence, Norrito and Tumbarello failed to disclose that Lenny Best had escaped from a police car on June 15, 1983, when he was being taken in, at Norrito's request, for questioning the day after the Choi murder.

225.   Lenny Best offered valuable deposition testimony in this case that has established: (a) that Lenny was taken into NYPD custody at Norrito's request on June 15, 1983, *see* L Best Dep. 32:3-12 (**Ex. 8**), (b) that Lenny escaped from a police car as soon as it parked in front of the 67th Precinct, *id*., 32:17 to 33:5, and (c) that Lenny knew and knows precisely who was actually involved in the Choi murder from his brother and his brother's friend, William Patterson, *see infra* ¶¶ 310-312.

226.    In the police car that evening (between 7 and 8 p.m.), the two police officers who took Lenny into custody told him that he would be questioned about a murder by Norrito.[23]  *Id.,* 34:5 to 35:8.

227.    Detective Tumbarello has affirmed Lenny Best's testimony in this regard. Tumbarello claims that he was not with Norrito when the latter had Lenny Best picked up – Tumbarello was at his Jay Street office on that day [at that time], on June 15. Tumbarello Dep. 131:16-23 (**Ex. 9**).  When Tumbarello arrived at the 67th Precinct later that day, he heard "some talk . . . about Lenny Best." *Id.,* 131:24 to 132:5.  Tumbarello heard numerous people talking about the fact that Lenny Best had jumped out of a police car when police officers tried to take him to the precinct that day.  *Id.,* 132:2 to 133:6, 133:5-7 and 133:15-22.

---

[23]   Lenny Best knew Norrito as a racist police officer:

> Q.      Did Norrito, the detective I clarified as Norrito, ever use any racial epithets in your presence?
> A.      Yes.
> Q.      What?
> A.      Called me a nigger. I have heard him call a few people niggers. Not only me, but a lot of us guys. But I also heard other officers do it too.  But, yes, I personally had him call me a nigger.

L Best Depo. 44:14-23 (**Ex. 8**).  Lenny also remembered being present with Cy Greene when Norrito approached the two of them on the street.  According to Lenny, Norrito called Cy a nigger and then Cy flipped him "the bird."  Lenny's account of that incident is:

> It was either Norrito or his partner in the car and they told him [Greene], We're going to get your little ass, bastard; we're going to get you. They told Cy that.  That I remember.  But I can't say it was this officer because there was two together, sometimes three in a car.  But I know when they rolled the car window down, I thought they were talking to me.  They ain't talking to me; they're talking to you. The police said, Yeah, I am talking to you, scumbag, and he pointed at Cy.  I remember that definitely.

*Id.,* 56:2-12.

228.    Lenny Best's "escape," when he was being brought in by the police to be interviewed by Norrito, was an event that should have been made the subject of an NYPD report – what was called "an unusual occurrence report."  According to Tumbarello, there was an obligation to make an unusual occurrence report about a suspect/witness being taken to the precinct who escaped.  Tumbarello Dep. 131:23-25, 142:2-7 (**Ex. 9**).

229.    Norrito himself testified at a deposition in this case that such a report would have been "absolutely" required *if such event occurred*, although he denied the event (Lenny Best's escape), or at least denied knowledge of it during his deposition. Norrito Dep. 121:2 to 124:22 and 124:23 to 126:14 (**Ex. 10**).  This appears to contradict Norrito's criminal trial testimony, because he testified at trial that he questioned Mark Best regarding the whereabouts of his brother and that he knew at the time of this questioning that Lenny Best had two outstanding arrest warrants.   Trial Tr. 192:9-11 (CG909) (**Ex. 5**).

230.    Keeping in mind that Lenny was sought because both he and his brother were potential suspects, a report should have been made that included the fact that a witness who was being brought in as a potential suspect, or the brother of a potential suspect, had escaped from a police car.   No such information was ever conveyed to Greene or defense counsel.

231.    The detectives' need to avoid criticism and discipline for letting Lenny Best escape and for failing to make the related required official report, motivated them, particularly Norrito, to "solve" the crime by pressuring Lenny's brother Mark into falsely identifying someone else, *i.e.*, Cy Greene, as the man who stabbed Choi.  *See infra* ¶¶ 310 and 322.

H.      **Detective Norrito Fabricates & Secretes Evidence**

1.      **Norrito Fabrication No. 1: Norrito Claims that Lenny Best Is
        Not One of the Local Pickpockets Eric Head Identified as
        Fleeing the Murder Scene**

232.    The interview of Eric Head was vitally critical for Cy Greene, yet police

and prosecutors ultimately hid, fabricated and lied at trial about the significance of

Head's interview and his disclosures.

233.    Head was the only witness who advised that he not only that he saw three

men fleeing the scene, but that he could *positively* identify all three of them because he

"knows these perps from the area.  He stated that they all ways [sic] stay on Church ave

[sic] and Nostrand ave [sic] lifting wallets (pick pockets)."  Defts' Ex. 16 (DD-5 re Head

Interview).  Again, the audiotape (and transcript) of the Head interview was not provided

to defense counsel.  During this interview, Head explicitly states that he saw two males

fleeing from the subway exit just above the staircase where the murder occurred and one

of the two was wearing a "brown, dark brown shirt . . . he had beige bell bottom pants."

Defts' Ex. 33 [Transcript of Head Interview of June 14, 1983] (CG366-69) at 2 and **Ex. 7

[**Audio Recording of Head Interview**]**.  Head confirmed "I don't know them personally,

but I know them from hanging out in the neighborhood and robbing other people. . . I

have seen them plenty of times . . . I chased a couple of them before."  *Id.*

234.    Head was able to describe the clothing worn by each black male distinctly

and he claimed to have seen them regularly doing pickpocketing at the subway station in

question.   Defts' Ex. 16 [DD-5 re Head Interview] ("at about 1635 hours he [Head] . . .

was called to the front of the store by his boss. He looked out and saw two male blacks

known to him running from the train entrance on the north west side going to Church

Ave. . . .A few seconds later he saw a male black leaving the train entrance on the south

-59-

west side, this male black who is also known to him was approched [sic] by the witness who said to him your [sic] at it again . . . this witness . . . knows these perps from the area.  He stated that they all ways [sic] stay on Church ave and Nostrand ave lifting wallets (pick pockets)."); *see also* Defts' Ex. 33 **[**Transcript of Head Interview of June 14, 1983] (CG366-69) at 2 (CG367) (emphasis added) ("[Head] . . . Guy on my side of the street was wearing the red shirt, with beige shorts, **the other guy** was wearing mixed color between a brown and beige dress clothes.  [ADA Sullivan:] **What kind of shirt did he have on?  What color?  [Head:] Brown, dark brown.  Polyester, he had beige bell bottom pants**.").

235.   Following his interview with ADA Sullivan, Norrito and Tumbarello at 9:50 p.m. on June 14, 1983, Head reviewed mugshot photographs to identify the black males he observed fleeing the subway station after the Choi murder.  *Compare* Defts' Ex. 16 *with* redacted version given to Attorney Cohen, **Ex. 3** [DD-5s re: Head Interview] (CG475).

236.   Head identified the three black males he observed fleeing the crime scene. *Compare* **Ex. 3** [DD-5 re: Head Interview] (CG475) *with* Defts' Ex. 15 at 8 (Tumbarello's Notebook).  *See also* Tumbarello Dep. 475:11-25 (**Ex. 9**)

237.    It is here where Detective Norrito begins fabricating evidence to: (a) discredit Eric Head as an eyewitness, (b) move attention away from the actual assailants,[24] and (c) establish a basis for arresting and convicting Cy Greene for the Choi

---

[24]   Norrito's Notebook writings, not produced to criminal defense counsel, indicate that he collected information from some unknown individual or individuals (confidential informants?) about a known "posse" of male blacks regularly involved in muggings/pick-pocketing at the Nostrand/Church subway station shortly after the murder (based on the location of the information chronologically in his notebook).  Defts' Ex. 14 at CG4028.

murder – Detective Norrito noted that Head identified "Joseph Ross, Ronald Blanding and *Eric Tisdale*" in his DD-5, while Tumbarello noted that Head identified "Joseph Ross, Ronald Blanding and *Lenny Best*."  Defts' Ex. 15 (Tumbarello Notebook) at p.8; *see also* Tumbarello Dep. 129:2-25 to 130:2-18 (**Ex. 9**).

238.    Tumbarello has testified unequivocally in this case that he remembers Head looking at photos in a mugshot book and identifying the persons Head saw running from the subway station.  Tumbarello Dep. 118:17-22 (**Ex. 9**).  Tumbarello specifically recalls Head identifying photographs of Lenny Best, Joseph Ross and Ronald Blanding. *Id.,* 129:2-25 to 130:2-18 (**Ex. 9**).

239.    Why would Norrito misrepresent the fact that the third individual identified was not "Lenny Best," when Tumbarello's handwritten notations, made contemporaneously with the identifications, is surely correct?  Why would Norrito ultimately deem Head an "unreliable" eyewitness, for no apparent reason, other than his claim that Head identified "Eric Tisdale" (Lenny Best) who was discovered to be in jail at the time of the Choi murder?  Answer: Norrito continued his misrepresentation and lie about the third identification up to and through trial to protect Mark Best and Lenny Best (and another unidentified "confidential informant").  *See infra* ¶¶ 310-312 and 317-321 .

240.    As will be seen below, Norrito had the motive and the opportunity to compose his DD-5 to delete Lenny Best's name and add the name of a known-jailed individual, Eric Tidwell: (a) to hide the identification of Lenny Best (and his escape from police custody), (b) to discredit Eric Head as "unreliable," and (c) to protect his

---

In a notation dated 10:30 pm (following notations regarding the Kim, Rahman and Head interviews). Norrito wrote down "Lenny Best, Marcus, Joe Ross . . . subjects admitts [sic] doing pickpockets."  *Id.*

informant(s), Mark Best *et al.*[25]  And Norrito likely did not know that Tumbarello had

taken detailed handwritten notes that might someday be produced to defense counsel.

241.   We call the Court's attention to one of the last notations in Norrito's

Notebook (10:30 p.m.) after the audiotaped interview of Head at 9:50 p.m.: "Leonard

Best, Marcus [Mark Best], Joseph Ross."  Defts' Ex. 14 [Norrito Notebook] at CG4026.

Undeniably, Norrito did, in fact, record Lenny Best's name in his Notebook on June 14,

1983 (at 10:30 p.m.), immediately after the Head audiotaped interview was completed

that night (it was begun at 9:50 p.m.).  *See* Defts' Ex. 14 [Norrito Notebook] at

CG4026.[26]

242.   Another witness, Colbert Narcisse, was the witness who advised Norrito

about Eric Tidwell, at least according to his Norrito's own Notebook notations.  Defts'

Ex. 14 [Norrito Notebook] at CG4031.

243.   Again, very significantly, the Notebooks of Tumbarello and Norrito were

not disclosed to Mr. Greene's defense counsel.  *See* Cohen Dep. 219:10-13; 223:17-19;

224:11-13; 231:11 to 232:4; 258:8-17 (**Ex. 1**) ("Well, I'm very surprised to see these

notebooks from Norrito and Tumbarello. And I – I'm sure I would have liked to have

been able to use -- utilize those, yes."):

Q:      . . . You see the entry that Mr. Norrito has in his notebook at the top
        of Page 4035?

---

[25]   Among other things done to discredit Eric Head is that Norrito testified, without
support, that Head was a burglar and stole cars.  Trial Tr. 236:6-25 (CG955); 246:21 to
247:22 (CG965-66); 191:11-12 (CG908) ("Mr. Head's testimony became nothing.") (**Ex. 5**).

[26]   Did Tumbarello know that Norrito had issued the false DD5?  He certainly should
have because Tumbarello acknowledged that he would have reviewed at least all of
Norrito's reports in the file.  Tumbarello Depo. 45:7-16 (as to Norrito's reports), 56:10-
20 (those reports "made available" to him) (**Ex. 9**).  A competent and constitutionally-
compliant detective would have had an obligation to confront Norrito and to bring the
discrepancy, the falsification, to the attention of the KCDA if Norrito didn't.

A.      Yes, I do.

Q.      Do you see where he says that, "Mark Best says his brother Lenny told him about the killing." See that?

        MS. CHIARINI: Objection to form.

A.      Yes.

Q.      Now, you were never advised of that, were you?

A.      No, I wasn't.

Q:      And again, that's the kind of information that you could have used effectively to cross-examine Norrito, correct?

A:      I'd agree with that.

Q:      So you weren't given the information about the "tall guy" statement by Kim; you weren't given accurate information about who Eric had identified, no less that he identified Lenny Best and not Eric Tidwell; and you weren't given information that Mark Best told Norrito that his brother Lenny told him about the killing. Am -- am I right that those --

A:      That information comes from these notebooks. I never saw them in my life.

Q:      And if you'd had that information, they would have been used effectively by you in cross-examining the detectives, right?

A:      I would have used them, sure.

Q:      And in this close case, every piece of additional significant information you could have had would have been meaningful in your mind, right?

A:      Could have been, yes.

*Id.,* 222:11 to 224:6; *see also id.,* 264:21 to 265:19 (Cohen testified that he "Never

saw [the notebooks] in my life."); Wade Tr. 76:14-78:7 (**Ex. 2**) ("the witness [Det.

Norrito] hands a book [apparently Norrito's notebook] to the Court," and later,

"THE COURT . . . hand[s] book to witness").  There is no indication in the record

that Mr. Cohen was provided the notebooks.  In fact, the ADA at that Wade

Hearing objected to and successfully prevented Plaintiff's attorney from even

getting a cursory look at one of the notebooks.[27]  *Id.,* 76:14-25 to 78:2-10.

---

[27]      This failure to turn over the true names of the individuals identified by Head was a *Brady* violation.  *See, e.g.,* Caplow Training Dep. 49:12-24 (**Ex. 14**) (emphasis added):

244.     As a recap of what evidence supports Plaintiff's claim that Norrito lied by substituting the name "Eric Tisdale" for "Lenny Best" when typing up his DD-5 report on his interview of Eric Head, we supply the following for the Court: (a) Tumbarello's Notebook explicitly and contemporaneously shows that Head identified "Joseph Ross, Ronald Blanding and Lenny Best" as the individuals he observed in and around the subway station at the time of Choi's murder, (b) Norrito's Notebook shows that he wrote the name "Lenny Best" down immediately following his late evening interview of Head (it is the first mention of Lenny Best in the police materials, along with Tumbarello's notes on the Head interview), (c) Norrito's Notebook shows that another witness (Colbert Narcisse) identified "Eric Tisdale" as a suspect, and (d) Norrito proceeded to interview Ronald Blanding and Joseph Ross, and attempt to interview Lenny Best (rather than Eric Tisdale), immediately after the late evening interview of Head.

245.     Former ADA Kallen's trial preparation notes, which were first provided to Greene during discovery ordered in this civil case, reveal that the prosecution was aware of this important conflict between Norrito's DD-5 and Tumbarello's notes, although this fact was never disclosed to the defense or trial judge.  In that regard, Kallen's notes read:





Defts' Ex. 43 (Kallen's Handwritten Notations) (NYC HHR 028919).

246.   Kallen interpreted this handwriting during his deposition: "Detective Tumbarello P 3 memo book, Eric Head . . . IDs . . . [p]hoto of L. Best . . . VS . . . DD-5 No. 5 arrow doesn't mention Best."   Kallen Dep. 197:10-24 (**Ex. 23**).   Kallen has explicitly acknowledged that this information should have been disclosed to defense counsel.  *Id.,* 198:9-15; *see also id.*, 197:7 to 198:15:

Q:      You now have 028919 in front of you and this is in your handwriting, right?

A.      Yes, sir.

Q.      It says, does it not, Detective Tumbarello P 3 memo book, Eric Head ID'd?

A.      IDs.

Q.      ID and then it says -- what is the next word?

A.      Photo of L. Best.

Q.      L. Best, right?

A.      Yes.

Q.      And then it says VS which means against, right?

A.      Yes.

Q.      DD-5 No. 5 arrow doesn't mention Best. When you made these notes you were aware of what Tumbarello's notebook said on page 3 about Eric Head having identified Lenny Best?

A.      Yes, sir.
                      *       *       *

Q.      And you knew that Norrito's DD-5 not only didn't mention Best but said that he identified Eric Tidwell, right?

A.      Actually what I have written here is the DD-5. I don't know whether that was Detective Norrito's or any other detective's. It doesn't say whose DD-5 it was but it says, DD-5 doesn't mention Best.

Q.      If, as I think it will turn out, if that DD-5 was Norrito's DD-5 in which he supposedly recorded the three men that Eric Head identified from photos, would it have been your obligation as assistant district attorney to make that known to the defense counsel?

A.      Yes.

247.    Kallen testified in his civil deposition that he made these notes in anticipation of witnesses' testimony as part of his preparation to try the case.  *Id*., 170:23 to 171:6, 172:6 to 173:2 (**Ex. 23**).

248.    For some reason, unrevealed by the records of the KCDA's office, Kallen did not try the case; ADA Greene, his former supervisor, did.  *See* Defts' Ex. 24 [Kallen Dep.] 90:15–18 ("[I]f I as a prosecutor have information that exculpates a defendant, then it's my obligation to turn over that material") and 124:4-6 (testifying that he had no memory of why he did not try the case).

249.    Considering Kallen had already conducted the pre-trial hearings and had prepared extensively to try the case, this shift in lead prosecutors is unusual to say the least:

> Q.      Isn't it obvious from these notes that you were well-prepared, even though you don't remember the case now, that you were well-prepared for the trial?
> A.      It appears that way, yes, sir.
> Q.      And that you were considering factors such as discrepancies between Tumbarello's notebook and Norrito DD-5?
> A.      Yes, sir.
> Q.      And, for example, when it came to my going over with you earlier the testimony you expected Marc Best to give you were going to disclose everything about the deal, weren't you?
> A.      Absolutely.

*Id.*, 198:23 to 202:14.

250.    Kallen claimed in his deposition that he had no memory of why he didn't try the case, *id.,* 123:24 to 124:6, which is dubious given how much work he had done on it and the absence of another, perhaps personal, reason.

251.    Likely—certainly a reasonable inference from the evidence—is that Kallen was taken off of the case because he had misgivings about prosecuting Greene based on what he saw in the police records and interviews.  *See generally id.,* 124:7-25 (Kallen testifying that "[i]n anyone's case I would not act as a trial counsel who I thought was not guilty of a crime") (**Ex. 23**).

252.    As discussed above, Kallen's trial preparation notes indicate his awareness of the conflict in Norrito's DD-5 and Tumbarello's notebook and he testified that he would have disclosed this at trial.  *Id.,* 197:7 to 198:15, 200:18 to 201:3 (**Ex. 23**).  Among other things, Kallen also testified that he would have disclosed the prosecution's deal with Mark Best.[28]  *Id.,* 202:10-14.  *See infra* at ¶¶ 301-309.

---

[28]    According to the Defendants' own expert this type of information should have been disclosed to defense counsel.  Caplow Training Dep. 57:6 to 58:11 (emphasis added):

Q.

Q.
A.

Q.
A.



253.    Thus, a jury could find that ADA Greene apparently took over the case once it became known that Kallen intended to fully discharge the prosecutor's obligations to turn over favorable material to the defense—which ADA Greene then failed to do.

**2.    Norrito Fabrication No. 2: Norrito Claims that Guerrier's "Fleeing" Panamanian Passengers Were "Not Part of the Group Involved in This Incident (Crime)"**

254.    As seen above, the brown-shirted stabber's movements can be directly traced from the murder scene where he was observed by: (a) Kim and Rahman fleeing up the subway steps on the north west side of the subway staircase (near the Carvel store) (Defts' Ex. 2 and Ex. 25), then (b) Head, who observed the brown-shirted black male exiting that north west staircase and running West on Church Avenue (Defts' Ex. 33 at 2), then (c) Mr. Lavaughn Ryan who observed three male blacks running on Church Avenue, away from the subway station, and two of them continuing on to Lloyd Street (*compare* Defts' Ex. 29 *with* redacted version supplied to Attorney Cohen, **Ex. 3** [DD-5s re: Ryan Interview] (CG479)),[29] then (d) James Robinson who pursued the brown-shirted stabber from Church Street (running West) to Lloyd Street, and then on to Erasmus Street, where Robinson saw the brown-shirted man enter Guerrier's cab at the intersection of Erasmus Street and Veronica Place (*compare* Defts' Ex. 27 *with* redacted version supplied to Attorney Cohen, **Ex. 3** [DD-5s re: Robinson Interview] (CG478)), and then, finally, (e) Reynold Guerrier, who confirmed that an "out of breath," brown-shirted man and two Spanish-speaking companions entered his cab, which was parked on

---

[29]    Plaintiff respectfully asks the Court to compare the original DD5s with the redacted versions of those same DD5s supplied to Plaintiff's criminal lawyer, Lewis Cohen, so that the Court has the full flavor of all the information withheld from criminal defense counsel.   The purposeful redactions denied criminal defense counsel of information relating to witnesses that was readily available to police and prosecutors.  In short, "the deck was stacked" at every level against defense counsel in violation of *Brady/Rosario*.

Erasmus Street near Veronica Place (*compare* Defts' Ex. 28 *with* redacted version supplied to Attorney Cohen, **Ex. 3** [DD-5s re: Guerrier Interview] (CG477) and Defts' Ex. 15 (Tumbarello Notebook) at 6-7 (CG 2383-84).

255.    While the DD-5 of the initial interview of Guerrier (Defts' Ex. 28) contains *some* information about what was learned from Guerrier that day (three black males entered his cab "out of breath"), the DD-5 lacks some very valuable information that Norrito and Tumbarello learned from Guerrier, which was recorded only in Detective Tumbarello's Notebook – vital Notebook pages that were not produced to Greene and his attorney.   *Compare* Defts' Ex. 28 [DD-5 of Guerrier Interview] *with* Defts' Ex. 15 [Tumbarello Notebook] at 6-7 (CG2383-84). Tumbarello's Notebook contains a wealth of information about Guerrier that would have been extremely valuable to Greene and his criminal attorney.  *See* Cohen Dep. 219:10-13; 223:17-19; 224:11-13; 231:11 to 232:4; 258:8-17 (**Ex. 1**) ("Well, I'm very surprised to see these notebooks from Norrito and Tumbarello. And I – I'm sure I would have liked to have been able to use -- utilize those, yes."); *see also id.* at 264:21 to 265:19 (Cohen testified that he "Never saw [the notebooks] in my life.").   Most remarkably, Norrito testified at the criminal trial that he had never even interviewed a cab driver.  Trial Tr. 164:22 to 165:2 (CG894-95) (Ex. 5) ("Q.  Did you speak to a cabdriver at all?  A. I did not.  No.  Q.  Did not?  A. No.").

256.    First, Guerrier advised that one of three black males who entered his cab at approximately 16:45, "out of breath," was wearing a "brown shirt."  Defts' Ex. 15 at 6.

257.    These men admitted to Guerrier that "they had a problem" and needed transportation immediately.  *Id*.   Guerrier described the brown-shirted male black, as

-69-

5'10" (the tallest of the three).  *Id*.  He also said all three passengers spoke Spanish.[30]  *Id*. Cy Greene does not speak Spanish.

258.   Guerrier's very valuable information set forth in the previous paragraphs was withheld from Greene and his criminal attorney.  This information is all the more significant in light of what we now know is false testimony offered by Norrito at Cy Greene's criminal trial -- **Norrito testified that that the black males seen fleeing into the cab were *not* part of the "group involved in this incident (crime) . . . because "we were later informed by a confidential informant who got into that cab**."  Trial Tr. 243:16-17 (CG 962); *see also* Trial Tr. 170:7-8 (Norrito: "Counselor, the cab had nothing to do with this case at all."); *id.*, 183:2 (Norrito: "It [Guerrier's cab] was irrelevant to this case.") (**Ex. 5**).  Remarkably, this highly relevant information was secreted by Norrito, *i.e.*, it was never conveyed to Greene or his criminal attorney, and Norrito concocted a story to explain why these individuals were in such a rush.  The black males in that cab were with the brown-shirted man, whose movements were traced from Kim-to-Rahman-to-Head-to-Ryan-to-Robinson-to-Guerrier, so these black males absolutely and undeniably were an integral "part of the group involved in this incident."  Norrito was unlawfully covering evidence up and, in doing so, he was fabricating a story to discredit Guerrier and anyone else who might provide evidence establishing Cy Greene's innocence.

---

[30]   The fact that the men in the cab spoke Spanish was deemed very significant by at least one ADA [ADA Mintz who thereby conceded that Tumbarello's Notebook pages should have been produced to defense counsel to supplement the Herlihy DD5] – "Q.  Do you think the defense should have been advised that these men who were supposedly seen running from the train station to the cab spoke Spanish? A. Yes." Mintz Dep. 186:19:23 (**Ex. 24**).

259.    The discussion of this important "lie" by Norrito is quoted from the criminal trial for the convenience of the Court (Norrito testimony):

Q.      And how did this cab figure into this particular incident?
        MR. COHEN: I object to that, your Honor. If he knows, your Honor. I object to it.
        THE COURT:  Overruled.

A.      **Some individuals at that location had seen a group of four boys flee in a cab minutes after this incident took place. What, in essence, alter [sic] turned out to be that there was several groups of individuals on each of these corners at that location and when upon seeing the police arrive they all --**
        MR. COHEN:  I object, your Honor.
        **THE COURT:  Officer, just wait a second. Just tell us, was that a group that was involve [sic] in this incident?**
        **THE WITNESS:  No, it was not, your Honor.**
        MR. COHEN:  I object then-, your Honor, and I ask that the answer be stricken.  He wasn't there.  How does he know? I object to it.
        **THE COURT:  How did you arrive at that conclusion, Officer?**
        THE WITNESS:  Well, your Honor
        MR. COHEN:   I object to it, your Honor.
        THE COURT:  Objection is overruled. Go ahead.
        **THE WITNESS: We were later informed by a confidential informant, who had gotten into that cab.**
        MR. COHEN:  Objection, your Honor.
        MR. MILLER:  Objection, your Honor.
        THE COURT: Overruled.

Trial Tr. 242:15 to 243:18 (emphasis added) (**Ex. 5**).

260.    Significantly, after passing on this misinformation, Norrito never revealed who that "confidential informant" was who provided that misinformation about who was in Guerrier's cab and where they were headed or, much more importantly "who got into that cab" (the identities of the brown-shirted man and his companions).  *See infra* ¶¶ 319-321.

261.    One of the reports that Norrito failed to make (and information that he failed to supply) was about the information he supposedly obtained, according to his deposition, from the Panamanian "confidential informant" who ran from the subway

station and entered Guerrier's cab.  *See* Norrito Dep. 136:19 to 138:17 (**Ex. 10**).  This

"confidential informant" allegedly gave an explanation that Norrito accepted without

making a record, without passing it on to Tumbarello,[31] and without passing it on to the

KCDA.  Tumbarello Dep. 298:3 to 299:4, 320:21 to 321:3 (**Ex. 9**).  Norrito knew or

should have known this group had been directly traced into Guerrier's cab and that they

were a known Panamanian pickpocket crew.  This is information that would have been

very significant for Greene's defense counsel in light of the fact that the brown-shirted

stabber was in Guerrier's cab along with Norrito's informant.

---

[31]   Tumbarello knew about the significance of the people in Guerrier's cab, but he claims that Norrito never told him about the "confidential informant":

> Q.   Do you recall interviewing Mr. Guerrier at the precinct on the night of the crime?
> A.   I don't recall if I interviewed him or Detective Norrito interviewed him.
> Q.   Do you recall taking notes of an interview of Mr. Guerrier on the night of the crime?
> A.   Yes, I took most of the notes, yes.
> Q.   What do you recall about what Mr. Guerrier told you and Detective Norrito at the precinct?
> A.   He said there were three people who got in his cab. They spoke Spanish and they wanted to get away from the area.
> Q.   That's the most you can recall without looking at your notes?
> A.   Yeah.
> Q.   Do you recall that the people who got in the cab were suspects for having committed the crime?
>        MS. WEISS: Objection to the form. You can answer.
> A.   No.
> Q.   Do you know why the cab driver was at the precinct to be questioned?
> A.   No, I don't know.
> Q.   Did Detective Norrito say anything to you about one of the occupants of the cab being a police informer?
> A.   No.

Tumbarello Dep. 93:11 to 94:22 (**Ex. 9**).

262.    Let's recap the circumstantial evidence that shows that Norrito lied about the significance of the people who were traveling in Guerrier's cab after Choi's murder: (a) the chocolate brown-shirted murderer was observed through a chain of eyewitnesses directly to Guerrier's cab (eyewitness Robinson actually chased him directly into Guerrier's cab), (b) Guerrier confirmed that a brown-shirted man entered his cab out of breath, who immediately advised that he and his colleagues "had a problem," (c) Guerrier confirmed that the black males were speaking Spanish, (d) the confessions of three of the assailants confirm that at least three of the Choi murder crew were Panamanians, who would have known Spanish (*see infra* ¶¶ 310-316), (e) one of the assailants, "Fulo," was a well-known NYPD "informant" (*see infra* ¶¶ 317-318), (f) Norrito has admitted that at least two of the individuals he interviewed were Panamanian (*see infra* ¶ 184), and (g) Norrito has admitted that one of the Panamanian individuals he interviewed was a known NYPD "confidential informant" (*see infra* ¶ 319).

263.    ADA Kallen certainly recognized the significance of Norrito's interview of these individuals:

> Q.    . . . [Y]ou would have wanted to find out from the detective in the case that he had supposedly spoken to an informant that cleared three suspects?
> MS. GRAGG: Objection.
> A.    **I would want to know and see a report as to the interview so I'd know the basis of the person's knowledge and everything else that relates to somebody's credibility and ability to observe. Yes, I'd want to know that**.
> *            *            *
> Q.    You're testifying, are you not, that information such as the ones I've just been discussing should have been reflected by a detective's report?
> A.    I would sure think so.
> Q.    And it should have been brought to the attention of the district attorneys?
> A.    Yes, sir.

Kallen Dep. 222:2 to 223:2 (emphasis added) (**Ex. 23**).[32]

264.    Norrito's deposition testimony in this regard is quite remarkable and it shows just how far Norrito would go to preserve Cy Greene's arrest and conviction, without regard to what really happened that day and who was really involved in Choi's murder (*i.e.*, Norrito has admitted that he "interviewed" the passengers in Guerrier's taxi,[33] among whom was the brown-shirted stabber seen entering that taxi; despite his unique knowledge, Norrito willfully failed to identify these individuals and/or provide any of this information to prosecutors who, in turn, failed to provide it to Greene or his criminal attorney):

> Q.    Did you think that these were possible suspects, possible perpetrators [the passengers in Guerrier's taxi]?
> A.    Possible.
> Q.    *Did you learn anything from any source about the people who went into the cab?*
> A.    *Yes.*
> Q.    *From whom did you learn?*
> A.    *I can't tell you exactly because it's not clear, but I interviewed these men.*
> Q.    Who [you?] actually interviewed these men?
> A.    Yes.
> Q.    There's no DD-5, is there?
> A.    *No, I didn't put [in] a DD-5. They were rushing because one of them's wife or girlfriend has [sic] having a miscarriage.* As a matter of fact, they were dropped off at Clarendon and Flatbush, but she gave them the wrong address because she was at Flatbush and

---

[32]    *See also* Caplow Training Dep. 25:4-13 (Caplow: " ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ").

[33]    Norrito Dep. 153:6-10 (**Ex. 10**) ("It's not clear in my mind, but somehow I went to go see these people.  I interviewed them.  I don't remember the time.  It was days after this case...")

Nostrand.  I think I found this out while investigating another case in the area. But this happened after several days into this investigation, so at the time --

Q.   Tell us all that you remember about this information that you got and who you got it from.

A.   That's all I remember, but *at the time it wasn't the focus of my investigation because* **I already was convinced that your client committed the crime.**

Q.   You were convinced of that because of the Mark Best interview?

A.   Mark Best interview, a lot of details he told us, other crimes that your client committed, which were all verified, and the fact that he picked him out -- out of the Catch Unit, and I believe a photo array was made for Mr. Kim and he picked him out. So this was all in a matter of days. ***So when I discovered this Panamanian thing, it was obsolete.***

Norrito Dep. 136:19 to 138:17 (**Ex. 10**) (emphasis added).[34]

Q.   So tell me, when you interviewed those three men --
A.   It was only one or two that I interviewed.
Q.   When you interviewed one or two --
A.   I think it was two.
Q.   *When you interviewed those two men, did you make a record of their names?*
A.   *No.*
Q.   *Did you write down anyplace anything about who they were?*
A.   *No.*
Q.   Did you tell the district attorney, any district attorney, about that?
A.   No.
Q.   Were the men Panamanian?
A.   I believe they were.

Norrito Dep. 143:16 to 144:11 (**Ex. 10**) (emphasis added).

**Q.   Would you agree that you had an obligation to accurately provide information to the prosecutors [about his interview with the Panamanians]?**
MS. WEISS: Objection to form.  You can answer.
**A.   Umm, yes.**
**Q.   Would you agree that you had an obligation to provide complete information about an investigation to the prosecutors?**

---

[34]   The record shows that Norrito secured the result that he determined that he wanted all along – the quick arrest and conviction of Cy Greene – and the recognition and "fruits" that followed for an arrest in a high profile murder case.  Norrito received letters of commendation (and a lunch) from the Korean Chamber of Commerce and the NYPD. Norrito Dep. 89:15-25, 91:12 to 93:10 (**Ex. 10**).

MS. WEISS: Objection to form.  You can answer.

**A.      Yes.**

Norrito Dep. 158:7-21 (**Ex. 10**) (emphasis added); *see also id.,* 168:24 to 169:7 ("Q. And you knew specifically that by not providing that information [the identity of passengers in Guerrier's taxi] in the DD-5, defense counsel would know nothing about it?  [Objection to form].  A. That's correct, Counselor.").

**I.      Day Three of the Investigation – Norrito & Mark Best Form an Undisclosed, Unholy Alliance**

**1.      Mark Best & Detective Norrito**

266.    To truly understand how Cy Greene was wrongfully convicted of Choi's murder, you must start with Mark Best, and Detective Norrito's relationship with Mark Best – how the latter relationship developed, how they used one another to each other's advantage, and how their relationship led to Cy Greene wrongfully becoming the target of the Choi murder investigation.  Their relationship is detailed below.

267.    Based both on Norrito's interview of Joseph Ross, and Lenny Best's escape from police custody on June 15, 1983, Mark Best was brought in as a suspect for an interview by Norrito on June 16, 1983.  *See* Defts' Ex. 14 at CG4035 [Norrito Notebook]; *compare* Defts' Ex. 35, *with* redacted version provided to Attorney Cohen [DD-5s re: Mark Best Interview], **Ex. 3**.

268.    At the Wade Hearing, Detective Norrito admitted that on the day of the Choi homicide, he "rounded up several people who were known to frequent that area [murder scene].  Mark Best was one of them.  [At] That particular time, I received no information from Mark Best.  The following day [June 15] I interviewed an individual (Joseph Ross – *see* Defts' Ex. 34 [DD-5 re: Interview of Joseph Ross]) who emphatically told me that Mark Best was at that location  . . . just about the time the homicide was

there.  So the day after that [June 16] I brought Mark Best in with this additional information I had as to his presence."  Wade Tr. 61:19-25 to 62:2-3 (CG626-27), **Ex.2**.

269.    Norrito testified at Greene's criminal trial that Mark Best was brought into the 67th precinct on June 16, 1983 as a *suspect* in the Choi homicide and that Mark Best was read his Miranda rights.  Trial Tr. 140:9-12 (CG 870), (Q: When you went to Mark Best, did you consider him in your trained mind as a suspect in this murder?  A: Yes.") **Ex. 5**.  But, at his deposition in this case, Norrito testified somewhat differently: "I always treated him as a suspect.  I never quite believed that he was innocent, but I didn't take him under arrest."  Norrito Dep. 242:5-11 (**Ex. 10**).  Elsewhere Norrito testified that he "had serious, serious reservations about Mark Best."  *Id.,* 214:6-8.  These "serious, serious reservations" were never conveyed to prosecutors and/or, if they were, they were not properly conveyed to Greene or his criminal attorney.

270.    The DD-5s and Notebooks of Norrito and Tumbarello show, indeed, that Mark Best should have been one of the earliest suspects in the Choi murder.  *See, e.g.*, DD-5 of Interview with a Mr. Johnson dated June 14, 1983 (CG430) ("When asked about any youths that hang around on the corner of Church & Nostrand Ave. he [Johnson] stated a girl named Brigit [Bridget Best] who has two brothers Lenny [Best] and Markus [Mark Best]"); DD-5 Canvas Report dated June 14, 1983 (CG431) ("Paul's Pizza – Unidentified male stated that 3 bad kids hang on the corner & grab pocketbooks etc. names of Punchy, Brigit [Bridget Best], Marki [Mark Best] & Lenny [Best]"), **Ex. 3.**

## 2.    Mark Best Was a Known Pickpocket Who Worked with Teams & Knives

271.    Mark Best was a pickpocket who was known to work with pickpocket teams on buses and trains.  L Best Dep. 14:3-8 (**Ex. 8**) ("They [Mark Best and his

friends] used to go on the trains and the buses and pickpocket people.  Actually, I think he was involved one time with a purse snatching, but for the most part, I knew they robbed picking pockets."

272.    Detective Norrito admits that he was fully aware of this fact.  Norrito Dep. 109:17-25 (**Ex. 10**).  Tumbarello has testified in this case that he didn't know this fact from Norrito – *i.e.*, he wasn't advised by Norrito – of any information about Lenny Best and Mark Best.  Tumbarello Dep. 161:15-24 (**Ex. 9**).

273.    In fact, Mark Best was charged with several crimes starting in 1982, including at least two before June 14, 1983 with co-defendants *where knives were used*, and he was charged with one crime, without a co-defendant, in September 1983, *involving the same type of gravity knife that was used to stab Choi*.  *See* NYC HHR 22471-22476 (**Ex. 30** hereto).  The latter information was not made available to Greene's criminal trial attorney, though discovery of that information was sought.  Wade Tr. 74:23-25 to 75:2-4 (CG639-640) (**Ex. 2**).

274.    Tumbarello has testified in this civil case that he did not know that Lenny Best and Mark Best were suspects – or that they were neighborhood crooks.  Tumbarello Dep. 165:23-25, 166:2-5, and 166:3-24 (**Ex. 9**).  Norrito allegedly didn't tell Tumbarello that Mark Best and Lenny Best had previously been arrested in the precinct.  *Id*., 166:5 to 167:4 and 167:5-8.  Thus, Tumbarello claims that he didn't know that Mark Best had a criminal record and charges pending against him.  *Id*., 167:10-22.

### 3.    Mark Best Provides His Account of the Choi Murder

275.    Norrito brought in Mark Best for a lengthy, five hour interrogation on June 16, 1983, commencing at 11:20 a.m. and ending at 4:20 p.m.  Defts' Ex. 14 [Norrito Notebook] at CG4035-36.

276.   Mark Best was especially vulnerable – psychologically and physically – to being pressured to name Cy Greene as the stabber to avoid himself (and/or his brother) being charged with the crime.  Both Norrito and his brother, Lenny, admit that Mark Best was susceptible to pressure.  Norrito Dep. 160:6-8 ("he was easily intimidated") (**Ex. 10**); L Best Dep. 27:20-21 ("He was a follower . . .") (**Ex. 8**).[35]

277.   Mark was borderline autistic; he was mentally "slow," likely as a result of his premature birth.   L Best Dep. 11:22–12:7.  He was mentally and emotionally handicapped (exemplified by his manner of speech heard on the audio recording of his precinct interview on June 16, 1984 – a copy of that audio recording is annexed hereto as **Ex. 8**).   And Norrito has openly admitted in his deposition that "Mark Best was a person whose credibility was questionable."  Norrito Dep. 158:23-25 and at 309:21-25 ("Umm, let me say that I had reservations about Mark Best from the beginning, until his interview with the District Attorney *and him taking a lie detector test*.") (emphasis added), (**Ex. 10**).

278.   According to Norrito's own handwritten notes (not provided to defense counsel), the first thing that Mark Best strangely blurted out when his June 16, 1983 interview began was: "Says his brother Lenny told him about the [Choi] killing."  Defts' Ex. 14 at CG4035.

279.   According to Norrito, Mark Best was soon providing a detailed eyewitness account of the Choi assault and murder – *an account that Norrito fortified by testifying (hearsay) that it was remarkably similar to the account provided by Kim*.  Trial Tr.

---

[35]   According to his brother, Lenny, Mark Best is now deceased – Mark perished at age 26, in the late 1990s.  L Best Depo. 10:18 to 11:9 (**Ex. 8**).

234:18 to 235:2 (Ex. 5); *see generally* Defts' Ex. 21 (Statement of Mark Best) and Ex. 11

hereto (Audio Recording of Mark Best Interview).

      280.   Best's account was so detailed that Norrito rightfully believes today that

Mark Best very well might have been a participant in the crime or a "lookout" for the

assailants who attacked Choi:

> Q.     Did you accuse him of possibly being involved in doing this crime?
> A.     No, I never accused him. I believed -- **I believed he [Mark Best] might have been a lookout,** but then I was convinced that he [sic] nothing to do with Cy Greene.
> **Q.**     **Did you tell the district attorney that you believed -- a district attorney, any one of them, that you believed he might have been a lookout?**
> A.     **Yeah, I think I might have.**
> Q.     Who did you tell that to?
> **A.**     **I might have told that to [ADA] Sullivan.**

Norrito Dep. 160:9-15 (**Ex.** 10 (emphasis added).

      281.   The latter opinion by Norrito was never disclosed to defense counsel by

ADA Sullivan, and Norrito's belief at that time would have made perfect sense, in that

Mark Best admitted that that he observed Choi and Kim in a store paying for a soda just

before he followed that pair into the subway station, *i.e.*, he observed a transfer of cash

just before the mugging began, and then observed every event that followed.  Defts' Ex.

21 [Mark Best Statement] at 2-3.

      282.   Mark Best's account of the crime is itself unbelievable, unless he was

participating in the crime – he allegedly was in all places, with alleged perfect vantage

points, and observed everything that occurred – from Choi and Kim's purchase of a soda

in a store (he was there), to their walk down the subway stairs (he was there), to Cy

Greene allegedly urinating on the subway stairs (he was there), to the chase and  assault

that took place on a landing below the subway stairs (he was there), and then the murder

across the landing on another staircase (he was there).  Defts' Ex. 21 [Mark Best Statement] and Ex. 35 [DD-5 re Interview of Mark Best].

283.    Mark Best's account did, however, differ significantly from Kim's in several critical ways.  For example, on page 7 of the transcript of his June 16, 1983 statement, the following is recorded: "Q: That's where the Oriental guy [Choi] scratched him [Cy Greene]?  right when he [Choi] scratched him, he [Greene] stabbed him too?  A: Yeah.  He stabbed him (inaudible)."  Defts' Ex. 21 at 7.  As to whether the Oriental man (Choi) had scratched the man who stabbed him and whether that meant anything to Norrito, the latter testified: "I don't recall this. I don't recall this conversation."  Norrito Dep. 223:9-14 (**Ex. 10**).

284.    In a similar fashion Norrito testified that he had no recollection of what appears on page 6 of the transcript of the Best interview, which reads:

Q:      . . .Where did they go from there? right there, does he [Greene] pull
        a knife out and stab him?
A:      The Oriental man scratched his hand.
Q:      The Oriental man scratched his hand?
A:      He stabbed him.  And put a knife out. (inaudible)
Q:      Where did they stab him, [on] the same stairway they came down?
A:      Yeah, right before you get to the middle of the booth, and then all
        the money. He fell. (inaudible) They got all the money, right
        (inaudible).
Q:      When did Rome [Greene] stab him?
A:      When he [Choi] scratched him [Greene] on his hand.

Defts' Ex. 21 at 6.

285.    When Norrito was asked if he was there listening to Mark Best give this information, Norrito said: "I have no recollection of it, Counselor."  Norrito Dep. 224:16-19 (**Ex. 10**).    When asked if this information fit with what Mr. Kim said, Norrito answered: "According to this, no."  *Id*., 224:20-22.

286.     Not only is the location of the murder different than the location described by Kim and Rahman (who both claimed that the stabbing occurred on the opposite staircase from where the Koreans entered the subway station), but Mark Best also claimed: (a) that Cy Greene's hand was scratched by Choi, (b) that Choi was stabbed in the back (not the chest), and (c) that two of the fleeing perps knocked him down *as they fled up the north west staircase where he allegedly observed the murder.   Compare* Defts' Ex. 21 [Mark Best Statement] at 6-8 (Q: So he stabbed him right there, right on the stairway that the Orientals came down . . . the same one that they were walking down into the subway . . .?   A: Yes.") *with* Defts' Ex. 25 [DD-5 re: Rahman Interview] (murder occurred on south west staircase and perps fled up south west staircase) and Defts' Ex. 26 [Rahman Statement] at 2 (after the stabbing, "Q: The Koreans ran the same way they came down [to the opposite staircase, the north west staircase], is that it?   A: The same way they came down.).

287.     Norrito *corrected* the murder location and how the perpetrators fled when he typed up his DD-5 on the Mark Best interview: "the oriental [Choi] ran towards the other side of the station, and Cy gave chase . . . The three perps ran up the stair well [sic] on the south west side and ran west on Church Ave . . . 2.  The witness then stated that he saw the orientals carrying his friend who got stabed [sic] up the north west stair well [sic] to street level.  *See* Defts' Ex. 35.  Norrito "cleaned up" Mark Best's statement in the DD-5 so that it conformed more closely to Kim and Rahman's statements, but the audio recording of Mark Best's statement sets forth what Mark really said and Norrito could not change the fact that Mark claimed that Choi was stabbed in the back.

### 4. Tumbarello Has Admitted Mark Best's Account Was Very Suspect

288.     Both during his precinct interview and ADA [audio recorded] interview, Mark Best said that Cy Greene stabbed Choi in the back.  Tumbarello Dep. 177:23-25 to 178:2-18 (**Ex. 9**).  Tumbarello knew this was not accurate.  *Id.,* 178:19-25 to 179:2-6.

289.     As to whether Tumbarello's hearing Mark Best state that he saw Cy Greene stab Choi in the back – and hearing Mark state that fact two times – and whether that raised a question about Mark's reliability, Tumbarello says he didn't know what he was thinking at that time because ". . . it doesn't make sense, I know."  *Id.,* 183:16 to 184:3.

290.     Tumbarello also was very troubled by the sequence of events described by Mark Best, *i.e.*, how Choi was scratching [Cy Greene] if [Cy Greene] was stabbing him [Choi] in the back.  *Id.,* 186:15-25, 187:2-18.

291.     Tumbarello also noted that there was no hand injury to Cy Greene when he was arrested – none that he noted.  *Id*., 311:8-23.

292.     Tumbarello was also concerned about the fact that Mark Best claimed that a third person was involved in the murder-robbery, "Jeffrey Davis."  *Id.,* 254:17 to 256:24.  This proved also to be wrong as Jeffrey Davis apparently was in jail or police custody at the time of the murder.  *Id*., 256:19-24.

### 5. Norrito Fabrication No. 3: Norrito Falsely Testifies that He Had Mark Best Undergo a Polygraph Examination

293.     As seen above, Norrito himself has openly admitted in his deposition that "Mark Best was a person whose credibility was questionable."  Norrito Dep. 158:23-25 and at 309:21-25 ("Umm, let me say that I had reservations about Mark Best from the

beginning, until his interview with the District Attorney *and him taking a lie detector test*.") (emphasis added) (**Ex. 10**).

294.   Norrito has falsely claimed that Mark Best underwent a polygraph examination:

Q.   A lie detector test?
A.   Yeah, we brought him in for him to take a lie detector test.
Q.   You're saying that on the day he was interviewed by --
A.   No, I'm not saying on the day. Sometime later. I don't know exactly when it was.
Q.   Do you know who took that test?
A.   There is a -- there was a technician in the Brooklyn DA's office, he was there for many, many years. He may still be there.

Norrito Dep. 310:2-15 (**Ex. 10**).

Q.   Have you ever seen the polygraph charts?
A.   No.

*Id*., 310:22-25.

I just remember speaking to the technician. I don't even recall what that conversation was, but he told me he didn't think this kid was lying, but he was unsure himself.
Q.   Did you bring Mark Best in to have the polygraph taken?
A.   I believe I did.

*Id*., 312:6-13.

295.   Norrito admits that he didn't complete a DD-5 regarding the alleged polygraph examination.  *Id*., 314:6-8.

296.   Suspecting that Norrito had, once again, falsely created evidence to bolster the credibility of Mark Best, Plaintiff's counsel conducted the deposition of Joseph Ponzi, a Chief Investigator (Polygraph Expert) for the KCDA on October 8, 2009.  Transcript Deposition of Joseph Ponzi ("Ponzi Dep.) (**Ex. 31**).   Ponzi produced the KCDA

Polygraph Logbook, which contains entries to record any polygraph examination administered by the KCDA.  *Id*., 27:15-18.

297.    Ponzi reviewed the KCDA Polygraph Logbook entries and testified that if any individual was asked to take a polygraph by a detective in Brooklyn, and there had been a meeting or interview with that individual, Ponzi says there would be an entry in the KCDA Polygraph Logbook and a corresponding file.  *Id*., 29:2-21.  Each file (including records, charts and the case file) was kept in a separate folder and filed in a cabinet.  *Id*.  All such files have been preserved to this day.  *Id*.

298.    If a detective, like Norrito, had requested a polygraph of Mark Best and an investigator from the KCDA's Office had met with the witness, Ponzi testified that there would unquestionably be a record of the meeting.  *Id*., 29:5-30:17.  If such a witness was brought to Ponzi, he would have initiated a pre-test interview, elicited pedigree information, and commenced that process by creating a file.  *Id*.

299.    Ponzi testified that he reviewed the KCDA Polygraph Logbook for 1983 (beginning in June) and he found no entry for Mark Best or John Best.  *Id.,* 43:5-11.  He testified that, if Norrito's testimony that he brought in Mark Best for a polygraph test was correct, then there should be an entry in his logbook, *id*., 53:9-16, because if the KCDA's Office had contact with any such witness-subject, there would be an entry in their Polygraph Logbook, *id.,* 54:14-16.

300.    Ponzi's testimony established that Norrito had not told the truth about Mark Best passing a polygraph examination administered by the KCDA.

**6.      Mark Best Is Promised a Deal If He Implicates Cy Greene**

301.    Mark Best admitted before his death that Norrito promised him a "deal" if he implicated Cy Greene in the murder of John Choi.  The details follow below.

302.    First, Norrito threatened Mark Best that he and his brother would be charged with Choi's murder if he did not "snitch" on someone else.  *See* Affidavit of Mark Best dated Feb. 26, 1991 (**Ex. 32**) at ¶¶ 5-6 ("I was told by police that if I did not name someone and subsequently identify him as having participated with the crime, I would still be charged with murder."); Defts' Ex. 53 [Affidavit of Hassan (Mark) Best sworn to on April 29, 1992] at ¶4 ("as I was scared to do 25 years to life in prison. So I blamed Cy Greene, and made a statement for the detectives."); *see also* L Best Dep. 49:13-17 ("They just wanted Cy. And my brother gave them Cy out of fear. One, it wasn't just because he was doing it to protect me.  My brother was also doing it to protect himself, because my brother was involved in this.")

303.    Having promised Mark Best that he and his brother would not be arrested, Norrito sweetened the "deal" further, by offering Mark Best a job in a laundromat that Norrito allegedly owned.  Affidavit of Mark Best dated Feb. 26, 1991 (**Ex. 32**) at ¶ 7 ("I did so [implicate Cy Greene] because of the threats that had been previously made and also because I was told by the police that they could get me a job in a laundromat.  In fact, the police officer did get me a job in a laundromat (I believe the officer was associated with the laundromat).").

304.    Mark Best testified about this very fact at a criminal court hearing on April 24, 1992:

> Direct Examination by Mr. Joseph:
> Q.     Am I correct, Mr. Best that you did not testify at the [Greene murder] trial?
> A.     Yes, sir.
>        The Court:     I know that.
> Q.     Where were you at that time, sir?
> A.     I was at a laundry mat.
> Q.     Was that a laundry mat that was owned by a Detective Norrito?

A.      Yes.
Q.      Did he know you were there?
A.      Yes.

Transcript of Hearing before Justice Michael Pesce on April 24, 1992, 17:14-24 ("April

24, 1992 Tr.") (**Ex. 28**).

305.    In a deposition in this case, under oath, Norrito denied providing a

laundromat job to Mark Best under questioning by Plaintiff's counsel:

Q.      He [Mark Best] continues to say in that paragraph, quote, I did so
        because of the threats that had been previously made and also
        because I was told by the police that they could get me a job in a
        laundromat, unquote.  Do you have any recollection of that?
A.      No.
Q.      He says after that, quote, In fact, the police officer did get me a job
        in a laundromat, and he says in parenthesis, I believe the officer was
        associated with the laundromat, close parenthesis, close quote.   Do
        you recall Mr. Best getting a job in a laundromat?
A.      Not me.
Q.      Any job with the assistance of the police?
A.      Not me. I wasn't involved.  *I don't know.  I have no recollection of it.*
        I know nothing about it.

Norrito Dep. 440:16-441:14 (emphasis added) (**Ex. 10**).

306.    At a hearing before on March 10, 1992, Tumbarello also specifically

denied knowledge of any deal Norrito made with Mark Best, but Tumbarello has

admitted that he was rarely made aware of everything that Norrito was doing with Mark

Best.  Transcript of March 10, 1992 Hearing before Justice Michael Pesce, 7:15-25 (**Ex.

33**).  Before Tumbarello testified at trial or hearings, Norrito instructed him on what to

say.  Tumbarello Dep. 400:15 to 401:4 (**Ex. 9**).

307.    In short, a deal apparently was cut with Mark Best by Norrito (and ADA

Kallen), a deal which was never disclosed to defense counsel.  ADA Kallen has testified

-87-

in this case that *such a deal was made and that it should have been disclosed to defense counsel prior to the trial*.  Kallen Dep. 202:10-14 and 144:14 to 146:11 (**Ex. 23**):

> **Q:** **And looking at the next page does it appear that you were making notes in preparation of Best disclosing by his answers and you obtaining by your questions the deal he has made with his attorney and the District Attorney's Office in regard to his open cases before testifying?**
> **A:** **Yes, sir.**
> Q:  So in the middle, and I think I can read all this so I'm not going to put you through it but if there's something I can't I'm going to ask you, have you plus attorney plus DA office entered into agreement, and you underlined the word agreement unless I did on this someone will correct me, entered into agreement with regard to your open cases, I read that correctly, right?
> A:  Yes, sir.
> **Q:** **And then you anticipated him to state the agreement on the record, correct?**
> **A:** **Yes.**
> **Q:** **And the agreement [with Mark Best] was to be if you decide to plead guilty on all cases you'll get 60 days' jail; is that correct? I read it correctly?**
> **A:** **Yes.  And then it continues and says "if testify truthfully in this homicide case."**
> **Q:** **I missed the last word. Testify truthfully in?**
> **A:** **In this it appears to say homicide case.**

*Id.,* 144:14 to 146:11 (emphasis added).

308.    Prior to the start of trial, defense counsel (Cohen) specifically asked the prosecutor (ADA Gerald Greene), in front of the trial judge, for all *Rosario* materials relating to Mark Best.  ADA Gerald Greene replied to Cohen that it had all been provided.  Trial Tr. 26:19 to 27:5 (CG735-54) (**Ex. 5**).[36]  This was not correct, as both Norrito and Kallen had offered an undisclosed deal to Mark Best.

---

[36]    Cohen also had argued for Mark Best's appearance at the Wade Hearing by arguing that Lenny Best was a suspect: "I respectfully suggest that Mark Best has a brother who is a definite suspect in this murder, may, in fact, have participated or committed the murder himself.  And I think on the question of motive with regard to any identification, false or otherwise, I should be entitled to examine with regard to Mark Best a little more carefully than I could if he were just some stranger who happened to come in and identify

309.   The specific "deal" cut with Mark Best was exactly what the jurors wanted to hear about before they completed their deliberations in Cy Greene's criminal trial. Trial Tr. 772:22-24 (CG1496) (**Ex. 5**) ("Jury Forelady: *"We would like to know about Detective Norrito's having anything to do with Mark Best.)*.

### 7.   Mark Best Ultimately Confesses that He Was Part of the Pickpocketing Team & that Cy Greene Played No Role in the Mugging/Murder of Choi

310.   Lenny Best has testified in this case that he knows who killed Choi, both from the mouth of his brother, Mark Best, and the mouth of his brother's friend, William Patterson, who were both present at the Choi murder, participating in the "mugging" as part of a pickpocket crew, along with at least two Panamanians:

> I told my brother . . . Listen, do the right [thing] there; one thing we ain't got is rats in our family; we don't snitch on people; you sat there and you made a statement against that man [Cy Greene]; you knew it wasn't true. But he [Mark] did it because he was scared.
>
> My brother was probably 14 years old and the police had him in the precinct and they pressured him and pressured him. They were talking about Cy. They just wanted Cy. And my brother gave them Cy out of fear.  One, it wasn't just because he was doing it to protect me. My brother was also doing it to protect himself, because my brother was involved in this.  Ain't no doubt about it.
>
> My brother was involved in it. Adolpho was involved in it.  Fulo was involved in it.  In fact, Adolpho did it.  I am telling you straight, man-to-man, the way I talk might be different from your way, but Cy didn't take that body. That is one I look you in the eye and tell you, not going from the streets, but I know from people who respect me and told me who did it.
>
> I know who did it a long time ago. **My brother was alive, there was no way in the world I'm going to walk in a courtroom and say my brother**

somebody."  Wade Tr. 63:25 to 64:10 (CG628-29) (**Ex. 2**); see also Wade Tr. 37:19 to 38:3 (CG 602-603) ("I certainly think that it's incumbent on the part of the District Attorney, especially in a case like this with a person like Mark Best who has a record maybe equal to the defendants and who has a motive in this particular case perhaps to make a false identification by virtue of the fact that his own brother was a suspect in the case.").

**did it, for nobody. That's not happening. Now that my brother's dead, I have no problem saying.  My brother, Fulo, Adolpho and some other kid and William [Patterson] was there.**  That's what happened.

They had a statement [Eric Head] that I was there.  **They saw me running from the subway.  You [Head] saw my brother running from the subway.** Remember something, I was much older than my brother.  Second of all, all my crimes have been burglaries.  I've been a burglar from the time I can remember.  I'm not sitting here to bullshit you. That's what I did.

Streets telling me, my brother telling me out of his own mouth and him and William acting the way the [they] were acting the next day.  Both of them were scared. Both of them didn't want to go outside. I asked my brother, What's going on; why you acting so; what you so scared about.

Then my brother told me that they were all there, but he didn't do anything. William said he was there, but he didn't do anything.  Adolpho was there. My sister has a baby by him.  Everybody in the street know who killed that man.  Everybody in the neighborhood knew.

*                      *                      *

**My brother was there.  Adolpho killed that man.  And how did it happen and what did it happen over?  Pickpocketing. That's what it happened over.  Pickpocketing.  My brother was bent over picking that man's pocket. That man woke up that they were picking his pocket and [he] tried to resist that and they stabbed that man up. That's the fact of the matter.**

L Best Dep. 49:4 to 51:5, and 52:7-15 (emphasis added) (**Ex. 8**).[37]

311.   Lenny clarified that at least two of the individuals involved in the

robbery/murder with his brother and William Patterson were Panamanians ("Fulo" and

"Adolpho") during his deposition; his testimony in this regard matches perfectly with the

taxi driver's (Reynold Guerrier's) statement that the brown-shirted man and his

---

[37]    Mark Best's (and William Patterson's) statements to Lenny Best about their involvement in the crime are admissible as "statements against penal interest" under Fed. R. Evid. 804(a)(4), 804(b)(3) and 807 .  Mark Best and William Patterson are both dead and unavailable, and their statements certainly exposed these men to criminal liability. William Patterson is deceased.  L Best Depo. 16:11-25 (**Ex. 8**).

colleagues who entered his cab were speaking Spanish (this fact, along with another confession that follows below):

> Q.     And what?
> A.     Then after that I talked to him [Mark Best] and William [Patterson] together.
> Q.     I missed that. You talked to him?
> A.     Paterson.  After that I talked to them together.
> Q.     That was close to the time of June 14 or later?
> A.     Just a little after.
> Q.     You said that you understood, and I take it from your brother because of what you said, that the crime was committed, according to Mark, with him present, William present and –
> A.     Adolpho.
> Q.     -- and the Panamanians?
> A.     Yes.
> Q.     Two Panamanians?
> A.     Yes, Adolpho and Fulo. From my understanding Adolpho was the one who allegedly stabbed this man.
> Q.     Is it Adolpho or is it Rudolpho?
> A.     Rudolpho.  On the street, I mean, we know.
> Q.     So it's somebody who you knew was a Panamanian called Rudolpho [Brown]?
> A.     Yes.

*Id.,* 60:3 to 61:4 (**Ex. 8**).[38]

312.   What Mark Best and William Patterson told Lenny Best has been confirmed by the sworn testimony of another (Panamanian) eyewitness, Ruperto Lindsay. Transcript of Ruperto Lindsay Deposition ("Lindsay Dep.") 21:8 to 23:23 (**Ex. 34**).

313.   Mr. Lindsay saw two Panamanians that he knew, Rudolpho [Brown] and Tony [Bowers] running from the subway station on June 14, 1983 on Church Avenue towards Rogers Avenue.  *Id.*

---

[38]   "His name was Rudolpho but we used to call him Adolpho. You know why we used to call him that?  His name was Rudolpho. We used to call him Adolph. You know Hitler?  That's how we started.  Adolph, Adolpho, and it just stuck."  L Best Dep. 71:23 to 72:5 (**Ex. 8**).

314.    Mr. Lindsay proceeded into the subway station to see why Rudolpho and Tony were running with such haste from some commotion in the subway station and, when he reached the bottom of the subway stairs, he observed a man on the ground and another man attempting to hold him.  *Id.,* 32:5-20

315.    A few days later, Mr. Lindsay approached Rudolpho in a park in Brooklyn and Lindsay asked him what had happened at the subway station:

Q.    What did you say to him?
A.    When we -- when I went -- when I called him, we went to the side, and **I asked him what happened the other day that I seen him and Tony running out of the train station, you know.  So he went on to tell me that they was trying to rob the Chinese guy, you know; and then in the process of it, he end up stabbing the Chinese guy in the chest, you know.**  And after that he won't say much, you know; so he told me.  I kept that to myself and kept it moving.

                    *                    *                    *

Q.    Were you surprised that he confessed to you?
A.    Not really. No, I wasn't really surprised. You know, I mean, if I -- to think about it now, **I wasn't really surprised that he mentioned it to me. You know, some people like to brag about certain things, you know, looking for reputation and stuff like that.  And we think to do that, especially when we are younger, we think this is, you know, [to] glorify a certain life-style.**  At least, that's my opinion now, you know, yes.
Q.    And why would Rodolfo be looking for reputation?
A.    Because when you look for reputation, people fear you. People respect you.

Lindsay Dep. 59:25 to 60:14, and 60:24 to 61:18 (emphasis added) (**Ex. 34**); *see also* Transcript of April 21, 2005 Criminal Court Proceedings, *People v. Greene*, Sup.Ct. Kings Co., Indict. No. 3521-83 at 15:12-19; 36:2-22; 39:10 to 40:11 (consistent testimony by Lindsay) (**Ex. 61**).

-92-

316.     According to Mr. Lindsay, "Tony" [Tony Bowers – *id.* at 55:3-10] died in the late 1980s during a shootout with police, *id.*, 70:8-12, and "Rudolpho" [Rudolpho Brown – *id.*, 55:13-17] died in the 1990s as a result of a drug overdose, *id.*, 70:16-19.

317.     Interestingly, Mr. Lindsay testified that "Fulo," who Mark Best admitted was part of the "crew" that attacked John Choi, was a well-known NYPD informant.  *Id.*, 80:4 to 81:4, and 82:16-21 (emphasis added) ("**Fulo did a lot of things, and, you know, and that was his way of getting over when he did get arrested.  They just used to let him go in exchange for information**, and he become [sic] a confidential informer."). Finally, Lindsay testified that "Fulo" was executed for being a snitch in another homicide case.  *Id,.* 81:13 to 82:15.

318.     Thus, "Fulo" was very likely the unidentified "confidential informant" in Guerrier's taxi who was interviewed by Norrito.  *See supra* ¶ 311.

319.     Norrito, however, evasively testified in this case that he never learned the real name or street name of the Panamanian confidential informant in Guerrier's cab. Norrito Dep. 150:21 to 151:16 (**Ex. 10**):

| | |
|---|---|
| Q. | And his name was? |
| A. | I never was told. |
| Q. | His nickname was? |
| A. | Never was told. |
| Q. | His street name was? |
| A. | Never was told. |
| Q. | Was he a confidential informant for the precinct? |
| A. | No. |
| Q. | Was he one you worked with? |
| A. | No. |
| Q. | How do you know he was a confidential informant? |
| A. | It was given to me by another police officer. |
| Q. | Who was that? |
| A. | Robert Carter.  Robert Carter.  He's a Panamanian, also. |
| Q. | Was he also in the 67th? |
| A. | Yes. |

320.    In short, Norrito met and interviewed several of Choi's killers, but he has never identified them or produced any report -- to both protect them and shield them from prosecutors, Greene and his criminal attorney.  Norrito Dep. 136:19 to 138:17 (**Ex. 10**).

321.    The involvement of the Panamanians also shows that Norrito totally fabricated a story about these men rushing to hospital because of an alleged "miscarriage" -- to disguise the identities of the Panamanians in Guerrier's cab.  Only Norrito knows why he would fail to file a DD-5 identifying those Panamanians and what they said to him when he interviewed them (to protect the informant and his crew?).  *See supra* ¶¶ 260-265.

322.    Finally, Mark Best also confessed to his brother, Lenny, what happened at the 67th Precinct on June 16, 1983, when Mark Best was interrogated for hours by Norrito:

> When I talked to my brother I said, What happened at the precinct when the police took you in.  He said they were asking him questions about Cy, they were asking him questions about me.
>
> I asked him, What did you tell the police.  He told me, the police told him that they wanted Cy, and that if he didn't give them Cy, if he didn't give them me, they were going to lock him up.
>
> I don't know how my name got caught up in it. I know for a fact I had nothing to do with this. I am a burglary [burglar].  I don't do jostling. But they wanted my brother to implicate Cy.  My brother told me himself he was scared to death and he couldn't implicate Cy. But they wouldn't let him go out of the precinct.  He told me that.
>
> They started asking him where I was.  Remember, this was before [actually one day later] I got picked over [up] by them. He told me that they asked him about me.  I was like, What did you ask you about me.  He said they asked him where I was, where I was living at.  The police told my brother that they know about me doing burglaries in the neighborhood.

> But for the most part they was talking about Cy. They wanted my brother to say Cy was involved in that. I asked him, Why did you say that. He said because he was scared.

*Id.,* 56:22 to 57:25; *see also id.*, 68:12-22.[39]

> **J.    Cy Greene Is Arrested Based Solely on Mark Best's False Statements to Norrito and Norrito's Fabrication & Secretion of Valuable Eyewitness Evidence**

323.    On June 21, 1983, Cy Greene and Larry Williams were arrested at Cy's mom's apartment. Norrito Dep. 232:15 to 234:5, 344:17 to 345:20, 380:10 to 381:7 and 401:25 to 402:8 (addressing his role in the case after the arrests, Norrito: "Other than testifying, no, that was it for me.") (**Ex. 10**). Norrito was present; Tumbarello was not. *Id.*; *see also* Tumbarello Dep. 373:3-7 (Tumbarello was the arresting officer "only on paper"), 243:18-25 (his name being on the arrest report was the idea of Lt. Gardella) (**Ex. 9**).

324.    When Cy Greene was arrested, he was in the company of his future co-defendant, Larry Williams, who had the great misfortune of being with Greene, being black and 5'7", and having a bruised eye. Norrito Dep. 208:3-12 (both had "facial wounds"), 232:23 to 233:23 (Greene has black eye, Williams has cut on nose); *compare* Tumbarello Dep. 312:23 to 313:19 (Tumbaerllo is reminded of his trial testimony where

---

[39]    Lenny Best repeatedly encouraged his brother, Mark, to tell the truth and to sign affidavits admitting that he participated in the robbery and murder. L Best Depo. 49:3-9; 66:3-9. *See* Affidavit of Mark Best dated Feb. 26, 1991 (**Ex. 32**) at ¶¶ 9-10 ("In fact, the guy who did the stabbing was named Panama. It was not the defendant. I know this from my own observation. I do not know Panama's real name or where Panama resides since I knew him from the street. 10. I can state that the defendant [Cy Greene] was not present at the time of the murder for which he was convicted since I was present and know that he was not there."); Defts' Ex. 53 [Affidavit of Hassan (Mark) Best sworn to on August , 1992 at ¶1] ("on June 14, 1983 at approximately 4:30 p.m. in the subway station on Nostrand avenue and Church avenue, I killed a chinese man by stabbing him with a knife, while me and others were attempting to rob him.").

the description of Williams was of a "red, bloodshot [left] eye") (**Ex. 9**). Based on the

latter factors, Williams was also arrested with Greene.

325. As to whether there was discussion between Tumbarello and Norrito about

whether it was right to proceed with an arrest of Mr. Greene at that point, Tumbarello has

testified:

> Q. Did you have a discussion with Detective Norrito about whether it
> was right to go ahead and arrest Mr. Greene at that point when you
> had these questions about the reliability of Mr. Best?
> MS. WEISS: Objection to the form.
> A. When this interview [of Mark Best] was done, I didn't know that
> they were going to lock up Mr. Greene. I wasn't even – I wasn't
> even there that day. I had no idea -- we were still supposed to be
> interviewing other people and I got this phone call that he was
> arrested.
> Q. As an experienced detective, you wanted to be satisfied that the
> evidence was at least reasonably convincing before you arrested
> someone for a homicide; is that right?
> A. Yes.

Tumbarello Dep. 184:19 to 185:15 (**Ex. 9**).

326. Nevertheless, Norrito took Cy Greene and Larry Williams into custody

and transported them to the 67th Precinct where the two were questioned; both men

denied that they were involved in any way with the Choi murder (and had alibis) through

recorded statements freely given to police (without defense counsel). Wade Tr. 15:6-18

(CG580); 40:5 to 41:13 (CG689-90). Lineups were scheduled immediately by Norrito.

*Id*.

## 1. The Greene/Williams Lineups Were Woefully Tainted

327. The Greene/Williams lineups were held on the second floor of the 67th

Precinct later that day, after the two were separately interrogated. Norrito Dep. 424:24 to

425:9 (**Ex. 10**).

-96-

328.    Greene and Williams were jailed together, alone, in a jail cell on the second floor of the 67th Precinct at around 4:30 p.m. on June 21, 1983 -- several hours prior to the commencement of their lineups.  Wade Tr. 20:22 to 21:3 (CG585-86).

329.    The jail cell in question was in the middle of the second floor of the 67th Precinct, visible from many angles on that floor.  *See* **Ex. 2** hereto: Wade Tr. 20:25 to 21:2-3 (CG585-86) (Norrito: "The cell is in the middle of the P.D.U."); 49:23-25, 50:7-8 (Norrito admits that anyone entering the detective's room can look from the center of that room and can see the jail cell).  *See also* Norrito Dep. 421:23 to 422:4 (asked if he was aware Kim was allowed in the bullpen area and viewed Greene and Williams, his initial statement: "That's kind of possible[,]" which, upon hearing his counsel's objection, he thereafter retracts, 422:15 to 425:3, calling it "nonsense").

330.    Tumbarello took Kim to the 67th Precinct at around 6:30 p.m.  *Id.,* 104:22-23 (CG669) (**Ex. 2**).

331.    Tumbarello left Kim alone in the catch unit with two other detectives who were instructed to "stay with them [Kim and Mark Best] and keep them separate."  *Id.,* 107:2-14 (CG673) (**Ex. 2**).

332.    Norrito left the 67th Precinct about 6:30 p.m. and he placed Mark Best in the "computer room" of the "catch room" on the second floor of the 67th Precinct when he arrived back with Best.  *Id.,* 22:7-9 and 23:2-4 (CG587).

333.    Kim and Mark Best were left in the "catch unit" separated only by a "partition" for several hours prior to the lineups.  *Id.*, 23:2-4 (CG587).

334.     Norrito admits he never saw Kim arrive at the 67th Precinct, *id*., 54:2-4 (CG619)), and Norrito first interacted with Kim at 8 p.m. that evening, *id.,* 55:2-3 (CG620).

335.     The lineups did not commence until 9:05 p.m. that night. *Id*., 55:22-25.

336.     Thus, Norrito and Tumbarello have each admitted that they were not with Kim on the second floor of the 67th Precinct in the hours (at least two hours) before the lineups, when Kim would have had the opportunity to examine Greene and Williams in a jail cell or converse with Mark Best in the "catch room."

337.     Greene and Williams were in that "bullpen" jail cell together from approximately 6:30 until the lineups started at 9:05 p.m. Wade Tr. 130:5-11 (**Ex. 2**).

338.      At the Wade Hearing, Greene and Williams both testified at length about the "Chinese" or "Oriental" man who repeatedly walked past their cell and stared at them prior to their lineups. Wade Tr. 126:23-25 to 128:2-6 (CG691-93); 131:5-20 (CG696); 132:19-24 (CG697); 136:8-10 (CG701); 137:10-12 (CG702); 151:2-25 153:2-20 (CG716-18) (**Ex. 2**).

339.     Greene had never seen this man before in his life and would not see him again until his criminal trial almost six months later.

340.     Nevertheless, Greene described this "Oriental" man with great detail during his Wade Hearing ("five-five, five-six [tall], [weighing] about one-thirty, one-twenty [pounds]." Wade Tr. 137: 10-12 (CG702) (**Ex. 2**).

341.     Greene was told by a janitor working in the 67th Precinct that day that the "Oriental" man staring at him was a witness who was there "to identify the men who had

killed his friend." Defts' Ex. 62 (Cy Greene Dep. excerpts) at 244:4-11; *see also* Wade Tr. 148:18-20 (CG713) (**Ex. 2**).

342. The two detectives who were supposed to be monitoring Kim's movements (to keep him away from Greene, Williams and Mark Best) have never been identified or produced for testimony. Trial Tr. 367:14-16 (CG1090) (Kim: "I waited there for two, three hours and during that time not the police that took me to the precinct, but some other officer told me to see the photos.") (**Ex. 5**).

343. The judge who presided over the Wade Hearing refused the request of defense counsel to elicit testimony from Kim and Mark Best as to what actually transpired on the second floor of the 67th Precinct on the evening the lineups were held. *Id.,* 82:19-23 (CG647) and 83:9-15 (CG648) (**Ex. 2**) (Attorney Cohen: ". . . we are not going to examine Mr. Kim and Mark Best. Am I correct? Because that's what seems to [be] happen[ing] . . . we would like the opportunity to question Mr. Kim and/or Mark Best" . . . The Court: "You will have your opportunity to question Mr. Kim when he takes the witness stand at testifies [at trial]. You can question him [then] to your heart's content.").

344. Finally, aside from the fact that Kim was allowed to view Greene and Williams in their jail cell before their lineups, several other lineup taints were present.

345. First, Greene's attorney properly argued that the lineups should have been conducted with Greene and the fillers standing, because having them seated hid the height of the lineup participants -- Greene was about 5'1" tall, Wade Tr. 135:4-7 (CG700) (**Ex. 2**) ("[I'm] about 5'1" tall"), and one of the fillers in his lineup was 6'3" tall (Patrick Palmer), (Dec. 19, 1984) Wade Tr. at 5:8. Norrito testified at the trial that "I

figured that everyone would look the same sitting down." Norrito wrongfully testified that all the fillers were from 5'5" to 5'9" and "all looked the same." Trial Tr. 239:20 to 240:2 (CG 958-59) (**Ex.** *5*).

346. Second, Greene's attorney properly asked Tumbarello whether Kim was shown photographs of anyone in the lineups prior to the lineup – Tumbarello emphatically said no, Wade Tr. 120:4-22 (CG685) (**Ex. 2**), while Kim testified at trial that he was shown about sixty photographs prior to the lineups, Trial Tr. 359:20-22 (CG1081) (**Ex. 5**). Someone is not telling the truth.

347. Third, Tumbarello told Kim, improperly, on the way to the lineup, that "we will line up the people who were at the crime scene, so pick one, pick them out." Trial Tr. 366:20-21 (CG1089) (**Ex. 5**). Prior to trial, Tumbarello denied making any such statement to Kim prior to the lineups. Wade Tr. 116:15-23 (CG681) (**Ex. 2**).

348. In sum, prosecutors improperly opposed producing Kim and Mark Best at the Wade Hearing and the presiding judge (Justice Joseph Lombardo) wrongfully refused to compel their attendance so that a proper examination of the alleged identifications could take place. Wade Tr. 82:19-33 to 83:9-15 (CG647-48) (**Ex. 2**). Norrito and Tumbarello were allowed, throughout the hearing, to testify improperly about the hearsay statements of Kim and Mark Best.

349. Justice Lombardo simply did not have all the facts before him; he didn't know that Norrito and Tumbarello had fabricated evidence and secreted other evidence; he didn't know that Norrito had "cut a deal" with Mark Best for pinning the crime on Cy Greene; he determined that Kim did not observe Greene or Williams in a jail cell prior to the lineups without hearing from Kim or the two detectives then assigned to supervise

him at the Precinct, and he improperly rejected the detailed and corroborating testimony of Greene and Williams that the latter two observed an "Oriental" man, freely moving around the second floor of the 67th Precinct, frequently and suspiciously, staring at them in their jail cell in the hour or two preceding their lineups. In a rush to judgment, Justice Lombardo gave no credit to the testimony of Greene and Williams even though it was not rebutted in any manner by the People.

### 2.      Tumbarello Wanted Other Eyewitnesses to See Lineups

350.    Tumbarello has testified that if had been in charge of the investigation, he would have had all the other eyewitnesses view lineups with Greene and Williams in them, Tumbarello Dep. 328:24 to 329:7 (**Ex. 9**) – that would have included eyewitness Fred Thomas, *id*., 408:6-15 – *because that was the proper practice*, *id*., 410:16 to 411:12.

### 3.      Other Exculpatory Evidence Was Not Produced Pre-Trial

351.    The extent of prosecutorial and police misconduct concerning Mark and Lenny Best is exemplified by the revelation during this civil case of two previously undisclosed prosecution memoranda dated August 29, 1983 and October 6, 1983, which show that the District Attorney's office had received information from a civilian, prior to the criminal trial, that "Lenny Best" was one of the persons who committed the crime in the subway, along with a "William" [Patterson], a "Roberto" [Rudolpho Brown], and a "Ronald Blanding." *See* Memorandum dated October 6, 1983 from Sylvia Lerner of the Civil Action Center to Dale Campbell KCDA Homicide Bureau, and Memorandum dated August 29, 1983 from Sylvia Lerner of the Civil Action Center to Dale Campbell KCDA Homicide Bureau (NYC HHR 023370) (**Ex. 35**).

352.    The pertinent parts of the August 29, 1983 Memorandum and October 6, 1983 Memorandum are quoted below:

Case No 4574

To: Dale Campbell

From: Sylvia Lerner
  8/29/83

An anonymous caller said she knows who really murdered a man in the subway at Nostrand and Church Avenues on 6/14 [*accurate*].  She says two young men have been picked up and are in jail [*accurate*] but "everyone knows" these are not the right defendants.

She gave me the following information about those she says she knows committed the crime:

1.      Called Shabazz but his real name is Roberto [*Rudolpho Brown*[40]] and he lives at ███████ Boulevard.  He is a Puerto Rican [*inaccurate – Panamanian*], 18-19 years old, dark skinned, chubby and short [*inaccurate*].

2.      Lenny Bess or Best [*inaccurate -- but close -- Mark Best*[41]], ███ ███████ Avenue is a brown skinned, black American, 21-22 years old, medium height and average build.

3.      First name is William [*Patterson - accurate*[42]].  She does no know his second name or where he lives.  He used to live on ████████ Avenue but has moved to Brownsville.  No description.

4.      Ronnie (no last name) [Blanding] [*likely accurate*[43]] lives on Church Avenue.  He is tall, thin, dark skinned, black American.

---

[40]  *See supra* ¶¶ 310-315 (re: involvement of Rudolpho Brown in Choi murder).

[41]  *See supra* ¶¶ 310-312 (re: involvement of Mark Best in Choi murder); *see also* L Best Dep. 50:10-13 ("They had a statement that I was there.  They saw me running from the subway. You saw my brother running from the subway.") (**Ex. 8**).

[42]  *See supra* ¶¶ 310-312 (re: involvement of William Patterson in Choi murder).

[43]  Ronald Blanding testified (at a post-trial criminal hearing) that Norrito picked him up and questioned him for two or three hours shortly after the Choi murder.  4/24/92 Tr. at 1-9 (CG at 3352 to 3360).  Norrito threatened Blanding that that he was going to be charged with the murder unless he identified the actual person who did it. *Id.,* 4 (CG 3355).  Norrito showed Blanding photos of Lenny Best and Cy Greene.  The detectives wanted Blanding to pick out Cy Greene and make a videotape of Blanding's identification. *Id.,* 5 CG 3356.  Blanding refused to identify Greene. *Id.,* 5 (CG3357).  Blanding also testified that Norrito threatened him outside the trial court advising him that the police would shift the blame to Blanding if he testified on behalf of Cy Greene. *Id.* at 7 (CG3358).  Blanding testified at trial similarly.  Trial Tr. at 536-39 (CG1259-62) (**Ex. 5**).

This woman, who sounds rational, says she overheard Shabazz bragging about the murder and she knows Lenny's sister [*Bridget, who had a child with Rudolpho*[44]] and heard it from her as well.  I asked her to listen for more information and let me know anything she hears and she agreed but I could not get any more out of her today.  She claims to be terrified of being killed.

**Ex. 35** at NYC HHR 23370 [addresses redacted here are within Ex. 35 under seal].

*　　　　　*　　　　　*

Case No 4574

To: Mr. Dale Campbell
        Homicide Bureau

From: Sylvia Lerner
          Citizen Action Center
          10/06/83

On 8/29/83 I sent you a memo, a copy of which is attached, giving you information about a murder committed in the subway at Nostrand and Church Avenues on 6.14.83.

The same anonymous person called back.  She claims that Lenny Bess or Best was shot by a detective in the commission of a crime but was able to get away and is still at large.  *His mother lives at* ▮▮▮▮▮▮▮▮▮ *Avenue near Linden Boulevard and she wants him to admit to the murder and give himself up but he has been unable to convince him.  The caller feels that if we sent someone to interview her, we could get her to give information about his whereabouts.*

As for Ronnie, she now knows his full name - Ronald Blanding and he lives on ▮▮▮▮ Avenue near ▮▮▮▮ Street.

All of this information may be nonsense as far as you are concerned but *the woman who gives it seems to know what she is talking about and I would not feel right unless I forwarded it to you for whatever it is worth.*

**Ex. 35** at NYC HHR 23369 (emphasis added) [addresses redacted here are set forth within the Ex. 35 filed under seal].

---

[44] L Best Dep. 51:3-4 (**Ex. 8**).

353.    A handwritten notation on the October 1983 memo states "Mr. Besunder –
look into & advise," *id.*, but no other information on any subsequent investigation has
been provided from the prosecution files.

354.    Again, the KCDA committed a *Brady* violation in failing to advise defense
counsel about this information at any time prior to trial.

355.    Crowning all that information concerning the Best brothers, the
prosecution also withheld that Mark Best was considered *by the KCDA* to have
participated in the crime when the case was being prosecuted.  *See* Handwriting on a
copy of Norrito's DD-5 report, which literally described Mark Best as a "co-defendant,"
a designation that was accompanied by the words "[DD-5] NOT TO BE DISCLOSED."
*See* Mark Best DD-5, Kallen Dep. Ex. 6, **Ex. 36** hereto.  The writing on this DD-5 copy
also described Mark Best as "participating" in the crime at issue and provided
information about a favorable deal with the District Attorney's office disposing of other
pending criminal charges against Mark Best.  *Id.*

356.    The copy of the DD-5 report with the handwritten information about Mark
Best was obtained by Greene's counsel at the direction of Justice Pesce during the CPL §
440.10 proceedings.

357.    Plaintiff learned from the civil deposition testimony in this case of Maria
Szulc, a former District Attorney paralegal assistant, that in 2002 she wrote the
information found on that copy of that DD-5 in connection with a review of records
related to plaintiff's FOIL application.  Transcript of Deposition of Maria Szulc 117:2-24
(**Ex. 37**).

358.    Ms. Szulc testified that the information she wrote had its source in information she found in the District Attorney's files. *Id.* at 119:2-123:9, 125:6-126:5. She specifically remembered having written "Co-Δ" (co-defendant) about Mark Best based on a written entry she had found in the District Attorney's files. *Id.,* 123:10-126:5.

359.    While no document reflecting such source information has been provided during the civil case discovery, her testimony confirms that her notations had their source in writings contemporary with the prosecution.

**K.    Norrito / Tumbarello – Neither Wants to Accept Responsibility Today for Greene's Arrest**

360.    Norrito and Tumbarello – neither one now wants to accept the responsibility of being the detective responsible for Greene's arrest.

361.    One of the conflicts between Norrito and Tumbarello involves Norrito's testimony that he was not in charge of the case, Norrito Dep. 254:11-2 (**Ex. 10**) ("I wasn't the arresting officer."), and that – depending upon which of his explanations you look at – Norrito was either working in equal participation with Tumbarello, or it was Tumbarello's case and Norrito was assisting him.[45]

---

[45]    Norrito expressed surprise that he had completed all the DD5s and Tumbarello none, since Tumbarello was the "arresting officer":

Q.    Most of the reports, certainly the ones you looked at so far, are by you. We had Herlihy, we had Rango, we had -- the other one, Higgins. None so far by Tumbarello.

A.    There was no 5s by him?

Q.    So far, of the ones we've been looking at, there are none by Tumbarello. I'm asking you if it was Tumbarello's case, as you're implying, and not yours, how come you're the author of almost all the reports?

A.    Well, possibly because he didn't have an assigned desk, he felt uncomfortable. It's not his command. I don't know. I thought he typed out 5s.

Norrito Dep. 255:8-25 (**Ex. 10**).

362.    One the other hand, Tumbarello consistently testified the other way -- he places the blame for Greene's arrest squarely on Norrito:

- Norrito was doing all the questioning.  Tumbarello Dep. 144:11-72 (**Ex. 9**).

- Tumbarello's only involvement with the police reports were the ones he made with the detective [Norrito] who typed them up.  Tumbarello Dep. 69:23 to 70:3 and 77:2-7.

- That it was Norrito's case and Tumbarello assisted.   Tumbarello Dep. 27:5-13; 36:10-21, 24-25.

- Norrito was in charge – Tumbarello was assisting him and doing whatever Norrito directed him to do - - if Norrito testified that Tumbarello was charge, that was not accurate.  Tumbarello Dep. 329:8-16, 17-24.

- Tumbarello assisted – did not lead – he was the arresting officer only on paper.  Tumbarello Dep. 312:8-14; 373:3-4.

- Norrito did the online booking report.  Tumbarello Dep. 420:16 to 421:6.

- Before Tumbarello testified at trial or hearings, Norrito instructed him on what to say.  Tumbarello Dep. 400:15 to 401:4.

- In sum, "he [Norrito] had the case."  Tumbarello Dep. 402:20 to 403:3.

363.    It is clear that neither detective wants any part of the responsibility for what went down in 1983 and 1984, now that there have been further disclosures of evidence since the criminal trial in 1984.

**L.    Tumbarello Admits There Was Likely No Probable Cause for Greene's Arrest**

364.     On the key question of whether there was probable cause for arrest, *i.e.*, whether the arrest should have been made when it was – the arrests of Cy Greene and Larry Williams – or whether the police should have waited for more investigation to be done, Tumbarello's testimony is enlightening: he testified that one of his duties in

working with Detective Norrito was to "gather evidence to determine who might be charged with the crime," Tumbarello Dep. 37:15-12 (**Ex. 9**), and his "duty to investigate this case to determine evidence as to who might be charged," *id.,* 44:24 to 45:2 and 6. Tumbarello now wholly admits that there was likely not probable cause for Greene's arrest. *Id.*, 409:21 to 410:15.

### M.  Hynes Admits That There Were Brady/Rosario Violations

365.   Testifying in his "official capacity" as the former Kings County District Attorney, Charles Hynes has admitted in this case that there appeared to be at least one *Brady* violation and that there was no exception under *Rosario* to disclose the exculpatory evidence in question.  Hynes Dep. 64:23 to 65:15 (**Ex. 19**).

### N.  A Grand Jury Indicts Greene & Williams

366.   Plaintiff has only been provided with copies of Jae Kim's Grand Jury testimony.  *See* Defts' Ex. 41 (Kim Grand Jury Testimony).

367.   Before the Grand Jury, Kim testified that "Right, and *the one guy, the taller than me, the black guy had the knife* and he tried to put it to my friend and another small guy, they tried to pull out something from his pocket. . . *Q. When you say tall what [was] he tall or was he taller than you?  A. Taller than me*."  Defts' Ex. 41 [Kim Grand Jury Testimony] (emphasis added) at 5.

368.   Plaintiff has no further information regarding the Grand Jury proceedings. *See Defts'* Ex. 43 [Nov. 27, 2012 Memorandum and Order, ECF No. 160], at 42–44 (Magistrate Judge Pollack concluding that only Mr. Kim and Detective Norrito testified before the Grand Jury and declining to order the production of Detective Norrito's testimony).  In light of everything that Plaintiff has learned about Detective Norrito's unlawful and improper conduct in the course of this civil rights action, Norrito's Grand

Jury testimony is now much more highly relevant and Plaintiff really would like to have this Court review it in light of Norrito's other fabrications.

369.    Cy Greene and his co-defendant Larry Williams were indicted for murder in the second degree in two counts—intentional and felony murder—and robbery in the first degree, involving the June 14, 1983 assault, robbery, and stabbing of John Choi.

**O.    The Trial: April 30 to May 9, 1984**

370.    The trial boiled down to one item of evidence against both Cy Greene and Larry Williams – Jae Kim's very tainted identification of them.

371.    Mark Best's alleged identification of Greene and Williams at lineups, however, was improperly testified to by Norrito several times at trial (this significant, hearsay bolstering of Kim's identification occurred without the appearance of Mark Best at trial).  While it became the subject of heated legal argument at trial, the trial judge did not strike this testimony.[46]  Trial Tr. 422:24 (CG1145) (Cohen: "he [ADA Greene] asked Detective Norrito, isn't it a fact that other than height that description of the height of the alleged perpetrator, the stabber, that Mark Best's testimony was exactly the same as Mr. Kim's. Okay. And he was permitted to get the answer and the answer was yes.  Now, nothing can be more prejudicial than that because for him -- for Detective Norrito to describe what Mark Best said when we know for a fact otherwise, that it wasn't, that the two identifications did not coincide, your Honor, that without producing Mark Best it is prejudicial.") (**Ex. 5**).  The court ultimately denied a motion by defense counsel to strike

---

[46]    Court: "I do think the People have made a sufficient effort to locate him and I do find that the People do not have control over Mark Best and their efforts to locate Mark Best were more than adequate."  Trial Tr. 652:7-11 (CG1376) (**Ex. 5**).

from the record any statements made by Norrito concerning Mark Best and his identification of the defendants.  Trial Tr. 653:2-9 (CG1377) (**Ex. 5**).

372.    Greene and Williams testified at the trial and presented alibi witnesses in support of their defense of mistaken and false identification.  Trial Tr. 436:6 to 438:6; 477:12-22; 548:11 to 551:25; 570:10 to 573:14 (**Ex. 5**).  Their attorneys also contended improper police investigation procedures caused the wrongful charges.  *Id*., 421:18 to 422:24.

373.    The prosecution argued to the jury that the difference between Greene's actual height at approximately 5'1" tall and Kim's descriptions of the stabber at 6' or 5'8" tall should be disregarded because Kim only measured by meters and centimeters. Trial Tr.  707:14-21 (CG1431) (**Ex. 5**).

374.    After more than two days of deliberation, the jury acquitted Greene of intentional murder but convicted him of felony murder and first-degree robbery, while Williams was convicted of first-degree robbery.  Trial Tr.  780:7-16 (**Ex. 5**).

375.    The significance of the undisclosed relationship between Norrito and Mark Best cannot be emphasized enough because the final request of the jury forelady, right before the verdicts were delivered, was an insightful: "**_We would like to know about Detective Norrito's having anything to do with Mark Best._**"  Trial Tr. 772:22-24 (CG1496) (**Ex. 5**).

**P.    Greene's Subsequent Appeals & Post-Conviction Proceedings**

376.    Greene's subsequent appeals and post-conviction collateral proceedings were unsuccessful until January 4, 2006, when his conviction was set aside due to a decision by Justice Michael L. Pesce, the same Justice who presided at the 1985 trial,

based on a finding of ineffective assistance of Greene's trial counsel.  Defts' Ex. 20 (Pesce's 2006 Decision).

377.    On June 11, 2008, after the Appellate Division affirmed Justice Pesce's decision, the KCDA filed a motion to dismiss all charges against Cy Greene.  Defts' Ex. 60 [440 Motion Hr'g Tr., *People v. Greene*, N.Y. Sup. Ct., Kings Cty., June 11, 2008 (Indictment No. 3521/83)], at 2:10–14.

### Q.    This Civil Rights Action & the Claims Asserted Herein

378.    The civil action was commenced on January 16, 2008.

379.    The complaint alleges federal constitutional violations of and causes of action under 42 U.S.C. §§ 1983, 1985(3), and 1986; equivalent New York State constitutional violations; and state law malicious prosecution and negligent failure to use due care in the performance of duties.

380.    These claims are supported by extensive evidence, some produced during the Freedom of Information Law ("FOIL") and 440 proceedings that led to Mr. Greene's exoneration and much more developed through discovery in this case.[47]

381.    Marshalling this evidence, Plaintiff has a strong case for violations of due process and *Brady* obligations.

382.    The violations set forth below are the principal ones, but the evidence reveals other police and prosecutorial misconduct that cumulatively impacted the outcome of Mr. Greene's trial and prolonged his wrongful incarceration.

---

[47]    This evidence is more than sufficient to negate any arguable semblance of probable cause or fair trial which might otherwise have existed.  *See*, *e.g.*, *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (probable cause presumption rebuttable by evidence establishing that police witnesses "have not made a complete and full statements of facts . . . have misrepresented or falsified evidence . . . or otherwise acted in bad faith").

383.    For a comprehensive list in bullet point format of Plaintiff's early evidence in support of his § 1983 claims, *see* Plaintiff's Objections and Responses to Defendants' Second Set of Interrogatories (dated July 17, 2013), and two supplemental responses (dated October 10, 2013, and June 19, 2014) (collectively referred to herein as "plaintiff's responses to defendants' contention interrogatories"), **Exhibits 20, 21 and 22**.

### R.    The Specific Claims Asserted Against the City, KCDA and the Individual Defendants Norrito, Tumbarello & ADA Sullivan

384.    The § 1983 claims asserted against the City and the individual defendants are summarized below:

Undisclosed and falsified evidence and police and prosecutorial misconduct

- Failure to disclose that eye-witness Jae Hark Kim described the stabber as a "tall guy" during his taped interview at the 67th Precinct on June 14, 1983, while Plaintiff was approximately 5' 1"/2" tall; and providing Greene's counsel with a deceptively contrived transcript of Mr. Kim's precinct interview that omitted the "tall guy" description, but had various handwritten additions and corrections indicating careful comparisons with the taped recording.

- Improperly undermining Jae Hark Kim's descriptions of the stabber as 6' and 5' 8"/9" tall by eliciting false testimony that Mr. Kim only measured people and things in meters and centimeters and not feet and inches.

- Failure to disclose that the cab driver, Reynold Guerrier, told the police that the three male suspects who ran into his cab after the murder were 5'8"-10" tall and spoke Spanish, which Plaintiff did not speak (with the brown-shirted man, the tallest of the three).

- Failure to disclose that the Detectives, at least Norrito, were aware in June 1983 that a group of dark-skinned, Spanish-speaking, Panamanian young men were involved in robberies and assaults in the Church and Nostrand Avenues neighborhood where the crime occurred.

- Failure to disclose that Norrito located and interviewed at least two of the three men who entered Mr. Guerrier's cab; and failure to disclose their identities and information.

- Fabrication and falsification of evidence, a story by Norrito, to explain why the Panamanian men were allegedly rushing away from the murder scene (a girlfriend of one had just had "a miscarriage") in Mr. Guerrier's cab.

- Failure to disclose that Norrito and Tumbarello had interviewed several witnesses who saw tall men running from the subway station immediately after the crime, including witnesses who knew Cy Greene and did not see him there; and failure to disclose their identities and information.

- Failure to disclose that Tumbarello and Norrito knew, as recorded in Tumbarello's memobook, that when Eric Head was interviewed by the Detectives at the 67th Precinct on the night of the crime, he identified Lenny Best as one of the three men (none of whom were Cy Greene) he saw fleeing from the subway station after the murder of John Choi; and that Head did not identify Eric Tidwell.

- Providing Greene's counsel with a DD-5 report prepared by Norrito that falsely stated that Eric Head had identified Eric Tidwell instead of Lenny Best as one of the three men he saw fleeing from the subway station.

- Failure to disclose that Norrito's notebook contained the notation that the person who identified a picture of Eric Tidwell was Colbert Narcisse, and contained no notation that Head had purportedly identified Tidwell.

- Norrito's false testimony at Plaintiff's pre-trial suppression hearing that Head's identification of Tidwell made him an unbelievable witness because Tidwell was incarcerated on the day of the crime; and failure to correct that false testimony.

- The prosecution and police were aware, as shown by the notes of former ADA Douglas Kallen, and yet failed to disclose that Norrito's DD-5 stating that Head observed Tidwell fleeing from the station was contradicted by Tumbarello's notebook entries about Head's precinct interview when Head identified Lenny Best, not Tidwell, as the person Head saw fleeing from the station.

- Failure to disclose that Lenny Best, who was a prime suspect in the murder (based on his known similar criminal activity and Eric Head's identification of him) escaped from a police car when being transported to the 67th Precinct to be interviewed the day after the murder; and failure to create a police report regarding Lenny Best's escape.

- Failure to disclose that Mark Best, Lenny Best's brother, was considered by the police and prosecution to be an uncharged co-defendant in the murder of John Choi.

- Failure to disclose that Norrito believed that Mark Best was a lookout during the crime.

- Coercing Mark Best during his June 16, 1983, interview at the 67th Precinct to identify Cy Greene as the person who stabbed John Choi by threatening to charge Mark Best and his brother Lenny Best with the murder.

- Failure to disclose that Mark Best—prior to providing his coerced and false identification of Cy Greene as the person who stabbed John Choi—told the Detectives, as shown in Norrito's Notebook, that Mark had learned about the murder from his brother Lenny.

- Failure to investigate Lenny Best's and Mark Best's involvement in the murder of John Choi.

- Failure to disclose that Norrito offered to provide a job for Mark Best.

- Failure to disclose that Mark Best was offered a lenient deal with regard to other criminal charges in exchange for his agreement to testify against Plaintiff.

- Failure to continue to investigate, locate, and interview Jeffery Davis, the alleged third perpetrator according to Mark Best.

- Failure to disclose that a male witness known as the "Mayor" of Church Avenue, who had information about the men who ran from the subway station to the taxi cab was interviewed; and failure to provide his identity and information.

- Numerous instances of incredible and dishonest deposition testimony by the ADA and Detective witnesses.

- Failure to disclose that Norrito had identified and interviewed at least two of the true assailants who were in Guerrier's cab and Norrito's fabrication of an excuse (a lie) for claiming that these individuals weren't involved in the Choi murder to protect an informant or informants.

- Fabricating a claim (a lie) that Mark Best underwent a polygraph examination to bolster his "eyewitness" account.

Identification procedures

- Failure to disclose that there was a female witness who told the Detectives that she could identify the suspects, and failure to disclose her identity and information (*see supra, footnote 21 at p. 41*).

- Allowing Jae Hark Kim to view Plaintiff and Larry Williams in a precinct jail cell before he identified them at their precinct lineups.

- Failure to have additional lineup viewings, or other identification proceedings, by the various other witnesses who told the Detectives they saw people running from the subway station.

<u>Additional facts demonstrating lack of probable cause to arrest or prosecute Plaintiff</u>

- Arresting and prosecuting Plaintiff for the murder of John Choi despite the foregoing undisclosed and falsified evidence and lack of proper investigations and procedures, as well as the following facts, *inter alia*:

    o that witnesses, including Abdul Rahman, James Robinson, Lavaughn Ryan, Fred Thomas, and Eric Head, identified the heights of the men seen fleeing from the subway station as varying between 5'5" and 6' tall, and that one of the men was wearing a brown shirt, a description that matched what Jae Hark Kim said about the stabber's clothing in his taped precinct interview;

    o that witnesses saw the men who fled from the subway station run to and get into a taxicab;

    o that the cab driver Mr. Guerrier identified one of the three tall men who fled the station to his cab as wearing a dark brown shirt;

    o that Mark Best's apparent psychological "instability" and criminal history—including his previously undisclosed use in another crime of the same kind of "007" knife used to stab Choi—and his identification of the photo of a third perpetrator, Jeffery Davis, raised further questions about his lack of reliability;

    o that Tumbarello rightly thought, although not disclosed to the defense, that further investigations and further lineups should have taken place before Cy Greene and Larry Williams were charged with the murder;

    o that Norrito interviewed at least two of the actual assailants seen running into Guerrier's cab, that he failed to report that fact (or their identities) to prosecutors (or defense counsel), and then he lied at Plaintiff's criminal trial claiming that these individuals were not involved in the crime even though eyewitness accounts traced these individuals directly into that cab;

    o that the KCDA received an anonymous tip via detailed telephone call (2x) from an individual who knew several important details about the crime and advised: (1) that Cy Greene and Larry Williams were not involved in the crime, (2) at least three other identified individuals

were involved in the murder, and (3) the names and addresses of people who knew and could identify the true assailants (this information was never conveyed to defense counsel).

Post-conviction proceedings

- Plaintiff commenced numerous post-conviction proceedings, including a direct appeal, C.P.L. § 440 proceedings, a federal habeas proceeding, and FOIL applications in which he raised claims related to the foregoing issues, including, without limitation, wrongful conviction, actual innocence, undisclosed and fabricated evidence, and improper police investigations.

- Failure to disclose the aforementioned exculpatory evidence and evidence of police misconduct during Plaintiff's post-conviction proceedings.

Municipal policies

- The Kings County District Attorney's Office maintained policies of:

  o failing to properly train and supervise ADAs in their *Brady-Giglio-Rosario* disclosure obligations;

  o failing to properly train ADAs and to implement procedures and guidelines to ensure that prosecutors discover all evidence known to police so that it may be properly disclosed, *see Kyles v. Whitley*, 514 U.S. 419, 438 (1995);

  o failing to discipline ADAs who violated their *Brady-Giglio-Rosario* obligations, as evidenced, *inter alia*, by the numerous reversals of convictions based on prosecutorial misconduct, documented in the Kings County District Attorney's files produced in the discovery in this case and other cases, *e.g.*, Jabbar Collins' case;

  o maintaining no adequate and appropriate system for transmitting unwritten *Brady-Giglio-Rosario* materials, such as witness statements, when the case is transferred from one ADA to the next;

  o maintaining no adequate and appropriate system for transmitting exculpatory information when the case is transferred from one ADA to the next;

  o instructing ADAs to not record statements by witnesses, which leads to *Brady-Giglio* statements not being recorded, transmitted to subsequent prosecutors assigned to the case, and ultimately, undisclosed to defense counsel;

- o failing to disclose *Brady-Giglio-Rosario* materials during post-conviction proceedings, including C.P.L. § 440.10 proceedings, federal habeas proceedings, and F.O.I.L. proceedings.

- There was a heightened awareness in the KCDA's Office regarding the need to investigate and disclose Mark Best's involvement in the crime for which Plaintiff was wrongly charged, prosecuted, and convicted, including, without limitation—

  - o handwritten notations on a copy of Det. Norrito's June 16, 1983 DD-5 summary of an interview of Mark Best maintained in the KCDA's Office indicating that it was not to be disclosed that Best was considered to be a co-defendant and that he was a participant in the crime and received a beneficial plea deal; and

  - o as detailed in a January 12, 1993 memo from ADA Amy Appelbaum to ADA Roseann Mackechnie (NYC HHR 028786-28789) (**Ex. 38**), Justice Michael Pesce, in a hearing held on January 8, 1993, ordered the KCDA's Office to investigate the allegations regarding Mark Best raised in Plaintiff's second C.P.L. § 440.10 motion. ADA Appelbaum's memo reports that Justice Pesce said at the hearing that "from the beginning, he thought that Best may have had either a greater or different type of involvement with this case than the evidence indicates" and that "Justice Pesce wants a well documented report of the investigation." The memo further states that "[Justice Pesce] said that if the attorneys handling [the investigation] are having trouble getting the support they need to do a thorough job or if he is dissatisfied with their work, he will contact District Attorney Hynes and impress upon him the need for this investigation." The memo also reported that "Justice Pesce expressed concern about the possibility of adverse publicity emanating from this case. He said that he would not want this case to attract the type of negative publicity that other cases prosecuted by the District Attorney's Office have attracted."

- The KCDA's Office did not conduct the thorough investigation required; and in response to Justice Pesce 1993 order, merely interviewed Mark Best, *see People v. Greene*, Indictment No. 3521/83 (Pesce, J., Nov. 12, 1993) (CG 003386-3389) (Defts' Ex. 54).

- The KCDA's Office maintained policies, which caused *Brady*, *Giglio*, and *Rosario* materials to be withheld from Plaintiff before and after his wrongful conviction, including, but not limited to:

  - o not disciplining ADAs for committing prosecutorial misconduct or for violating other ethical rules, *see* Ogiste Dep. 38:14-40:5, 41:18-24, 45:11-17, 51:25-52:25, 57:9-59:16, 64:12-68:9, 123:17-124:9 (**Ex.**

**39**); Ogiste Exs. 3-9 (**Ex. 40**); Mandel Dep. 122:5-123:25, 124:9-184:6 (**Ex. 41**); Mandel Exs. 5-22 (**Ex. 42**); NYC HHR 2140-2145 (showing ADA who was not disciplined for *Rosario* violation and for lying to the Court about it) (**Ex. 43**);[48]

o   not reporting ADAs who committed prosecutorial misconduct or who violated other ethical rules to the Bar Committee on Character and Fitness or to their current employers, Ogiste Dep. 40:6-41:5, 45:11-17, 57:9-59:16 (**Ex. 39**); Ogiste Exs. 8-9 (**Ex. 40**); Ng Dep. 23:20-25 (**Ex. 44**); Mandel Dep. 126:10-15, 130:23-132:6, 137:12-138:18, 139:3-142:4, 145:14-148:12, 155:13-156:23, 170:9-173:6, 177:16-178:9 (**Ex. 41**);

o   not reviewing case files of trial ADAs who had been found to have committed prosecutorial misconduct, Ogiste Dep. 53:2-17 (**Ex. 39**);

o   not maintaining a written disciplinary policy, Ogiste Dep. 29:19-30:2 (**Ex. 39**);

o   not requiring ADAs who became aware of prosecutorial misconduct by other ADAs to report that misconduct to their supervisors, Ogiste Dep. 41:18-42:8 (**Ex. 39**);

o   maintaining no procedure for when a supervisor who became aware of a problem with an ADA needed to raise those issues with the executive staff, Ogiste Dep. 24:7-15 (**Ex. 39**);

o   not requiring ADAs to maintain records of *Brady* materials in a case or to keep track of *Brady* disclosures, despite knowing that failing to maintain a log of *Brady* material and disclosures was a bad practice that would lead to a failure to comply with *Brady* obligations, Ng Dep. 202:13-203:3 (**Ex. 44**); Mandel Dep. 81:15-82:14, 89:3-90:4, 195:7-197:24 (**Ex. 41**); *see Boyette v. Lefevre*, 246 F.3d 76, 86 (2d Cir. 2001) (discussing New York Supreme Court Justice Ruth Moskowitz's 1991 or 1992 decision to grant the defendant's 440 motion in principal part because the prosecutor from the KCDA's office "did not keep a log of documents that had been disclosed");

---

[48]   As used herein, "Mandel Dep." refers to the transcript of the Fed. R. Civ. P. 30(b)(6) deposition of Jodi Mandel, held March 6, 2014, and "Mandel Ex." refers to the exhibits to that deposition; "Ogiste Dep." refers to the transcript of the Fed. R. Civ. P. 30(b)(6) deposition of Lance Ogiste, held April 16, 2014, and "Ogiste Ex." refers to the exhibits to that deposition; and "Ng Dep." refers to the transcript of the Fed. R. Civ. P. 30(b)(6) deposition of Kin Ng, held November 26, 2013; and "Ng Ex." refers to the exhibits to that deposition.

o   providing inconsistent and inadequate training for newly hired ADAs, Ng Dep. 45:4-55:19, 92:15-93:4 (**Ex. 44**); Ng Exs. 2, 4, 6, 7, 10-12 (**Ex. 45**);

o   providing no formal training to certain newly hired ADAs before they were assigned to the Appeals Bureau, Ng Ex. 3 (**Ex. 45**); Mandel Dep. 42:23-47:24 (**Ex. 41**); Mandel Ex. 1 (**Ex. 42**);

o   providing inadequate and incorrect training on *Brady* and *Rosario* disclosure obligations, Ng Dep. 62:7-64:25; 84:18-86:2 (**Ex. 44**); Ng Exs. 6, 8, 10, 13, 15-19, 23 (**Ex. 45**);

o   training ADAs to not take notes of witness statements and dissuaded ADAs from making written notes of inconsistent witness statements, Ng Dep. 169:20-171:6, 172:13-173:18, 178:13-180:17, 186:13-187:15 (**Ex. 44**); NYC HHR 34298-34299 (stating that it was "a problem" that ADA "F.C." was generating "too much Rosario material" and that ADA "R.F." "needs to . . . reduc[e] the amount of Rosario material generated") (**Ex. 46**);

o   not training ADAs on how to maintain and keep track of unwritten witness statements, Ng Dep. 186:13-187:15; 189:14-190:4 (**Ex. 44**); Ng Dep. Exs. 20-22 (**Ex. 45**);

o   not training ADAs, and maintaining no procedure, on how to transfer a case to ensure that all potential *Brady*, *Giglio*, and *Rosario* information would be passed from one ADA who handles a case to the next, Ng Dep. 183:9-185:4, 186:13-187:15 (**Ex. 44**);

o   not circulating notice or information to KCDA attorneys or staff members when a case was reversed on appeal, even when the reversal involved prosecutorial misconduct, Mandel Dep.  184:11-185:4 204:12-16, 205:15-208:11 (**Ex. 41**);

o   not producing memos where an appellate decision criticized an ADA for misconduct but the conviction was still upheld, and not circulating notice or information to KCDA attorneys or staff members regarding that misconduct, Mandel Dep. 123:18-25 (**Ex. 41**);

o   not circulating notice or information to KCDA attorneys or other staff members when an ADA was disciplined for misconduct, Mandel Dep. 208:15-209:13; Ogiste Dep. 120:14-18, 121:11-17 (**Ex. 39**);

o   not consistently sending Appellate Division decisions criticizing a trial ADA's conduct to the ADA's supervisor, Mandel Dep. 117:17-21 (**Ex. 41**); and

o   not conceding prosecution error, even when the KCDA's Office acknowledged that the error was egregious and should have been conceded, *e.g.*, Mandel Dep. 148:17-150:9; Brief of Respondent, *People v. Gordon*, 2008 NY Slip Op 03241 (2d Dep't Apr. 8, 2008) (App. Div. Docket No. 2005-11678) (NYC HHR 034240-34278) (**Ex. 47**).

•   The KCDA's Office has had ample notice of persistent and ongoing *Rosario* and *Brady* violations by ADAs in the office.  *E.g.*, Ogiste Exs. 3-4; NYC HHR 034300-34567 (**Ex. 48**).

•   The Transit Authority/NYPD maintained policies of:

o   not requiring officers, and detectives in particular, to provide all evidence to prosecutors to allow them to decide what must be disclosed under *Brady* and its progeny, and instead allowing detectives to make subjective decisions about what is relevant evidence that must be provided to prosecutors, *see, e.g.*, Transcript of Robert Stewart Deposition ("Stewart Dep.") 27:16-28:5 (**Ex. 18**), which violates due process, *see Kyles*, 514 U.S. at 438 ("any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials");

o   not requiring written reports of witness interviews, *see, e.g.*, Transcript of Stewart Dep. 26:2-29:23 (**Ex. 18**), Norrito Dep. 60:16-61:7 (**Ex. 10**);

o   not requiring written reports or disclosure to prosecutors of exculpatory evidence, such as a person fleeing from a police car while being transported to the precinct to be interviewed regarding a crime he is suspected of committing, *see, e.g.*, Stewart Dep. 30:4-33:10 (**Ex. 18**);

o   deliberate indifference to police corruption and other forms of police misconduct, such as falsified reports, by maintaining an intentionally ineffectual system to investigate and uncover misconduct, having no command accountability, and failing to appropriately discipline officers for misconduct, *see, e.g.*, Milton Mollen *et al.*, The City of New York, *Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department* 3 (July 7, 1994) ("Mollen Commission Report") ("For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it. . . .  This abandonment of effective anti-corruption efforts did more than avoid public exposure of corruption, it fueled it.   It sent a message

throughout the Department that integrity was not a high priority and that Department bosses did not really want to know about corruption. In short, it gave everyone in the Department an excuse for doing what was easiest: shutting their eyes to corruption around them.");

o deliberate indifference to the violation of the rights of minorities, *see, e.g.*, Mollen Commission Report, *supra*; Leadership Conference on Civil Rights, Leadership Conference Education Fund, *Justice on Trial: Racial Disparities in the American Criminal Justice System* ("*Justice on Trial*") 9 (Evidence during investigation of LAPD "revealed that officers [had] manufactured evidence and perjured themselves to produce convictions, thousands of which could be affected by the revelations. . . . General patterns of misconduct similar to the LAPD scandal have been revealed in New York, where the Mollen Commission uncovered widespread brutality and corruption in the Bronx directed largely at blacks and Hispanics . . . ."); Human Rights Watch, *Shielded from Justice: Police Brutality and Accountability in the United States* (1998) ("*Shielded from Justice*") ("There is often a racial or ethnic component to police abuse cases in New York City . . . .").

### S.   Expert Witness Opinion on the Liability of the KCDA

385.   Plaintiff's claims against the KCDA are supported by the sworn Report of

Ellen Yaroshevsky[49] dated June 12, 2015, a copy of which is annexed hereto as **Ex. 49**.

386.   Ms. Yaroshevsky has opined that, during the specified time period (1980–

2010), the KCDA's Office failed to adequately train new and existing Assistant District

Attorneys ("ADAs") about their disclosure obligations pursuant to *Brady v. Maryland*,

---

[49]   Professor Yaroshevsky was a Clinical Professor of Law at the Benjamin N. Cardozo School of Law for over twenty years (she very recently moved on to Hofstra Law School). She teaches and has taught a range of courses, including Legal Ethics, Evidence, and Wrongful Convictions. She written extensively on the subject of prosecutorial disclosure obligations, including *Prosecution Ethics in Context* (with Bruce A. Green), in LAWYERS IN PRACTICE (Leslie C. Levin and Lynn Mather (eds.)), University of Chicago Press (2012); and *Prosecutorial Disclosure Obligations*, 62 HASTINGS L.J. 1321 (2011). She has also lectured on such subjects, including a presentation on *Criminal Law and Ethics: The Present State of Brady, A View from Both Sides* for the New York County Lawyers Association in April of 2013. Her C.V. is attached to her Report (**Ex. 49**) as Appendix A.

(hereinafter "*Brady*"), *People v. Rosario* (hereinafter "*Rosario*") and other applicable law.

387.    Professor Yaroshevsky has opined further that the KCDA's Office also failed to monitor and adequately discipline ADAs whose cases had been identified in appellate decisions as those raising issues about violations of *Brady*, *Rosario* and other law regarding discovery.  These failures fostered an environment in the KCDA's Office that did not promote the importance of complying fully with its *Brady* and *Rosario* obligations.  The Office's disclosure policies and practices were likely to cause the failure to uncover previously undisclosed evidence during post-conviction proceedings.  The undisclosed evidence in Cy Greene's case is consistent with the Office's problematic disclosure policies and practices.

388.    Professor Yaroshefsky opinions are based on the documents, facts and deposition testimony summarized in her Report (**Ex. 49** at 3 to 10).

389.    Certain portions of her Report are quoted below for the convenience of the Court:

### 1.    Municipal Liability Facts

➢ Between 1985 and 1990, 15 convictions were set aside for *Brady* violations during the tenure of prior District Attorney Elizabeth Holtzman.[50]

➢ Richard Laskey, an Assistant District Attorney from the era of District Attorney Holtzman testified that he could not recall any instance of discipline of an ADA under Elizabeth Holtzman, nor of any memo circulated to the office regarding a procedure or policy for such discipline.

---

[50]    *See, e.g.*, *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001); *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001); *People v. Machado*, 90 N.Y.2d 187 (1997); *People v. Lebovitz*, 942 N.Y.S.2d 638 (2d Dep't 2012); *People v. Clarke*, 885 N.Y.S. 629 (2d Dep't 2009); *People v. Bond*, 95 N.Y.2d 840 (2d Dep't 2000); *People v. Campbell*, 703 N.Y.S.2d 498 (2d Dep't 2000); *People v. Lewis*, 689 N.Y.S.2d 168 (2d Dep't 1999).

➤ ████████████████████████████████[51]

➤ ████████████████████████████[52]

➤ ████████████████████████████████[53][54][55]

➤ The Office did not have in place a clear and adequate procedure or policy to inform ADAs of reversals where the court held that the attorney engaged in a *Brady* or *Rosario* violation or other form of misconduct.[56] The Office also did not inform anyone of a reversal if the ADA had left the Office.[57]

➤ The reversal memos do not discuss the nature of the Appellate Division's findings with respect to *Rosario* or *Brady* violations, noting only that they would not seek leave to appeal,[58] or that the failure to comply was inadvertent.

➤ ████████████████████████████████[59]

---

[51]    Transcript of Richard Laskey Deposition ("Laskey Dep.") 51:20-52:2 (**Ex. 50**); Transcript of Lance Ogiste Deposition ("Ogiste Dep.") 45:11-17 and 58:16-20 (**Ex. 39**); Transcript of Kim Ng Deposition ("Ng Dep.") 23:20-25 (**Ex. 44**); Transcript of Jodi Mandel Deposition ("Mandel Depo.") at 126:10-15(**Ex. 41**).

[52]    Letter to Myron Beldock, Beldock Levine & Hoffman LLP, from Hanna Taylor, Hughes Hubbard (Jan. 14, 2010) ¶¶ 1–8 (Ex. 51).

[53]    NYC HHR 29331, 29334, 29341, 29349, 23950, 29364, 29433, 29448, 29450, 29455 (**Ex. 52**).

[54]    NYC HHR 29342, 29373 (**Ex. 53**).

[55]    NYC HHR 29415 (**Ex. 54**).

[56]    Mandel Dep. at 117:17-21; 123:18-25; 208:15-209:13 (**Ex. 41**); Ogiste Dep. 120:14-18; 121:11-17 (**Ex. 39**).

[57]    *See* Letter to Myron Beldock, Beldock Levine & Hoffman LLP, from Hanna Taylor, Hughes Hubbard (Jan. 14, 2010) ¶¶ 1–9 (**Ex. 51**).

[58] NYC HHR 29405, 29424 (**Ex. 55**).

[59] Mandel Depo. 157:4-15 (**Ex. 41**).

███████████████████████████████████[60].

➢ The Office did not have any policy, practice, or system in place for transmitting unwritten *Brady-Giglio* materials, such as witness statements, when a case was transferred from one ADA to the next.

➢ ADAs did not maintain records of the *Brady* materials or disclosures in a case.

➢ ADAs were trained not to record relevant *Brady-Giglio* statements.

➢ The Office also did not require ADAs to maintain a list of all *Brady* disclosures.

➢ Training for new attorneys included only a one or two hour program on *Brady* and *Rosario* disclosure requirements.

➢ The Office provided CLE trainings about *Brady* and *Rosario* on occasion but there is no record that it was mandatory to attend them.

➢ One week of training was provided to prosecutors prior to working in the Appeals Division.

➢ Attorneys in the Appeals Bureau did not have a consistent practice of reviewing the entire case file in each case.

**Ex.** 49 at 3 to 5.

390.    Professor Yaroshefsky has also made the following findings:

**The following information was known to the prosecution but was not disclosed to the defense before or in relation to the 1985 trial, and was only discovered afterwards:**

➢ During Kim's tape recorded interview by ADA Sullivan on the night of the crime in the presence of Detectives Norrito and Tumbarello, which recording was not provided to criminal trial counsel, Kim described the stabber as a "tall guy";

---

[60] *See, e.g.*, NYC HHR 034320 (████████████████████████████████████████████"); NYC HHR 034341 (████████████████████████████████████████████").

➢ The transcript of Kim's tape recorded precinct interview provided to the defense before the 1985 trial inaccurately omitted "tall guy" from Kim's description;

➢ The Detectives and prosecutors believed that Mark Best was a participant in the crime and considered him an uncharged co-defendant in the murder of John Choi;

➢ In anticipation of his trial testimony, prosecutors made a deal with Mark Best to not charge him with the Choi crime and to favorably dispose of several other criminal charges;

➢ As recorded in Detective Tumbarello's notebook entries, at Eric Head's precinct interview he made a photo identification of Lenny Best, and not Eric Tidwell, as the third male he saw running from the station;

➢ On June 15, 1983, Lenny Best, Mark Best's brother, escaped from police who were bringing him to the precinct to be questioned by Detective Norrito about the crime, an incident which was not memorialized in any note or police report;

➢ Mark Best had told Detective Norrito, as recorded in his memobook, that Mark had learned about the murder from his brother Lenny;

➢ ADA Kallen, who was in charge of prosecuting the case for over a year prior to trial before being replaced by ADA Gerald Greene, had made trial preparation notes recognizing that Tumbarello's notebook entry that Head had identified Lenny Best conflicted with Norrito's DD-5 and hearing testimony that Head had identified Eric Tidwell;

➢ Cab driver Guerrier told Detective Tumbarello in a precinct interview that the three black male youths who entered his cab shortly after the crime were 5'8" to 5'10" and spoke Spanish to each other;

➢ Detective Norrito was aware in June 1983 that a group of Panamanian young men  were involved in robberies and assaults in the Church and Nostrand Avenues neighborhood;

➢ Norrito had identified and questioned at least one of those Panamanians who was seen running from the station and entering Guerrier's cab and accepted his explanation, without investigation, that they were running because of an emergency;

➢ The Detectives were advised by a witness on the day of the crime that she could identify persons seen running from the station;

-124-

➤ Another witness, the "Mayor of Church Ave," told a detective that the men "got in a cab";

➤ The District Attorney's office was advised by an anonymous woman caller in August and October 1993 that Greene and Williams were wrongfully accused, including various information about four persons ("Lenny Best, Shabazz/Roberto, Ronald Blanding and William") who purportedly committed the crime;

➤ 16-year-old Mark Best had been charged with robbery and theft crimes beginning in 1982, including at least two before June 14, 1983 with co-defendants where knives were used and one, without a co-defendant, in September 1983 involving a gravity knife of the same type used in the June 14th crime.

**T. Battle of the Experts: Yaroshefsky Versus Caplow**

391.    Remarkably, the Defendants have chosen not to submit the Report of their own expert, Stacy Caplow ("Caplow"), or any of her deposition testimony as an expert witness, on the subject of prosecutorial training and misconduct in support of their motion for summary judgment.  This is actually not surprising because Caplow's findings mostly support Plaintiff's positions in this litigation.  And, even where Caplow disagrees with Plaintiff's positions, the opinions of Plaintiff's expert, Professor Yaroshefsky, show that Professor Caplow's opinions on *Brady/Rosario* are incorrect.

392.    The Expert Report of Professor Stacy Caplow, dated August 31, 2015, for the Defendants ("Caplow Report") (**Ex. 56**) and the Report of Professor Ellen Yaroshefsky, dated June 12, 2015, for the Plaintiffs ("Yaroshefsky Report") (**Ex. 49**), and the respective deposition testimony of these two experts, diverge in many aspects, at least five (5) of which are of direct relevancy to the instant issue whether there exist disputes of fact sufficient to defeat Defendants' motion for summary judgment.

393.    Yaroshefsky's  appropriate criticisms of Caplow's findings are presented under these categories below:

*Training criticisms*:

1) Caplow:  It is difficult to standardize an internal disciplinary policy.
2) Caplow:  There are no enforceable ethical provisions.
3) Caplow's conflation of "new" and "newly discovered" evidence.

*Fundamental misunderstanding of the law criticisms:*

4) Yaroshefsky: *Brady v. Maryland* extends to favorable evidence (to the defense), not just exculpatory evidence.
5) Yaroshefsky: *Brady v. Maryland* does not allow for a "materiality" determination at the pre-trial and trial phases of criminal litigation.

## 1. Yaroshefsky KCDA Training Criticisms:

394.   Caplow asserts three primary points regarding training in the Caplow Report (as discussed in her deposition), with respect to which Yaroshefsky directly takes issue:

### a. Caplow contends it is difficult to standardize an internal disciplinary policy

395.   Yaroshefsky disagrees.  First, Professor Yaroshefsky takes issue with Professor Caplow's position that "[i]t is difficult to standardize internal disciplinary procedures."  Caplow Report at 19 (**Ex. 56**).  Yaroshefsky disagrees, contending that the combination of a "written policy," and with it, notice both of its existence and of due process elements for those who may violate that policy, and a "methodology for holding them accountable," are the ways of establishing and maintaining internal discipline. Transcript of Ellen Yaroshefsky's Deposition ("Yaroshefsky Dep.") 189:4-5 (**Ex. 57**). This is part of the "culture of compliance" Yaroshefsky advocates (and which she insists is not a best practices model of her own, but rather a way of implementing existing ethical standards.  *Id.*, 191:20 to 192:6, 225:4 to 229:14 (**Ex. 57**).

396.   Professor Caplow, in making the observation freely acknowledges that "apparently there is no policy manual or disciplinary guidelines."  Caplow Report at 18

(**Ex. 56**).  Caplow also emphasizes the position of other defense witnesses that there are "office policies and practices when Brady violations were exposed."  *Id*.  However, in doing so, Caplow overlooks the facts brought out in the deposition of District Attorney Hynes that several ADAs, as to whom appellate and Federal courts had found egregious issues of prosecutorial misconduct, including violations of *Brady*, not only seem to have escaped investigation (in nearly every instance Hynes could not recall whether any investigation had occurred, and complained that the matters were not brought to his attention, suggesting its own profound degree of internal policy breakdowns), but these ADAs also were subsequently promoted to positions of authority and supervision within the office.  *See* Hynes Dep. 79:5 to 117:3 (**Ex. 19**).[61]

> **b.**    **Caplow contends there are "no enforceable ethical provisions"**

397.    The second area where Professor Yaroshefsky takes issue with Professor Caplow's Report (the former read Caplow's Report, not her deposition), Yaroshefsky

---

[61]    Former District Attorney Hynes was confronted with eleven (11) cases which involved findings of prosecutorial misconduct, including *Brady* violations, as to which he, virtually uniformly, expressed no recollection as to whether any internal investigation of the ADA's actions was commenced.  Among these cases are: (1) *People v Jackson* case (the ADA ████████,* at the time, an Executive Assistant DA, having been promoted, established that Hynes's approval required for same); this ADA committed a *Brady* violation as found by the Second Department; it was not brought to Hynes' attention, and he is not aware of the actions, or of any investigation resulting therefrom [Hynes Dep. 81:23 to 85:9 (**Ex. 19**)]; and (2) *People v. Vielman* case (ADA ████████*), who was subsequently promoted to supervisor; ADA advanced "false premise… blatantly misled jury" [Hynes Dep. 85:10 to 89:11 (**Ex. 19**)]; *People v. Jones* (ADA: ████████,* whom Hynes describes as someone he lost because he "wasn't paying him enough"); the ADA "failed to correct testimony" and the KCDA conceded error (which would have required Hynes' approval as well); there was no investigation Hynes is aware of; he does not recall) [Hynes Dep. 89:21 to 90:23 (**Ex. 19**)].  Cases involving Brady violations included: (1) *Leka v. Portundo* (Federal *habeas corpus* case); he reviewed the conviction on the defense attorney's request; does not recall that the case involved a *Brady* failure [Hynes Dep. 113:2-28 (**Ex. 19**]; (2) *Boyette v. Lefevre*; does not recall if misconduct was investigated; judge was Ruth Moskowitz who granted a 440 motion; when told it was "*Brady*" he says he doesn't know the specifics; the issue in part was the ADA is not keeping a "trial log" of what was turned over to the defense [Hynes Dep. 113:21 to 116:15 (**Ex. 19**)].  [*ADA names redacted here may be found in **Ex. 19** under seal (Hynes Dep.)].

Dep. 113:6-9, 176:16-21 (**Ex. 57**), is in Caplow's [apparent] position that "there are no enforceable ethical provisions," *id.*, 180:2-4, 189:6 to 190:5.   Professor Caplow delineates between issues related to disciplinary actions against ADAs, who have since left the office (where the two experts in fact agree little can be done), and those who are still acting prosecutors.   Not only does Caplow's contention announce defeat at the outset, it also displays what Yaroshefsky asserts is a fundamental lack of understanding of the ABA MODEL RULES OF PROSECUTORIAL CONDUCT, RULE 3.8 ("Rule 3.8"), "requiring lawyers to turn over information, evidence, that tends to negate guilt," a concept which goes hand in hand with compliance with *Brady v. Maryland*.

398.   Yaroshefsky concedes the difficulty in disciplining assistants who are no longer with the office, but expands the point thus:

> [A]nd then she [Caplow] says: There are several reasons why going to an external body would be a draconian approach that is misdirected.  I disagree with that.  And when she [Caplow] says: For example, the offending conduct, while possibly improper, simply does not violate an enforceable ethics rule -- ethical rule.  And that's just not the case.

Yaroshefsky Dep. 189:15-25 (**Ex. 57**).

399.   Asked, is it her position that attorneys should be referred to the Bar Association for discipline and disbarment if they violate the *Brady* rules, Yaroshefsky affirms, but with the qualification that it be "[i]n certain circumstances," which she describes as "egregious" or intentional violations.  Yaroshefsky Dep. at 190:15-25 (**Ex. 57**).  She draws a distinction between *Brady* violations which are not intended and would not refer these assistants to disciplinary committees (some advocates would, she would not).  *Id.*, 190:17 to 191:22 (**Ex. 57**).  She would, however, advocate that the intentional

violators be so directed.  It is in respect of the middle ground, where the *Brady* violation is "negligent," that she advocates the need for a "culture of compliance":

> If there's a negligent violation, what has to happen is that the office looks at how did this happen, why did it happen, what can we do to assure in the future it won't happen.  It's like any other organization or culture or corporation that has a problem, that is a serious problem, where there's a violation, they will sit down and say: How did this happen, why did it happen, what do we do to prevent it in the future.

Yaroshefsky Dep. 191:8-19 (**Ex. 57**).

400.    Asked whether this, as further elaborated upon in her report ("culture and compliance" and the "sufficiency of compliance") is intended to "preven[t] negligent failures to disclose in addition to intentional failures to disclose," she answers "[a]bsolutely." *Id*., 191:20 to 192:2 (**Ex. 57**).  Yaroshefsky adds that the goal is to avoid all failures to disclose, and by virtue of same, "[t]he goal is to comply with the Constitution." *Id.,* 192:5-6 (**Ex. 57**).

401.    Yaroshefsky endorses the public position adopted by D.A. Hynes, that the goal is to err on the side of disclosure so that you're not having to make a determination of whether a particular set of facts or evidence is required to be disclosed or not. *Id.*, 192:7-17 (**Ex. 57**).  As is demonstrated by Hynes' deposition, and the number of cases as to which he comments that no one brought it to his attention, there is a difference between his policy and his implementation of such a policy.  *See, e.g.*, Hynes Dep. 108:9 through 113:25 (**Ex. 19**).[62]

---

[62]    A singular example of how the win-at-all-costs culture of the KCDA, still alive and well from the 1980s, overwhelmed the implementation of D.A. Hynes' policies and priorities, directed as they were toward imposing a sense of professional responsibility on individual ADAs, is provided by the *People v. Larry Bennett* case 13 AD 3d 384 (2nd Dept. 2004) (the case is addressed in the Hynes deposition at 108:9 to 113:25).  The matter was first raised in the deposition of D.A. Hynes when he was asked about a

### c.      Kaplow conflates "new" with "newly-discovered"

402.    The third area of fundamental disagreement lies in what Professor Yaroshefsky argues is  a misunderstanding, on the part of Professor Caplow, of the relatively new ABA MODEL RULES OF PROSECUTORIAL CONDUCT, RULE 3.8:

> [I]t is a provision, if I have the language exactly correct, when a prosecution comes to know of new, credible, and material evidence, indicating that a person was wrongfully convicted, then you have obligations to disclose. In her report, she conflates "new" with "newly-discovered."  The specific intent of that rule was not to do that. *And the reason is, "newly discovered", which is a term of art in a 440 motion, means that the lawyer couldn't have -- the defense lawyer couldn't have discovered it at the time.  If the defense lawyer could have discovered [it] at the time but didn't, it defeats the motion.*  When 3.8(c) was passed, the idea was supposed to be it doesn't matter whether the

reversal memorandum authored by office personnel,



Hynes Dep. 109:24 to 110:11 (**Ex. 19**).

Left to address the comments, D.A. Hynes admitted that "[t]his decision was not brought to my attention that I can recall[,]" (*id.*, 110:18-19) and that he did not recall whether an investigation into the prosecutorial misconduct was performed (*id.*, 110:24 – 111:5) adding that "I think maybe it's significant because the Appellate Division didn't address the misconduct[,]" (*id.*, which appears to miss the principal argument of the KCDA memo:

. D.A. Hynes is left to express frustration and his desire to investigate it (which he partly retracts on the objection of his counsel). Further questioning revealed that the case ultimately ended up before the Second Circuit, which found the prosecutorial conduct "egregious." *Id.*, 112:2.

defense lawyer could have found it or not. If it's new, you have an obligation, as a prosecutor, to take action, if it's material and credible, as well.

Yaroshefsky Dep. 192:25 to 193:25 (emphasis added).

403. It is from this point that the colloquy turns to the *Connick v. Thompson* case, as to which Yaroshefsky strongly disagrees with defense counsel in respect of what the case represents. Yaroshefsky Dep. 194:2 to 205:7 (**Ex. 57**). For purposes here, the emphasis Yaroshefsky places upon distinguishing between legitimate distinctions on the basis of materiality and credibility (as they would apply in an appellate context), and the plain inapplicability of making such a determination in the pre-trial phase.

### 2. Fundamental disagreement as to the applicable law of *Brady v. Maryland*:

404. Professor Yaroshefsky makes a fourth and a fifth sharp distinction between her reporting and Professor Caplow's, stating where she feels the latter is flat-out wrong in respect of *Brady v. Maryland*:

#### a. Caplow constantly equates Brady with exculpatory evidence, and underemphasizes to the point of ignoring entirely, the fact that favorable evidence to the defense is also *Brady* material

405. In making this point, Yaroshefsky is direct:

I believe she [Caplow] made a number of errors, and if that reflects the type of training that went on during that period, then -- it's evidence, is why the training was inadequate.

Yaroshefsky Dep. 177:16-23 (**Ex. 57**).

406. The problem, for Professor Yaroshefsky lies in how Caplow dangerously truncates *Brady*:

First of all, let me just say, she [Caplow] constantly equates *Brady* with exculpatory evidence. That's not the law. That's number one. So if that's how she's training people, then that's a significant problem.

\* \* \*

-131-

And that's real important, because it leaves out impeachment and there's no mention whatsoever of the ethical standards throughout.

*Id.*, 178:11-21 (**Ex. 57**).

407.    Asked elsewhere to describe the "constitutional law" on the subject, Yaroshefsky is equally direct:

> A:      . . .When you learn of or come to know of *Brady* material, you have an obligation to turn it over.
> Q.      And is there an ethical obligation above and beyond that?
> A.      It's phrased a little differently.  So it's -- the ethics rule says you learn, you know, of new credible material evidence, you should disclose it to the defense and, in certain circumstances, to the court.

*Id.*, 183:20-184:7 (**Ex. 57**).

> **b.      Professor Yaroshefsky sees absolutely no place for a "materiality" determination at the pre-trial or trial phase of a criminal case**

408.     In discussing what evidence must be disclosed to defense counsel, Caplow constantly refers to the "materiality" of the evidence, which is the appellate standard for the grounds for a reversal of conviction.  According to Yaroshefsky, this is not the standard to determine, pre-trial, whether information should be disclosed and she adds that it's a very significant problem, if that's the way people are being trained at the KCDA. *Id.*, 178:23 to 179:6 (**Ex. 57**).

409.    Clearly, this is where Yaroshefsky's analysis is fully corroborated by the treatment accorded *Brady* by the prosecutors in this case, particularly ADA Phyllis Mintz.  It also is manifested by the existence of a "*Brady materiality standard*" to which Hynes testifies.[63]    The fact that here, Kings County ADAs could be applying a

---

[63]    The existence of such a standard is further borne out by the emphasis Professor Caplow places on "materiality" determinations in her Report:

"materiality standard," is itself the problem.  That problem is magnified by the way ADA Mintz argues against disclosing *Brady* evidence, which her former colleague, ADA Kallen, clearly concedes should be disclosed (this most profoundly applies to the discrepancy between Norrito's DD-5 and Tumbarello's notes on the topic of the Eric Head identification of Lenny Best: while Kallen concedes the point on the basis of the conflict between the detectives -- something which could be attacked on cross-examination -- Mintz does not concede the point until she is reminded that Norrito also actually lied on the witness stand as to whom Head had identified).  *See, supra*, at ¶¶ 245-247; *see also* Kallen Dep. 193:13 to 195:16; 197:7 to 198:15; 198:23 to 202:14 (**Ex. 23**); Mintz Dep. 176:19 to 183:9) (**Ex. 24**).

410.    ADA Mintz's misunderstanding of *Brady* is likely a product of that same training which Yaroshefsky criticizes, as described in the Caplow Report.  ADA Mintz spins out at least three variations of the same "materiality" theme in the course of her deposition, arguing each one as a reason matters were properly, in her view, withheld from defense counsel at trial:

---

    The disclosure obligation exists regardless of the kind of request made by the defense. The test is one of materiality: Undisclosed evidence is material only if there is a "reasonable probability" that it would gave altered the outcome of a trial, defining a reasonable probability as "a probability sufficient to undermine confidence in the outcome." [quoting United States v. Bagley, 473 U.S 667 (1985)].

Caplow clearly, as Yaroshefsky argues, fails to distinguish between the proper role of such a "materiality" determination in a post-trial adjudication, and the profound Constitutional questions which are begged when a prosecutor, at a pre-trial phase, is placed in the role of first determining materiality *before then deciding* to provide disclosure to the defense in compliance with *Brady*, and in doing so completely overlooks whether the material is either exculpatory or favorable to the defense.

-133-

> a. Brady material is turned over "when it's useful" (Mintz. Dep. 144:15 to 145:13)[64]
> b. Brady material must be "material" (*Id.*, 180:3-11)[65]
> c. Brady material is subject to a "minimal level of credibility", and she displays hostility to the issue of turning over information (*Id.*, 201:11-13).

None of these extrapolations of *Brady* are valid at the pre-trial or trial phase. Yaroshevsky Dep. 109:11 to 110:5, 178:23 to 179:6 (**Ex. 57**). Moreover, in each instance where Mintz invokes one of these theories, she is in direct conflict with the testimony of former ADA Kallen. See *supra* ¶ 405.

411. Arguably the most significant disagreements relative to the Caplow Report, at least for purposes of determining the issue of summary judgment, are the disagreements between Professor Caplow and the other Defendants. For example, where Professor Caplow claims that the "tall guy" references related to Kim's precinct interview

---

[64]     The full exchange, between 144:15 and 145:13, which related to the deal between the prosecution and Mark Best, is particularly demonstrative:

> Q.     If it was true, in your opinion, based on your experience as an Assistant District Attorney, should that information have been provided to the defense?
>  MS. GRAGG: Objection.
> A.     *If it was true, it should be provided to the defense at some time when it's useful, when it can be fully used by the defense, yes.*
> Q.     Sometime when it's useful?
> A.     Yes.
> Q.     Wouldn't the information that somebody who was going to and who had identified Mr. Greene as the stabber in the case had made a deal to testify at trial have been information that would have been helpful right away?
>  MS. GRAGG: Objection.
> Q.     As soon as given?
> A.     *It's not really helpful until trial. At the trial it can be used to put doubt about the credibility of the witness. But before that, you know, what are you going to use it for?*

[65]    Note how this falls in line exactly with the questioning of Hynes, who has to address, from within the Handbook" a heading, "Brady materiality requirement."  Hynes Dep. at 61:9-15 (**Ex. 19**).

are "not *Brady* Material" (Caplow Report at 10-11 - **Ex. 56**), she differs with the conclusion expressed by D.A. Hynes, who in his deposition adopted the position that they probably were *Brady*: "I read the Magistrate Judge's decision directing my testimony. And one of the things that she mentions is this misidentification by size.  And on its face, it certainly looks like a *Brady* violation to me."  Hynes Dep. 64:18-22 (**Ex. 19**). The agreement with Hynes' position on the part of former ADA Kallen has previously been addressed.  *See* Kallen Dep. 82:16 to 83:14 (**Ex. 23**).

412.    Professor Caplow's arguments literally are at odds with the facts of the case in other places.  For example, she characterizes the decision to disclose information as "easy" where the evidence is "categorically exculpatory, *e.g.*, a plea deal, a confession from another person, or a misidentification at a lineup" (Caplow Report at 9 - **Ex. 56**). What she fails to recognize is how every one of these elements were present during the trial of Cy Greene.  The first case (plea deal) is arguably the most egregious, since the effort at trial was affirmatively directed toward keeping information of the plea deal with Marc Best from the defense.  As noted, *supra*, former ADA Kallen clearly testified this evidence of a plea deal should have been disclosed to the defense, *see* Kallen Dep. 144:8 to 146:11 (**Ex. 23**), and that Kallen was prepared to do so at trial, prior to his re-assignment, *see, supra*, ¶¶ 250-252;  Kallen Dep. 202:10-14 (**Ex. 23**).

413.    The same is true of Professor Caplow's statement at page 13 of her Report, that "[i]t is clear from the written training materials, that any notes from anyone – police, ADAs, etc. – of witnesses who testify should be turned over to the defense." Caplow Report at 13 (**Ex. 56**).  Professor Caplow makes this statement in a case where the notebooks of Detectives Norrito and Tumbarello were clearly and wrongfully

withheld from the defense.  Defense counsel at the trial, Lewis Cohen (himself a former ADA), and the attorney who is the scapegoat in Caplow's opinion ("whose deficient performance was the basis for the CPL § 440 grant"), *id.,* 11, testified clearly that he not only was deprived of the detectives' notebooks, but he knew how he would have used them at trial: "[H]ad I seen the notebooks, I think in my cross-examination, I would have utilized them."  Cohen Dep. 264:21 to 265:12).  Cohen continued the point thus:

> Q.    Is there anything that you have learned today, or at any time up until today, that would have changed that defense strategy, that is, using an alibi defense?
> A.    Well, I'm very surprised to see these notebooks from Norrito and Tumbarello. And I -- I'm sure I would have liked to have been able to use -- utilize those, yes.
>           *        *        *
> Q.    Is it customary practice to get detectives' notebooks before trial?
> A.    Yeah. Sure. It's -- it's mandated, mandated by the Court, sure.

Cohen Dep. 258:8-17; 259:22–25 (**Ex. 1**).[66]

As also noted above in this Rule 56.1 Counter-Statement, the withholding of the notebooks would have "astounded" ADA Mintz.  Mintz Dep. 180:16 (**Ex. 24**). Clearly the KCDA was in violation of its *own training materials*, as conceded by Professor Caplow, when it withheld the notebooks from Cohen, who unequivocally testified he could have made use of them in cross examining Norrito and others.

---

[66]    In her desire to bury Cohen, not to praise him, Professor Caplow quotes him (on p. 10 of her Report) extensively where he comments on what he would have done if provided the "tall guy" information: "[a]bsolutely nothing, except add that one more question to the hundreds [he asked]."  While not dismissing the statement, it should be recalled that Cohen was still engaged in a defense of his professional actions, as is clear from other passages within the transcript.  In a passage not referred to by Caplow, Cohen takes back large parts of the prior statement when referring to the closeness of the case, and how any one additional piece of evidence or impeachment could have been dispositive: "I can't really answer that except it would have been an additional factor which the jury would have been -- been able to consider."  Cohen Dep. 112:17-19 (**Ex. 1**).

414.   Relatedly, and briefly addressing Professor Caplow's deposition testimony, she appears to have at one time been possessed of a far greater awareness of the institutional pressures to which individual ADA's clearly are subjected, at least in writing papers as an academic professor:

> In the congested urban criminal justice system with which I am most familiar, the prosecutor often has little contact with the crime victim, delegating information gathering to police, paralegals, or more junior ADAs. Case processing can resemble an assembly line, but one without much oversight and quality control. In many prosecutors' offices, there is little case handling continuity particularly when a prosecution is structured horizontally so that the arrest, indictment, plea negotiation and final stages are handled by ADAs assigned to the particular bureaus through which a case passed before its final resolution (i.e., complaint room, lower court, grand jury, superior trial court). At the early stages of a case, before any decisions about the direction of the prosecution have been made, the ADA who eventually will handle the trial and the plea negotiations has not even been assigned.   Given this discontinuity and disconnectedness, it is easy to see how a prosecutor can enter a plea bargain or even dismiss a case without the complainant's knowledge, input, or acquiescence.   In the absence of a relationship of trust and collaboration, it is also not surprising that the victim might lose commitment to the case, particularly after the typical adjournments and delays, resulting in a dismissal or a disproportionately low guilty plea. Alternatively, the prosecutor might be  [*15]  compelled to use, or threaten to use, coercive means to assure the victim's cooperation against her will.

> *                              *                              *

> When I was running training programs for entry level ADAs, [FN46] I tried to import models from clinical education to teach a victim-centered approach to working with crime victims.  Unfortunately, my efforts fit awkwardly with both office practices and the prevailing understanding of the prosecutorial role. **As soon as the recently graduated, neophyte ADAs begin to conduct their own interviews, to handle their own cases, and to respond to the pressures of the job, the quasi-client-centered counseling model collapses. I confess, therefore, to a naivete about the nature of being a prosecutor and the deep influence of the socialization process of becoming a prosecutor. Within their first year in the office, my former clinic students undoubtedly [*16] consider my advice hopelessly idealistic, unrealistic, and impractical - if they remember it at all.**

> [FN46: I served as Director of Training in the Brooklyn District Attorney's Office from 1983-1986. My early years of practice, however, were on the

-137-

defense side so I never experienced personally learning about prosecution from the ground up.]

Stacy Caplow, "What If There Is No Client?: Prosecutors As 'Counselors' to Criminal Defendants," 5 Clinical L. Rev. 1, *14 to *16 (Fall 1998) (emphasis added) (**Ex. 60**).

> There are undeniable pressures to analyze issues from a prosecutorial perspective that the newcomer, eager to thrive in this environment might have trouble resisting. These pressures likely lead them to be conservative or tough and to take few risks in fear of actual or perceived problems. **Sooner or later, many ADAs succumb to the imperatives of the adversary system. They begin to keep score of their win loss record to treat defense attorneys as untrustworthy enemies, to see the world in absolute terms populated by bad guys or skells, to judge people as types rather than individuals, to become fearful of being too lenient lest generosity backfire or supervisors object. To develop an air of arrogance or self righteousness [sic], to read the law in the light most conducive to prosecution and conviction rather than fairness and justice** and to become inured to the punitive and retributive quality of today's criminal justice system.
>
>  *  *  *
>
> **For some ADAs power interferes with justice. There are simply too many examples of impropriety, misconduct and even illegality to ignore. Not everyone changes, of course, but as Professor Abbe Smith forcefully asks, given the many internal and external influences at work, quote, can you be a good person and a good prosecutor[?].**

Caplow Dep. 66:24 to 68:13 (quoting from a law review article Caplow had authored) (emphasis added) (**Ex. 58**).

415.   In sum, Professor Yaroshefsky is fully validated in her criticism of the attitude of ADAs toward *Brady/Rosario* within the KCDA by the above-cited material. This is proven in application by the manner in which *Brady* and *Rosario* are cited by ADA Mintz, *et al.*  Granted this is inferring much from a single ADA, but it is further substantiated by the clear number of cases which have been a source of rebuke to the KCDA, notwithstanding the announced policies of former District Attorney Hynes.

Clearly some old habits die hard, and his constant refrain that no one brought the cases listed here to his attention bespeaks the problem.[67]

416.     At a minimum, an enormous number of factual disputes exist on this issue and those relating to police misconduct raised above.   For the foregoing reasons, the Defendants' motion for summary judgment should be dismissed in its entirety.

---

[67]     It is very significant that Cy Greene's trial judge, who also oversaw all of the post-trial criminal proceedings, always suspected that the KCDA was withholding evidence relating to Mark Best's relationship with Detective Norrito and the KCDA.   ADA Appelbaum captured Justice Pesce's frustration in an enlightening January 12, 1993 memorandum to her supervisor (23 years ago):

> On January 8, 1992 [sic – 1993], the most recent calendar date, **Justice Pesce** stated that he was reserving decision [on Cy Greene's 440 motion] pending an investigation by our office into Mark Best's allegations.   More specifically, **he instructed us to use all available resources to investigate the credibility of Best's allegations.   He said that from the beginning, he thought that Best may have had either a greater or different type of involvement with this case than the evidence indicates.** He wants us to conduct this investigation within the next thirty days, and wants to know who will be handling it by next week.   He said that the attorneys handling the investigation may speak with him during the thirty days.   By February 8, 1993, Justice Pesce wants a well documented report of the investigation.   He will want to know exactly what was done during the course of the investigation.   **He said that if the attorneys handling it are having trouble getting the support they need to do a thorough job or if he is dissatisfied with their work, he will contact District Attorney Hynes and impress upon him the need for this investigation.** Additionally, **Justice Pesce expressed concern about the possibility of adverse publicity emanating from this case.   He said that he would not want this case to attract the type of negative publicity that other cases prosecuted by the District Attorney's Office have attracted.** Some of Justice Pesce's statements were made on the record; some were not.

January 12, 1993 memorandum from ADA Amy Appelbaum to ADA Roseann Mackechnie (NYC HHR 028786-028789) (emphasis added) (**Ex. 38**).

Dated: New York, New York
        November 1, 2016

                                    Respectfully submitted,


                                    By:__*John F. Schutty*_____
                                        John F. Schutty, Esq.
                                            (JS2173)
                                    Law Office of John F. Schutty, P.C.
                                    271 Main Street, Second Floor
                                    Eastchester, New York 10709
                                    Tel:  (914) 202-0076

                                    Counsel to Plaintiff Cy Greene