UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

                                 :

**CY GREENE,**

                        Plaintiff,

                           **- against -**

**CITY OF NEW YORK, NEW YORK CITY TRANSIT AUTHORITY, MICHAEL NORRITO, JOSEPH TUMBARELLO, ROBERT SULLIVAN, and CHARLES J. HYNES,**

                        Defendants.

**MEMORANDUM & ORDER**

08-cv-00243 (AMD) (CLP)

----------------------------------------------------------------- X

**ANN DONNELLY,** District Judge.

The plaintiff brought this action on January 16, 2008 against the City of New York, the New York City Transit Authority, the Kings County District Attorney, former New York City Police Department Detective Michael Norrito, former New York City Transit Authority Detective Joseph Tumbarello, and former Assistant District Attorney Robert Sullivan, alleging violations of his constitutional rights in connection with his arrest and prosecution for a 1983 homicide.[1]  On April 5, 2016, the defendants moved for summary judgment on all of the plaintiff's claims.  For the reasons set forth below, the defendants' motion for summary judgment is granted in its entirety, and the plaintiff's complaint is dismissed.

---

[1] The plaintiff voluntarily discontinued his claims against ADA Sullivan on February 13, 2017. (ECF 292.)

**OVERVIEW**

John Choi was murdered in Brooklyn, New York on June 14, 1983. The plaintiff and his co-defendant, Larry Williams, were arrested seven days after the murder. That same day, two witnesses to the crime, Jae Hark Kim and Mark Best, identified the plaintiff and Williams in separate lineups. Both the plaintiff and Williams made videotaped statements to a prosecutor, and denied any involvement in the murder. The case was presented to a grand jury, which indicted the plaintiff and Williams for murder and robbery.

One of the critical issues at the plaintiff's trial, at which only one of the eyewitnesses testified, was the reliability of that witness's identification of the plaintiff. The defense also attacked the police investigation that led up to the arrest, and presented an alibi. The jury found the plaintiff guilty of one count of second degree murder and one count of first degree robbery.[2]

The plaintiff's conviction was affirmed by the Appellate Division, Second Department, and his petition for habeas corpus was denied. The trial judge, Michael Pesce, denied the plaintiff's first three 440.10 motions. In his fourth 440.10 motion, the petitioner alleged *Brady* and *Rosario* violations, and that his trial attorney was ineffective. Judge Pesce rejected the *Brady* and *Rosario* claims, but found that the plaintiff's trial attorney was ineffective because he did not listen to an audiotaped interview of the eyewitness in a case where identification was a critical issue, and failed to call another witness.

Accordingly, Judge Pesce vacated the plaintiff's conviction. That decision was affirmed by the Second Department on February 13, 2007, and the Kings County District Attorney's Office dismissed all charges against the plaintiff on June 11, 2008.

---

[2] Williams was acquitted of murder but convicted of robbery.

# FACTUAL BACKGROUND

At about 4:45 p.m. on June 14, 1983, John Choi was murdered on the stairs of a subway station at Church and Nostrand Avenues in Brooklyn, New York. (Defendants' Local Civil Rule 56.1 Statement of Material Facts as to which there is no Genuine Dispute ("56.1 Stmt."), ECF 251, ¶ 2; Plaintiff's Local Civil Rule 56.1 Counter-Statement of Material Facts ("56.1 Counterstmt."), ECF 275, ¶ 2.)[3] As Mr. Choi and his friend, Jae Hark Kim, headed down the

---

[3] The facts are taken from the parties' submissions pursuant to Local Rule 56.1 as well as the Court's review of the entire record. Both the plaintiff and the defendants moved to strike the other side's 56.1 statement. (*See* ECF 257, 283.) The Court denied both motions, noting that it would disregard statements that did not conform to the Federal Rules of Civil Procedure and Local Rule 56.1(d) of the Eastern and Southern Districts of New York. (*See* April 21, 2016 Order; November 23, 2016 Order.) Local Rule 56.1(d) requires that each statement of material fact must be "followed by citation to evidence which would be admissible." Further, it is inappropriate to include legal argument in a 56.1 statement or counter-statement. *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F.Supp.2d 290, 309 (E.D.N.Y. 2013). In reviewing the parties' 56.1 statements, the Court has afforded no weight to any legal argument or to statements that are not supported by evidence. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) ("[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that 'where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion."); *Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact"). The plaintiff's 56.1 counterstatement is replete with both argument and statements that include no citations to evidence. Indeed, there are large portions of the plaintiff's 56.1 Counterstatement that consist entirely of argument, and read more like a screenplay than a 56.1 statement. A few examples make this point. *See, e.g.*, 56.1 Counterstmt. ¶ 55 ("Disputed, since both Norrito and Tumbarello testified at a Wade Hearing against Plaintiff and Norrito testified against Plaintiff at the criminal trial; Norrito fabricated and lied at the criminal trial about his interview with Eric Head, the involvement of Mark Best in a crime, and the importance of the identity of the occupants in Mr. Guerrier's cab, including the brown-shirted stabber . . . In short, both Norrito and Tumbarello were intimately involved in the prosecution of Cy Greene."); *id.*, ¶ 264 ("Norrito's deposition testimony in this regard is quite remarkable and it shows just how far Norrito would go to preserve Cy Greene's arrest and conviction, without regard to what really happened that day and who was really involved in Choi's murder . . ."); *id.*, ¶ 266 ("To truly understand how Cy Greene was wrongfully convicted of Choi's murder, you must start with Mark Best, and Detective Norrito's relationship with Mark Best -- how the latter relationship developed, how they used one another to each other's advantage, and how their relationship led

steps of the subway station, four black men chased Mr. Choi. (56.1 Stmt. ¶ 4; 56.1 Counterstmt. ¶ 4.) Mr. Choi ran to the steps on the opposite side of the station, but fell, and one of the men stabbed him in the chest and thigh. (56.1 Stmt. ¶ 4; 56.1 Counterstmt. ¶ 4.) Two of the other assailants hit Mr. Choi and went through his pockets before running up the stairs to the street. (56.1 Stmt. ¶ 4; 56.1 Counterstmt. ¶ 4.) Mr. Choi was bleeding from the chest; Mr. Kim carried him to the street, and ran into a restaurant, asking that the police be called. (56.1 Stmt. ¶ 4; 56.1 Counterstmt. ¶ 4.) Mr. Choi died at the Kings County Hospital Emergency Trauma Unit. (Declaration of Karen M. Chau ("Def. Ex."), Ex. 1.)

**The Investigation**

Detective Michael Norrito of the 67th Precinct and Detective Joseph Tumbarello of the New York City Transit Authority were assigned to investigate Mr. Choi's murder. (56.1 Stmt. ¶ 5; 56.1 Counterstmt. ¶ 5.) The detectives arrived on the scene shortly after Mr. Choi's stabbing, and canvassed the area to identify any eyewitnesses to the crime. (56.1 Stmt. ¶ 6; 56.1 Counterstmt. ¶ 6.) During the course of their investigation, the detectives took notes, and they

_____

to Cy Greene wrongfully becoming the target of the Choi murder investigation. Their relationship is detailed below.") This type of narrative and argument in a 56.1 Counterstatement violates the Federal Rules of Civil Procedure, the local rules of this District, and is of no help to the Court, since it requires the court to sift through thousands of pages of transcripts and depositions in order to determine the factual basis, if any, for the plaintiff's claims; this is inefficient, and a waste of resources. *See Watson v. Grady*, No. 09–cv–3055 (NSR), 2015 WL 2168189, at *1, n. 2 (S.D.N.Y. May 7, 2015) ("The failure of Plaintiff's counsel to follow the simple mandates of Local Rule 56.1 renders it difficult for the Court to determine which facts are actually in dispute based on evidence versus which facts are simply 'disputed' because Plaintiff alleges that they are in dispute.'") (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 86, n. 2 (S.D.N.Y. 2012)). Although a court is not required to search the record, *Risco*, 868 F. Supp. 2d at 86, n. 2 (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001), I have undertaken a thorough review of the entire record.

and other officers prepared DD5 forms.  (56.1 Stmt. ¶ 7; 56.1 Counterstmt. ¶ 7.)  ADA Robert Sullivan also took audio or video recorded statements from certain witnesses after they were interviewed by the detectives; these recordings were then transcribed by an employee of the Kings County District Attorney's ("KCDA's") Office.  (56.1 Stmt. ¶ 7; 56.1 Counterstmt. ¶ 7.)

**Mr. Kim's Statements**

Mr. Kim was interviewed by the police several times on June 14, 1983.  At about 4:45 p.m., he spoke to Police Officer Castriccone, one of the first officers to arrive on the scene.  (Def. Ex. 1.)  Mr. Kim reported that he was ahead of Mr. Choi as they were walking towards the token booth.  (*Id*.)  He heard yelling and turned to see Mr. Choi surrounded by four black men.  (*Id*.)  Mr. Choi attempted to run away, but the perpetrators knocked him down and stabbed him.  (*Id*.)  Mr. Kim described the first perpetrator as a 16 to 18 year old black male who was 6'0" tall, and the second perpetrator as a 16 to 18 year old black male who was 5'8" tall.  (*Id*.)

Mr. Kim also spoke to Police Officer Williams, and reported that the stabber was a 130 pound, black male, between 18 and 20 years old, 5'8" to 5'9" tall, with a medium build, a chocolate colored shirt, and dark pants.  (Declaration of John F. Schutty Filed in Support of Plaintiff's Opposition to the Defendants' Motion for Summary Judgment, ("Pl. Ex."), Ex. 3, at CY 000433.)  Mr. Kim then spoke to Detective Norrito at around 5:00 p.m. at the 67th Precinct.  (Def. Ex. 5.)  He described the stabber as a black male, 5'9' tall, of medium build and with short hair, a chocolate colored shirt and dark pants.  (*Id*.)  He reported that there were two other black men who were standing around the victim.  (*Id*.) [4]

At about 9:11 p.m. on June 14, 1983, ADA Robert Sullivan conducted a taped interview

---

[4] Detective Norrito also saw Mr. Kim at the hospital, but did not interview him because he was distraught.  (Declaration of Meaghan C. Gragg ("Gragg Decl."), Ex. 30, at 230-31.)

of Mr. Kim, with both Detectives Norrito and Tumbarello present.[5]  (56.1 Stmt. ¶ 12; 56.1 Counterstmt. ¶ 12; Def. Ex. 2, at CY 000133.)  A non-ADA employee of the KCDA's office transcribed the tape.  (56.1 Stmt. ¶¶ 13-14; 56.1 Counterstmt. ¶¶ 13-14.)  The transcript of the interview does not include the world "tall guy."  (56.1 Stmt. ¶ 15; Def. Ex. 2.)  In the audio recording of the interview, however, Mr. Kim can be heard describing the perpetrator as a "black guy, tall guy" who "got the knife and I saw he tried to stab my friend."  (Def. Ex. 18.)

**Other Witness Interviews**

Investigators interviewed various witnesses both on the day of the stabbing, and afterward.

### Abdul Rahman

At about 6:30 p.m. on the day of the stabbing, Detectives Norrito and Tumbarello interviewed Abdul Rahman, a vendor who was setting up his stand in the subway station at the time of the incident.  (Def. Ex. 14, at CG 004022; Def. Ex. 25.)  Rahman told the detectives that he saw the victim running toward the staircase on the southwest side of the station, with three black men running after him.  (Def. Ex. 25.)  The three men began fighting with the victim, and when a train pulled into the station, the perpetrators ran up the stairs, dropping a knife and money on the floor.  (*Id*.)  Rahman described each of the perpetrators as about 5'8" tall and 120 pounds.[6]  (*Id*.)  One was 15 to 19 years old and wore a red shirt and tan shorts; the second was

---

[5] Four different prosecutors were involved at various stages of this case.  ADA Sullivan, who had been at the office for less than two years, was responsible for interviewing witnesses and anyone who was arrested.  A different prosecutor, Kathy Plazner, presented the case to the grand jury.  Douglas Kallen, of the homicide bureau, did the pre-trial hearings in December of 1984.  At some point in 1985, he was made a supervisor in another bureau and no longer tried cases.  He left the office in 1986.  (Gragg Decl., Ex. 24, at 13-14, 24.)  Gerald Greene, another homicide assistant, ultimately tried the case.

[6] At a post-judgment hearing, Rahman testified that he would no longer describe the perpetrators

between 15 to 20 years old, and wore a brown shirt with dark pants; the third was 17 years old, and wore a white shirt with stripes.  (*Id.*)

ADA Sullivan interviewed Rahman later that same night.  (56.1 Stmt. ¶ 18; Def. Ex. 26.) During that interview, Rahman said that he saw three black men chasing the victim, but did not see who was holding the knife.  (56.1 Stmt. ¶ 18; Def. Ex. 26.)  On one occasion, Rahman looked through photographs of suspects, but did not identify anyone.  He refused to look at any additional photographs.  (Pl. Ex. 5, at 247-49.)

**James Robinson**

At about 6:30 p.m. on the night of the stabbing, Detective Vance Herlihy interviewed James Robinson, who said that he was in the area of Church and Nostrand Avenues when a man told him to stop another man running on Nostrand Avenue.  (56.1 Counterstmt. ¶ 19; Def. Ex. 27.)  Robinson chased the man, who was black, about six feet tall, and wore a brown shirt and pants; the man got into a taxi that was stopped by a fire hydrant.  There were other people in the taxi.  (Def. Ex. 27.)

**Reynold Guerrier**

Detective Tumbarello interviewed Reynold Guerrier, a taxi driver, at around 6:35 p.m. (56.1 Stmt. ¶ 20; 56.1 Counterstmt. ¶ 20; Def. Ex. 15, at CG002383-84.)  Guerrier said that at around 4:45 p.m., he was stopped at an open fire hydrant on Erasmus Street between Veronica and Lloyd Street when three black men got into his cab and asked to be driven to Flatbush Avenue.[7]  (Def. Ex. 15, at CG002383-84.)  Mr. Guerrier told them that he was off-duty, but the

_____

as all being the same height and weight; rather, he said that the perpetrators were about 5'8" to 5'10" tall, but that none were as short as his wife, who was 5'5".  (Pl. Ex. 4.)

[7] The parties agree that Mr. Guerrier was parked a few blocks from the subway station where the incident took place.  (56.1 Stmt. ¶ 20; 56.1 Counterstmt. ¶ 20.)

men said that they had "a problem" and needed to get to Flatbush Avenue. (*Id.*) He took them to Flatbush and Clarendon, where they got out. (*Id.*) He told the detective that he could not identify them because they were behind him, but said that they were between 18 to 20 years old, 5'8" to 5'10" tall, and were speaking Spanish. (*Id.*) One of the men was wearing a brown shirt, shorts, and sneakers; Guerrier described him as being 5'10" tall. (*Id.*)

Detective Herlihy also spoke to Guerrier that same day and prepared a DD5 of their interview. (56.1 Stmt. ¶ 22; Def. Ex. 28.) The DD5 reflects that Guerrier told him that three black men, about 20 years in age, got into his cab, that they were out of breath, and that they said they had a problem and needed to get to Flatbush Avenue. (Def. Ex. 28.)

**Eric Head**

At about 7:00 p.m., Norrito interviewed Eric Head, who was working at a carpet store across the street from the subway where Mr. Choi was stabbed. (56.1 Stmt. ¶ 28; Def. Ex. 16.) Head reported that at around 4:35 p.m., he saw two black men run out of the subway station; a few seconds later, another black man ran out of the subway station's southwest entrance. (Def. Ex. 16.) Head said that he recognized all three of the men as local pickpockets. (*Id.*) When he approached the man who left from the southwest entrance, the man fled. (*Id.*)

Later that same night, Head spoke to ADA Sullivan, with Detectives Norrito and Tumbarello present. (56.1 Stmt. ¶ 32; Def. Ex. 33.) He stated that he saw three men leave the subway station, and that while he did not know them personally, he knew that they robbed people in the neighborhood. (56.1 Stmt. ¶ 32; Def. Ex. 33.) Head said that one of the three men, whom he described as a "little kid," walked out of the subway station, but then began to run when Head approached him. (56.1 Stmt. ¶ 32; Def. Ex. 33.)

Head then viewed photographs at the Catch Unit. (56.1 Stmt. ¶ 29.) The DD5 form

prepared by Detective Norrito indicates that Head identified Joseph Ross as the person who fled

from the southwest entrance, and Ronald Blanding and Eric Tidwell as the men he saw standing

at the entrance to the subway about five minutes before the stabbing.  (*Id.* ¶ 28; Def. Ex. 16.)

According to Head, all three were pickpockets.  (Def. Ex. 16.)   Detective Tumbarello's

notebook indicates that Head identified Leonard Best, Joseph Ross, and Ronald Blanding as

having been at the scene of the crime.  (56.1 Stmt. ¶ 30; Def. Ex. 15, at CG002385.)  Detective

Norrito's notebook contains an undated entry with the names Leonard Best, Joseph Ross, and

Marcus; there is no additional information in the entry.  (56.1 Counterstmt. ¶ 240, Def. Ex. 14, at

CG 004028.)

### Joseph Ross

The day after the stabbing, at around 5:00 p.m., Detectives Norrito and Tumbarello

interviewed Joseph Ross, whom Head said was near the subway station about five minutes

before the stabbing.  (56.1 Stmt. ¶ 33.)  Ross said that he was at Church and Nostrand Avenues at

around 4:00 p.m. with his friend Mark Best, but left the scene before the incident.  (56.1 Stmt. ¶

34; Def. Ex. 34.)  He said that Mark Best saw what happened, and recommended that the

detectives question him.[8]  (56.1 Stmt. ¶ 34; Def. Ex. 34.)

### Lenny Best

At an April 17, 2010 deposition, Lenny Best testified that uniformed officers picked him

up in the early evening of June 15, 1983; they told him that they were taking him in to the 67th

---

[8] At a May 18, 2010 deposition, Ross testified that, while he told the police that he and Mark Best were in the vicinity just before the stabbing, and that he left Best in the area, he never said that Best had seen anything or that they should speak to him.  (56.1 Counterstmt. ¶ 216; Pl. Ex. 29, at 247-48.)  He further testified that detectives pushed and hit him to pressure him to speak about the homicide.  (56.1 Counterstmt. ¶ 217; Pl. Ex 29, at Tr. 232-33.)

Precinct to speak with Detective Norrito. (Pl. Ex. 8, at 31-32.) Best thought that the police wanted to talk to him about a burglary that he committed the day before, but the officers asked him about the homicide in the subway station. (*Id*., at 32-34.) They also asked questions about his brother, Mark Best, and the plaintiff, Cy Greene. (*Id*., at 35.) Lenny Best told the officers that he did not know anything about it. (*Id*., at 33.) As the officers were taking him out of the car in front of the precinct, he ran away to Snyder and Rogers Avenue. (*Id*., at 32-35.) The police never questioned him again about the events of June 14, 1983. (*Id*., at 35.)

Detective Norrito testified at his deposition that he had never heard that Lenny Best ran away from officers who picked him up. (Pl. Ex. 10, at 118.) Detective Tumbarello said that he had heard rumors at the precinct that Lenny Best had run from a police car. (Pl. Ex. 9, at 132-33.)[9]

**Mark Best**

Detective Norrito first interviewed Mark Best[10] on the day of the murder, because he knew him to frequent the area of the homicide, but "received no information" from him at the time. (56.1 Counterstmt. ¶ 206; Pl. Ex. 2, at 61-62.) After receiving Joseph Ross's tip, however, Detective Norrito questioned Mark Best again on June 16, 1983. (56.1 Stmt. ¶ 35; Def. Ex. 35; Pl. Ex. 2, at 61-62.)

---

[9] At his deposition, Detective Herlihy said that he had not heard of any such incident. He was asked whether a detective would have been required to prepare a DD5 about it, assuming it happened. Detective Herlihy answered, "A witness? Bringing a witness and the witness gets out and runs away? No, I wouldn't . . . do a five on that, no." He continued, "[B]ecause a guy runs away? No, we just send guys out to look for him again. We'll get him." However, if the escapee had been "under arrest with handcuffs on, [t]hat's a different story." (Gragg Decl., Ex. 15, at 64-65.)

[10] According to Mark Best's brother Lenny, Mark Best was "borderline autistic" and "slow." (Pl. Ex. 8, at 11.) The plaintiff also described Mark Best as "slow" and "semi-retarded." (Gragg Decl., Ex. 51 at 44-45.)

At this point, Detective Norrito suspected that Mark Best was involved in Mr. Choi's murder, and interviewed him at the precinct.  (56.1 Stmt. ¶ 269; Pl. Ex. 5, at 140.)  Best said that on June 14, 1983 at around 4:20 p.m., he was at the top of the subway station stairs on Church and Nostrand Avenues.  (Def. Ex. 35.)  The plaintiff, whom Best knew as "Tony Rome," was urinating in the stairwell, when two "oriental" men came into the station.  (*Id*.)  The plaintiff tried to grab one of the men's wallets, and then chased him.  (*Id*.)  Two other black men also chased the victim.  (*Id*.)  The plaintiff took out a knife and stabbed the victim.  (*Id*.)  The plaintiff and one of the other men picked up money that had fallen to the floor and ran up the southwest stairwell to Church Avenue.  (*Id*.)

Detective Norrito showed Best a photographic array that included the plaintiff's photograph; Best identified the plaintiff, and provided the plaintiff's home address.  (*Id*.)

ADA Sullivan interviewed Best on tape, with Detectives Norrito and Tumbarello present, at around 3:43 p.m. on June 16, 1983.  (56.1 Stmt. ¶ 40; Def. Ex. 21.)  Best stated that on the day of the murder, he went into a Chinese restaurant near the train station to buy a soda, and saw two "Chinese" men who were also buying something.  (Def. Ex. 21, at 2.)  The men walked down into the train station, where the plaintiff, whom Best knew from the area, was urinating.  (*Id*., at 2-3.)  Best, who at this point was standing at the bottom of the stairwell, saw the plaintiff reach into one of the men's pockets; two other men came down the stairs to help the plaintiff.[11]  (*Id*., at 3-5.)  The other "oriental" man tried to help his friend, but another man stopped him.  (*Id*.)  The victim fell on the steps, and scratched the plaintiff's hand as he fell.  (*Id*., at 6.)  The plaintiff stabbed him in the back and picked up the victim's money, which had fallen to the floor.  (*Id*., at

---

[11] Ultimately, however, Best said that four men were involved in the crime.  (*Id*., at 5.)

6-7.)  The perpetrators then ran past Best, knocking him down, and left the subway station.  (*Id.*, at 7-8.)

**The Plaintiff's Arrest**

Detective Norrito went to the plaintiff's home several times in an effort to locate him; the plaintiff's mother told the detective that he had not been home in a while.  (Def. Ex. 7, at 249-50.)  For the next week, a precinct employee called the plaintiff's home looking for him.  On June 21, 1983, the plaintiff answered.  (*Id.*, at 250.)  Then, Detectives Norrito and Collins went to the apartment, where they picked up the plaintiff and his co-defendant, Larry Williams.  (56.1 Stmt. ¶ 46; 56.1 Counterstmt. ¶ 46.)  Norrito took both men into custody and drove them to the 67th Precinct, where they were questioned.  (56.1 Counterstmt. ¶ 326.)

Detective Tumbarello met the plaintiff at the precinct, and noticed that he did not meet Mr. Kim's description of the stabber as a "tall guy;" this made him question whether they had the right person.  (Pl. Ex. 9, at Tr. 204-06.)  Nevertheless, he placed the plaintiff under arrest later that same day.  (56.1 Stmt. ¶ 46; 56.1 Counterstmt. ¶ 46; Def. Ex. 17.)

At the precinct, the plaintiff and Williams were in a holding cell in the middle of the detective unit.  (56.1 Stmt. ¶ 48; 56.1 Counterstmt. ¶ 328.)  The witnesses, Best and Mr. Kim, were taken to separate parts of the building; Best was put in the Catch Unit, while Mr. Kim was taken to the computer room, behind a partition.  (Def. Ex. 22, at 23.)  Mr. Kim and Best did not speak to each other before the lineup was conducted.  (*Id.*)

**The Lineups**

Starting at about 9:05 p.m., detectives ran two separate lineups, one with the plaintiff and one with Larry Williams.  (56.1 ¶ 52; 56.1 Counterstmt. ¶ 52.)  Mr. Kim and Mark Best then viewed each line-up separately.  (56.1 ¶¶ 53-54.)  The participants in the plaintiff's lineup were

seated.[12]  (56.1 Stmt. ¶ 345; Def. Ex. 3, at 137-38.)  Mr. Kim identified the plaintiff as the

perpetrator "from the robbery;" he noted that the plaintiff had "big eyes" and was the one who

was "holding [the] knife."  (Def. Ex. 37, at CG 003983.)  Mark Best also identified the plaintiff

as "the one that stabbed the man."  (*Id*.)  Mr. Kim identified Williams as the one who "push[ed]

[him] around," and Best identified him as having been in the subway "with the other guy."  (*Id*.,

at CG 003992.)

### **Anonymous Tip Memos**

On August 29, 1983, Sylvia Lerner from the Citizen Action Center sent a memo to the

KCDA's Office reporting a call from an anonymous caller, "who sounds rational."  (Pl. Ex. 35.)

According to the memo, the caller said that while she knew that two young men were in jail for

the June 14, 1983 homicide, "everyone knows" that they were not the perpetrators.  (*Id*.)  The

caller said that the following people were involved:  Roberto, also known as "Shabazz," an 18 to

19 year old Puerto Rican man who was "dark-skinned and chubby and short;" Lenny Bess or

Best, a 21 or 22 year old "brown-skinned black man of medium height and average build;" a man

named William; and a tall, thin dark skinned black man named Ronnie.  (*Id*.)

According to a second memo, dated over a month later on October 6, 1983, the same

anonymous caller called back to provide additional information.  (*Id*., at NYC HHR 023369.)

This time, the caller said that Lenny Best's mother wanted him to admit to the murder, but was

unable to convince him to do so.  (*Id*.)  The caller "fe[lt] that if we sent someone to interview

her, we could get her to give information about his wheareabouts."  (*Id*.)  The caller also stated

that a detective shot Best while Best was committing a crime.  (*Id*.)  She specified that "Ronnie,"

---

[12] Mr. Kim, however, testified at trial that he asked that the lineup participants stand up.  (Gragg
Decl. Ex. 32, at 362-64.)

whom she had identified in the first call, was "Ronald Blanding." (*Id*.) She also provided his address. (*Id*.) The author of the memo stated that the caller "seems to know what she is talking about." (*Id*.) The plaintiff contends, without citation, that these memos were never turned over to his trial counsel. (Pl. 56.1 ¶ 354.)

**Pre-Trial Proceedings**

A grand jury indicted the plaintiff on June 24, 1983 for two counts of murder and one count of robbery for robbing and killing Mr. Choi. (56.1 Stmt. ¶ 57; 56.1 Countersmt. ¶ 57.) Mr. Kim and Detective Norrito testified before the grand jury. (56.1 Stmt. ¶ 57; 56.1 Countersmt. ¶ 57.) Mr. Kim described the robbery and stabbing; at two different points, he described the stabber as "taller than me," and said that another "small guy" tried to pull something out from Mr. Choi's pocket. (56.1 Stmt. ¶ 58; 56.1 Counterstmt. ¶ 58; Def. Ex. 41, at 5-6.)

The plaintiff was arraigned on July 6, 1983, and pled not guilty. (56.1 Stmt. ¶ 59; 56.1 Counterstmt. ¶ 59.) Prior to trial, the plaintiff moved to suppress the lineup identifications. On December 14, 1984, the Honorable Joseph Lombardo presided over a *Wade* hearing. (56.1 Stmt. ¶ 60; 56.1 Counterstmt. ¶ 60.) Detectives Norrito and Tumbarello testified for the prosecution, and the plaintiff and Mr. Williams testified for the defense. (56.1 Stmt. ¶ 61; 56.1 Counterstmt. ¶ 61.)

At that hearing, Detective Norrito testified about some of the circumstances of the investigation, the arrest of the plaintiff and Larry Williams, and the identification procedures. Detective Norrito also testified about Mr. Kim's various descriptions of the stabbers. Mr. Kim described the stabber to Officer John Casteroni, one of the first officers on the scene; Mr. Kim said that the stabber was a six foot tall black man, from 16 to 18 years old, with short hair and a

medium build.  (Gragg Decl. Ex. 27, at 9-10, 64-65.)  Later, at the precinct, Mr. Kim told

Detective Norrito that the stabber was a 5'9" black man, 18 to 20 years old with a medium build

and short hair, wearing dark pants and a chocolate brown shirt.  (*Id*., at 8-9.)

Detective Norrito also testified that he interviewed Mark Best, who identified the stabber

as "Tony Rome;" the detective looked through a list of known nicknames and determined that

the plaintiff was "Tony Rome."[13]  (*Id*., at 11-15, 33.)  Detective Norrito took the plaintiff and

Larry Williams into custody on June 21, 1983, and took them to the 67th Precinct.  (*Id*., at 15-

17.)  Both the plaintiff and Williams were placed in a holding cell in the precinct's detective unit;

the cell was not visible from the doorway.  (*Id*., at 15, 48-50.)  Meanwhile, Detective Tumbarello

picked up Mr. Kim and Detective Norrito got Mark Best.  (*Id*., at 69.)  The witnesses were

separated; Best was in a computer room, and Mr. Kim was with two detectives, behind a screen.

(*Id*., at 23, 55-56.)  Detective Norrito instructed Mr. Kim not to leave the room.  (*Id*., at 55, 68-

69.)

Both Best and Mr. Kim separately viewed two lineups—one containing the plaintiff and

one with Williams—and both identified the plaintiff and Williams.  (*Id*., at 90-92.)  Mr. Kim

called the petitioner "big eyes," and said that he was "holding the knife."  (*Id*., at 92-93.)  At

various points during the hearing, Detectives Norrito and Tumbarello referred to their notes.

(*Id*., at 8, 9, 63, 76-78, 97, 103.)  During cross-examination, the plaintiff's attorney asked if the

detective had "any notes or memorandums that you made in this case."  (*Id*., at 76.)  Detective

Norrito answered that he had "a book, a steno pad."  (*Id*.)  When the plaintiff's counsel asked to

see the detective's notebook, the prosecutor objected to "counsel just perusing through the

---

[13] Detective Norrito spoke to Best on the day of the murder, along with other people "known to frequent that area," but got no information from him on that day.  The next day, another informant directed Norrito to Best.  (Gragg Decl. Ex. 27, at 61-62.)

notebook." (*Id.*, at 76-77.) Judge Lombardo looked through the notebook, and the plaintiff's attorney did not ask any follow-up questions about it, or protest that he did not have it.[14] (*Id.*, at 78.)

At the hearing, the plaintiff and Williams both testified, and claimed that they saw an "Oriental" or "Chinese" man looking at them while they were in the precinct cell. (56.1 Stmt. ¶ 62; 56.1 Counterstmt. ¶ 62.) Williams said that the man was between 38 and 40 years old, was 5'8" tall, and "heavy set," weighing between 180 and 200 pounds; he did not know if this man viewed the lineup. (Gragg Decl. Ex. 27, at 130-32.) According to Williams, the man walked by the cell several times, for a total of ten seconds. (*Id.*, at 132-33.) "Hours later," Williams was placed in a lineup. (*Id.*, at 128.)

The plaintiff also testified that about an hour and a half before the lineup, an "Oriental" or "Chinese" man "just kept walking back and forth playing with his hair, just looking at us, looking, walking back and forth." (*Id.*, at 136, 147-48, 151-53.) The man looked "mad, upset, like." (*Id.*, at 152.) He also saw the man talking to a detective; the man was about 5'5" or 5'6", and weighed between 120 and 130 pounds. (*Id.*, at 137.) A janitor told the plaintiff that the man was "supposed to be a witness," and that "there's an Oriental man, somebody here, supposed to say somebody killed, something like that, killed his brother-in-law, something, his friend, or something." (*Id.*, at 147-50.)

---

[14] At another point, Williams' lawyer wanted to see a document; the prosecutor asked that the witnesses' addresses be redacted. (Gragg Decl. Ex. 27, at 97-98.) Williams' attorney responded that he was "not interested in the addresses." Judge Lombardo commented that he had tried "four cases in a row" in which witnesses were hesitant to testify because they had been "terrorized and threatened," either by the defendants or "by their families and friends." (*Id.*, at 98-99.) The judge cautioned the parties not because he had a specific concern in this case, but because of the frequency with which witnesses had been threatened in other cases. (*Id.*, at 99-100.)

Both defense counsel asked that Mr. Kim and Mark Best be called to testify at the hearing. Judge Lombardo denied the request because they had not established that the identification procedures were unduly suggestive.[15] (*Id.*, at 82-84.)

After both sides rested, the prosecutor, Douglas Kallen, told the court that he wanted to start the trial the following Monday, because he had a "witness . . . whose name has been mentioned during the course of this hearing who is available to me now, but may not be available to me in January." (*Id.*, at 157.) Mr. Cohen, the plaintiff's lawyer, commented that if the witness was "the kind of witness who's in jail now and is going to get out of jail in the next little while, Mr. Kallen is worried about him running away, doing this, doing that; he can't be a heck of a good witness." (*Id.*, at 158.) Mr. Cohen went on to say, "We know what this case is about. We know what Mr. Best's record is." (*Id.*, at 158.)

On January 2, 1985, Judge Lombardo issued an oral decision with findings of fact and conclusions of law.[16] The portion of the transcript that the parties provided establishes that Judge Lombardo found that the identification procedures were proper, that the fillers were similar in height, appearance and weight, and thus, that the lineup was not unduly suggestive. (Def. Ex. 42, at 33.) He rejected both the plaintiff's and William's testimony as "inherently

---

[15] The plaintiff characterizes this ruling as improper, but it appears to be consistent with New York law. *See, e.g.*, *People v. Chipp*, 75 N.Y.2d 327, 337 (N.Y. 1990) (the hearing court has the discretion to deny a defense application to call identifying witnesses at a *Wade* hearing, because "[t]o hold otherwise would . . . only encourage the misuse of *Wade* hearings" and "would enable defendants to harass identifying witnesses and to transform the hearing into a discovery proceeding.").

[16] The parties have not supplied a complete transcript of that decision; it appears to be missing at least eight pages. (*See* Def. Ex. 42.)

incredible, untrustworthy."[17] (*Id*., at 32.)

**The Trial**

The plaintiff went to trial in April of 1985 before the Honorable Michael Pesce and a jury. The central issue at the trial was identification. Six witnesses testified for the prosecution: Jae Hark Kim, Detectives Tumbarello and Norrito, Police Officer Pilato, who was one of the first officers on the murder scene, a doctor from the Office of Chief Medical Examiner, and Mr. Choi's brother-in-law. Mark Best did not testify. Mr. Kim, the victim's friend, was the only witness to identify the plaintiff as the killer. The jury heard evidence that Mr. Kim had given different descriptions of the stabber: that he was 5'9" tall, that he was 6 feet tall, and that he was taller than Mr. Kim, who estimated his own height as 5'4". (Gragg Decl. Ex. 30, at 133; Gragg Decl., Ex. 32, at 346, 350-51.) Mr. Kim also testified that he was standing below the stairway where Mr. Choi was stabbed, and that he was more comfortable measuring height in meters than in feet and inches. Nevertheless, the evidence established that the plaintiff, who was 5'2" tall, was not as tall as the estimates Mr. Kim had given; the jury also had the opportunity to see the plaintiff when counsel asked him to stand up.[18] (Gragg Decl. Ex. 32, at 315-16, 332, 347-51, 374; Gragg Decl. Ex. 33, at 567; Gragg Decl. Ex 34, at 684-85.)

In addition to the evidence about the height discrepancies, the jury heard that the events transpired very quickly, that Mr. Kim did not pay attention to the faces of the men on the stairs as he passed them, and that his opportunity to see the stabber's face was limited to the time that

---

[17] Judge Lombardo also referred to a third witness, someone named Patrick Palmer, who apparently testified for the defense on another date. (Def. Ex. 42, at 24.) The transcript of this portion of the hearing has not been submitted.

[18] The plaintiff testified that he was 5'2", while the arrest report lists the plaintiff's height as 5'5". (Gragg Decl., Ex. 33, at 567; Def. Ex. 17.)

the stabber was on the top step of the subway stairs, when Mr. Choi was being stabbed. (Gragg Decl. Ex. 32, at 311-18, 335-36, 341-44, 371-73.) Counsel established through one of the first officers on the scene, Officer Pilato, that Mr. Kim was asked questions at the scene in order to prepare the UF61 report, and that the section in that report entitled "can identify" was blank.[19] (Gragg Decl. Ex. 30, at 273.)

Mr. Kim also testified about the lineups. He said that a detective told him to wait in a room, which he did. (Gragg Decl. Ex 32, at 383.) While he waited, he looked at about 60 photographs, but did not recognize anyone. (*Id.*) During the lineups, he asked to have the participants stand and turn so that he could see their profiles.[20] (Gragg Decl., Ex. 32, at 362-64, 383-85).

In addition to the evidence of identification, the jury learned through defense counsel's cross-examination that in the days after the murder, Detective Norrito interviewed witnesses who did not identify the plaintiff or Williams, but did identify other people. Eric Head, one of the people that Norrito interviewed, identified Eric Tidwell as a participant; Norrito learned that Tidwell was in prison at the time of the murder. (Gragg Decl., Ex. 30, at 143-44, 191.) The detective had information that minutes after the murder, four men fled in a taxi; he said that he did not believe that they were involved because of information he received from a "confidential informant."[21] (*Id.*, at 242-43.) Defense counsel also questioned Norrito about an interview of

_____

[19] During his cross examination of Mr. Kim, Larry Williams' attorney used the transcript of Mr. Kim's taped interview with ADA Sullivan. (Gragg Decl. Ex. 32, at 376.)

[20] Neither defense attorney cross-examined Mr. Kim about the plaintiff's and Williams' claim, at the suppression hearing, that an Asian man looked at them while they were in the detective squad's holding cell.

[21] At his deposition, Detective Norrito testified that he never knew the name of this confidential informant. (Pl. Ex. 10, at 150-51.) He also testified that he interviewed two of the men who entered the taxi, but did not create a DD5 about the interviews, note the interviewees' names,

the taxi driver, done by Detective Herlihy; counsel used Detective Herlihy's DD5 to ask

questions. (*Id.*, at 164-65.) Counsel also cross examined Norrito about Mark Best.[22] Joseph

Ross told Detective Norrito that Mark Best, whom the detective described as a neighborhood

pickpocket, was at the scene and that Norrito should talk to him. Norrito brought Best in,

advised him of his rights, and informed him that he was a suspect in a homicide.[23] (*Id.*, at 142-

44, 159.)

Counsel also cross examined Detective Norrito about Mark Best's brother, Lenny Best, a

burglar with a "bad" background. (*Id.*, at 140-41.) At the time of the murder, Lenny Best had

two outstanding warrants.[24] (*Id.*, at 192.) Although the detective received information about

other potential participants in the murder, he did not conduct lineups with any of those people.

Both the plaintiff and Larry Williams testified for the defense, and both denied

participating in the crime. Williams testified that on June 14th, he was at his mother's house in

Bushwick, seven miles from the scene of the murder. (Gragg Decl., Ex. 33, at 477-78.) His

mother, Dorothy Williams, also testified that he was at home on the day of the murder, except for

---

inform the district attorney, or make a report about it because he believed that the plaintiff was
the perpetrator and that the case was closed. (Pl. Ex. 10, at 136-38, 142-144.) He also testified
that he believed the men in the taxi were Panamanian. (*Id.*, at 144.)

[22]   Until this point, the jury had heard very little about Best. The prosecutor did not refer to Best
in his opening statement, and asked Detective Tumbarello only whether Best had an opportunity
to see the lineup.

[23] Norrito also testified that Mark Best made a videotaped statement to an assistant district
attorney. (Gragg Decl. Ex. 30, at 162.) At his January 9, 2009 deposition, Norrito testified that
although he had "serious, serious" reservations about Mark Best, "his description of what
transpired was perfect." (Def. Ex. 7, at 214.)

[24] At one point, the plaintiff's attorney asked Detective Norrito whether he or any other officer
had ever shot Lenny Best. (Gragg Decl. Ex. 30, at 140-41.)

a trip to a nearby dry cleaner.[25]  (*Id*, at 435-38.)  Williams said that he first heard about the murder from the plaintiff's cousin, Ronald Blanding, who told him that detectives arrested Reginald Greene, the plaintiff's brother, for the murder.  (*Id*., at 518-20.)  Williams also said that Norrito threatened to charge him with the homicide if he did not name the plaintiff as a participant.  (*Id*., at 523-29.)  Norrito did not give him any additional information about the murder, and told him that he could make a statement to an assistant district attorney if he chose. (*Id*., at 524.)  Williams made a videotaped statement to a prosecutor, in Norrito's presence, in which he denied any role in the murder. (*Id*., at 523-25, 528.)  That videotape was played for the jury.

The plaintiff's cousin, Ronald Blanding, also testified.  He said that Norrito brought him to the precinct on the day of the murder and threatened to blame him for the murder if he did not "come up with the name" within two days.  (*Id*., at 535-39.)  Norrito also showed him photographs of people that Blanding knew from the neighborhood, including Lenny Best and the plaintiff's brother, Reginald Greene.  (*Id*., at 537.)  Blanding denied committing the crime, and Norrito said that either Blanding was "a good actor" or telling the truth; Norrito said he was going to "take [Blanding's] word for it," and then allowed him to leave.  (*Id*., at 536-39.)

The plaintiff and his brother's girlfriend, Barbara Nichols, testified that the plaintiff was at Ms. Nichol's apartment at the time Mr. Choi was killed.  (*Id*., at 547-51, 570-72, 576-77.)  The plaintiff heard about the murder from Blanding, who told him that detectives threatened to charge Blanding with the crime.  (*Id*., at 576.)  When he was arrested, the plaintiff denied committing the crime to Norrito and to an assistant district attorney; the videotape of the latter

---

[25] A private investigator testified that he went to the dry cleaner and saw a receipt with Williams' name, date June 14th, the day of the murder; when he returned to get the receipt, the dry cleaner no longer had it.  (Gragg Decl. Ex. 33, at 451-62.)

statement was played for the jury.  (*Id.*, at 581-84.)

Throughout the trial, both defense attorneys referred to and attempted to introduce various reports that summarized detectives' interviews with potential witnesses, including James Robinson, Joseph Ross, Fred Thomas, Abdul Rahman, and the taxi driver, Reynold Guerrier.  At one point, when the plaintiff's attorney tried to introduce a DD5 containing Eric Head's identification of Joseph Ross, Ronald Blanding and Eric Tidwell as participants in the crime, the prosecutor objected on hearsay grounds, and explained that he had given the lawyers the names of the witnesses named in the reports:  "[T]hey have their names.  I told them the names.  They have the people.  If they wanted to get them they could have reached out and got them as witnesses.  They can call them if they want to as witnesses." (Gragg Decl., Ex 30, at 145-51.)  In another exchange, when Mr. Cohen was attempting to put police reports into evidence, the prosecutor said that "all reports are turned over" and "every information he requested was given to him as soon as he requested the names of witnesses, the recording officer, and so forth."  (*Id.*, at 203.)  Mr. Cohen answered, "No question about it."  (*Id.*)

Prior to summations, the lawyers for both the plaintiff and Williams asked Judge Pesce to give an adverse missing witness charge to the jury based on the prosecutor's failure to call Mark Best.  After a hearing at which two paralegals testified about efforts to locate Mark Best, the court found that he was not under the prosecutor's control, and therefore denied the defense application.  (Gragg Decl., Ex 34, at 616-652.)

In summation, Mr. Cohen argued that Mr. Kim's varying descriptions of the killer's height, all of which were inconsistent with the plaintiff's height, made Mr. Kim's identification unreliable.  (*Id.*, at 681-82, 684-85, 689, 699-700.)  Counsel also attacked the investigation as sloppy and incomplete.  He commented on Detective Norrito's failure to put other suspects in

lineups, particularly Mark Best, whom counsel described as "the suspected murderer" who "precipitated" the plaintiff's arrest.  (*Id*., at 691.)  Counsel also commented on the prosecution's failure to call Best as a witness.  (*Id*., at 681-82, 684-85, 689-700.)  The prosecutor conceded that Mark Best "might very well" have been one of the others involved in the murder.  (*Id*., at 705.)

On May 10, 1985, after two and a half days of deliberation, the jury found the plaintiff guilty of second degree murder and first degree robbery.  (56.1 Stmt. ¶ 78.)  They acquitted Williams of the murder, but convicted him of robbery.  (Def. Ex. 20, at 3.)  The plaintiff was sentenced to concurrent, indeterminate prison terms of fifteen years to life for the murder and two to six years for the robbery.  (Def. Ex. 56, at 1.)

**Post-Trial Proceedings**

**Appeal**

The plaintiff, through new counsel, appealed his conviction to the Appellate Division, Second Department, arguing that his trial lawyer was ineffective because he "elicited hearsay testimony from a homicide detective which indicated that a second witness who did not testify at trial saw the defendant stab the victim."  *People v. Greene*, 160 A.D.2d 726, 726 (2d Dep't 1990).  On April 2, 1990, the Second Department affirmed the plaintiff's conviction, finding that Mr. Cohen's actions:

> were consistent with a strategy to supplement the mistaken identification
> defense by suggesting that the police had seized upon an unreliable tip
> made by an individual who was himself a suspect in order to quickly close
> the case.  Under these circumstances, defense counsel's decision to elicit
> testimony regarding this individual 'was at most a mistaken judgment as
> to trial strategy and cannot be characterized as ineffective assistance of
> counsel.'

*Id.*  The Court of Appeals denied the plaintiff leave to appeal this decision on June 19, 1990.  76 N.Y.2d 789 (N.Y. 1990).

The plaintiff also sought habeas corpus relief on the basis of ineffective assistance of counsel, which was denied. *Greene v. Walker*, 205 F.3d 1322 (2d Cir. 1999).

**First 440 Motion**

On April 16, 1991, the plaintiff, through counsel, filed the first of four 440.10 motions to vacate his conviction, claiming that he had newly discovered evidence requiring that his conviction be vacated. (56.1 Stmt. ¶ 80; 56.1 Counterstmt. ¶ 80.) In support of his application, the plaintiff submitted a February 26, 1991 affidavit from Mark Best.[26] (Def. Ex. 50.) In his affidavit, Best swore that while he observed the attack at the subway station, he was not involved in it and was not associated with any of the attackers. (*Id.*, ¶¶ 1-2.) Nevertheless, he claimed, the police picked him up and threatened to charge him with murder. (*Id.*, ¶ 3.) He also asserted that he was placed in a lineup, but was not identified. (*Id.*, ¶ 4.) The police again threatened to charge him with the murder if he did not identify a participant. (*Id.*, ¶ 5.) Because he feared that the police would charge him, and because Detective Norrito promised to get him a job in a laundromat, Best then falsely identified the plaintiff as a participant. (*Id.*, ¶¶ 6-7.) Best claimed that he later told police that he could not say the plaintiff was present at the murder, but that the police told him to "stay with this same story." (*Id.*, ¶ 8.) According to Best, someone named Panama was the real killer. (*Id.*, ¶ 9.)

Judge Pesce held an evidentiary hearing on the motion, at which Mark Best testified. (56.1 Stmt. ¶ 81.) Best, who was incarcerated at the time of the hearing, testified that Detective Norrito and another officer showed him a photograph of the plaintiff, and then punched and kicked him repeatedly until he identified the plaintiff. (Gragg Decl. Ex. 38, at 3, 12-13.) He

---

[26] Mark Best had changed his name to Hasan Best.

claimed that the officers threatened to charge him with murder if he did not identify the plaintiff, and that they also offered him money and a job at a laundromat.[27] (*Id.*, at 13-16.) When Best insisted that he did not know who murdered Mr. Choi, they beat him again and forced him to identify the plaintiff at a lineup. (*Id.*, at 15-16.) Best first claimed that he told the assistant district attorney about the detectives' threats and beatings, but that the A.D.A. "didn't want to hear it;" he then claimed that he did not advise the prosecutor, but told other police officers about what had happened.[28] (*Id.*, at 62, 64, 88.)

Detective Tumbarello also testified. He interviewed Mark Best on June 16, 1983. Best told him that he was at the entrance to the Nostrand Avenue subway station, and saw the plaintiff, whom he knew as Tony Rome, urinating on the landing of the subway stairs. (Gragg Decl., Ex 40, at 4-5.) As two "Orientals" went down the steps, the plaintiff tried to take one of the men's wallets. (*Id.*, at 4.) When the second man ran to the other side of the staircase, the plaintiff and two other men chased him, and the plaintiff stabbed the victim. (*Id.*, at 4-5.) The plaintiff and his accomplices picked up the victim's money and ran. (*Id.*, at 5.) At the precinct, Best identified the plaintiff's photograph, and made the same statement on videotape to an assistant district attorney. (*Id.*, at 5-6.) He did not complain that he was beaten or coerced.[29]

---

[27] Detective Norrito testified at his deposition that he told Mark Best that he suspected that he was a lookout for the crime, as there were things he said that only someone who had participated would know. (Pl. Ex. 10, at 438-39.) He did not recall, however, telling Mark Best that he was going to arrest him and charge him with murder. (*Id.*, at 439.) Detective Norrito denied giving Best a job in a laundromat. (*Id.*, at 440-41.)

[28] Best also testified that Norrito never contacted him again, but that at the time of the trial, he was working in Norrito's laundromat. (Gragg Decl., Ex. 38, at 15-17.)

[29] Ronald Blanding also testified at the hearing, and gave substantially the same testimony that he had given at the plaintiff's trial; the only difference was that he claimed that detectives showed him the plaintiff's picture, not Reginald Greene's. Blanding said that the officers wanted him to identify the plaintiff and Lenny Best, and to record a statement saying that he had seen

(*Id.*, at 6-7.)

On the record at the April 24, 1992 hearing, Judge Pesce denied the motion to vacate, finding that Best's testimony did not meet "very minimal requirements" of credibility. (56.1 Stmt. ¶ 83; 56.1 Counterstmt. ¶ 83; Def. Ex. 52.)

**<u>Second 440 Motion</u>**

The plaintiff filed a second motion to vacate his conviction on June 30, 1992. (56.1 Stmt. ¶ 84; Counterstmt. ¶ 84.) The motion included a new affidavit from Mark Best. (Def. Ex. 53.) This time, Best confessed that he was the one who murdered Mr. Choi on June 14, 1983. (Def. Ex. 53.) He claimed that two days later, Detective Norrito and another detective, "who I have worked for and who I knew would believe me that Cy Greene had committed the crime," questioned him about the crime. (*Id.*) Because he did not want to go to jail, he told detectives and then the prosecutor that the plaintiff committed the murder. (*Id.*)

On November 12, 1993, Judge Pesce denied the motion. (56.1 Stmt. ¶ 86; 56.1 Counterstmt. ¶ 86; Def. Ex. 54.) In his decision, Judge Pesce noted that he had ordered the government to investigate Best's allegations. (Def. Ex. 54, at 2.) The prosecutor reported to Judge Pesce that he had interviewed Best, who said that either the plaintiff or one of his associates forced Best to sign the affidavit; Best told the plaintiff's lawyer the same thing.[30] (*Id.*)

---

them commit the crime. They said that if he did not comply, they were going to pin the murder on him. (Gragg Decl., Ex. 41, at 4-5.) Blanding did not make the statement, nor did he identify the plaintiff as having been involved. (*Id.*, at 6.) Blanding also said that at some point, Detective Norrito was "harassing" him in the hallway outside the courtroom at trial, telling him to say "all different things" on the witness stand. (*Id.*, at 7.) Blanding said that he "changed [his] story," but did not specify how. (*Id.*, at 7-8.) Judge Pesce ultimately struck this testimony, finding that it did not constitute newly discovered evidence. (*Id.*, at 8-10.)

[30] The plaintiff's characterization of this portion of Judge Pesce's decision as "pure hearsay" is somewhat odd, as Judge Pesce was not a witness, but a judge explaining the reasons for his decision. (56.1 Counterstmt. ¶ 85.)

After reviewing the trial transcripts and the plaintiff's first 440 motion, Judge Pesce concluded

that Best's assertions were "without merit." (*Id.*, at 2-3.) He noted that Best had made "a

number of contradictory statements" about the incident, that he was not convinced that Best's

statements were truthful, and that he did not believe they would have significantly altered the

jury's verdict. (*Id.*, at 3.)

Mark Best died sometime in 1996. (56.1 Stmt. ¶ 87; 56.1 Counterstmt. ¶ 87.)

### **Third 440 Motion**

The plaintiff, acting *pro se*, filed a third 440 motion on April 13, 1994. (56.1 Stmt. ¶ 88;

56.1 Counterstmt. ¶ 88.) In connection with this motion, the plaintiff submitted a copy of what

purported to be a "confidential" police document called an "Unusual Occurrence Report

Addendum." (Def. Ex. 56, at 1.) The document had "Detective Norrito" and "67 Hom." typed

on it, and had the following narrative:

> Victim was robbed and stabbed to death by four Hispanic males,
> while entering the Subway Station on Nostrand and Church
> Avenue. Perpetrators fled the scene of Crime in some unknown
> matter [sic]. The victim could have been involved in 'organized
> crime,' the friend of the victim stated 'Mr. Choy told him he owed
> someone a large sum of money for a Business transaction." (*Id.*)

Judge Pesce appointed counsel for the defendant, and ordered a hearing to establish "the nature

and reliability" of the addendum report. (*Id.*) Detective Norrito testified that he did not prepare

the report, and did not direct anyone else to do so. (*Id.*, at 2.) He had never used any such form

during his time at the NYPD, and said that there was no "67 Hom." unit in existence. (*Id.*)

The prosecutor reported that he had made a Freedom of Information Act request seeking

all documents that the police department sent to the defendant, and learned that the document the

plaintiff submitted to the Court was not among them. (*Id.*) Judge Pesce concluded that the

document was a forgery and "unworthy of belief," and therefore did not qualify as *Rosario*

material, *Brady* material, or newly discovered evidence. (*Id.*, at 3.) Accordingly, he denied the motion.

### Fourth 440 Motion

The plaintiff, represented by the law firm Beldock Levine and Hoffman, LLP, filed his fourth 440 motion to vacate his conviction on December 1, 2003. (56.1 Stmt. ¶ 89; 56.1 Counterstmt. ¶ 89.) The basis of this motion was that the prosecution had failed to turn over *Brady* and *Rosario* materials, including the tape recording of Mr. Kim's statement to ADA Sullivan, in which Mr. Kim said that the perpetrator was a "tall guy,"[31] and the statement of the cab driver, Reynold Guerrier, who indicated that the three men in his cab were speaking Spanish. (Def. Ex. 57, at Notice of Motion; Def. Ex. 59, Second Reply Affirmation in Support of Motion to Vacate, ¶ 3.) The plaintiff also argued that he had uncovered new evidence, and that his trial lawyer, Lewis Cohen, was ineffective. (Def. Ex. 20, at 3-4.)

At the hearing on the motion, Abdul Rahman, Ruperto Lindsay, the plaintiff, and Lewis Cohen—the plaintiff's trial lawyer—testified. At the time of the hearing, Mr. Cohen was retired and did not recall much of the trial, which had taken place more than twenty years earlier. (Gragg Decl., Ex. 47.) He recalled that he reviewed the DD5s, and went to the crime scene, where he noted that the token booth was not open. (*Id.*, at 13-14; 57.) He did not call many of the witnesses named in the DD5s, and remembered being concerned about what they would say, and that they might actually inculpate the plaintiff if they testified. He acknowledged, however, that he should have interviewed them. (*See, e.g.*, *id.*, at 17, 19-20, 40.) Mr. Cohen did not recall

---

[31] The plaintiff admitted that the prosecutor turned over the transcript of the interview, which did not have the "tall guy" part of the statement.

whether he received the taped version of Mr. Kim's statement, or if he simply relied on the transcript.[32] (*Id*., at 34-35.)

Ruperto Lindsay, who was serving consecutive sentences totaling more than 25 years to life in prison for murder and attempted murder, testified that he met the plaintiff, whom he knew as Tony Rome, one time in 1985, while both were in Rikers Island. (Gragg Decl., Ex. 48, at 10-11.) Mr. Lindsay claimed that he overheard the plaintiff talking about his case, and realized that the plaintiff must be innocent, because Lindsay knew that the real killers were Panamanian men named Tony and Rodolfo. (*Id*., at 14-16.) Lindsay claimed that on the day of the murder, he saw Tony and Rodolfo running from the train station, and that he saw a man lying on the floor of the subway station. (*Id*., at 36-37.) Two or three weeks later, Rodolfo admitted to Lindsay that he stabbed the man one time. (Gragg Decl., Ex 49, at 36, 39-40.) When he saw the plaintiff at Rikers Island, Lindsay "mentioned" that he knew the plaintiff was innocent, but declined to explain the basis of his knowledge because he did not want "to get involved." (Gragg Decl., Ex.

---

[32] At 2010 depositions, Mr. Cohen testified that he received a transcript of Mr. Kim's taped interview from ADA Kathy Plasner, whom Mr. Cohen described as "a very honorable person." (Gragg Decl., Ex. 19, at 88-89.) Ms. Plasner told Mr. Cohen that the transcript was "authentic," so he "didn't bother to listen" to it. (*Id*., at 88-89.) Had he listened to the tape, the only additional steps he would have taken would have been to "add that one more question to the hundreds I asked about the identification," and mentioned it in his summation, "which I think I did *ad nauseum* with respect to the identification." (*Id*., at 90-91.) He did not agree that he had been intentionally misled with respect to the tape, and said that "[i]t was my error in not having listened to the audio." (*Id*., at 93.) With respect to the detective's notebooks, Mr. Cohen testified that he had "absolutely no recollection" of whether he did or did not receive them. (Gragg Decl., Ex. 23, at 347.) The *Wade* hearing transcript in which Detective Norrito testified that he had a "steno pad" related to the case refreshed Mr. Cohen's memory that at the time of the trial, he knew that Detective Norrito had kept a notebook. (*Id*., at 346.) It would have been his practice to ask for and review the detective's notebooks. (*Id*., at 345-48.)

48, at 15; Gragg Decl., Ex. 49, at 121-23.) Lindsay believed that both Tony and Rodolfo had died sometime in the late 1980s or early 1990s.[33]  (*Id.*, at 140-41.)

The plaintiff testified about his interactions with his attorney, Mr. Cohen, and his efforts to persuade him to take various investigative steps, including interviewing witnesses.  The plaintiff got the DD5s around the time of the *Wade* hearing, (Gragg Decl., Ex. 51, at 23-25), and wanted his lawyer to investigate the information contained in them, including: 1) that detectives were trying to get other people to confess; 2) that witnesses had seen people running from the scene, including one witness who called out, "Oh, you are at it again;" 3) that Abdul Rahman was a witness, and that his home address was in the DD5; 4) that four Spanish speaking men had gotten into a cab, and; 5) that the cab driver's license plate number was listed in the DD5. (Gragg Decl. Ex. 51, at 42, 48, 52, 69-70, 84-85.)

In addition, the plaintiff urged Mr. Cohen to interview Mark Best, whom the plaintiff described as "slow," "easily manipulated," and "semi-retarded."  (Gragg Decl., Ex. 51, at 44-45, 217.)  The plaintiff was convinced that Best would never testify against him because he was a "weak individual."[34]  (*Id.*, at 47.)  When the plaintiff read the DD5 about Mark Best's statement to detectives, the plaintiff urged Mr. Cohen to speak to Lenny Best; the plaintiff told Mr. Cohen that Lenny Best was "apprehended for this crime, too, and jumped out of the police car and got away, and they never went and arrested him again or even questioned him again for this case." (Gragg Decl., Ex. 51 at 26, 35, 37-38, 178, 180-81.)

---

[33] The plaintiff referenced this and other alleged "confessions," in both his 56.1 statement and at oral argument.  However, these "confessions" do not appear to be tethered to any of the plaintiff's actual claims in this action.

[34] The plaintiff claimed that Mark Best decided on his own to confess to the crime in connection with the plaintiff's earlier 440 motion.  (Gragg Decl., Ex. 52, at 216-17.)

The plaintiff told counsel that Jeffrey Davis, whom Best had also identified, could not have participated in the crime because he was in jail at the time. (*Id.*, at 47.) Although he once suspected that Lenny Best was involved, he told Mr. Cohen that Panamanians had committed the crime. (*Id.*, at 59.) The plaintiff wanted Mr. Cohen to talk to people in the neighborhood where the murder occurred. Whenever the plaintiff urged Mr. Cohen to interview a witness or investigate the information in the DD5s, Mr. Cohen answered, "Don't worry about it," or "He's a bum."[35] (Gragg Decl. Ex. 52, at 211-12.)

Judge Pesce issued a written decision granting the plaintiff's motion to set aside the verdict. (Def. Ex. 20.) He rejected Lindsay's testimony, finding that it was "not credible." (*Id.*, at 3.) Nor did he credit the plaintiff's testimony, which he found to be "clearly tailored to meet the demands of the motion;" the only portion of his testimony that was "clearly credible is that he would lie and commit fraud to obtain his release from jail as he had attempted in the previous two motions." (*Id.*) Judge Pesce also rejected the *Brady* claims, finding that "no exculpatory evidence was withheld from former defense counsel. Trial counsel's failure to follow up on documents or information given him by the government does not constitute a *Brady* violation." (*Id.*, at 3-4.) Judge Pesce did, however, find that while Mr. Cohen did do some investigation, his failure even to interview the witnesses named in the DD5s, including Abdul Rahman, was ineffective, especially since Mr. Kim was the only witness to identify the plaintiff. (*Id.*, at 11-12, 16.) The judge also found that Mr. Cohen's failure to listen to the audio tape of Mr. Kim's interview with an ADA was unreasonable, because if he had listened to the tape, he would have

---

[35] The plaintiff conceded that he had created a fake DD5 for the earlier 440.10 motion. The plaintiff came up with the idea after reading an article that described cases in which defendants were getting new trials because they had not been provided with certain police forms. Then, in order to get Mr. Cohen to submit an affidavit, he sent the form to Mr. Cohen with a letter claiming that he had received it from the NYPD in response to a FOIA request. (*Id.*, at 146-57.)

heard that Mr. Kim described the perpetrator as a "tall" person. (*Id.*) The court concluded that two of these shortcomings—the failure to call Abdul Rahman at trial and the decision to rely on the transcript rather than to listen to the tape itself—deprived the plaintiff of a fair trial.

Although there was other evidence of Mr. Kim's varying height descriptions, the judge concluded that the additional description on the tape could have been important in the context of this one witness identification case. (*Id.*, at 12.) For these reasons, on January 4, 2006, Judge Pesce granted the plaintiff's motion to vacate his conviction based on ineffective assistance of counsel. (*Id.*) Judge Pesce's decision was affirmed by the Second Department on February 13, 2007, *People v. Green*, 37 A.D.3d 615 (2d Dep't 2007), and the KCDA's Office dismissed all charges against the plaintiff on June 11, 2008. (56.1 Stmt. ¶ 95.)

## PROCEDURAL HISTORY

The plaintiff initiated this civil rights action on January 16, 2008, alleging false arrest, malicious prosecution, suppression of exculpatory evidence, conspiracy to suppress exculpatory evidence, racially motivated conduct, negligent hiring and training by the Kings County District Attorney's Office, and *Monell* violations. Early in the litigation, the defendants filed a third-party complaint seeking contribution in the plaintiff's case against them from Mr. Cohen, alleging that the plaintiff's injuries, if any, were caused by the intentional or negligent actions of Mr. Cohen in representing the plaintiff at his criminal trial. (ECF 39.) The Honorable Raymond J. Dearie dismissed the third-party complaint on May 12, 2010, (ECF 104, modified at ECF 134), and the parties continued with discovery.[36] Through the course of discovery, the parties took at least 30 depositions and exchanged more than 40,000 pages of documents. (ECF 245, at 1.) After the close of discovery, the defendants moved for summary judgment on all counts of the

---

[36] This case was reassigned to me on November 16, 2015.

complaint. As I explain below, the defendants' motion is granted, and the plaintiff's complaint is dismissed in its entirety.

## DISCUSSION

The theme of actual innocence is prominent in the plaintiff's suit against the defendants. In the more than thirty years since his conviction, the plaintiff repeatedly tried in multiple state court proceedings to undo that conviction, insisting at every turn that he did not kill John Choi. Judge Michael Pesce, who presided over the trial and every one of the post-judgment proceedings with painstaking attention to detail and a thorough understanding of the factual record, observed on many occasions that he thought that the evidence against the plaintiff was weak; while he declined to interfere with the jury's verdict, he imposed the minimum sentence, and wrote to the Parole Board on the plaintiff's behalf. And, in the final post judgment hearing, the nature of the evidence was a key factor in his finding that the plaintiff's lawyer had rendered ineffective assistance of counsel, entitling the plaintiff to a new trial.

The issue in this venue, however—a federal lawsuit for monetary damages—is not guilt or innocence, as it was in the state criminal proceedings; rather, the question is whether the plaintiff has raised an issue of fact about whether the defendants deprived him of certain rights in connection with his arrest and the trial. The plaintiff might very well be innocent of Mr. Choi's murder. I express no opinion on that question. The only issue before me is whether he has raised an issue of fact that the defendants did something to deprive him of his rights.

## I.     Standard of Review

A district court may grant a motion for summary judgment if the submissions of the parties—in the form of affidavits, deposition transcripts, or other documentation—taken together show that there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a) & (c); *see*

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In deciding whether there is a genuine dispute as to a material fact, the court is not to evaluate credibility, and must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *see also Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.")

Once the moving party has met its burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). In other words, the party opposing summary judgment may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Nor is a mere "scintilla of evidence in support of the [non-movant's] position" adequate. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). On the other hand, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the court must deny the request for judgment as a matter of law. *Anderson*, 477 U.S. at 248.

## II.    Analysis

The plaintiff's complaint asserts a host of claims, the factual bases of which are not always clear. In some instances, the plaintiff asserts a claim, and instead of focusing on facts

related to that particular claim, tosses in every allegation he makes for every other claim, without regard to the nature or elements of the claim.  For example, in his false arrest claim, the plaintiff references events occurring after the arrest, and even cites the results of a DNA analysis that occurred years later,[37] none of which is relevant to an evaluation of what the detectives knew when they arrested the plaintiff.  Equally confounding, the plaintiff frequently builds arguments on a nonexistent or misinterpreted record, which, as noted earlier, requires the court to go through almost every page of this voluminous record.  Nonetheless, the Court considers each of the plaintiff's claims and any supporting evidence, and the defendants' asserted grounds for summary judgment, below.

a)       § 1983 Claims

The plaintiff asserts several constitutional claims pursuant to Section 1983, including false arrest, malicious prosecution, and denial of a fair trial.  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks and citation omitted).  While federal courts look to state law to determine the elements of a particular claim arising under Section 1983, it is the violation of the constitutional right that is actionable under Section 1983.  *Morse v. Spitzer*, No. 07-cv-4793-CBA-RML, 2012 WL 3202963, at *2 (E.D.N.Y. Aug. 3, 2012) (citations omitted).  Thus, the court must identify the specific constitutional right allegedly infringed before evaluating a claim under Section 1983.  *Id.* (quoting *Albright*, 510 U.S. at 271).

---

[37] It is not even apparent that DNA analysis was available in 1983, when the plaintiff was arrested.

## 1. False Arrest

A Section 1983 claim for false arrest rests on an individual's Fourth Amendment right to be free from unreasonable seizures, including arrests without probable cause. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see also Williams v. City of Mount Vernon*, 428 F.Supp.2d 146, 154 (S.D.N.Y. 2006) ("It is well established that an arrest without probable cause is a constitutional violation.") "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Williams*, 428 F.Supp.2d at 154 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n. 9 (1979)). To state a claim for false arrest under Section 1983 or New York law, a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (internal citation omitted); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law.") (citing *Weyant*, 101 F.3d at 852). Probable cause is a complete defense to a false arrest action. *Weyant*, 101 F.3d at 852 (internal citation omitted).

### a) Statute of Limitations

The defendants contend that the plaintiff's false arrest and imprisonment claims are barred by the three-year statute of limitations applicable to Section 1983 actions arising in New York.[38] *Melendez v. Greiner*, 477 F. App'x 801, 803 (2d Cir. 2012). Although state law governs

---

[38] In New York, "claims of false arrest are synonymous with those of false imprisonment." *Williams*, 428 F.Supp.2d at 157 (internal citations omitted).

the length of the statute of limitations, federal law governs the accrual of a Section 1983 claim; for false arrest and imprisonment claims, the statute of limitations begins to run "when the alleged false imprisonment ends." *Wallace v. Kato*, 549 U.S. 384, 388-89 (2007). In turn, a false imprisonment ends when the plaintiff becomes held pursuant to legal process—"when, for example he is bound over by a magistrate or arraigned on charges." *Id.*, at 389. Here, there is no dispute that the plaintiff was arrested on June 21, 1983, indicted by a grand jury on June 24, 1983, and arraigned on July 6, 1983. The plaintiff was therefore held pursuant to legal process by July of 1983, at the latest. There is also no dispute that he did not file this action until 2008, more than twenty-five years later, well beyond the statute of limitations.

In an effort to avoid this result, the plaintiff cites *Heck v. Humphrey*, 512 U.S. 477 (1994), for the proposition that his claim did not actually accrue until 2007, when the state court vacated his conviction on the ground that his attorney was ineffective. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Dated April 5, 2016 ("Pl. Mem."), at 16-17.) The Supreme Court explicitly rejected this interpretation of *Heck*, however, in *Wallace v. Kato*, 549 U.S. 384. In that case, Wallace was arrested for murder in 1994; his conviction was overturned in 2001. *Id.* at 386-87. Wallace claimed that his April 2, 2003 Section 1983 action alleging false arrest, among other things, was timely because his claim did not begin to accrue until his conviction was overturned. *Id.* at 387.

Observing that it was "not disposed to embrace this bizarre extension of *Heck*," the Court declined to "adopt[] . . . a principle that goes well beyond *Heck*: that an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." *Id.* at 393. Instead, the Court held that the statute of limitations on Wallace's Section 1983 false arrest claim "commenced to run when he appeared before the examining magistrate

and was bound over for trial," and not when his eventual conviction was overturned. *Id.* at 391; *see also Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015) ("*Heck* only comes into play potentially to delay accrual of an action when a resolution of that action in a plaintiff's favor could not be reconciled with an extant criminal conviction.")[39] As for Wallace's contention that he could not file a false arrest claim before he was convicted, the Court observed that "it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended." *Id.* at 393-94.

Moreover, the Court found that even where a Section 1983 cause of action accrues before a conviction is set aside, the statute of limitations is not tolled during that time period. *Id.* at 394-95; *see also Smith*, 782 F.3d at 101 ("Nor does the *Heck* rule operate as a toll on the statute of limitations when a criminal conviction that would be impugned by a § 1983 action occurs after the accrual of the § 1983 action.") The plaintiff's argument that equitable tolling should apply to his case because his lawyer was determined to be ineffective is not persuasive. The state court determined that the plaintiff's counsel was ineffective not as a general matter, but because counsel failed to take discrete steps that were significant in the context of the case. The plaintiff does not explain how counsel prevented him from filing his false arrest claim within the limitations period. Under these circumstances, the plaintiff is not entitled to equitable tolling of the statute of limitations.

As the Second Circuit has made clear, the *Wallace* decision applies retroactively.

---

[39] The Court also specifically rejected Wallace's contention that "the initial Fourth Amendment violation set the wheels in motion for his subsequent conviction and detention," explaining that at common law, "damages for detention after issuance of process or arraignment would be attributable to a tort other than the unlawful arrest alleged in petitioner's complaint—and probably a tort chargeable to defendants other than the respondents here." *Wallace*, 512 U.S. at 391.

*Mallard v. Potenza*, 376 F. App'x 132, 133 (2d Cir. 2010) ("Mallard's contention that *Wallace* does not have retroactive effect is belied by *Wallace* itself, which applied its holding to the parties in that case.")  Therefore, the plaintiff's claims for false arrest and imprisonment began to accrue when he was arraigned in 1983, and his false arrest claims filed in 2008 are well beyond the statute of limitations and are dismissed.  *See McCloud v. Cutler*, No. 06-cv-5443, 2008 WL 906701, at *1 (E.D.N.Y Apr. 3, 2008) (adopting Report and Recommendation) (plaintiff's false imprisonment claim was untimely, as it "accrued from the moment he was re-incarcerated, more than three years before he brought this action."); *Forbes v. City of New York*, 15-cv-3458, 2016 WL 6269602, at *3 (S.D.N.Y. Oct. 26, 2016) (dismissing plaintiff's false arrest claims as untimely where plaintiff's complaint was filed more than three years after he was arraigned); *Hadid v. City of New York*, No. 15-cv-19, 2015 WL 7734098, at *4 (E.D.N.Y. Nov. 30, 2015) ("Plaintiff's false arrest claim, like that in *Wallace*, is not subject to *Heck* tolling.").

### b)      Substantive False Arrest Claims

Even if his claims of false arrest and imprisonment were not time-barred, the plaintiff still has not raised a genuine issue of material fact that would allow him to take these claims to a jury.

Probable cause to arrest is a complete defense to an action for false arrest brought under New York law or Section 1983, even if the plaintiff is ultimately acquitted or the case is dismissed.  *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Weyant*, 101 F.3d at 852); *Gonzalez*, 728 F.3d at 155 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or § 1983.") (internal citations and quotation marks omitted); *see also Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)), *aff'd* 539 F. App'x 17 (2d Cir. 2013).  A police officer has probable cause to arrest when she has "knowledge or

reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Candelario v. City of New York*, No. 12-cv-1206, 2013 WL 1339102, at *4 (S.D.N.Y. Apr. 3, 2016) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "Probable cause is not a particularly demanding standard." *Chodkowski v. City of New York*, No. 06-cv-7120-LBS, 2007 WL 2717872, at *4 (S.D.N.Y. Sept. 11, 2007) (quoting *United States v. Solomonyan*, 452 F.Supp.2d 334, 343 (S.D.N.Y. 2006)).

In determining whether probable cause existed at the time of the arrest, the Court assesses "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (citation omitted). Probable cause does not require that an officer have absolute certainty that a suspect is guilty; for that reason, the reviewing court must "consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted). While an officer may not ignore "plainly exculpatory evidence," a court must consider the "totality of the circumstances" surrounding the arrest; probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Panetta*, 460 F.3d at 395 (internal citations and quotation marks omitted).

Moreover, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Id.* at 395 (internal quotation marks and citations omitted); *Thomas v. Culberg*, 741 F. Supp. 77, 80 (S.D.N.Y. 1990) ("Officers have probable cause to arrest if they receive information from some person—normally the putative victim or eyewitness—who it seems reasonable to believe is telling the truth.")

(quoting *Daniels v. United States*, 393 F.3d 359, 361 (D.C. Cir. 1998) (internal quotation marks omitted)).

Here, there is no dispute that Mark Best, who claimed to have been an eyewitness to the killing, told Detective Norrito that he saw someone whom he knew as "Tony Rome" rob and murder John Choi. His account of the crime was similar to that provided by Mr. Choi's friend, and another eyewitness, Jae Hark Kim. Detective Norrito showed Best a photo array; Best picked the plaintiff's photo out of the array, and gave the plaintiff's home address. On its own, Best's identification gave the police probable cause to arrest the plaintiff.

The plaintiff claims, however, that Best's identification was not credible. He argues that the detectives forced Best to identify the plaintiff, presumably because Best's brother, Lenny Best, "escaped," not from the defendants, but from two uniformed police officers. The plaintiff also says that Best's identification could not be the predicate for an arrest because Best might have also been a participant in the crime. In addition, the plaintiff cites variance discrepancies in the evidence, which he claims should have alerted the detectives that they did not have probable cause to arrest the plaintiff.

The chief difficulty with the plaintiff's claims about Mark Best is that there is no admissible evidence to support them. There is no dispute that Mark Best has died, and is obviously unavailable to testify. His affidavits are hearsay, and his testimony before Judge Pesce is inadmissible. *O'Brien v. City of Yonkers*, No. 07-cv-3974, 2013 WL 1234966, at *7 (S.D.N.Y. Mar. 22, 2013) (adopting Report and Recommendation) ("Testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay.") (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219–20 (2d Cir. 2004)). There is no hearsay exception that applies to Best's testimony. It is not admissible under the "former hearsay"

exception set forth in Federal Rule of Evidence 804(b)(1), because the defendants against whom the testimony would be offered were not parties in the state post-trial proceedings. *See United States v. Amato*, No. 03-cr-1382, 2006 WL 1788190, at *1-3 (E.D.N.Y. June 26, 2006); *O'Brien*, 2013 WL 1234966, at *7 (noting that defendant officers in a § 1983 action "were not parties to the prior criminal proceeding"); *Annunziata v. City of New York*, No. 06-cv-7637, 2008 WL 2229903, at *8 (S.D.N.Y. May 28, 2008) ("[T]he prosecutor in plaintiff's criminal trial (the Kings County District Attorney's Office) and the defendants in the instant action (the City of New York and Detective Henn) are not the same parties, nor are they in privity with each other.").[40]

Ronald Blanding's testimony does not change this result. Of course, while Blanding, who is the plaintiff's cousin, did say at the trial that detectives pressured him to identify the plaintiff's brother, a claim that he refined at his deposition by saying that they pressured him to name the plaintiff, Blanding consistently testified that he refused to identify anyone. And more importantly, Blanding's statements have nothing to do with Mark Best.[41]

Nor does Joseph Ross's deposition testimony alter this result, because Ross confirmed that he told detectives that Mark Best was in the area of the murder not long before it happened. Ross admitted that he told detectives that he and Mark Best were together on June 14, 1983, near the subway station at about 4:00 p.m., and that he left Mark Best at that location at 4:10 p.m.

---

[40] Nor would Leonard Best be permitted to testify about his brother's statements, as that evidence is hearsay.

[41] The logic of the plaintiff's theory that the detectives forced Mark Best to identify the plaintiff in order to get back at Lenny Best, who "escaped" other officers, is not immediately apparent; in any event, this theory cannot be explained to a jury without the inadmissible evidence of Mark Best's hearsay statements.

The only detail that Ross denied was that he told detectives to question Best because he saw what happened.  (Gragg Decl., Ex. 17, at 246-47, 263-64, 286, 290-91.)   However, detectives questioned people identified as having been in the vicinity of the stabbing; thus, Ross's information, even without the suggestion that detectives should talk to him, led the detectives to Mark Best.

The plaintiff also claims that the detectives knew that Mark Best's credibility was questionable, for two somewhat inconsistent reasons.[42]  First, he says that Best's account was too similar to Mr. Kim's account, which suggests that Best must have participated in the crime; on the other hand, the plaintiff says that Best's account differed from Kim's in "several critical ways."  (56.1 Counterstmt. ¶¶ 279-287.)  To the extent that the detectives suspected that Best was a participant, they were not required to discount what he said.  Indeed, Detective Norrito said that the fact that Best's account was corroborated by what Mr. Kim said added credibility to Best's statement.[43]

Moreover, differences between Best's and Kim's descriptions do not defeat probable cause for the plaintiff's arrest.  *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (conflicting accounts of arrestee and two eyewitnesses did not defeat probable cause); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (officers had probable cause for arrest even

---

[42] The plaintiff mischaracterizes the detectives' testimony as to their beliefs.  For example, the plaintiff claims that Detective Tumbarello now "wholly admits that there was likely not probable cause for Greene's arrest."  (Pl. Mem., at 5.)  Detective Tumbarello did not testify that he believed that there was not probable cause for the plaintiff's arrest; rather, he testified that he "possibly" would have brought in more eyewitnesses to view a lineup before charging the plaintiff with the crime.  (Pl. Ex. 10, at 410-11.)

[43] At his January 9, 2009 deposition, Norrito testified that although he had "serious, serious" reservations about Mark Best, "his description of what transpired was perfect."  (Def. Ex. 7, at 214.)

though victim and arrestee offered differing accounts of the crime); *Crews v. Cty. of Nassau*, 996 F.Supp.2d 186, 205 (E.D.N.Y.) ("The Second Circuit has held consistently that conflicting accounts of a crime do not vitiate the probable cause established by an eyewitness identification or alleged victim of a crime.").

None of the other discrepancies the plaintiff cites affect the determination of probable cause; these include the height descriptions, which did not match the plaintiff, and the existence of other suspects, including the men who got into Guerrier's taxi. It is not the job of investigating officers to determine whether a suspect's guilt can be proved beyond a reasonable doubt. Nor are they required to pursue every possible avenue of investigation before making an arrest. *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior to be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity."); *Gisondi v. Harrison,* 72 N.Y.2d 280, 284-85 (N.Y. 1988) ("[T]he police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it.")

Police officers do not "sit as prosecutor, judge or jury;" their job is "to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause*, 887 F.2d at 372. At a minimum, even if the officers did harbor some doubts as to Mark Best's credibility or the accuracy of the identification, they would be protected by qualified immunity, because Best's identification provided arguable probable cause to arrest the plaintiff.[44] *Ackerson*, 702 F.3d at 21 ("An arresting officer is entitled to qualified immunity even when, as in

---

[44] The lineups, the forensic tests, and the supposed "secret deal" between prosecutors and Best are all post-arrest issues, and could not have affected the probable cause determination.

this case, probable cause to arrest does not exist, 'if he can establish that there was 'arguable probable cause' to arrest.") (internal citation omitted).

### 2. Malicious Prosecution

In order to prevail on a Section 1983 malicious prosecution claim, the plaintiff must demonstrate a violation of his rights under the Fourth Amendment, and must establish the elements of a state law malicious prosecution claim. *Manganiello v. City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted). To establish a claim of malicious prosecution under New York law, a plaintiff must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* (citations omitted). "Because 'accusers must be allowed room for benign misjudgments,' the New York Court of Appeals has held that the law 'places a heavy burden on malicious prosecution plaintiffs. . . .'." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (quoting *Smith–Hunter v. Harvey,* 95 N.Y.2d 191, 195 (2000)).

Probable cause to prosecute requires "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant." *Nnodimele v. Derienzo*, No. 13-cv-3461, 2016 WL 337751, at *7 (E.D.N.Y. Jan. 27, 2016) (quoting *Rounseville v. Zahl,* 13 F.3d 625, 629 (2d Cir. 1994)). If the evidence permits a reasonable belief that a prosecution against the defendant "could succeed," a malicious prosecution claim cannot survive summary judgment. *Nnodimele*, 2016 WL 337751, at *7 (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

The plaintiff plainly meets the first two elements of a malicious prosecution claim: (1) a criminal proceeding was initiated and continued against him; and (2) the proceedings ultimately

terminated in his favor. The parties' dispute centers on whether there was probable cause to prosecute the plaintiff and whether the defendants were motivated by "actual malice."

The plaintiff was indicted by a grand jury on June 24, 1983 for the murder and robbery of Mr. Choi. A grand jury indictment creates a presumption of probable cause. *Savino*, 331 F.3d at 73. A plaintiff can only overcome this presumption "by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Nnodimele*, 2016 WL 337751, at *7 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013)). More specifically, "[t]he presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented and falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283. "Even then," however, "'the existence of probable cause independent of the allegedly falsified evidence is a defense' to a malicious prosecution claim." *Maldonado v. City of New York*, No. 11-cv-3514, 2014 WL 787814, at *8 (S.D.N.Y. Feb. 26, 2014) (quoting *Morse v. Spitzer*, No. 07-cv-4793, 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012)).

The plaintiff bears the burden of proof to rebut the presumption created by the grand jury indictment, and must provide more than "mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73 (internal citation omitted). In addition, "[t]he burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially[.]'" *Maldonado*, 2014 WL 787814, at *8 (quoting *Rothstein*, 373 F.3d at 284 (2d Cir. 2004)). The Second Circuit has "set forth a 'competing testimony plus' standard

to assess whether a plaintiff has sufficiently rebutted the presumption of probable cause." *Maldonado*, 2014 WL 787814, at *8 (internal citation omitted). This "'plus factor' consists of evidence corroborating the plaintiff's story and suggesting misconduct in the procurement of the indictment." *Id*.

In other words, the plaintiff must establish some connection between the alleged falsification of evidence and the procurement of the indictment. *Rothstein*, 373 F.3d at 275 ("The grand jury's . . . indictment presumptively established . . . probable cause. [The plaintiff] was required to rebut that presumption by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*.") (emphasis added); *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000) ("For example, in Zahrey's case, his liberty was not impaired until, after the evidence was both fabricated *and used by introducing it in evidence before the grand jury*, an indictment was later returned and Zahrey was later arrested.") (emphasis added); *Colon v. City of New York*, 468 N.Y.S.2d 453, 455 (N.Y. 1983) ("If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.").

Here, only two witnesses testified before the grand jury: Jae Hark Kim and Detective Norrito. While the plaintiff submitted portions of Mr. Kim's grand jury testimony, the record does not include any of Detective Norrito's grand jury testimony. Under these circumstances, the plaintiff has not pointed to anything in Detective Norrito's grand jury testimony that could rebut the presumption of probable cause arising from the indictment. *See Rothstein*, 373 F.3d at 284 (presumption of probable cause created by grand jury indictment not rebutted where the content of cooperator's grand jury testimony was unknown, and the plaintiff's sole basis for arguing that the presumption was rebutted was that the cooperator "testified in the grand jury,

and therefore the indictment must have been procured by perjury."); *see also Frederick v. New York City*, No. 11-cv-469, 2012 WL 4947806, at *9 (S.D.N.Y. Oct. 11, 2012) ("*Rothstein* set a high bar for malicious prosecution claims in cases where a grand jury issued an indictment. In effect, it requires plaintiffs to prove what happened before the grand jury to negate probable cause.") And, Detective Tumbarello did not testify in the grand jury proceeding. *Bertuglia v. City of New York*, 133 F.Supp.3d 608, 627–28 (S.D.N.Y. 2015) ("With respect to whether Schaffler lied to the grand jury, it is undisputed that Schaffler did not testify before the grand jury and thus, it was impossible for him to have presented false testimony to the grand jury.").

Even if the plaintiff had established what happened before the grand jury, however, he has not raised an issue of fact as to whether the defendant detectives provided "a complete and full statement of facts" to the DA, "misrepresented or falsified evidence," "withheld evidence, or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283. While the plaintiff does level a number of accusations against the named defendants and the various prosecutors involved in the case, the accusations have almost no factual content. The following excerpt from the plaintiff's brief makes the point: "Seeing how neither detective now wants to take ownership of the egregious violations of Plaintiff's rights, it is entirely possible that ADAs Sullivan, Kallen, and Greene were never informed about all the fabrications and secretions [sic], and the unduly suggestive procedures that were used during lineup and interrogations." (Pl. Mem., at 22.) A second example: "[B]ased on the egregious *Brady/Rosario* violations by the ADAs and the KCDA, it is more than likely that the latter knew of the fabrications and tainted lineup, but they did not care because of the KCDA's 'win at all costs' mentality." (*Id.*) The plaintiff does not specify what it is that the detectives are alleged to have told the prosecutors before the case was presented to the grand jury, or what information they provided to them. This type of conjecture

and surmise is insufficient to rebut the presumption of probable cause that arises from a grand jury indictment. *Savino,* 331 F.3d at 73 (internal citation omitted).

The same problems underlie the plaintiff's assertions that the detectives falsified and withheld evidence. For example, the plaintiff argues that Mr. Kim saw him in a holding cell before the lineup; the plaintiff cites his testimony at the suppression hearing that an "oriental" man was walking back and forth in front of the cell, looking at them. At his deposition, the plaintiff conceded that he did not know if this man was Mr. Kim. (ECF 294-1, at 244-45.) But even assuming that Mr. Kim saw the plaintiff prior to the lineup, there is no allegation or evidence that either Detective Norrito or Tumbarello had anything to do with it. It is well-settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir. 2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006)); *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (same); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir. 1986) (same). Since the plaintiff has alleged no personal involvement by either individual defendant, his claim must fail.[45]

As for the lineup itself, the plaintiff complains that the fact that all participants were seated was unfair to him. There is, however, no record of the fillers' heights. The record also shows that while the lineup participants were seated when Mr. Kim first came into the room, he asked that they stand and turn before he made his identification.

The plaintiff also argues that "the undisclosed relationship between Detective Norrito and Mark Best is extraordinarily significant." (Pl. Mem., at 14.) The plaintiff points to Ronald

---

[45] At the *Wade* hearing, the plaintiff's co-defendant, Larry Williams, told a somewhat similar story, albeit with a significantly different description of the "oriental" man. The co-defendant was not deposed in connection with this proceeding.

Blanding's claim at trial that the detectives threatened him, and his post-conviction claim that detectives wanted him to identify the plaintiff, which Blanding refused to do. (Pl. Mem., at 7.) The plaintiff also points to Joseph Ross's denial in a deposition that he told police officers that Mark Best witnessed the murder. (*Id.*)

There are multiple problems with these claims. First, as noted, Norrito's testimony before the grand jury is not part of the record on summary judgment; the Court has no information about the substance of his testimony. *See Rothstein*, 373 F.3d at 284 (finding argument that "Carriere testified in the grand jury, and therefore the indictment must have been procured by fraud" to be baseless where "the content of Carriere's grand jury testimony is unknown, as is the content of rest of the government's presentation.")

Further, none of the witnesses the plaintiff cites—Blanding, Ross, or Best—testified before the grand jury. In other words, the plaintiff has made no connection between the defendants' allegedly coercive conduct toward witnesses and the indictment. *Id.* at 275 ("Rothstein's cause of action is for malicious *prosecution,* not for maliciously making false statements to law enforcement authorities."); *Zahrey*, 221 F.3d at 352 ("Zahrey's . . . liberty was not impaired until, after the evidence was both fabricated *and used by introducing it in evidence before the grand jury*, an indictment was later returned and Zahrey was later arrested.") (emphasis added); *Colon*, 468 N.Y.S.2d at 455 ("If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.").

These allegations therefore do not form the basis of a claim for malicious prosecution against the detectives.[46]

The plaintiff also relies on Abdul Rahman's testimony at one of the post-conviction hearings that the assailants were 5'8" tall, and from this, argues that Detective Norrito must have falsified information on his DD5. (Pl. Mem., at 13.) First, Rahman did not testify in the grand jury, nor is there any evidence that he was mentioned in the grand jury. Second, the plaintiff mischaracterizes Rahman's testimony. As the hearing transcript makes plain, Rahman did not deny telling detectives in 1983 that the perpetrators were all about 5'8" tall; rather, he testified that "sit[ting] here today"—at a March 25, 2005 hearing—he would not give that description. (Pl. Ex. 4.) Therefore, aside from the fact that he did not testify in the grand jury, Rahman's testimony does not raise a material issue of fact as to whether Norrito or Tumbarello fabricated any evidence.

Finally, the plaintiff claims that prosecutors withheld *Brady* and *Rosario* material from defense counsel, and that "prosecutors and police did all that they could do" to conceal Mr. Kim's "tall guy" description from the plaintiff. (Pl. Mem., at 13.) However, as discussed in Section II(A)(4) below, the summary judgment record does not raise an issue of material fact as to these claims.

In sum, the plaintiff has failed to raise evidence sufficient to rebut the presumption of probable cause created by the grand jury indictment. At a minimum, Detectives Norrito and Tumbarello, to the extent that they were even involved in the prosecution of the plaintiff, are

---

[46] Moreover, even if Best had testified before the grand jury—and he did not—the plaintiff has no admissible evidence that he was coerced to identify the plaintiff, which the plaintiff appears to concede.

protected by qualified immunity.  The defendants' motion for summary judgment as to the plaintiff's malicious prosecution claims under both federal and New York state law is granted.

### 3.    Fair Trial

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights."  *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016).  A detective denies a defendant a fair trial when he generates "false information likely to influence a jury's decision and forwards that information to prosecutors."  *Id.* (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)); *see also Victory v. Pataki*, 814 F.3d 47, 64 (2d Cir. 2016) ("[W]e have held that Section 1983 liability attaches for knowingly falsifying evidence even where there simultaneously exists a lawful basis for a deprivation of liberty."); *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016) ("In particular, the requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim.").  Additionally, a fair trial claim may arise if "police or prosecutors withhold material exculpatory or impeaching evidence from a defendant."  *Fappiano*, 640 F. App'x at 118.  Probable cause is not a defense to a fair trial claim.  *Jovanovic v. City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012).

The plaintiff's fair trial claims are not especially clear, since he does little more than cite to a large swath of his 56.1 counterstatement, which, as noted above, is frequently merely argument that is unsupported by the record.  (Pl. Mem., at 29-30.)  Nevertheless, to the extent that his allegations can be gleaned from his 56.1 Counterstatement, he seems to claim that: (1) Norrito purposefully and falsely reported that Eric Head identified Eric Tisdale rather than Lenny Best as a participant in the crime (56.1 Counterstmt. ¶¶ 232-253); (2) Norrito falsely

testified at trial that the men fleeing from Guerrier's cab were not involved in the crime (*id.*, ¶¶ 254-265); and (3) Norrito falsely testified at his deposition that Mark Best had undergone a polygraph test. (*Id.*, ¶¶ 293-300.) The plaintiff also claims that "a tremendous number of *Brady/Rosario* violations" underlie his fair trial claim. (Pl. Mem., at 30.)

The Court first considers the plaintiff's claim that Norrito purposefully substituted Eric Tisdale for Lenny Best as one of the people that Eric Head identified from the photographic array. The only basis for this claim is a comparison of one of Norrito's DD5s with Tumbarello's notebook entry regarding Head's identification; Norrito's DD5 says that Head identified "Joseph Ross, Ronald Blanding, and Eric Tisdale," while Tumbarello wrote that Head identified "Joseph Ross, Ronald Blanding, and Lenny Best." (56.1 Counterstmt. ¶ 237.) The plaintiff points to no evidence, however, that the discrepancy—assuming there is one—between Norrito's inclusion of Eric Tisdale in the DD5 and Tumbarello's inclusion of Lenny Best in his notebook is actually a deliberate "falsification" of evidence.[47] In fact, as the plaintiff points out, Norrito's notebook did

---

[47] The plaintiff's 56.1 Counterstatement on this issue is decidedly unhelpful. In one portion, rather than cite to record evidence, the plaintiff poses a series of rhetorical questions, and then posits an answer:

> Why would Norrito misrepresent the fact that the third individual identified was not 'Lenny Best,' when Tumbarello's handwritten notations, made contemporaneously with the identifications, is surely correct? Why would Norrito ultimately deem Head an 'unreliable' eyewitness, for no apparent reason, other than his claim that Head identified 'Eric Tisdale' (Lenny Best) who was discovered to be in jail at the time of the Choi murder? Answer, Norrito continued his misrepresentation and lie about the third identification up to and through trial to protect Mark Best and Lenny Best (and another unidentified 'confidential informant.

(56.1 Counterstmt. ¶ 239.) This purported statement of "fact" highlights the speculative nature of the plaintiff's fair trial claim.

include Lenny Best's name in an entry that corresponds to the time that Eric Head's interview concluded. (56.1 Counterstmt. ¶ 241; Def. Ex. 14, at CG 004028.) The claim that Norrito falsified evidence, whereas Tumbarello's notebook notation is "surely correct," is sheer speculation, and does not create a material issue of fact for trial.[48] *See Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 473–74 (S.D.N.Y. 2003), *aff'd* by 426 F.3d 549 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (to survive summary judgment, a plaintiff must produce admissible evidence to support her pleadings, and "may not rely on conclusory allegations or unsubstantiated speculation."). Additionally, it is clear that the prosecutors had the DD5 of Eric Head's interview, as well as both detectives' notebooks, and were aware of the difference in potential perpetrators that each one identified. (*See* 56.1 Counterstmt. ¶¶ 245-47.) Under these circumstances, the plaintiff has not pointed to evidence that Norrito provided misleading information to prosecutors.

Second, the plaintiff claims that Norrito lied at trial when he testified, in response to a question by the plaintiff's counsel, that he did not think that the men who got into Guerrier's cab were involved in the crime.[49] First, a detective's opinion about who was or was not involved in a crime is not susceptible to being characterized as true or false, since it is an opinion. The question is whether the jury had the facts on which the detective's opinion was based; the record shows that it did.

---

[48] Further, in his interview with ADA Sullivan, Best ultimately stated that there were four men involved in the crime. (*Id.*, at 5.)

[49] In his 56.1 Counterstatement, the plaintiff appears to claim that Norrito lied at trial when he testified that he did not interview the cab driver. (56.1 Counterstmt. ¶ 255.) The record does not support that conclusion. As the DD5 itself reflects, Detective Herlihy interviewed Guerrier— which came out at trial—and an account of an interview with Guerrier appears in Tumbarello's notebook, not Norrito's. (*See* Def. Ex. 28; Def. Ex. 5, at CG002383; Def. Ex. 14.) There is no evidence in the record to suggest that Norrito participated in any interview of Guerrier.

In any event, the plaintiff's claim is premised on purported items of "circumstantial evidence" that do not raise a genuine issue of material fact. The plaintiff cites the following: Lenny Best's deposition testimony—thirty years after the trial—that he knew who the real perpetrators were, and that two of them were Panamanians; that Norrito admitted in his deposition that two of the people he interviewed were Panamanian; and that Norrito did not create a DD5 of his interviews with the people in Guerrier's cab. (56.1 Counterstmt. ¶¶ 262-265; 310.) None of these details, however, creates a genuine issue of material fact that Norrito lied to prosecutors or at trial when he said that he believed that the occupants in the taxi were not part of the murder.[50] Rather, the plaintiff's claim is grounded in speculation and is insufficient to survive a motion for summary judgment.[51]

The plaintiff also claims that Detective Norrito lied at his 2009 deposition when he claimed that Mark Best took a polygraph test. Even if this were a lie rather than a failure of memory, it has nothing to do with the plaintiff's 1985 prosecution. There is no evidence that Norrito said anything about a polygraph at the plaintiff's trial. It therefore cannot be "false information" that would be likely to "influence a jury's decision." *Garnett*, at 838 F.3d at 280.

---

[50] Moreover, almost all of these details—excepting Lenny Best's opinion—were available to defense counsel and were made known to the jury at trial. The detective's opinion as to whether the men in the cab were involved was no more relevant than his opinion that the plaintiff was involved in the crime would have been.

[51] *See, e.g.*, 56.1 Counterstmt. ¶ 260 ("Significantly, after passing on this misinformation [about the confidential informant], Norrito never revealed who that 'confidential informant' was who provided that misinformation about who was in Guerrier's cab and where they were headed or, much more importantly, 'who got into that cab.'"); *see also id.* ¶ 321 ("The involvement of the Panamanians also shows that Norrito totally fabricated a story about these men rushing to the hospital because of an alleged 'miscarriage' – to disguise the identities of the Panamanians in Guerrier's cab. Only Norrito knows why he would fail to file a DD5 identifying those Panamanians and what they said to him when he interviewed them (to protect his informant and his crew?).")

Finally, as will be discussed in Section III(A), below, the plaintiff has not pointed to any non-speculative evidence that could allow his *Brady* and *Rosario* claims to survive the defendants' motion for summary judgment. For these reasons, the defendants' motion for summary judgment on the plaintiff's fair trial claims is granted.

### 4. *Brady* and *Rosario* Claims

The plaintiff contends that prosecutors and detectives withheld certain evidence that they were required to disclose to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963),[52] including, among other things, (1) a recording of Kim's statement to ADA Sullivan; (2) that detectives and prosecutors believed that Mark Best was a participant in the crime; (3) a so-called "deal" between prosecutors and Mark Best that prosecutors would not charge him with the murder and would dispose of pending criminal charges; (4) Detective Tumbarello and Norrito's notebooks; (5) Lenny Best's "escape" from the police; (5) that the taxi driver, Guerrier, told Detective Tumbarello that the three men who entered his cab were 5'8" to 5'10" tall and spoke Spanish; (6) that Norrito had interviewed at least one of the men who got into Guerrier's taxi; (7) that an anonymous caller told the DA's office in 1993 that the plaintiff and Williams were wrongfully accused; and (8) that Mark Best was charged with crimes including robbery and theft in 1982. (Pl. Mem., at 11-12.)

A true *Brady* claim has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Poventud v. City of N.Y.*, 750 F.3d 121, 133 (2d Cir. 2014) (internal citation omitted).

---

[52] The plaintiff repeatedly uses *Rosario*, *Brady*, and *Giglio* interchangeably, but the disclosure obligations mandated by these three cases are not the same.

In order to prove prejudice, the plaintiff must establish that the evidence was material; in other words, the plaintiff must demonstrate that the "evidentiary suppression undermines confidence in the outcome of the trial." *Fappiano*, 640 F. App'x at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Ambrose v. City of New York*, 623 F.Supp.2d 454, 467 (S.D.N.Y. 2009) (quoting *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir. 2001)). However, "materiality does not depend on factual innocence, but rather what would have been proven absent the violation." *Poventud*, 750 F.3d at 134.

First and foremost, the named individual defendants, Detectives Norrito and Tumbarello, can only be liable if they did not turn over *Brady* material to the prosecutors. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("[T]he police satisfy their obligations under *Brady* when they turn exculpatory evidence over to prosecutors," as "[i]t is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense."); *Blake v. Race*, 487 F.Supp.2d 187, 216 (E.D.N.Y. 2007) ("[T]o the extent Blake attempts to argue that the police had some disclosure obligation beyond providing Brady material to prosecutors, *Walker* precludes such an argument.") The plaintiff concedes that all of the material he characterizes as *Brady* or *Rosario* material was "known to the prosecutors, but not disclosed to the defense." (Pl. Mem., at 11-12.) That detectives gave the prosecutors the information that the plaintiff claims was withheld ends the inquiry. It bears noting, however, that the record on what the prosecutors disclosed to defense counsel is either silent, or does not support the plaintiff's claims.

The plaintiff has the burden to show that the government failed to disclose evidence that

was favorable to him.  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("In order to

establish a *Brady* violation, *a defendant must show*, inter alia, (1) that the government failed to

disclose favorable evidence, and (2) that the evidence it 'suppressed' was material) (emphasis

added)); *Harris v. United States*, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998).  The plaintiff has not

met that burden.

The plaintiff's trial lawyer, Lewis Cohen, testified that he had no record, inventory, or

memory of what materials he had been given.  (Def. Ex. 48, at 337-38; Gragg. Decl., Ex. 23, at

347 ("[I]n this particular case I have no recollection at all of that time period.  It is a long time

ago.").)  He destroyed his case files long after the trial had ended, and at least fifteen years

before his deposition.  (56.1 Stmt. ¶ 77; Def. Ex. 45, at 118-119; Def. Ex. 48, at 337-340.)

According to his deposition testimony, Mr. Cohen signed an affidavit, which is not part of the

record, attesting that he had not received certain materials from the DA's office.  Mr. Cohen

admitted at that he relied on the plaintiff's post-conviction lawyer, Myron Beldock, to determine

what had or had not been provided to him at the time of trial, and that he was not able to verify

some of the statements in his affidavit because he had not kept his trial files.[53]  (Def. Ex. 48, at

337-340.)  Similarly, the KCDA has no records of what was turned over to defense counsel.  In

---

[53] Mr. Lewis was asked the following questions and gave the following answers

> Q:  Were you relying on Mr. Beldock in formulating an opinion about whether you
> received documents at the time of trial?
> A:  Look, in my heart, I was hoping that there was information here that would help Mr.
> Greene . . . I was hoping that this information would help Mr. – Mr. Greene in – or in his
> eventual outcome of the case.  That was my hope and expectation.  I had been an
> advocate for him during the trial very extensively.
> Q:  Were you being an advocate for him here as well in your affirmation?
> A.  I – I guess I was, yes.

(Def. Ex. 48, 338:14-339:7.)

other words, there is simply no evidence in the record of what was or was not provided to defense counsel at the time of trial.[54]  Contrary to the plaintiff's claim, an absence of evidence does not create an issue of material fact.  *See Wausau v. Underwriters Ins. Co. v. Cincinnati Ins. Co.*, 198 F. App'x 148, 149 (2d. Cir. 2006) ("Because of the absence of evidence creating an issue of fact to the contrary, the district court did not err in holding that Cincinnati had failed to demonstrate a material issue of fact in dispute. Summary judgment was appropriate.").

The absence of evidence that the prosecution actually withheld exculpatory materials from defense counsel necessitates a grant of summary judgment on the plaintiff's *Brady* claims, and there is no reason to address the particulars of the plaintiff's claims.  But because of the way the plaintiff characterizes the record, and then extrapolates from those characterizations, some comment on that record is warranted.[55]  This is because, in many respects, the record actually refutes the plaintiff's claims that certain information was withheld.

For example, the plaintiff alleges that prosecutors suppressed evidence that Mark Best was considered to be a suspect.  However, Mark Best as a suspect was one of Mr. Cohen's themes at trial.  It was Mr. Cohen who elicited evidence about Best, including a cross examination of Norrito in which Mr. Cohen established that Norrito advised Best of his rights

---

[54] The plaintiff's expert, Professor Ellen Yaroskevsky, cites a list of materials that were supposedly "known to the prosecution but [were] not disclosed to the defense," but cites no source for her claims.  (Pl. Ex. 49, at 7-8.)  It is not clear whether plaintiff's counsel asked her to assume that the materials were not disclosed, or whether her conclusions were based on specific evidence.

[55]  For example, the plaintiff now claims that prosecutors failed to turn over the audio recording of Kim's statement to ADA Sullivan. (Def. Mem., at 11.)  In granting the plaintiff's 440 motion for ineffective assistance of counsel, however, Judge Pesce concluded that Mr. Cohen had the tape but did not listen to it, and that if he had, he would have heard Kim describe the perpetrator as a "tall" person.  (*Id.*, at 10, 13.)  In other words, Judge Pesce vacated the plaintiff's conviction based, in part, on a claim that the audio statement *was* turned over to his counsel, and that his counsel was ineffective for failing to listen to it.

and told him that he was a suspect in a homicide.[56]  (Gragg Decl., Ex. 30, at 142-44, 158-59.)

The record also undercuts the plaintiff's claims that prosecutors did not give Detectives Norrito's and Tumbarello's notebooks and DD5s to the plaintiff's lawyer.  Both detectives referred to their notebooks during the plaintiff's *Wade* hearing, over four months before the plaintiff's criminal trial began, which clearly alerted counsel that they existed.  (Gragg Ex. 27, at 8, 9, 63, 76-78, 97, 103.)  Under these circumstances, even if the notebooks were not turned over, they do not form the basis of a claim under *Brady*.[57]  "[E]vidence is not considered to be suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); *see also DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) (information may be considered disclosed where defense counsel already knew of, or had constructive knowledge of, certain information).

That the prosecutors turned over the disputed materials is further buttressed by the plaintiff's testimony in the final 440.10 hearing where he claimed that he did have certain documents, but that his lawyer did not use them.  Thus, he repeatedly urged Mr. Cohen to investigate much of what he now claims was withheld, including Lenny Best's escape, the

---

[56] Mr. Cohen asked Norrito:  "Did you tell Mark Best that he was a suspect in a homicide that took place at such and such location on Church and Church on the 14th of June 1983?"  Norrito responded:  "Yes."  (Gragg Decl., Ex. 30, at 142.)

[57] Mr. Cohen testified at his deposition that he had "absolutely no recollection," thirty years after the trial, of whether he did or did not receive the notebooks.  (Gragg Decl., Ex. 23, at 347.)  While at one point Mr. Cohen said that he had "never [seen the notebooks] in his life," (Gragg Decl., Ex. 19, at 223), the *Wade* hearing transcript in which Detective Norrito testified that he had a "steno pad" related to the case refreshed Mr. Cohen's memory that at the time of the trial, he knew that Detective Norrito had kept a notebook.  (*Id.*, at 346.)  It would have been his practice to ask for and review the detective's notebooks.  (*Id.*, at 345-48.)

Spanish speaking occupants of the taxi, and the role of the Panamanians in the murder. (Gragg Decl. Ex. 51, at 26, 35, 37-38, 42, 48, 52, 69-70, 84-85, 178, 180-81.)

Some of the information about which the plaintiff complains does not fall into the *Brady* category. This includes the so-called "deal" that prosecutors allegedly made with Mark Best, which the plaintiff now says included not only a plea deal for Best's pending cases, but a promise that prosecutors would not charge Best with murder. (Pl. 56.1 ¶¶ 301-309.) Of course, if Best had testified at trial, any plea deal would have to have been disclosed. But Best did not testify at the trial. And there is nothing in the record to support the plaintiff's claim that Best was promised that he would not be prosecuted for murder. The only evidence of a deal is a series of questions that Mr. Beldock posed to the trial prosecutor, presumably based on some notes that are not part of the summary judgment record, but that indicate that the prosecutor was contemplating offering Best a deal to cover three cases in criminal court, in exchange for truthful testimony "in this homicide case." (56.1 Counterstmt. ¶ 307; Gragg Decl. Ex. 24, at 144-146.) Mr. Kallen had no memory of any deal.[58] (Gragg Decl. Ex. 24, at 141-42.) Best, however, never gave any testimony at the plaintiff's trial, which was concededly part of the "deal."[59]

In sum, the plaintiff has submitted no evidence to support his claim that prosecutors withheld certain materials from his trial counsel, and makes no showing that the defendants withheld exculpatory evidence from the prosecutors. The plaintiff has not submitted sufficient

---

[58] Best had apparently already pled guilty and served a sentence for those crimes, because he was not in jail at the time of the plaintiff's trial.

[59] There are also the memorandums of the anonymous calls, in which the caller relates that "everyone knows" that the real culprits were Lenny Best and the plaintiff's cousin, Ronald Blanding, and that the police had shot Lenny Best. There is no evidence that the memos were withheld. In any event, counsel's question to Norrito at trial -- asking if he knew that the police shot Lenny Best – suggests that he had the information. The memos themselves would not be admissible, and much of their content was known to the defense through other sources. There is no way to know who the caller was, and what, if any, connection she had to the plaintiff.

evidence to raise a triable issue of fact, and summary judgment is granted as to those claims.

### 5.    *Monell* Claims

The plaintiff argues that the KCDA's Office failed to train, supervise, or discipline its employees on their *Brady* and *Rosario* obligations, which gives rise to a "policy" claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Municipalities may be sued directly under Section 1983 for constitutional deprivations imposed upon the plaintiff pursuant to a "governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.* Where, however, a "claim turns on a failure to train," a "municipality's culpability for a deprivation of rights is at its most tenuous." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Further, unless the plaintiff demonstrates that his constitutional rights were violated by "persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013).

As explained above, the plaintiff has not raised a genuine issue of material fact that there were any *Brady* or *Rosario* violations, and thus, that his constitutional rights were violated. As the plaintiff has not raised a genuine issue of fact as to the underlying constitutional violation, the plaintiff's *Monell* claims are dismissed.

### 6.    Claims Against the District Attorney in His Official Capacity

The plaintiff names Charles J. Hynes, the former District Attorney of Kings County, as a defendant "in his official capacity and as the successor to such previous District Attorneys." (ECF 1, ¶ 11.) Mr. Hynes was not the District Attorney when the plaintiff was arrested or tried. It is not clear whether the plaintiff is suing Mr. Hynes because a District Attorney oversaw the

prosecution of the plaintiff, or because he was at some point responsible for the KCDA's office. Either way, however, the claims against him are dismissed.

The Eleventh Amendment "bars an action for damages against a state in federal court, and this bar extends to suits brought against state officials in their official capacity." *Reid v. Schuman*, 83 F. App'x 376, 377 (2d Cir. 2003) (citing *Kentucky v. Graham,* 473 U.S. 159, 169 (1985)). "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993). Therefore, to the extent that the plaintiff's claims against Mr. Hynes are for decisions the KCDA's office made in prosecuting the plaintiff, Mr. Hynes is immune from suit under the Eleventh Amendment. This includes claims against Mr. Hynes for any role with respect to training and supervision on *Brady* and other disclosure obligations. *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009).

"With respect, however, to claims centering not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, the district attorney has been treated not as a state official but rather as an official of the municipality to which he is assigned. *Ying Jing Gan,* 996 F.2d at 536. "Where, as to such administrative matters, the district attorney acts as 'manager' of the District Attorney's office of one of New York City's constituent counties, he may be considered a municipal policymaker for the City of New York." *Id.* (internal citation omitted). Because any claims against DA Hynes for his role as a "policymaker" for the KCDA would be duplicative of the plaintiff's claims against the City of New York under *Monell*, those claims are dismissed. *See McCray v. City of New York*, Nos. 03-cv-9685, 03-cv-9974, 03-cv-10080, 2007 WL 4352748, at *26, at n. 29 (S.D.N.Y. Dec. 11, 2007); *Barmore v. Aidala*, No. 04-cv-0445, 2006 WL 1978449, at * (N.D.N.Y. Jul. 12, 2006)

("The real party in interest in an official capacity suit is the governmental entity and not the named official. In this case, because plaintiffs bring only official capacity claims against the individual defendants and a *Monell* type claim against the District, they are redundant to the claims against the District, and the court dismisses plaintiffs' official capacity claims against the individual defendants.") (quoting *Booker v. Board of Educ., Baldwinsville Central School District*, 238 F.Supp.2d 469, 475 (N.D.N.Y. 2002)).

### 7. Equal Protection Claims

The plaintiff also raises an equal protection claim in his complaint, but does not mount any opposition to the defendants' motion for summary judgment on this point. "[A] partial response" to a summary judgment motion "arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Jackson v. Federal Exp.*, 766 F.3d 189, 194-95 (2d Cir. 2014). Nonetheless, the Court considers the merits of his equal protection clause claims.

The plaintiff states in his complaint that the defendants "were motivated and tainted by racial and class discrimination because of an improper attitude towards black people." (Complaint ¶ 210.) He also alleges that Detective Norrito used a racial slur to refer to him. "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). In order to state a race-based claim under the equal protection clause, "a plaintiff must allege that a government actor intentionally discriminated against him on the basis of race." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 1999).

First, courts in this Circuit have found that "[t]he use of racial slurs, alone, fail to state a claim for a violation of the equal protection clause of the Fourteenth Amendment." *Oliver v.*

*Cuttler*, 968 F.Supp. 83, 88 (E.D.N.Y. 1997) (citing *Haussman v. Fergus*, 894 F.Supp. 142, 149 (S.D.N.Y.1995)); *Haussman*, 894 F.Supp. at 149 ("the taunts, insults and racial slurs alleged to have been hurled at plaintiff by defendants, while reprehensible if true, do not comprise an infringement of constitutional guarantees."); *Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y. 1986) ("the use of such language, no matter how abhorrent or reprehensible, cannot form the basis for a § 1983 claim.")

Further, the plaintiff has not pointed to any evidence that Norrito or anyone else treated similarly situated non-minority groups differently, or that he treated the plaintiff differently than other similarly situated minorities. *See Brown*, 221 F.3d at 337 ("[I]f a plaintiff seeks to prove selective prosecution on the basis of his race, he 'must show that similarly situated individuals of a different race were not prosecuted.") (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Therefore, the plaintiff cannot sustain his claim under the equal protection clause, and the defendants' motion for summary judgment on this claim is granted.

### B.     Section 1983 and Section 1985 Conspiracy Claims

The plaintiff alleges in his complaint that the NYPD and KCDA's Office conspired to convict him of the Choi murder. To prevail on a conspiracy claim under Section 1983, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culberston*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). A plaintiff must also allege facts "that support a meeting of the minds or agreement, rather than vague or conclusory allegations of a conspiracy." *Webb v. Goord*, 340 F.3d. 105, 110 (2d Cir. 2003); *Fincher v. Cty. of Westchester*, 979 F. Supp. 989, 997 (S.D.N.Y. 1997) ("In order to establish a

conspiracy claim under § 1983, [the plaintiff] must show that the[] defendants 'acted in a willful manner, culminating in an agreement, understanding, or 'meeting of the minds' to violate his rights.")  However, because "'conspiracies are by their very nature secretive operations,' [they] may have to be proven by circumstantial, rather than direct, evidence."  *Pangburn*, 200 F.3d at 72 (internal citation omitted).

Similarly, to support a conspiracy claim under Section 1985(3), the plaintiff must show (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws . . . (3) an act in furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of the United States."  *Brown*, 221 F.3d at 329.  "The conspiracy must be motivated by racial animus."  *Id.* at 341 (internal citation omitted).  To establish a claim of witness intimidation under § 1985(2), a plaintiff must establish (1) a conspiracy between two or more persons, (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiff."  *Chalal v. Paine Webber Inc.*, 725 F.2d 20, 23 (2d Cir. 1984).

The plaintiff claims that Detectives Norrito and Tumbarello, as well as ADAs Sullivan, Kallen, and Gerald Green, participated in a sweeping conspiracy to "pursue, arrest, and prosecute Cy Greene."  (Pl. Mem., at 26.)  According to the plaintiff, this alleged conspiracy spans the time period from the plaintiff's arrest through the years of his post-conviction proceedings, and includes the following alleged acts: the arrest of the plaintiff without probable cause, the alleged withholding of information including the "anonymous tip memo" and the "tall guy" description from the audiotape of Mr. Kim's interview with ADA Sullivan, and the prosecutors' alleged failure to turn over exculpatory materials during post-conviction proceedings.  (*Id.*, at 26-28.)  The plaintiff has not pointed to any evidence, however, that there was any agreement among the

detectives or prosecutors to arrest and convict him. Rather, he claims that the jury could infer a conspiracy based on the plaintiff's characterization of the criminal case against him. But this "evidence" is speculative and conclusory, and does not satisfy the plaintiff's burden to point to specific facts demonstrating a genuine issue for trial. *See Fincher*, 979 F. Supp. at 997 ("Fincher has provided only the flimsiest circumstantial evidence to support his allegations that Cruz knowingly falsely identified Fincher to the grand jury and that the Ossining police colluded with Cruz in this frame-up. Fincher's speculation about a 'perjury conspiracy' is insufficient to meet his burden of setting forth specific facts showing a genuine issue for trial."); *Amato v. Hartnett*, 936 F.Supp.2d 416, 440 (S.D.N.Y. 2013) (granting defendants' motion for summary judgment where the "[p]laintiff has not included any allegations or competent evidence to show that the individual Defendants 'acted in a willful manner, culminating in an agreement' that violated his rights secured by the Constitution.") (internal citation omitted).

Moreover, since a conspiracy under Section 1985 must be motivated by discriminatory racial animus, the Court dismisses these claims for the same reasons that it dismissed the plaintiff's equal protection claims. *See Brown*, 221 F.3d at 341 (affirming "district court's dismissal of plaintiffs' § 1985(3) claims for the same reasons that we dismissed plaintiff's equal protection and § 1981 claims.")

C.      **Section 1986 Claims**

A Section 1986 claim must be predicated on a valid Section 1985 claim. *Brown*, 221 F.3d at 341. Because the Section 1985 claim does not survive summary judgment, the plaintiff's Section 1986 claim is dismissed as well.

D.      **New York State Constitutional Claims**

The plaintiff brings claims under the New York state constitution for deprivations of his

rights to due process, equal protection, and to be free from unreasonable searches and seizures. (Complaint ¶¶ 239-240.) The defendants argue, however, that the New York state constitutional remedies are precluded because the plaintiff has alternative remedies. The plaintiff does not address this argument.

While the New York State Court of Appeals "has recognized a cause of action for damages based on official conduct violating the State's Constitution," it has also explained that "such a cause of action is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes' or 'appropriate to ensure full realization of the plaintiff's rights.'" *Biswas v. City of New York*, 973 F. Supp. 2d 504, 521 (S.D.N.Y. 2013) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 761 N.E.2d 560, 563 (2001)). "Thus, the state constitutional tort is usually available only in cases in which a plaintiff . . . has no alternative remedy." *Biswas*, 973 F.Supp.2d at 521 (citing *Lyles v. State,* 2 A.D.3d 694, 770 N.Y.S.2d 81, 82 (App. Div. 2003), *aff'd on other grounds*, 3 N.Y.3d 396, 787 (2004)). As district courts in this Circuit consider actions for damages under Section 1983 to be adequate alternative remedies, the plaintiff's state constitutional claims are precluded. *Biswas*, 973 F.Supp.2d at 522; *see also Hershey v. Goldstein*, 938 F. Supp. 2d 491, (S.D.N.Y. 2013) ("District courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983.").

### E.    Common Law Negligence Claims

The plaintiff also asserts a claim against the individual defendants for their alleged negligent failure to use due care in the performance of their duties. (Complaint ¶¶ 247-48.) Under established New York law, however, a plaintiff may not recover under a negligence claim as an alternate theory of liability for false arrest, imprisonment, or prosecution. *Rheingold v.*

*Harrison Town Police Dept.*, 568 F. Supp. 2d 384, 396 n.3 (S.D.N.Y. 2008); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."); *McSween v. Edwards*, 91 F. Supp. 2d 513, 525 (E.D.N.Y. 2000) ("New York law prohibits recovery under a general theory of negligence when the traditional remedies of false arrest and imprisonment are available.") (internal citations and quotation marks omitted).

Similarly, the plaintiff's negligence claims against the City and New York City Transit Authority must fail. (Complaint ¶¶ 249-251.) First, "[t]he theor[y] of respondeat superior ... [is][an] avenue[ ] to establish vicarious liability, and . . . do[es] not stand alone as [a] substantive cause of action." *Donelli v. Cty. of Sullivan*, No. 07-cv-2157, 2009 WL 2365551, at *12 n.10 (S.D.N.Y. July 31, 2009) (quoting *Brady v. Lynes*, No. 05-cv-6540, 2008 WL 2276518, at *5 (S.D.N.Y. June 2, 2008)). As there is no substantive right of action against the individual defendants for common law negligence, the plaintiff's claim against the City and the Transit Authority cannot survive. Nor can the plaintiff's claim for negligent hiring or supervision against these entities survive where, as here, neither Norrito nor Tumbarello has been shown to have acted outside the scope of their authority. *Newton v. City of New York*, 681 F. Supp. 2d 473, 488 (S.D.N.Y. 2010) ("To state a claim for negligent supervision under New York law, a plaintiff must first demonstrate that an employee was negligent.").

## CONCLUSION

The defendants' motion for summary judgment is granted in its entirety.  The plaintiff's complaint is dismissed, and the Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

            /s/ Ann M. Donnelly
            _____
            Ann M. Donnelly
            United States District Judge

Dated: Brooklyn, New York
       March 15, 2017